| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

UNITED STATES OF AMERICA,      )
                               )      No.  12 CR 124
          Government,          )
                               )
Vs.                            )      Chicago, Illinois
                               )
WILLIAM BEAVERS,               )      March 19, 2013
                               )
          Defendant.           )      9:51 o'clock a.m.

VOLUME 4
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL
AND A JURY

For the Government:

          THE HONORABLE GARY S. SHAPIRO,
          UNITED STATES ATTORNEY
          BY: Matthew Michael Getter
              Carrie E. Hamilton
              Debra Riggs Bonamici
              Samuel B. Cole
          Assistant United States Attorneys
          219 South Dearborn Street
          Suite 500
          Chicago, Illinois   60604
           (312) 353-5300

For the Defendant:
          KAPLAN & SOROSKY
          BY:  Sheldon M. Sorosky
          158 West Erie
          Chicago, Illinois 60610
          (312) 640-1776


          Court Reporter:

          Blanca I. Lara, CSR, CP, RPR
          219 South Dearborn Street
          Room 2504
          Chicago, Illinois 60604
          (312) 435-5895

1    Appearances (continued:)

2

3    For the defendant:

4                        OFFICES OF AARON B. GOLDSTEIN
                         BY: Aaron Benjamin Goldstein
5                        6133 South Ellis
                         Chicago, Illinois 60637
6                        (773) 752-6950

7                        OFFICES OF LAUREN FAUST KAESEBERG
                         BY:  Lauren Faust Kaeseberg
8                        2140 N. Lincoln Park West
                         Suite 307
9                        Chicago, Illinois 60614
                         (773) 517-0622

10

                         LAW OFFICE OF SAMUEL E. ADAM
11                       BY:  Samuel Forbes Adam
                              Samuel Adam, Jr.
12                       6133 South Ellis Avenue
                         Suite 200
13                       Chicago, Illinois 60637
                         (312) 726-2326

14

15

                         Henderson Adam, LLC
16                       BY:  Victor P. Henderson
                         The Insurance Center Building
17                       330 South Wells, Suite 1401
                         Chicago, Illinois 60606
18                       (312) 262-2900

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2    WITNESS                                        PAGE

3    PAUL PONZO

4    Direct Examination (Resumed) By Mr. Getter.......... 666

5

6

7    EXHIBITS

8    government Exhibits Summary Chart 8 and Summary      668

9    Chart 8 A.........................................

10   Government Exhibit Summary Chart 9 and 9 A ......... 687

11   Government Exhibit Summary Chart 10 ................ 697

12   Government Exhibit Summary Chart 10 A.............. 698

13

14

15

16

17

18

19

20

21

22

23

24

25

|          |    |                                                            |
|----------|----|------------------------------------------------------------|
|          | 1  | (The following proceedings were had out of the             |
|          | 2  | presence of the jury in open court:)                       |
|          | 3  | THE COURT:  Don't leave the courtroom.  We're going to     |
|          | 4  | resume almost immediately.                                 |
| 10:19:02 | 5  | THE MARSHAL:  All rise.                                     |
|          | 6  | (The following proceedings were had in the presence of     |
|          | 7  | the jury in open court:)                                    |
|          | 8  | THE COURT:  Except for the witness, everyone may be        |
|          | 9  | seated.                                                     |
| 10:19:40 | 10 | Do you understand you're still under oath?                 |
|          | 11 | THE WITNESS:  Yes, Your Honor.                             |
|          | 12 | THE COURT:  Please proceed.                                 |
|          | 13 | (Brief pause.)                                              |
|          | 14 | MR. GETTER:  Should I proceed, Your Honor?                 |
| 10:19:52 | 15 | THE COURT:  Yes.                                            |
|          | 16 | PAUL PONZO, GOVERNMENT WITNESS, PREVIOUSLY SWORN           |
|          | 17 | DIRECT EXAMINATION (resumed)                               |
|          | 18 | BY MR. GETTER:                                              |
|          | 19 | Q.  Agent Ponzo, let's move on to exhibit Summary Chart 8. |
| 10:20:00 | 20 | From some of these 100 checks from the campaign fund       |
|          | 21 | to Mr. Beavers, did you find check stubs that said that those |
|          | 22 | checks were reimbursed by a later personal check for Mr.   |
|          | 23 | Beavers?                                                    |
|          | 24 | A.  Yes, it did.                                            |
| 10:20:13 | 25 | Q.  Now, again, have those campaign checks that the record said |

1  said were later reimbursed actually been or deposited and

2  cashed?

3  A.  Yes; in an earlier date.

4          MR. GETTER:  May I approach the witness?

10:20:29    5          THE COURT:  You may.

6          MR. GETTER:  Showing defense what is marked as

7  Government Exhibit Summary Chart 8.

8  BY MR. GETTER:

9  Q.  Agent Ponzo, what is it that I just handed to you?

10:20:41   10  A.  This is Summary Chart 8, a summary that I prepared

11  regarding the reimbursed checks.

12  Q.  How did you prepare this chart?

13  A.  I reviewed documents from the three campaign funds of

14  Mr. Beavers and gambling records, D-2's, and his personal bank

10:20:57   15  accounts.

16  Q.  Did you put together the backup materials that you used to

17  create Summary Chart 8?

18  A.  I did.

19          MR. GETTER:  Showing the defense what's been marked as

10:21:17   20  Government Exhibit Summary Chart 8 A.

21          May I approach?

22          THE COURT:  You may.

23  BY MR. GETTER:

24  Q.  Handing you what has been marked as Government Exhibit

10:21:23   25  Summary Chart 8 A.

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 6 of 74 PageID #:1461
Ponzo - direct by Getter
668

1    Agent Ponzo, what is that?

2    A.  This is the backup documents that I used to prepare Summary

3    Chart 8.

4         MR. GETTER:  At this point, Your Honor, the government

10:21:40    5    moves Summary Chart 8 and Summary Chart 8 A into evidence.

6         MR. GOLDSTEIN:  No objection.

7         THE COURT:  Admitted.

8      (Government Exhibits Summary Chart 8 and Summary Chart

9       8 A were received in evidence.)

10:21:46    10   BY MR. GETTER:

11   Q.  Agent Ponzo, looking at --

12        MR. GETTER:  Oh, and may I have permission to publish

13   to publish 8?

14        THE COURT:  You may publish.

10:21:52    15     (Exhibit published to the jury.)

16   BY MR. GETTER:

17   Q.  Agent Ponzo, looking at page 1 of this Summary Chart, as

18   soon as it appears on the screen.

19        MR. GETTER:  If we blow up the top portion of that,

20   please.

21     (Brief pause).

22   BY MR. GETTER:

23   Q.  Could you describe for the jury what the different columns

24   of information are in this chart?

10:22:08    25   A.  The first column is the account the check was drawn on, the

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 7 of 74 PageID #:1462
Ponzo - direct by Getter
669

1   next column is the check number, the next column is the date of

2   the check, the neck column is the date the check was cashed,

3   the next column is the date the check was processed, the next

4   column is the amount of the check, the next column is the time

10:22:26   5   the check was cashed, the next column is the date the personal

6   check was written to reimburse those checks, the next column is

7   the description that appeared on the line of the campaign

8   account.

9       The next set of entries are from the gambling records

10:22:44   10   provided by Horseshoe, the date of the gambling, the date

11   Mr. Beavers' player's card was in the slot machine, the time it

12   went in and the time it came out, and then the purpose that was

13   indicated on the D-2.

14   Q.  Could you please turn to the second page of Summary Chart

10:23:02   15   8.

16       MR. GETTER:  And if I could, have I have the top

17   portion blown up, please.

18       (Brief pause).

19   BY MR. GETTER:

10:23:11   20   Q.  There's a list of 7 checks here.  Do you see that, that

21   have been blown up on the screen?

22   A.  Yes.

23   Q.  What was the first of these checks listed in this group of

24   7?

10:23:25   25   A.  It was a check written to Mr. Beavers from Friends For

Ponzo - direct by Getter

1  Beavers.  It was check 315.

2  Q.  I apologize, I meant to blow up the bottom portion of it.

3  Sorry about that.

4     (Brief pause).

10:23:39  5  BY MR. GETTER:

6  Q.  What was the first check listed in this bottom section of

7  checks?

8  A.  It was a check made payable to William Beavers from the 7th

9  Ward Democratic Organization, check 1862.

10:23:53  10  Q.  When was that check issued -- or when was it -- what was

11  the paid date of the check?

12  A.  It was dated March 8th, 2007.

13  Q.  What was the xx last or the 7th of those checks in this

14  group?

10:24:06  15  A.  It was check 1873 dated April 19th, 2007.

16  Q.  In that group of 7 checks, do you see two checks dated

17  April 9, 2007?

18  A.  Yes.

19  Q.  Were those 2 of the 3 April 9, 2007 checks you discussed

10:24:25  20  earlier in your testimony?

21  A.  Yes.

22  Q.  And you explained in a separate chart?

23  A.  I did.

24  Q.  Now, for each of these 7 checks, why does it say

10:24:35  25  "reimbursed --"  do you see where it says "reimbursed for check

1  3664"?

2  A.  Yes.

3  Q.  Where did you get that language?

4  A.  I got that from each stub from the campaign records of the

10:24:53  5  7th Ward Democratic Organization.

6  Q.  Did you see a check 3664 in reviewing these records?

7  A.  Yes, I did.

8  Q.  What is check 3664?

9  A.  It's a check, Mr. Beavers' personal check, written out from

10:25:05  10  his personal account to the 7th Ward Democratic Organization.

11  Q.  What is the date of check 3664?

12  A.  May 31st, 2007.

13  Q.  Agent Ponzo, I'd like you to take a look at the documents

14  you used to create this portion of the chart.

10:25:21  15         Showing you what has been marked as Government Exhibit

16  campaign check 50.

17         MR. GETTER:  Could you blow up the check, please.

18  BY MR. GETTER:

19  Q.  What is this, Agent Ponzo?

10:25:41  20  A.  This is check 1862 made payable to William Beavers from the

21  7th Ward Democratic Organization dated March 8th, 2007, in the

22  amount of $2,000.

23  Q.  When was this check -- was this check cashed?

24  A.  Yes, it was.

10:25:54  25  Q.  When was it cashed?

Ponzo - direct by Getter

1    A.  It was cashed on March 8th, at 11:36 a.m.

2    Q.  Showing you page 51 from Government Exhibit HHCAS 3, what

3    does this show the highlighted blown up line?

4    A.  It shows that Mr. Beavers player's card went in a slot

10:26:23    5    machine in Horseshoe at 10:51 a.m., came out of a slot machine

6    at 10:56 a.m.

7    Q.  You said the check was cashed at 11:36 a.m.?

8    A.  Correct.

9    Q.  Did you see any further activity on Mr. Beavers player's

10:26:35   10    card that morning?

11    A.  Yes.

12    Q.  What happened with respect to his player's card after the

13    check was cashed at 11:36 a.m.?

14    A.  Player's card went in the slot machine at 10:50 --

10:26:46   15    11:55 a.m. and came out of the slot machine at 11:57 a.m.

16    Q.  Look at the check stub for check 1862.  We'll blow up that

17    check stub.

18         What is the date of the check stub?

19    A.  March 8th, 2007.

10:27:03   20    Q.  What does the stub indicate the payee is?

21    A.  W. Beavers.

22    Q.  And is there writing in the explanation section or the 4

23    section of this stub?

24    A.  Yes, there is.

10:27:16   25    Q.  What does it say?

1    A.  "Reimburse per check 3664."

2    Q.  Does that writing appear to you to be the same handwriting

3    as the handwriting 3/8/07 and W. Beavers?

4              MR. GOLDSTEIN:  Objection, Your Honor:

10:27:33    5              THE COURT:  Overruled.  It's permissible non-expert

6    testimony.

7    BY THE WITNESS:

8    A.  The handwriting appears different.

9    BY MR. GETTER:

10:27:47   10    Q.  I'd like to take a look at the next check, check 1863.

11    We'll below that up.

12              What is this check?

13    A.  Check 1863 is a check from the 7th Ward Democratic

14    Organization made payable to William Beavers dated March 31st,

10:28:05   15    2007 in the amount of $2,000.

16    Q.  Was this check cashed?

17    A.  Yes, it was.

18    Q.  When was it cashed?

19    A.  That one I couldn't tell what date it was cashed.

10:28:15   20    Q.  Were there two possible dates when it was cashed?

21    A.  Yes, the date of the check which would be March 31st, 2007,

22    or the date the check was processed which was April 2nd, 2007.

23    Q.  Did you look at the casino records concerning Mr. Beavers'

24    player's card for both March 31st and April 2nd, 2007?

10:28:35   25    A.  I did.

1  Q.  I show you the records for March 31st '07.

2      What is the first activity with respect to Mr.

3  Beavers' playing card on March 31st, 2007?

4  A.  Mr. Beavers' player's card went in on a slot machine at

5  Horseshoe on March 31st, 2007 at 12:04 p.m.

6  Q.  Did you also check the casino records for Mr. Beavers'

7  player's card for April 2nd?

8  A.  I did.

9  Q.  And showing you that section of Government Exhibit HHCAS

10 3 -- well, we don't have it here, but do you recall whether

11 there was any information concerning Mr. Beavers' player's card

12 for April 2nd, 2007?

13 A.  Yes, but there wasn't any record of any gambling activity

14 that day.

15 Q.  So it appears that the card was not used April 2nd?

16 A.  Correct.

17 Q.  Let's look at the check stub for check 1863.

18     What did this -- according to this check stub, what is

19 this payable to?

20 A.  W. Beavers.

21 Q.  And what is the language in the explanation section?

22 A.  "Reimbursed per check 3664."

23 Q.  I'd like to show you check 1866.

24     Could you describe this check?

25 A.  Check 1866 is a check made payable to William M. Beavers

|        |    |                                                               |
|--------|----|---------------------------------------------------------------|
|        | 1  | from the 7th Ward Democratic Organization dated April 5th, 2007 |
|        | 2  | in the amount of $2,000.                                       |
|        | 3  | Q.  Was this check cashed?                                     |
|        | 4  | A.  Yes, it was.                                               |
| 10:30:11 | 5  | Q.  When was it cashed?                                        |

1  from the 7th Ward Democratic Organization dated April 5th, 2007

2  in the amount of $2,000.

3  Q.  Was this check cashed?

4  A.  Yes, it was.

10:30:11  5  Q.  When was it cashed?

6  A.  It was cashed April 5th, 2007 at 11:43 a.m.

7  Q.  Did you review the casino records with respect to

8  Mr. Beavers' player's card for April 5th, 2007, the same day

9  this check was cashed?

10:30:28  10  A.  I did.

11  Q.  According to those casino records, was there any activity

12  on Mr. Beavers' player's card that day?

13  A.  Yes, there was.

14  Q.  There's a line there that is highlighted for April 5th,

10:30:40  15  2007.  What is the first time that Mr. Beavers' player's card

16  went into a machine that day?

17  A.  12:03 p.m.

18  Q.  Is that about 20 minutes after the check was cashed?

19  A.  Yes.

10:30:54  20  Q.  If we look at the check stub for check 1866.

21       What is contained in the explanation section of this

22  check stub?

23  A.  The explanation is "reimburse for check 3664."

24  Q.  I'd like to show you check 1867.

10:31:16  25       Could you describe this check?

```
         1  A.  Check 1867 is from the 7th Ward Democratic Organization

         2  made payable to William M. Beavers dated April 9th, 2007 in the

         3  amount of $2,000.

         4  Q.  Was this check cashed?

10:31:32 5  A.  Yes, it was.

         6  Q.  When was it cashed?

         7  A.  It was cashed on April 9th at 12:05 p.m.

         8  Q.  Did you review the casino records with respect to

         9  Mr. Beavers' player's card for April 9th, 2007?

10:31:44 10 A.  I did.

         11 Q.  And showing you that -- that record.

         12     At what time did Mr. Beavers' player's card first go

         13 into the machine on April 9th, 2007?

         14 A.  12:31 p.m.

10:32:00 15 Q.  Now -- actually, let's show you the check stub for check

         16 1867.

         17     What explanation is provided in this check stub?

         18 A.  "Reimburse for check 3664."

         19 Q.  Show you check 1867 now.

10:32:22 20     What is this check -- from your Summary Chart, Agent

         21 Ponzo, do you know whether check 1869 -- or 1868 was cashed?

         22 A.  Yes, it was.

         23 Q.  When was it cashed?

         24 A.  April 9th, 2007 at 2:07 p.m.

10:33:17 25 Q.  Going back to the casino record with respect to
```

1  Mr. Beavers' player's card on April 9th, was there further

2  activity on his card that afternoon following the cashing of

3  check 1868 at 2:07 p.m.?

4  A.  Yes.

10:33:52  5  Q.  What do the gambling records show?

6  A.  The card went into the slot machine at 2:27 p.m.

7  Q.  What does the check stub for check 1868 indicate as the

8  explanation?

9  A.  "Reimburse for check 3664."

10:34:09  10  Q.  Showing you now -- excuse me, showing you now check 1872.

11      Would you describe this check?

12  A.  Check 1872 is from the 7th Ward Democratic Organization

13  made payable to William M. Beavers dated April 18th, 2007 in

14  the amount of $2,000.

10:34:33  15  Q.  Was this check cashed?

16  A.  Yes.

17  Q.  When was it cashed?

18  A.  It was cashed on April 18th, 2007 at 8:09 a.m.

19  Q.  Did you review the casino records with respect to Mr.

10:34:47  20  Beavers' player's card for April 18th, 2007?

21  A.  Yes.

22  Q.  Do you see any activity on his player's card that day?

23  A.  Yes.

24  Q.  What was the first activity on his player's card that day?

10:34:55  25  A.  Mr. Beavers' player's card went in the slot machine at

1    3:03 p.m.

2    Q.  Showing you now the check stub for check 1872.

3         What is indicated in the explanation section of this

4    stub?

5    A.  "Reimburse for check 3664."

6    Q.  And now the last check in this group of 7.  Showing you now

7    check 1873.

8         Could you describe this check, please.

9    A.  Check 1873 is from the 7th Ward Democratic Organization

10   made payable to William M. Beavers dated April 19th, 2007 in

11   the amount of $4,000.

12   Q.  Was this check cashed?

13   A.  Yes, it was.

14   Q.  When was it cashed?

15   A.  April 19th, 2007 at 12:11 p.m.

16   Q.  Did you review the casino records for Mr. Beavers' gambling

17   card for April 19th, 2007?

18   A.  I did.

19   Q.  Did you see any activity on his player's card that day?

20   A.  Yes.

21   Q.  What was the first activity on his player's card that day?

22   A.  It was at 12:33 p.m.

23   Q.  So is that about 22 minutes after check 1873 was cashed?

24   A.  Yes.

25   Q.  Could you look back at Summary Chart 8, the first page.

| | |
|---|---|
| 1 | MR. GETTER:  Could you blow up the bottom section, |
| 2 | please. |
| 3 | BY MR. GETTER: |
| 4 | Q.  What are we looking at here, Agent Ponzo? |
| 10:36:28  5 | A.  Another set of checks that were used or cashed by |
| 6 | Mr. Beavers from his campaign fund accounts. |
| 7 | Q.  Which campaign fund account does this group of 4 checks |
| 8 | deal with? |
| 9 | A.  Citizens For Beavers. |
| 10:36:39  10 | Q.  What was the first of these 4 checks? |
| 11 | A.  Check 2012. |
| 12 | Q.  And what is the date of that check? |
| 13 | A.  April 1st, 2006. |
| 14 | Q.  What is the fourth of this group? |
| 10:36:50  15 | A.  Check 2017. |
| 16 | Q.  And what's the date of that check? |
| 17 | A.  April 14th, 2006. |
| 18 | Q.  Do the records that you reviewed indicate Mr. Beavers' |
| 19 | writing a check, a personal check back to the campaign and |
| 10:37:08  20 | saying to reimburse these four checks? |
| 21 | A.  Yes. |
| 22 | Q.  What check was that? |
| 23 | A.  Check 542. |
| 24 | Q.  From one of his personal accounts? |
| 10:37:16  25 | A.  Yes. |

1    Q.  What was the date of that check that Mr. Beavers wrote?

2    A.  May 30th, 2006.

3    Q.  I'd like to look at some of the documents you put together

4    to support this section of the Summary Chart.

10:37:30    5        First I'd like to show you check 2012, the first of

6    this group of four.

7        Could you describe this check, please.

8    A.  Check 2012 from Citizens For Beavers made payable to

9    William M. Beavers, dated April 1st, 2006, in the amount of

10:37:47    10    $2,000.

11    Q.  Was this check cashed?

12    A.  It was.

13    Q.  When was it cashed?

14    A.  I didn't know what day it was cashed.

10:37:53    15    Q.  Were there two possible days that it was cashed?

16    A.  Yes.

17    Q.  What were the two possible days it was cashed?

18    A.  April 1st, 2006 or April 3rd, 2006.

19    Q.  Did you review the casino records with respect to

10:38:02    20    Mr. Beavers' player's card for both those dates?

21    A.  I did.

22    Q.  Looking first at April 1st in the player's card record,

23    Government Exhibit HHCAS 3, do you see any activity on

24    Mr. Beavers' player's card for April 1st, 2006?

10:38:19    25    A.  Yes.

Ponzo - direct by Getter

681

1  Q.  What is the first activity on this card that day?

2  A.  11:54 a.m.

3  Q.  Is that about an hour and a half after the check was

4  cashed?

10:38:32  5  A.  Roughly.

6  Q.  Did you also review his player's card activity for

7  April 3rd, 2006, the other possible date this check could've

8  been cashed?

9  A.  I did.

10:38:44  10  Q.  Was there any activity on the card that day?

11  A.  Yes.

12  Q.  What was the first activity you saw on the card that day?

13  A.  The first activity I saw was at 11:39 a.m.

14  Q.  Was that also about an hour and a quarter after the check

10:38:58  15  was cashed if the check was cashed that day?

16  A.  Yes.

17  Q.  If we look at the check stub, then, for check 2012.

18       What is written next to the word "two" on this check

19  stub?

10:39:15  20  A.  Looks like "ALD."

21  Q.  And in the explanation section of the check stub, can you

22  read what that writing says?

23  A.  "March 21st, primary, unused, return via 542."

24  Q.  And is that -- is 542 the number of Mr. Beavers' personal

10:39:35  25  check?

Ponzo - direct by Getter

682

1   A.  It is.

2   Q.  Could we look, then, at check 2013.

3        Could you describe this check?

4   A.  Check 2013 is a check from Citizens For Beavers to William

5   M. Beavers dated April 3rd, 2006, in the amount of $2,000.

6   Q.  Was this check cashed?

7   A.  It was.

8   Q.  When was it cashed?

9   A.  April 3rd, 2006 at 9:33 a.m.

10   Q.  Did you review his player's card record from the casino for

11   that day?

12   A.  I did.

13   Q.  And that's actually something we already just looked at, is

14   that not right?

15   A.  That's right.

16   Q.  Okay.  And what was, again, the first activity on his

17   player's card for April 3rd, 2006?

18   A.  11:39 a.m.

19   Q.  So about two hours after check 2018 -- I'm sorry, after

20   check 2013 was cashed?

21   A.  Yes.

22   Q.  What is the check stub -- showing you the check stub for

23   2013.

24        What is written in the explanation section?

25   A.  "March 21st primary, unused, return via 542."

Ponzo - direct by Getter

683

1  Q.  I'm going to show you the third check from the series of

2  four, check 2014.

3        Could you describe this check?

4  A.  Check 2014 is from Citizens For Beavers made payable to

10:40:53  5  William M. Beavers, dated April 5th, 2006, in the amount of

6  $2,000.

7  Q.  Was this check cashed?

8  A.  It was.

9  Q.  When was it cashed?

10:41:02  10  A.  April 5th, 2006 at 2:33 p.m.

11  Q.  Did you review the casino records with respect to

12  Mr. Beavers' player's card for April 5th, 2006?

13  A.  I did.

14  Q.  Showing you now Page 6 of Government Exhibit HHCAS 3.

10:41:20  15        Was there activity on Mr. Beavers' player's card

16  April 5th, 2006?

17  A.  Yes.

18  Q.  What was the first time Mr. Beavers' player's card was put

19  into a machine at the Horseshoe Casino that day?

10:41:31  20  A.  2:47 p.m.

21  Q.  Is that approximately 14 minutes after check 2014 was

22  cashed?

23  A.  Yes.

24  Q.  And now the fourth -- excuse me.  Let me just look at the

10:41:42  25  check stub for check 2014.

|        |    |                                                                       |
|--------|----|-----------------------------------------------------------------------|
|        | 1  | What is written in the explanation section of the                     |
|        | 2  | stub?                                                                  |
|        | 3  | A.  "March 21st, primary, unused, return via 542."                    |
|        | 4  | Q.  And now the fourth check of this group of four, check 2017.        |
| 10:41:59 | 5 | Could you describe this check?                                       |
|        | 6  | A.  Check 2017 is from Citizens For Beavers made payable to           |
|        | 7  | William M. Beavers, dated April 14th, 2006, in the amount of          |
|        | 8  | $2,000.                                                               |
|        | 9  | Q.  Was this check cashed?                                            |
| 10:42:10 | 10 | A.  It was.                                                          |
|        | 11 | Q.  When was it cashed?                                               |
|        | 12 | A.  April 14th, 2006 at 2:06 p.m.                                     |
|        | 13 | Q.  Did you review the Horseshoe Casino records with respect to       |
|        | 14 | Mr. Beavers' gambling card for April 14th, 2006?                      |
| 10:42:23 | 15 | A.  I did.                                                           |
|        | 16 | Q.  Do you see the two lines that are highlighted and blown up?       |
|        | 17 | A.  I do.                                                             |
|        | 18 | Q.  What does the first line indicate with respect to the time        |
|        | 19 | that the card was used?                                               |
| 10:42:34 | 20 | A.  It indicates that the card went in a slot machine at            |
|        | 21 | 12:17 p.m. and came out of the slot machine at 12:30 p.m.             |
|        | 22 | Q.  Now, you said that check 2017 was cashed at 2:06 p.m.?            |
|        | 23 | A.  Correct.                                                          |
|        | 24 | Q.  What's the next line the player's card record show?               |
| 10:42:50 | 25 | A.  It shows that Mr. Beavers' player's card went in a slot          |

Ponzo - direct by Getter

1    machine at 2:58 p.m. and came out of that slot machine at

2    3:01 p.m.

3    Q.  So it's put back in the machine, according to these

4    records, at about 52 minutes after check 2017 was cashed?

10:43:07    5    A.  Correct.

6    Q.  Showing you the check stub, then, for check 2017.

7           What is written in the explanation section of this

8    check stub?

9    A.  "Unused, returned via 542."

10:43:17    10   Q.  Agent Ponzo, do you know what Mr. Beavers did with the cash

11   from these campaign checks before he puts the money back into

12   the campaign accounts?

13   A.  No, I don't.

14   Q.  Now, there are five sections that you have in Chart 8,

10:43:38    15   correct?

16   A.  Yes.

17   Q.  Is each section associated with a separate check that

18   Mr. Beavers wrote back into the campaign fund?

19   A.  Yes.

10:43:47    20   Q.  Are those the -- from your review of the record, are those

21   the only 5 personal checks that Mr. Beavers wrote back into the

22   campaign fund?

23   A.  No.

24   Q.  But were those the only ones of the 100 checks for which

10:44:00    25   the check stub said it was a reimbursement?

1    A.  Yes.

2    Q.  Looking at this chart, Summary Chart 8.  Of the 100

3    campaign checks that Mr. Beavers wrote to himself, how many of

4    them had a check stub indicating reimbursement?

10:44:16    5    A.  There's 25.  25 of them.

6    Q.  I'd like to turn your attention, then, to Summary Chart 9,

7    Agent Ponzo.

8            MR. GETTER:  May I approach the witness?

9            THE COURT:  You may.

10:44:35    10    BY MR. GETTER:

11    Q.  Agent Ponzo, I'm going to hand you the binder of Summary

12    Charts 1 through 11.

13            Could you take a look at Summary Chart 9, please.

14    A.  I have it.

10:44:50    15    Q.  Did you find check stubs for some of these 100 checks that

16    said "void" on the stub where the explanation section is?

17    A.  Yes.

18    Q.  Were those checks cashed?

19    A.  Yes, they were.

10:45:04    20    Q.  Looking at Government Exhibit Summary Chart 9, could you

21    describe, generally, what this chart is?

22    A.  This is a chart of the campaign fund checks made payable to

23    Mr. Beavers that were cashed in which the stub line said

24    "avoid."

10:45:21    25    Q.  What documents did you use to create the Summary Chart?

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 25 of 74 PageID #:1480
Ponzo - direct by Getter
687

1    A.  The campaign records, bank records, and I reviewed the

2    casino records.

3    Q.  Did you gather the documents that you used in order to

4    create this Summary Chart?

10:45:35    5    A.  Yes.

6           MR. GETTER:  Showing defense what has been marked as

7    Government Exhibit Summary Chart 9 A.

8           May I approach?

9           THE COURT:  You may.

10:45:48    10   BY MR. GETTER:

11   Q.  Handing you now what's marked as Government Exhibit Summary

12   Chart 9 A.

13          Agent Ponzo, what did I just hand you?  What is 9 A?

14   A.  9 A is the backup documents that I used to prepare Summary

10:46:05    15   Chart 9.

16          MR. GETTER:  At this point the Government moves

17   Exhibit Summary Chart 9 and 9 A into evidence.

18          MR. GOLDSTEIN:  No objection.

19          THE COURT:  Admitted.

10:46:13    20      (Government Exhibit Summary Chart 9 and 9 A were

21       received in evidence.)

22          MR. GETTER:  Permission to publish Summary Chart 9?

23          THE COURT:  Given.

24      (Exhibit published to the jury.)

10:46:20    25   BY MR. GETTER:

1    Q.  What is this entitled?

2    A.  Campaign Fund Checks Payable to William M. Beavers with the

3    "void" on the stub.

4          MR. GETTER:  Can we blow up the top line with the

10:46:31  5    names of the columns.

6    BY MR. GETTER:

7    Q.  Could you describe for the jury what the different columns

8    are on this chart.

9    A.  The first column is the check number, the next column is

10:46:40  10    the amount of the check, the next column was date of the check,

11    the next date was the date the check was cashed, the next

12    column is the date the check was processed, the next column is

13    the time the check was cashed.

14          The last three columns are a review of the gambling

10:46:58  15    records at Horseshoe, the date the player's card went into the

16    slot machine, the time it went into the slot machine and the

17    time it came out of the slot machine.

18    Q.  I'd like to pull back from this blow-up and focus just on

19    the line for check 344.

10:47:12  20          Could you describe for the jury what information is

21    contained on this chart with respect to check 344?

22    A.  Check 344 was a check made payable to Mr. Beavers from his

23    campaign fund in the amount of $2,000.  The date of the check

24    was August 6th, 2008.  The date it was cashed was also August

10:47:36  25    6th, 2008.  The date it was processed was August 6th, 2008.

Ponzo - direct by Getter

1    The time the check was cashed was 2:12 p.m.  Mr. Beavers'

2    player's card went in a slot machine at Horseshoe at -- on

3    August 6th, 2008, went in at 11:02 a.m., it came out at 11:06

4    a.m., and then later it went in another slot machine at

10:48:02    5    5:35 p.m. and came out at 5:41 p.m.

6    Q.  I'd like to just show you a couple of the backup documents

7    that you gathered for check 344.

8          First showing you check 344.  What does this show?

9    A.  It shows check 344 made payable to William M. Beavers from

10:48:24    10    Friends For William Beavers, dated August 6th, 2008, in the

11    amount of $2,000.

12    Q.  And you said this check was cashed?

13    A.  It was.

14    Q.  At what time?

10:48:34    15    A.  2:12 p.m.

16    Q.  And then did you review the casino records with respect to

17    Mr. Beavers' player's card for August 6th, 2008?

18    A.  I did.

19    Q.  And there are two lines that are highlighted and blown up.

10:48:50    20    Are those the times that are contained in the Summary Chart

21    that you just relayed to the jury?

22    A.  Yes.

23    Q.  And, finally, showing you the check stub for check 344.

24          Is there a date on that check stub?

10:49:05    25    A.  No.

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 28 of 74 PageID #:1483
Ponzo - direct by Getter
690

1  Q. Does it list who the check is payable to?

2  A. No.

3  Q. Does it list the purpose of the check?

4  A. No.

10:49:12  5  Q. Is there writing on the check stub?

6  A. Yes.

7  Q. What does it say?

8  A. Void.

9  Q. And is there an "X" through the check stub?

10:49:19  10  A. Yes.

11  Q. Is there an amount contained?

12  A. On the right side there's $2,000.

13  Q. In reviewing all of these records with regard to the void

14  check stubs, Agent Ponzo, where the check stubs simply says

10:49:40  15  "void" on it and has no explanation, what effect, if any, does

16  it have on your ability to determine what Mr. Beavers did with

17  the cash from his check?

18       MR. GOLDSTEIN: Objection, Your Honor.

19       THE COURT: I know. I'm thinking.

10:50:02  20    (Brief pause).

21       THE COURT: Overruled.

22  BY MR. GETTER:

23  Q. What ability does it have on your -- excuse me. What

24  effect, if any, does it have on your ability to determine what

10:50:12  25  Mr. Beavers did with the cash from this check?

1  A.  It impaired my ability to determine what happened with the

2  cash.

3  Q.  Does it have any effect on your ability to determine any

4  possible tax implications of the cash from this check to

10:50:25  5  Mr. Beavers?

6           MR. GOLDSTEIN:  Objection, Your Honor.

7           THE COURT:  Overruled.

8           THE WITNESS:  Yes, it does.

9  BY MR. GETTER:

10:50:31  10  Q.  What effect does it have?

11  A.  It impaired my ability to determine if there was any tax

12  effect.

13  Q.  Do you know for certain what he did with these checks that

14  said "void" on them on the stub?

10:50:43  15  A.  No, I don't.

16  Q.  Were any of these checks that said "void" on the stub

17  reported on the campaign's D-2's disclosure forms?

18  A.  No, they were not.

19  Q.  Agent Ponzo, having gone through all these records from the

10:51:00  20  campaigns, from the banks, and the casino, are you able to say

21  with absolute certainty what Mr. Beavers did with the cash from

22  these 100 campaign checks?

23  A.  No, I'm not.

24  Q.  So are you able to look on the check-by-check basis and

10:51:15  25  figure out what is done with the cash in any particular check?

1   A.  No.

2   Q.  But did you, as conservatively as possible, try to figure

3   out how much of the cash from these 100 checks was used for

4   personal as opposed to campaign use?

10:51:30   5   A.  I did.

6   Q.  Could you describe, generally, for the jury how you did

7   that?

8   A.  I looked at all the campaign records, all the checks that

9   were made payable to Mr. Beavers, and then I looked for

10:51:40  10   anything that I can find in receipts, invoices, notes, adding

11   machine tapes, anything I could find that would tell me how the

12   cash was spent.

13   Q.  Since you weren't able to trace the cash from these checks,

14   are you saying that you instead looked at all the 100 checks

10:52:02  15   together as a group, in a sense?

16   A.  Yes.

17   Q.  And did you then compare them to the campaign records?

18   A.  I did.

19   Q.  And did you look to see what the campaign records said was

10:52:13  20   done with these checks?

21   A.  I did.

22   Q.  What specific types of campaign records did you review in

23   order to see what the campaign said was done with the money

24   from these checks?

10:52:26  25   A.  I reviewed all the canceled checks, all the check stubs,

1    any notes, invoices, any documents, I reviewed the D-2's, I

2    reviewed personal bank records of Mr. Beavers also.

3    Q.  And if the campaign record said that a check or a portion

4    of a check was spent in a certain way, for purposes of your

10:52:48    5    analysis, did you credit the campaign's explanation at face

6    value?

7    A.  I did.

8    Q.  So if the campaign said that a particular check to

9    Mr. Beavers was used for a certain campaign-related purpose,

10:53:01    10    did you say, for purposes of your analysis, that the money was

11    spent that way?

12    A.  I did.

13    Q.  Did you do that even if the check had been cashed?

14    A.  Yes.

10:53:10    15    Q.  Even if the cash from that check couldn't be traced?

16    A.  Yes, I did.

17    Q.  Even if the check was cashed several months before the

18    expense that the campaign said was associated with this check

19    was ever incurred?

10:53:26    20    MR. GOLDSTEIN:  Objection; leading.

21    THE COURT:  Overruled.

22    BY THE WITNESS:

23    A.  Yes.

24    BY MR. GETTER:

10:53:31    25    Q.  Did you do it even if the check was cashed during the time

1  between when Mr. Beavers' player's card went into and out of

2  machines at the Horseshoe?

3  A.  Yes, I did.

4  Q.  Did you -- did you do it even if the campaign records said

10:53:47  5  that the money was unused for a primary election that occurred

6  weeks before the check was even issued?

7      MR. GOLDSTEIN:  Objection; leading.

8      THE COURT:  Overruled.

9  BY THE WITNESS:

10:53:57  10  A.  Yes, I did.

11  BY MR. GETTER:

12  Q.  So if the campaign said that a check was for a particular

13  purpose, then you went with that purpose for purposes of your

14  analysis, is that correct?

10:54:08  15  A.  Yes, I did.

16  Q.  Even if you found a receipt that the campaign didn't even

17  say was for campaign-related purposes, did you still include it

18  among campaign-related expenses for purpose of your analysis?

19  A.  I did.

10:54:26  20  Q.  For purposes of your analysis, why did you give him credit

21  for all these items as being campaign uses rather than personal

22  uses?

23  A.  I was just trying to find what cash was left after

24  reviewing all the canceled checks and all the checks that were

10:54:42  25  cashed.  I was looking for any record to see if there was --

1    how the cash was spent and what was left over.

2    Q.  I believe you said earlier that you took all the claimed or

3    possible campaign-related uses of the cash and subtracted it

4    from the amount of 100 checks Mr. Beavers wrote to himself, is

10:55:02    5    that correct?

6    A.  Yes.

7    Q.  What did that leave you with?

8    A.  That left me with records showing that even the campaign

9    said that there was this amount of cash left in Mr. Beavers'

10:55:19    10    possession.

11    Q.  I want to make sure that I understand exactly what you're

12    saying here with respect to your analysis.

13            By crediting at face value every explanation that the

14    campaign gave, are you simply assuming, for purposes of your

10:55:32    15    analysis, whether he spent this cash for campaign versus

16    personal use?

17    A.  Yes.

18    Q.  Are you saying, one way or another, whether you believe the

19    campaign records as to what was done with the cash?

10:55:44    20    A.  No, I --

21            MR. GOLDSTEIN:  Objection, Your Honor.

22            THE COURT:  The objection is overruled.

23    BY THE WITNESS:

24    A.  No, I'm not.

10:55:51    25    BY MR. GETTER:

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 34 of 74 PageID #:1489
Ponzo - direct by Getter
696

1  Q.  So the figure that you came up with, the difference between

2  the amount of the 100 checks to Mr. Beavers and the amount of

3  all possible or claimed campaign-related expenses, is that just

4  an absolute minimum amount based on your analysis that was used

5  for personal use?

6  A.  Yes.

7  Q.  Could it have been more than that?

8  A.  It could've been.

9  Q.  Did you prepare a Summary Chart to help you explain the

10  income calculations that you did?

11  A.  I did.

12  Q.  Does your Summary Chart include calculations for each year

13  2006, 2007 and 2008?

14  A.  Yes, it does.

15  Q.  What materials did you use to prepare that chart?

16  A.  I used records from the campaign funds, bank records from

17  the campaign funds, notes, invoices, D-2 records, and the

18  personal bank records of Mr. Beavers.

19  Q.  Do you have in front of you Government Exhibit Summary

20  Chart 10?

21  A.  Yes.

22  Q.  Could you describe, generally, what Government Exhibit

23  Summary Chart 10 is?

24  A.  Summary Chart 10 is entitled Cash Remaining in Mr. Beavers'

25  Possession for years 2006 through 2008 and that's my

10:56:09

10:56:19

10:56:29

10:56:49

10:57:02

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 35 of 74 PageID #:1490
Ponzo - direct by Getter
697

1  calculation of the checks that were made payable to Mr. Beavers

2  and cashed and then all the various subtractions that I made.

3  Q.  And the documents you relied on to create Government

4  Exhibit Summary Chart 10, were those materials you just

5  described a moment ago?

6  A.  Yes.

7          MR. GETTER:  The government moves Summary Chart 10

8  into evidence.

9          MR. GOLDSTEIN:  No objection.

10         THE COURT:  Admitted.

11     (Government Exhibit Summary Chart 10 was received in

12       evidence.)

13  BY MR. GETTER:

14  Q.  And did you gather the materials that you used to prepare

15  Summary Chart 10?

16  A.  I did.

17         MR. GETTER:  Showing the defense what is marked

18  Summary Chart 10  A.

19         May I approach?

20         THE COURT:  You may.

21  BY MR. GETTER:

22  Q.  Agent Ponzo, I just handed you what is marked Government

23  Exhibit Summary Chart 10 A.

24         What is that?

25  A.  These are all the backup documents that I used to prepare

10:57:21

10:57:27

10:57:32

10:57:43

10:57:56

1    Summary Chart 10.

2            MR. GETTER:  Government moves Summary Chart 10 A into

3    evidence.

4            MR. GOLDSTEIN:  No objection.

10:58:07    5            THE COURT:  Admitted.

6        (Government Exhibit Summary Chart 10 A was received in

7         evidence.)

8            MR. GETTER:  Permission to publish Summary Chart 10?

9            THE COURT:  You may.

10:58:13   10        (Exhibit published to the jury.)

11   BY MR. GETTER:

12   Q.  I put up on the screen the first page of Summary Chart 10.

13           Could you describe for the jury what this chart --

14   what this page of the chart shows?

10:58:24   15   A.  This shows the amount that was remaining in Mr. Beavers'

16   possession after cashing the checks and my review of all the

17   documents to try to determine how much was left in his hands,

18   in his possession, by year, the years 2006, 2007 and 2008.

19   Q.  And then does it include a totals chart at the end -- I'm

10:58:46   20   sorry, totals column at the end?

21   A.  Yes.

22   Q.  Could you describe the formula you used to figure out these

23   figures.

24   A.  The first description there is the campaign fund checks

10:59:00   25   made payable to William M. Beavers, then I subtracted expense

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 37 of 74 PageID #:1492
Ponzo - direct by Getter
699

1  that --

2  Q.  That first line, is that the total amount per year of the

3  checks written from the campaign to Mr. Beavers?

4  A.  Yes.

10:59:11  5  Q.  Okay.  Go ahead.  I'm sorry.

6  A.  The next line is the expenses related to campaign fund

7  checks that were payable to William M. Beavers.  The next line

8  is the receipts that I found that were not associated with a

9  certain campaign fund check.  The next line is the D-2 items

10:59:30  10  that didn't have a receipt or any amount written on a check

11  stub.  And then the last portion is any other subtractions that

12  I made.

13  Q.  And then the final line?

14  A.  That gave me what cash remained in Mr. Beavers' possession.

10:59:46  15  Q.  Now, just to clarify, Agent Ponzo, this Summary Chart, does

16  this deal just with the 100 checks?

17  A.  Yes.

18  Q.  Does this Summary Chart deal at all with the

19  68-thousand-dollar check from Mr. Beavers' campaign fund to his

11:00:00  20  pension fund?

21  A.  No.

22  Q.  Does it deal with the $1200 a money Cook County contingency

23  expense checks?

24  A.  No.

11:00:07  25  Q.  Are there additional pages of this chart to help expand on

1    the information provided in the first page?

2    A.  Yes.

3    Q.  Let's start with 2006.

4        This is page 2 of 24.  Would you describe for the jury

11:00:28    5    what this couple of pages in the chart entitled "Campaign Fund

6    Checks Payable to William Beavers 2006" shows?

7    A.  This shows all checks made payable to William Beavers from

8    his three campaign fund accounts for the year 2006 that were

9    cashed.

11:00:45    10    Q.  Could you explain the different columns?

11    A.  The first column is the number, I'm just counting the

12    number of items on the chart.  The next column is the bank

13    date, the next column is the campaign fund, the next column is

14    the check number, and the last column is the amount of the

11:01:01    15    check.

16    Q.  Could we turn to page 2  -- I'm sorry, page 3.

17        How many checks were written from his three campaign

18    funds to Mr. Beavers in 2006?

19    A.  47.

11:01:14    20    Q.  And what is the total amount of those checks?

21    A.  96,000.

22    Q.  Going back to the first page of this exhibit.

23        You mentioned that the second line which is subtracted

24    from 96,000 is expenses related to campaign fund checks payable

11:01:35    25    to William M. Beavers, correct?

1    A.  Correct.

2    Q.  Turning now to that section of this chart for 2006.

3         Did you provide some more detail on what you mean by

4    that?

5    A.  I did.

6    Q.  Could you explain for the jury what the section of this

7    chart entitled Expenses Related to Campaign Fund Checks Payable

8    to William Beavers For the Year 2006 shows?

9    A.  The first five columns, the number column, the bank date,

10   the campaign fund, the check number and check amount.

11   Q.  Is that the same information that was contained in the

12   first section of this chart?

13   A.  Yes.

14   Q.  Did you add two more columns here?

15   A.  I did.

16   Q.  What two columns did you add?

17   A.  I added amount credited against check and what the stub

18   indicated for that check.

19   Q.  What do you mean by "Amount Credited Against Check," that

20   second column from the right?

21   A.  I looked for anything that I could subtract against a

22   certain check, and if I was able to I put an amount in the

23   "amount credited against check" column.

24   Q.  What did you do to try and match up amounts credited

25   against check versus the check?

1    A.  I looked on the check stubs, then I looked through all the

2    receipts and invoices to see if there was a check number

3    written on the receipt and then I matched those with the

4    checks.

11:02:54    5    Q.  So if a check stub for a particular check to Mr. Beavers

6    had an explanation for the check's purpose, then you took that

7    explanation at face value for purposes of this chart?

8    A.  I did.

9    Q.  Did you know for a fact whether the cash was actually used

11:03:10    10   in the way the stub described?

11   A.  No, I don't.

12   Q.  For some of these lines, do you see an indication that the

13   amount credited against check is less than the amount of the

14   check?

11:03:32    15   A.  Yes.

16   Q.  Like, for instance, let's blow up lines 3, 7 and 8.

17        For Line 3, could you describe why you have a figure

18   of $757.85 in the column "amount credited"?

19   A.  The stub said "women's auxiliary $757.85."  I looked

11:04:01    20   through all the receipts to see if there was a receipt that was

21   associated with check 2002.  I couldn't find the receipt, but I

22   gave credit for the amount that was written on the stub line.

23   Q.  Did you apply the same sort of reasoning to lines 7 and 8,

24   those two checks?

11:04:14    25   A.  Yes, I just added the amounts that were written on the stub

1   line and put them in the column "Amount Credited Against

2   Check."

3   Q.  For some of these checks, if we could pull out --

4           For some of these checks, is there an indication that

5   the check was reimbursed?

6   A.  Yes.

7   Q.  Looking at lines 12, 13, 14 and 16, if we could blow those

8   up.

9           Here, what do you have in the stub indicate column for

10  these 4 checks?

11  A.  "March 21st, primary, unused, return via 542."

12  Q.  Are these the 4 checks -- 4 of checks that we reviewed in

13  Summary Chart 8, I believe?

14  A.  Yes.

15  Q.  So when you were doing your income analysis here, did you

16  give Mr. Beavers credit for purposes of figuring out any

17  potential personal use of this money for the explanation

18  provided in the check stub?

19  A.  Yes, I did.

20  Q.  Despite having reviewed the casino records and the

21  explanation on the stub, you still gave him credit for it in

22  your chart?

23  A.  I did.

24  Q.  And did you give him credit for that even though those

25  checks were written in April, which is after the March 21st

1  primary had already been held?

2  A.  Yes, I did.

3  Q.  Now, by the way, what do those 4 checks add up to?

4  A.  $8,000.

11:05:56  5  Q.  But the check that he wrote back to the campaign wasn't for

6  $8,000, was it?

7  A.  No, it wasn't.

8  Q.  What amount was it for?

9  A.  It was for $10,000.

11:06:09  10  Q.  So what did you do with regard to that extra $2,000 that he

11  put back into the campaign?

12  A.  In my other subtraction section I gave credit for the other

13  $2,000.

14  Q.  The next page, page -- sorry, page 6, what was the total

11:06:34  15  amount of expenses related to campaign fund checks payable to

16  William Beavers for the year 2006?

17  A.  $67,151.32.

18  Q.  Did you then subtract that amount, as well, from the

19  $96,000 figure representing the amount of checks written from

11:06:52  20  the campaign fund to Mr. Beavers?

21  A.  Yes.

22  Q.  Did you look further in the campaign records for any

23  indication of what possible campaign-related expenses there

24  might have been?

11:07:08  25  A.  I did.

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 43 of 74 PageID #:1498
Ponzo - direct by Getter
705

1   Q. Did you find other receipts in the campaign records that

2   weren't attributed to a particular check?

3   A. I did.

4   Q. For those other receipts, did the campaign say where the

11:07:22  5   money to pay for those expenses came from?

6   A. No, it didn't.

7   Q. In those cases, did you have any idea whether the receipts

8   were actually associated with any of those 100 checks to

9   Mr. Beavers?

11:07:33  10  A. No.

11  Q. How were those receipts exempt?

12  A. They were just in a manila folder with a rubber-band around

13  them.

14  Q. Were they made in any particular order?

11:07:41  15  A. They were by year and by campaign fund.

16  Q. But within that, was there any order to them?

17  A. No.

18  Q. Did you list those receipts that you found in another

19  section of this chart?

11:07:53  20  A. I did.

21  Q. If we could turn to page 7, please.

22       What is this section of the chart?

23  A. This is a section where I reviewed receipts that didn't

24  have a check number on them and I added them up for each year.

11:08:07  25  Q. So could you describe the columns here?

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 44 of 74 PageID #:1499
Ponzo - direct by Getter
706

1  A.  The first column is the number, I'm just counting the

2  numbers of items on the chart.  The next column is the date

3  that was on the receipt, the next column is the amount that was

4  on the receipt, and then the last column is just a description

11:08:28  5  that was on the receipt.

6  Q.  Did you attach in your supporting information in 10 A

7  certain pages -- I'm sorry, did you attach copies of these

8  actual receipts that you found in the records?

9  A.  Yes, I did.

11:08:45  10  Q.  That you put in this section called "receipts not

11  associated with the campaign fund check"?

12  A.  I did.

13  Q.  I'd like to show you one of those receipts.

14      MR. GETTER:  Can we blow this up.

11:08:58  15  BY MR. GETTER:

16  Q.  Is this a receipt that you found in the campaign records

17  for 2006?

18  A.  Yes, it is.

19  Q.  What is this a receipt for?

11:09:10  20  A.  It says "one fruit and yogurt parfait."

21  Q.  From?

22  A.  From McDonald's.

23  Q.  For how much?

24  A.  For $1.09.

11:09:25  25  Q.  Showing you another receipt.  Did you find this receipt in

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 45 of 74 PageID #:1500
Ponzo - direct by Getter
707

1   the campaign records for 2006?

2   A.  I did.

3   Q.  What is this -- what does this receipt appear to be for?

4   A.  It's from a smoke shop.

11:09:37   5   Q.  In where?

6   A.  In Indiana.  Whiting, Indiana.

7   Q.  And what sorts of items are listed in this receipt?

8   A.  It's like a brand carton of cigarettes, a couple of cartons

9   of cigarettes.

11:09:53   10   Q.  What's the total amount of the receipt?

11   A.  $83.59.

12   Q.  Is this another receipt that you found in the campaign

13   records for 2006?

14   A.  Yes, it is.

11:10:05   15   Q.  What is this?

16   A.  It's a receipt from Family Dollar stores.

17   Q.  And what items were purchased according to this receipt?

18   A.  Foam plate, mince onion, toothpaste, mouthwash, pine bowl

19   cleaner, looks like petroleum jelly, garlic, Ajax dish, Joy,

11:10:32   20   and some cards.

21   Q.  And what was the total amount of this receipt?

22   A.  $16.37.

23   Q.  Showing you one more receipt.

24        What is this receipt?

11:10:42   25   A.  Kenwood Liquors in Chicago.

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 46 of 74 PageID #:1501
Ponzo - direct by Getter
708

1    Q.  Is this various purchases of different kinds of alcohol?

2    A.  And some pop, too, yes.

3    Q.  And what is the amount of this receipt?

4    A.  $25.22.

11:10:55    5    Q.  Agent Ponzo, these four receipts, were these all the

6    receipts you found in the campaign records or did you find

7    more?

8    A.  I found more.

9    Q.  Did you give, for purposes of your income analysis, did you

11:11:06    10    give Mr. Beavers credit for these four receipts as

11    campaign-related expenses?

12    A.  Yes, I did.

13    Q.  Why?

14    A.  They were in the campaign records and I accepted what was

11:11:17    15    in the campaign records.

16    Q.  Do you know for a fact whether those receipts were campaign

17    related or not?

18    A.  No, I don't.

19    Q.  But you assume for purposes of your analysis that they

11:11:30    20    were, is that right?

21    A.  Yes.

22    Q.  Let's go to the next page, page 11.

23        Looking at page 11 of this chart.  How many different

24    items, expense items, did you find in reviewing the campaign

11:11:53    25    records for 2006?

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 47 of 74 PageID #:1502
Ponzo - direct by Getter
709

1    A.  73.

2    Q.  And what was the total amount of those expenses?

3    A.  $18,489.98.

4    Q.  Did you then subtract that total figure from the $96,000 in

11:12:05  5    checks that Mr. Beavers wrote to himself from the campaign

6    funds?

7    A.  Yes.

8    Q.  Did you keep looking in the campaign records for other

9    possible campaign-related expenses?

11:12:15  10   A.  I did.

11   Q.  Did you look through the campaign's D-2 disclosure forms?

12   A.  I did.

13   Q.  Why did you look through the campaign's disclosure reports?

14   A.  To see if there were any checks -- any items listed on the

11:12:31  15   D-2 that there was no receipt, and it wasn't listed anywhere

16   that I could find and there was no check for that specific

17   item.

18   Q.  Did you find some expenses on the D-2's for which there

19   were no receipts or records in the campaign files?

11:12:47  20   A.  Yes.

21   Q.  Did you list them out in Chart 10?

22   A.  I did.

23   Q.  Looking at page 11 of this chart.

24           What does this page show?

11:13:12  25   A.  Page 11 shows the total amount of items that were on the

1    D-2 where I couldn't find a receipt and I couldn't find an

2    amount on the check stub and I couldn't find a check written

3    out directly for these items.

4    Q.  Agent Ponzo, I think we may have gotten some things

11:13:32  5    confused.  Could we go back a couple of pages on this chart.

6    Keep going back.

7         If you could look, Agent Ponzo, at page 9 of Summary

8    Chart 10.

9    A.  Yes.

11:13:48  10   Q.  What was the total amount of the receipts not associated

11   with the campaign funds check for the year 2006?

12   A.  There were 94 of them which totaled $5,251.03.

13   Q.  So is that a correction from what you said earlier?  I

14   think we have the wrong section of the chart there.

11:14:09  15   A.  Yes.  Right.

16   Q.  So for those expenses not contained -- or for the expenses

17   not associated with a particular campaign check, that figure

18   was $5,251.03?

19   A.  Yes.

11:14:26  20   Q.  Okay.  I'm sorry, I gave you the wrong section of the chart

21   to look at.

22        Going back to the D-2 section of the chart which

23   starts on page 10.

24        Did you find certain expenses listed on the D-2 chart

11:14:37  25   that were not already accounted for in the campaign records?

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 49 of 74 PageID #:1504
Ponzo - direct by Getter
711

1   A.  Yes.

2   Q.  And did you list those out in this section of the chart

3   entitled D-2 Items, No Receipt, No Amount on Check Stub?

4   A.  I did.

11:14:49   5   Q.  How many such items did you find in the D-2's for 2006?

6   A.  73.

7   Q.  And what was the total amount of those?

8   A.  $18,489.98.

9   Q.  Did you subtract that amount from the $96,000 in campaign

11:15:09   10   checks that Mr. Beavers wrote to himself in 2006?

11   A.  I did.

12   Q.  Did you look even further?

13   A.  I did.

14   Q.  What else did you look for?

11:15:20   15   A.  I looked for any other checks that were deposited into the

16   campaign fund account from Mr. Beavers' personal accounts and I

17   looked for any cash that was deposited into the campaign fund

18   accounts.

19   Q.  Could you look at page 12 of the chart.

11:15:35   20       What is page 12?

21   A.  Page 12 is a chart entitled Other Subtractions For the Year

22   2006.

23   Q.  And could you describe what items are listed on this chart,

24   this section of the chart?

11:15:48   25   A.  Personal checks that were written from Mr. Beavers'

Ponzo - direct by Getter

1    personal account and deposited into the campaign fund accounts

2    and cash that was deposited into the campaign fund accounts.

3    Q.  So, for instance, looking at the third item here "Cash

4    Deposited Into Citizens For Beavers," do you see that?

11:16:09  5    A.  Yes.

6    Q.  How did you find that figure?

7    A.  In the records of Citizens For Beavers, the bank records, I

8    found on October 25th, 2006 a deposit slip that had a cash

9    amount of $625.

11:16:26  10   Q.  Looking at page 12, what is the total amount of these other

11   items that you included on other subtractions for the year

12   2006?

13   A.  $3,625.

14   Q.  Did you subtract that amount of the $96,000 figure?

11:17:02  15   A.  I did.

16   Q.  Let's move on to 2007.

17       Did you conduct the same sort of analysis for 2007 as

18   you did for 2006?

19   A.  I did.

11:17:16  20   Q.  Could you look at page 13 of the Summary Chart.

21       But before we get there, when we were talking about

22   the other subtractions a moment ago, what is this that you're

23   being shown on the screen right now?

24   A.  This is the deposit slip from Citizens For Beavers that

11:17:44  25   indicated, under the currency portion, $625.  I didn't find a

1    cash-in ticket, but I accepted that that amount was currency

2    since the $625 was listed in the currency line.

3    Q.  So that is where you got the $625 figure that was on the

4    line of other subtractions for 2006?

11:18:07    5    A.  Yes.

6    Q.  Sorry about that.  Now, back to 2007.

7            THE COURT:  I think we'll take a short break now.

8            THE MARSHAL:  All rise.

9    (The following proceedings were had out of the

11:18:47   10      presence of the jury in open court:)

11           THE COURT:  Please be seated in the courtroom.

12           10 to 15 minutes.

13           Anything you want to bring up before we go?

14           MR. GETTER:  One moment, Judge.

11:19:03   15           THE COURT:  You can be seated.

16    (Brief pause).

17           MR. GETTER:  Judge, there is one issue we want to talk

18    about, if we could.  The last chart in the binder is Summary

19    Chart 11, which is the tax due and owing chart that Agent Ponzo

11:19:19   20    prepared.

21           Two things with respect to Chart 11.  One, Agent Ponzo

22    corrected an error that we found in Summary Chart 11 and

23    provided the corrected Summary Chart 11 to the defense, and

24    with the Court's permission we would like to substitute it into

11:19:36   25    the binders.

1      MR. GOLDSTEIN:  No objection.

2      THE COURT:  Okay.

3      MR. GETTER:  The section issue with respect to tax due

4  and owing is, we are not planning on having Agent Ponzo opine

11:19:48   5  as to what is or is not a loan.  Instead, we're going to ask

6  Agent Ponzo, based on his review of the campaign records, did

7  he find documents indicating loans; loan agreements, notes on

8  check --

9      THE COURT:  Right.

11:20:06  10      MR. GETTER:  -- that kind of thing.

11      We are then proposing to ask him about -- to lead into

12  the tax due and owing chart in two ways:  One, is to ask him,

13  essentially, if you were to assume for the sake of argument

14  that the 101 --

11:20:27  15      You want him out for this?

16      THE COURT:  No.

17      MR. GETTER:  Okay.

18      -- that the 101 checks, including the pension fund,

19  68-thousand-dollar check, were bona fide loans, would it have

11:20:37  20  affected the way -- essentially, would it have affected the way

21  you did your tax due and owing chart, would there have been a

22  need to prepare a tax due and owing chart.  I expect the answer

23  is going to be not really because loans aren't income.

24      Then we're going to say, if you assume that those 101

11:20:55  25  checks are not loans, are not bona fide loans, would you then

1  prepare a tax due and owing chart based on that assumption that

2  they are not loans.  He'll say "yes, I did that," and then

3  we'll show him Summary Chart 11 which is that second scenario.

4          The point being that since we're not asking Agent

11:21:17  5  Ponzo to opine on what is or isn't a loan for purposes of his

6  tax due and owing chart, we're not opening the door for the

7  defense to ask questions of Mr. Ponzo that would go to whether

8  he's an expert on what is or isn't a loan or to open the door

9  for their expert to testify as to what is or isn't a loan.

11:21:39  10         MR. HENDERSON:  Your Honor, we're going to front it

11  now.  Our expert does have an opinion on whether or not they

12  are loans.  So this is just a back-door attempt to try to keep

13  our from testifying.  We are clearly of the opinion that the

14  books and records that have been provided by Mr. Beavers and

11:21:50  15  all the records that they have reviewed establish that it is a

16  loan, as well as their own documents establish that they were

17  loans, because the analysis that has been done by Agent Ponzo

18  shows money --

19         THE COURT:  You got some books or exhibits showing

11:22:06  20  what those papers are?

21         MR. HENDERSON:  Those are the Government Exhibits,

22  Your Honor.  The Government Exhibits show it.

23         THE COURT:  Show what?

24         MR. HENDERSON:  The Government Exhibits show that

11:22:19  25  money has been taken out from the -- out of the campaign fund

1 and replaced.

2     THE COURT: But usually in order to have a loan, you

3 have something more than that.

4     MR. HENDERSON: That's not always the case, Your

5 Honor. There's no law that says that.

6     THE COURT: But what you're going to have to do is

7 you're going to have to explain in some detail to me exactly

8 what your proof of loan is.

9     MR. HENDERSON: Well, as I said, again, the first

10 portion of it is the government's own records --

11     THE COURT: No, I want to see it on paper. If you're

12 going to tell me there's no paper, there's nothing that says

13 this is a loan, there's nothing, leaving aside the loan,

14 nothing that says "repay," nothing that says anything about

15 interest, nothing that says anything about interest free, if

16 there's no paper, if somebody is doing it just on the basis of

17 circumstance that money was taken out and then later returned

18 and that this established that it was a loan, he's not opening

19 the door. What he's saying is are there any papers.

20     MR. HENDERSON: No, what he's saying is that he's

21 going to try to keep our expert from going into that. If their

22 expert doesn't want --

23     THE COURT: No, but that's a different issue.

24     MR. HENDERSON: Well, but what Mr. Getter --

25     THE COURT: What he doesn't want to do is he doesn't

11:22:35
11:22:57
11:23:13
11:23:39
11:23:49

1    want to open the door to asking this guy his opinion about a

2    loan, he's just asking if he found any paper.  He found no

3    paper, that's a fact.  And if I understand what you're telling

4    me correctly, it's not a fact that you're going to dispute.

11:24:11    5    You're going to have an expert get up and say there is no

6    paper, there is nothing signed as a loan agreement but

7    nonetheless it is my expert opinion it is a loan because of X,

8    Y and Z which are facts not contained in a piece of paper.  In

9    other words, what he's going to say is, in effect, he has

11:24:35    10    encountered nothing that was a formal loan document, and your

11    guy is going to say, yeah, there was no formal loan document

12    but it is a loan, in my opinion, because of the following steps

13    people took.

14           So the answer to the question is, he's not opening the

11:24:54    15    door for you to get it in for the reasons that he's expressing,

16    but you are perfectly free to offer other reasons why it comes

17    in not because the door was opened but because it's a

18    difference.

19           MR. GOLDSTEIN:  Your Honor, I think we've gone a

11:25:15    20    little far afield.  The issue that the government is raising --

21           THE COURT:  No kidding!

22           MR. GOLDSTEIN:  The issue the government is raising as

23    to cross whether it opens the door.

24           THE COURT:  It does not open the door.

11:25:27    25           MR. GOLDSTEIN:  And I don't think what I propose

1      potentially would be on cross is in any way violating the rule,

2      but what I would like to do with the agent on cross-examination

3      is to further establish, because they're going to finish off or

4      at some point they're going to get the agent to say "well, if

11:25:47    5      it was a loan, this is how I would have calculated it" and I

6      would like --

7              THE COURT:  Wait.  Wait.

8              Are you going to do that?

9              MR. GETTER:  Say that again?

11:25:55    10             MR. GOLDSTEIN:  You're going to give the agent, in

11     essence, two hypotheticals, for lack of a better term.  One

12     hypothetical is, if you treated these as loans, how would this

13     affect the tax.

14             MR. GETTER:  I'm going to ask him if he treated it as

11:26:12    15     bona fide loans would there have been a need to do a tax due

16     and owing analysis.  And I expect his answer, he's going to be

17     particularly meticulous, his answer is going to be only with

18     respect to the Cook County Contingency fund checks no one was

19     saying those were loans.  And then I'm going to ask him "did

11:26:30    20     you perform such an analysis" and he's going to say "no."  So

21     then I'm going to ask him, "assuming that they weren't bona

22     fide loans, did you do a tax due and owing" and he's going to

23     say "yes."

24             MR. GOLDSTEIN:  What I would like to establish on

11:26:45    25     cross is the basis for which he will say that if they were bona

1   fide loans, he would not do a tax due and owing.  Not to

2   challenge and say you found these loans or you didn't find

3   these loans.  But, for example, Section 61 --

4           THE COURT:  You're going to ask him to assume there

11:27:05   5   was a loan?

6           MR. GOLDSTEIN:  I'm going to ask him basically --

7           THE COURT:  The fact of the matter is is that this

8   witness has been presented basically as adding and subtracting

9   and examining documents and making assumptions.  He essentially

11:27:35   10   avoided testifying to personal knowledge of anything except

11   what was on pieces of paper, and that's the line they're trying

12   to get him not to cross, and they've been careful not to cross

13   it themselves.  If you are going to ask the same sort of

14   question which says "assuming there was a loan," maybe.

11:27:58   15           MR. GOLDSTEIN:  Can I ask him the question "assuming

16   there were a loan, the reason why you wouldn't do the tax due

17   is because the tax code says loans aren't income," can I

18   establish that through Section 61 and 63 of the --

19           THE COURT:  That is something I do with instructions.

11:28:18   20           MR. GOLDSTEIN:  But we are in this weird place.  He

21   hasn't been established as an expert but I do believe he's

22   given very close expert opinion, particularly at the beginning.

23           THE COURT:  No, I don't think that at all.  I think

24   what this guy has done is he's put a lot of numbers and clock

11:28:38   25   timing up on the board which are independent facts without

11:29:05

1   drawing an inference.  They were very careful not to have him

2   draw that inference, and rightfully so.  Everything else he's

3   talked about is what assumptions he's made, one of them, on the

4   face of it, appears to be a very gigantic assumption in your

5   client's favor.  But this person is an assumption evidence,

6   assuming this, what do the numbers add up to, where is the

7   subtraction, period; that's all he did.  The government really

8   didn't do more than that with this witness and I'm not going to

9   let you do more than that with this witness.

11:29:29

10      So what you're going do is you're going to give me in

11  writing exactly what questions you want to ask him in the area

12  that you are talking about and I'll tell you whether it falls

13  within the manner and purpose for which this witness has given

14  his testimony.  Because this witness has so far simply said

11:29:55

15  these are a bunch of assumptions I made, this is what I found,

16  and if those assumptions are true, this is what a bottom line

17  amount is, period.  And, basically, the only thing you want to

18  say to him is is "well, assume it's a loan, what happens,"

19  which is going to be a fact not in dispute.  And you're better

11:30:24

20  off if they get it in an instruction, anyway.  They could get

21  that from me, not out of the struggle on the courtroom floor.

22      Ten minutes.

23  (Recess.)

24      THE MARSHAL:  All rise.

11:49:31

25  (The following proceedings were had in the presence of

1      the jury in open court:)

2              THE COURT:  Please be seated.

3              Give me a minute.

4          (Brief pause).

11:50:20   5              THE COURT:  You may resume.

6              MR. GETTER:  Thank you, Judge.

7    BY MR. GETTER:

8    Q.  Agent Ponzo, I'd like to talk about 2007.

9              Did you conduct the same type of calculation for 2007

11:50:30  10    that you did for 2006?

11    A.  I did.

12    Q.  Could you look at page 13 of Summary Chart 10.

13              MR. GETTER:  And if we could publish that on the

14    screen, please.  Thank you.

11:50:50  15          (Brief pause).

16    BY MR. GETTER:

17    Q.  What is this, Agent Ponzo?

18    A.  This is the campaign fund checks payable to Mr. Beavers for

19    the year 2007.

11:50:57  20    Q.  How many such checks were there from his three campaign

21    funds to Mr. Beavers in 2007?

22    A.  26.

23    Q.  And what was the total amount of those 26 checks?

24    A.  $69,300.84.

11:51:17  25    Q.  Could you look at the next page of the chart, please, page

1      14.

2            What is this?

3    A.  This is a chart that I prepared that was for the expenses

4    that related to certain campaign fund checks for the year 2007.

5    Q.  And for 2007 did you find any check stubs that said a check

6    was reimbursed by a subsequent personal check from Mr. Beavers?

7    A.  I did.

8    Q.  Looking at lines 3, 6, 7, 8, 9, 12 and 13 that are

9    highlighted.

10           Do you see those?

11   A.  I do.

12   Q.  What do you have in the far right column of this chart with

13   respect to those checks?

14   A.  "Reimbursed per check 3664."

15   Q.  Are these the 7 checks you discussed earlier when you were

16   going over reimbursed checks to Mr. Beavers?

17   A.  Yes.

18   Q.  You indicate on this chart whether there were certain

19   checks for 2007 for which the check stub did not contain an

20   explanation?

21   A.  Yes.

22   Q.  I highlighted lines 16, 17, and 19, do you see that?

23   A.  I do.

24   Q.  What are those items that are highlighted, generally?

25   A.  There are three checks from two different campaign fund

1    accounts to Mr. Beavers that were cashed and the stubs were

2    blank.

3    Q.  And did you testify earlier about just one example of a

4    check stub that was blank?

11:53:03   5    A.  Yes.

6    Q.  I'm sorry, I think two that were blank, correct?

7    A.  Correct.

8    Q.  Do you know for certain what Mr. Beavers did with the cash

9    from these 26 campaign checks to him in 2007?

11:53:16   10   A.  No.

11   Q.  Do you know if they were campaign related or personal use?

12   A.  No, I don't.

13   Q.  But did you treat them as campaign related for purposes of

14   your income calculation?

11:53:26   15   A.  Yes, I did.

16   Q.  What was the total amount of these expenses related to

17   checks for 2007?

18   A.  $42,884.14.

19   Q.  Did you subtract that figure from the total amount of the

11:53:41   20   26 checks written from the campaigns to Mr. Beavers in 2007?

21   A.  Yes, I did.

22   Q.  And for 2007, did you also collect the receipts from

23   campaign records that the campaign did not attribute to any

24   particular check?

11:53:54   25   A.  Yes, I did.

1   Q.  Could you look at page 16 of the chart.

2       What is this?

3   A.  This is a schedule of the receipts that I found in the

4   campaign records that didn't have a check number on them for

5   the year 2007.

6   Q.  What was the total -- first of all, how many items were

7   there?

8   A.  14.

9   Q.  And what was the total amount of these items?

10   A.  $1,731.59.

11   Q.  Did you subtract that figure from the amount of 26 checks

12   written to Mr. Beavers in 2007?

13   A.  I did.

14   Q.  And, again, did you assume that these 14 receipts were all

15   campaign related?

16   A.  Yes, I did.

17   Q.  Did you look even further in the campaign records for 2007?

18   A.  Yes, I did.

19   Q.  Did you review the three Beavers' campaign D-2's for that

20   year?

21   A.  I did.

22   Q.  If you would look at page 17 of the chart.

23       What is this page?

24   A.  This is the D-2 items where I didn't find a receipt and

25   also there was no check specifically for these items and I

11:54:07

11:54:15

11:54:34

11:54:49

11:55:00

1    didn't find an amount on the check stubs.

2    Q.  How many such items were there for that year?

3    A.  11.

4    Q.  And what was the total amount?

11:55:12    5    A.  $2,034.49.

6    Q.  Did you subtract that figure from the total amount of the

7    26 checks written from the campaigns to Mr. Beavers in 2007?

8    A.  I did.

9    Q.  Did you also look for other money put back into the Beavers

11:55:28    10    campaign accounts?

11    A.  Yes, I did.

12    Q.  Could you look at page 18 of the chart.

13        What is this?

14    A.  This is the part of the chart where I looked for other

11:55:39    15    subtractions.

16    Q.  And did you find any such subtractions?

17    A.  Yes, I did.

18    Q.  What subtractions did you find?

19    A.  There were two checks deposited into Citizens For Beavers

11:55:50    20    that Mr. Beavers wrote out from his personal accounts.

21    Q.  What were the amounts of those checks?

22    A.  A check 3365 was for $6,000 and check 3700 was for $2,500.

23    Q.  So is the total amount for those other subtractions for

24    2007 $8,500?

11:56:09    25    A.  Yes.

Ponzo - direct by Getter

1   Q.  Did you subtract that figure from the total amount of

2   checks written from the campaign funds to Mr. Beavers for 2007?

3   A.  I did.

4   Q.  Let's turn to 2008, Agent Ponzo.

11:56:25   5         Page 19 of this chart.

6         Did you conduct the same sort of income analysis for

7   2008 that you did for the years 2006 and 2007?

8   A.  I did.

9   Q.  What is page 19?

11:56:39   10   A.  It's the checks -- campaign fund checks made payable to

11   William Beavers for the year 2008.

12   Q.  And how many such checks were there in 2008?

13   A.  27.

14   Q.  What was the total amount of those 27 checks?

11:56:50   15   A.  $61,000.

16   Q.  Could you look at the next page of the chart, page 20.

17        What is this?

18   A.  This is a chart that detailed the expenses related to

19   certain campaign fund checks that were payable to Mr. Beavers

11:57:11   20   for the year 2008.

21   Q.  For 2008 did you find any check stubs that said the check

22   was reimbursed by a later personal check from Mr. Beavers?

23   A.  No.

24   Q.  Did you find any check stubs for campaign checks to

11:57:30   25   Mr. Beavers where those stubs had no explanation?

11:57:43

1  A.  Yes.

2  Q.  Did you also find check stubs for campaign checks to

3  Mr. Beavers in 2008 where those stubs said "void"?

4  A.  I did.

5  Q.  Showing you page 20 of the Summary Chart 10.

6       Do you see there are 23 lines -- or 23 checks listed

7  on this page?

8  A.  Yes.

9  Q.  And do you see that all but one of those checks are

11:57:58

10  highlighted?

11  A.  Correct.

12  Q.  For all of those 22 checks on this page that are

13  highlighted, what does the stub indicate?

14  A.  It either indicated void or it was blank.

11:58:12

15  Q.  Turn to page 21.

16       And then on 21 there's nothing highlighted, but are

17  there four more items on that page?

18  A.  Yes.

19  Q.  And of those four items, are there any voids listed?

11:58:27

20  A.  Yes.

21  Q.  How many?

22  A.  Two.

23  Q.  What are the other two stubs?

24  A.  The one next to number 24 is Allstate Insurance, PO Box

11:58:40

25  3576, Akron, Ohio.  And the next, Line 25, we didn't get a stub

1    for that check, check 1904, so I didn't indicate anything

2    there.

3    Q.  What is the total amount of the expenses related to

4    campaign fund checks payable to Mr. Beavers for 2008?

11:58:59    5    A.  $18,389.07.

6    Q.  Did you subtract that figure from the 61-thousand-dollar

7    figure for the total of the 27 checks from the campaign to

8    Mr. Beavers?

9    A.  I did.

11:59:12    10    Q.  Did you continue to look in the 2008 records for the

11    campaign?

12    A.  I did.

13    Q.  Did you find any campaign records consisting of receipts

14    that the campaign did not associate with any particular check

11:59:30    15    to Mr. Beavers?

16    A.  Yes, I did.

17    Q.  Could you look at page 22 of this chart.

18         How many such items did you find for 2008?

19    A.  15.

11:59:45    20    Q.  Do you know whether any of these 15 items were campaign

21    related or personal related?

22    A.  No, I don't.

23    Q.  Did you assume, for purposes of your analysis, that they

24    were all campaign related?

12:00:00    25    A.  Yes, I did.

Case: 1:12-cr-00124 Document #: 122 Filed: 04/03/14 Page 67 of 74 PageID #:1522
Ponzo - direct by Getter
729

1  Q.  What was the total amount of those receipts not associated

2  with the campaign fund check?

3  A.  $14,190.98.

4  Q.  Did you subtract that figure from the total amount of

5  campaign checks to Mr. Beavers for 2008?

6  A.  Yes, I did.

7  Q.  Did you look through the campaign committee D-2's for 2008

8  to see if there were any expenses listed on the D-2's that were

9  not contained in the campaign records?

10  A.  I did.

11  Q.  Did you find any?

12  A.  I did.

13  Q.  Looking at page 23 of the chart.

14        How many such items did you find?

15  A.  Three.

16  Q.  What was the total amount of those three items?

17  A.  $2,867.84.

18  Q.  Did you subtract that figure from the total amount of

19  campaign checks written from Mr. Beaver's campaign funds to

20  himself for 2008?

21  A.  I did.

22  Q.  Were you done there?

23  A.  No.

24  Q.  What else did you look for?

25  A.  Other items that were deposited into the campaign fund

1    accounts.

2    Q.  Did you find any?

3    A.  Yes, I did.

4    Q.  Would you look at page 24, the last page of Summary Chart

12:01:19    5    10.

6            MR. GETTER:  If we could blow that up, please.

7    BY MR. GETTER:

8    Q.  Could you describe what these items were?

9    A.  The first items were personal checks written from

12:01:31    10   Mr. Beavers' personal accounts into Friends For William

11   Beavers, it was check 4072 and check 710, and then there was

12   also cash deposited into Friends For William Beavers in 2008.

13   Q.  And what was the total amount of those four items?

14   A.  $11,000.

12:01:50    15   Q.  Did you then subtract that 11-thousand-dollar figure from

16   the total amount of checks from the campaign funds to

17   Mr. Beavers for 2008?

18   A.  I did.

19   Q.  For the cashed checks without any explanation, the blank

12:02:12    20   check stubs, did the fact that the check stubs were blank

21   affect your ability to determine what was done with the cash?

22           MR. GOLDSTEIN:  Objection.

23           THE COURT:  Overruled.

24   BY THE WITNESS:

12:02:25    25   A.  Yes, it did.

BY MR. GETTER:

Q.  How did it affect your ability to determine what was done
with the cash?

A.  It impaired my ability to determine what happened with the
cash.

Q.  Did that make it harder to determine whether the cash from
the check was campaign related versus personal use?

A.  Yes.

MR. GOLDSTEIN:  Objection.

THE COURT:  Read that one back.

(Question read.)

THE COURT:  Overruled.

(Answer read.)

BY MR. GETTER:

Q.  For the cashed checks where the check stubs said "void,"
did the fact that the check stubs said "void" affect your
ability to determine what was done with the cash from those
checks?

A.  Yes.

Q.  How did it affect your ability to do that?

A.  It impaired my ability to find out what happened with the
cash at the time the check was cashed.

Q.  With the cashed checks where the check stubs said they were
for expenses that didn't happen until months later after the
check was written and cashed, did that affect your ability to

1 determine what was done with the cash from the checks?

2 A. Yes, it did.

3 Q. How did it affect your ability to do that?

4 A. The cash was -- the check was cashed one day date and then

12:03:46 5 the invoice was at a much later date.

6 Q. Could you go back to page 1 of Summary Chart 10.

7      In the bottom line --

8      MR. GETTER: If you could blow that up, please.

9 BY MR. GETTER:

12:04:14 10 Q. The bottom line of this chart, I believe you said that that

11 represents cash remaining in Mr. Beavers' possession based on

12 your income analysis, correct?

13 A. Correct.

14 Q. And based on the assumption that you gave Mr. Beavers

12:04:29 15 credit for everything you found whether you knew it was

16 campaign related or not?

17 A. Correct.

18 Q. For 2006 what was the total amount that you determined

19 could not be -- could not be anything but personal use?

12:04:46 20 A. 1,000 --

21      MR. GOLDSTEIN: Objection, Your Honor.

22      MR. GETTER: I can rephrase that, Judge.

23 BY MR. GETTER:

24 Q. Given your assumptions, Agent Ponzo, what was the total

12:04:57 25 amount from 2006, of these 100 checks--I'm not talking about

1    the $68,000, I'm not talking the Cook County Contingency

2    Fund--for these 100 checks what was the total amount in 2006

3    that you could not tie to any possible campaign-related

4    expenses based on the campaign records?

12:05:17   5    A.  $1,482.67.

6    Q.  For 2007, based on those same assumptions, in the 100-check

7    analysis, how much money was left after your income analysis

8    that you could not attribute to any possible campaign-related

9    expense based on the campaign's records?

12:05:38   10   A.  $14,150.62.

11   Q.  For 2008, what was that figure?

12   A.  $14,552.11.

13   Q.  Did you total the figure for all three years?

14   A.  I did.

12:05:52   15   Q.  What was that figure for all three years?

16   A.  $30,185.40.

17   Q.  Agent Ponzo, if a person underreports the amount of his

18   income, does that affect the IRS's ability to determine the

19   amount of taxes owed?

12:06:13   20        MR. GOLDSTEIN:  Objection, Your Honor.

21        THE COURT:  Overruled.

22   BY THE WITNESS:

23   A.  Yes, it does.

24   BY MR. GETTER:

12:06:19   25   Q.  In reviewing the campaign and bank records, did any of the

1   100 campaign checks have any -- excuse me, have anything on the

2   memo line saying that the check was a loan to Mr. Beavers?

3   A.  No, they did not.

4   Q.  Did any of the check stubs for those 100 checks say that

12:06:38  5   the check was a loan to Mr. Beavers?

6   A.  No, they did not.

7   Q.  Did any of the campaign disclosure reports list any of

8   those 100 checks as loans to Mr. Beavers?

9   A.  No, they didn't.

12:06:49  10  Q.  Did any of the campaign disclosure statements for 2006

11   through 2008 use the word "loan" at all?

12   A.  No.

13   Q.  Did you find any loan agreements between Mr. Beavers and

14   any of the campaign committees?

12:07:01  15  A.  No, I didn't.

16   Q.  Did you find any promissory notes between Mr. Beavers and

17   the campaign committees for 2006 to 2008 again?

18   A.  No, I didn't.

19   Q.  Did you find any document indicating that Mr. Beavers paid

12:07:16  20  interest on the campaign money he took in 2006 to 2008?

21   A.  No, I didn't.

22   Q.  Did you find any document reflecting a commitment for

23   Mr. Beavers to pay back the campaign money within a certain

24   period of time that was made at the time he took the money?

12:07:34  25  A.  No, I didn't.

1  Q.  Did you find any document at all that reflected a

2  commitment from Mr. Beavers to pay back money from any of the

3  100 campaign checks that was made at the time he took the

4  money?

12:07:46   5  A.  No, I didn't.

6  Q.  And, finally, Agent Ponzo, did you find any document of any

7  kind reflecting that Mr. Beavers was obligated to pay back any

8  of this campaign money at the time he took the money?

9  A.  No.

12:08:00   10  MR. GETTER:  Your Honor, could we have a brief

11  sidebar, please?

12  THE COURT:  You may.

13  (Proceedings heard at sidebar on the record.)

14  THE COURT:  Go ahead.

12:08:30   15  MR. GETTER:  We decided not to put in Summary Chart

16  11, the tax due and owing, and not to have Agent Ponzo testify

17  about it.

18  THE COURT:  Okay.

19  MR. GETTER:  So those things are still in the exhibit

12:08:41   20  binders.

21  THE COURT:  You can take them out.

22  MR. GETTER:  Okay.  Great.

23  THE COURT:  Are we done?

24  MR. GETTER:  We are.

25

Ponzo - direct by Getter

736

1       THE COURT:  Good.  We are going to break for lunch.

2       You should say "that's all."

3       MR. GETTER:  I will do that.

4   (Proceedings resumed within the hearing of the jury:)

12:09:16   5       MR. GETTER:  No further questions.

6       THE COURT:  We're going to break now.  We will resume

7   sometime between 1:00 and 1:10.

8       THE MARSHAL:  All rise.

9   (The following proceedings were had out of the

12:09:25   10    presence of the jury in open court:)

11      MR. GETTER:  What time, Judge?

12      THE COURT:  Between 1:00 and 1:10.  We're adjourned.

13

14  (Luncheon recess taken from 12:10 o'clock p.m. to 1:10

12:10:01   15    o'clock p.m.)

16

17          *    *    *    *    *    *    *    *

18

19

20  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

22

23

24      /s/Blanca I. Lara                    date

25