IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,    )
                             )    No.  12 CR 124
          Government,        )
                             )
Vs.                          )    Chicago, Illinois
                             )
WILLIAM BEAVERS,             )    March 20, 2013
                             )
          Defendant.         )    8:28 o'clock a.m.

VOLUME 5
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL
AND A JURY

For the Government:

            THE HONORABLE GARY S. SHAPIRO,
            UNITED STATES ATTORNEY
            BY: Matthew Michael Getter
                Carrie E. Hamilton
                Debra Riggs Bonamici
                Samuel B. Cole
            Assistant United States Attorneys
            219 South Dearborn Street
            Suite 500
            Chicago, Illinois   60604
             (312) 353-5300

For the Defendant:
            KAPLAN & SOROSKY
            BY:  Sheldon M. Sorosky
            158 West Erie
            Chicago, Illinois 60610
            (312) 640-1776


            Court Reporter:

            Blanca I. Lara, CSR, CP, RPR
            219 South Dearborn Street
            Room 2504
            Chicago, Illinois 60604
             (312) 435-5895

1   Appearances (continued:)

2

3   For the defendant:

4                           OFFICES OF AARON B. GOLDSTEIN
                            BY: Aaron Benjamin Goldstein
5                           6133 South Ellis
                            Chicago, Illinois 60637
6                           (773) 752-6950

7                           OFFICES OF LAUREN FAUST KAESEBERG
                            BY:  Lauren Faust Kaeseberg
8                           2140 N. Lincoln Park West
                            Suite 307
9                           Chicago, Illinois 60614
                            (773) 517-0622

10
                            LAW OFFICE OF SAMUEL E. ADAM
11                          BY:  Samuel Forbes Adam
                                 Samuel Adam, Jr.
12                          6133 South Ellis Avenue
                            Suite 200
13                          Chicago, Illinois 60637
                            (312) 726-2326

14

15
                            Henderson Adam, LLC
16                          BY:  Victor P. Henderson
                            The Insurance Center Building
17                          330 South Wells, Suite 1401
                            Chicago, Illinois 60606
18                          (312) 262-2900

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2     WITNESS                                          PAGE

3     BARRY GERSHINZON

4     Direct Examination By Mr. Henderson..................921

5     Voir Dire Examination By Mr. Henderson..............952

6     Voir Dire Examination By Mr. Cole...................963

7     Further Voir Dire Examination By Mr. Henderson......965

8     Further Voir Dire Examination By Mr. Cole...........967

9     Further Voir Dire Examination By Mr. Henderson......975

10

11

12    EXHIBITS

13        ..................................................

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        (The following proceedings were had out of the

 2         presence of the jury in open court:)

 3             THE COURT:  Whoever wants to can come to the

 4         lectern.

 5        (Brief pause).

 6             MR. GOLDSTEIN:  Good morning, Your Honor.

 7             MR. COLE:  Good morning, Your Honor.

 8             Maybe before we do the jury instructions we could talk

 9    about the expert.  I think there's still some outstanding

10    disagreements we have with the scope of his testimony.

11             THE COURT:  What instructions are agreed to?

12             MS. BONAMICI:  Your Honor, and Lauren can check me, 1,

13    2 and 3 are agreed to, 4 is agreed to as modified.

14             THE COURT:  How is it modified?

15             MS. KAESEBERG:  I think 4 is agreed to.

16             MS. BONAMICI:  Pardon me?

17             MS. KAESEBERG:  I think 4 is agreed to.

18             MS. BONAMICI:  Your Honor, I'll pass up a set of

19    modified instructions.

20             THE COURT:  So are we striking judicial notice?

21             MS. BONAMICI:  Correct.

22             THE COURT:  Okay.  What is next?

23             MS. BONAMICI:  5 is agreed to as modified, adding the

24    first sentence of the pattern, that was the modification.

25             (Brief pause).
```

08:27:09 (line 5)
08:27:30 (line 10)
08:28:04 (line 15)
08:28:15 (line 20)
08:28:34 (line 25)

1      THE COURT:  Okay.

2      MS. BONAMICI:  6 is agreed to.

3      7 is agreed to.  There was some modification.  We

4  removed the brackets around the second paragraph because the

08:29:12    5  defendant does intend to put on a case.

6      THE COURT:  Okay.

7      MS. BONAMICI:  8 is still holding.  We have not been

8  told so far whether the defendant has decided to testimony.

9      You have an answer to that?

08:29:29  10      MS. KAESEBERG:  Not at this time.

11      MS. BONAMICI:  So 8 is on hold, then.

12      THE COURT:  Right.  As it usually is.

13      MS. BONAMICI:  9 is agreed to as modified.  We removed

14  the last factor which related to inconsistent statements of

08:29:44  15  witnesses.

16      THE COURT:  Yes.

17      MS. BONAMICI:  10 is agreed to.  11 is still in the

18  packet but is withdrawn.  11 related to inconsistent

19  statements, it's withdrawn by the government.

08:30:00  20      THE COURT:  Yeah.

21      MS. BONAMICI:  12 is --

22      THE COURT:  Wait.  Wait.  Wait.

23      MS. BONAMICI:  I'm sorry, Judge.

24      THE COURT:  I'm just making little notes.

08:30:06  25

1        (Brief pause).

2              THE COURT:  Okay.  12?

3              MS. BONAMICI:  12 is on hold.

4              THE COURT:  Yeah.

08:30:14    5              MS. BONAMICI:  13 is on hold.  We didn't make any

6    modifications to this.  This is going to be dependent on what

7    you decide with respect to the expert, potentially.

8              14 is agreed to as modified.  We took the last part of

9    this sentence out because there were summaries where we didn't

08:30:38   10    admit the exhibits, so it's confusing.  So it's just simpler

11    now.

12              THE COURT:  Okay.

13              MS. BONAMICI:  And that's agreed to as modified.

14              15 is agreed to.  16 is agreed to.  17 the defendant

08:31:01   15    objects.  18 --

16              THE COURT:  Wait.  Wait.  Wait.

17              MS. BONAMICI:  And my understanding is you just want

18    to pass --

19              THE COURT:  Yeah, we're just passing them.

08:31:15   20              MS. BONAMICI:  Okay.

21              THE COURT:  Okay.  Next?

22              MS. BONAMICI:  18 is my understanding that the

23    defendant plans on offering a modification.  We haven't seen

24    that yet.

08:31:27   25              MS. KAESEBERG:  I thought you were going to decide --

1    MS. BONAMICI:  Oh, and we did.  Actually we made a

2  modification and the defendant has suggested that --

3          Are you going to add?

4          MS. KAESEBERG:  That was when we were going to decide

08:31:39    5  so if it's changed --

6          MS. BONAMICI:  No, I'm sorry, I got it wrong.  It's my

7  understanding that 18 is agreed to as modified.

8          MS. KAESEBERG:  Correct.  Yes.

9          THE COURT:  Okay.

08:31:54    10         Numerically, we're halfway through, but it's only

11  numerically.

12         MS. BONAMICI:  Actually there's a lot of agreed

13  instructions.  You'll be shocked by this.

14         MS. KAESEBERG:  It's very reasonable.

08:32:10    15         MS. BONAMICI:  19 is agreed to.  20 there's an

16  objection.  And at this point the government would withdraw 20

17  subject to hearing the defense case and the arguments.  So this

18  is something, actually, that we would like to hold.

19         THE COURT:  Okay.  So I have 17 and 20 --

08:32:34    20         MS. BONAMICI:  Pardon me?

21         THE COURT:  I have 17 and 20 are in the holding

22  corral.

23         MS. BONAMICI:  13 is also holding and 8 and 12.  8 and

24  12 relate to the defendant's testimony --

08:32:47    25         THE COURT:  Yeah.  Right.  That's a different issue.

1    MS. BONAMICI:  Okay.

2         21, there's an objection.

3    THE COURT:  What?

4    MS. BONAMICI:  Objection.

08:32:59    5    THE COURT:  21.  Okay.

6    MS. BONAMICI:  And 22 is the one that I was speaking

7  about before.  It's my understanding that the defendant may

8  offer a modification, but we haven't gotten it yet so I don't

9  if that's for sure.

08:33:14    10    MS. KAESEBERG:  No, 22 is agreed.  That's the elements

11  instruction.

12    MS. BONAMICI:  I thought you wanted to add something

13  here.

14    MS. KAESEBERG:  No, we're not.

08:33:23    15    MS. BONAMICI:  Okay.  So never mind.

16    THE COURT:  22 is okay.

17    MS. BONAMICI:  Agreed.

18    MS. KAESEBERG:  Yes.

19    MS. BONAMICI:  Okay.  Nice.

08:33:28    20         23 is agreed.  24 is agreed.  25 there was an

21  objection, but it was subject to the possibility that it might

22  be okay when a loan instruction was added.  We've added a loan

23  instruction at this point, but we don't think that Lauren has

24  had a chance to review it.

08:33:53    25    MS. KAESEBERG:  We haven't.

1          THE COURT:  All right.  We'll put it on hold.

2          MS. KAESEBERG:  Okay.

3          MS. BONAMICI:  29, the government has offered a

4     modified --

08:34:02  5          THE COURT:  Wait.  Wait.

6          MS. BONAMICI:  I'm sorry, 25.

7          THE COURT:  25.

8          MS. BONAMICI:  The government has offered a modified

9     instruction.

08:34:10  10         MS. KAESEBERG:  I think the numbers are off.  This is

11    the old 26 that you withdrew and then --

12         MS. BONAMICI:  You're right.  There's a mistake.

13         MS. KAESEBERG:  Okay.

14         MS. BONAMICI:  So on page 29 of the modified

08:34:21  15    instructions, government instruction 26 is improperly

16    designated as government instruction number 25.

17         THE COURT:  Okay, I have two 25's here.

18         MS. BONAMICI:  Correct.  The first one is actually 25

19    and the second one is actually 26.

08:34:38  20         THE COURT:  That's what I thought you were saying, I

21    was just wanted to be sure.

22         26 is?

23         MS. KAESEBERG:  Objection to that.

24         THE COURT:  Okay.

08:34:47  25         26 A?

1          MS. BONAMICI:  26 A is the loan instruction.

2          MS. KAESEBERG:  If we could just reserve on that one?

3  We haven't had a chance to look at it.

4          THE COURT:  Okay.  27?

08:35:02  5          MS. BONAMICI:  27 is -- there's an objection.

6          THE COURT:  27 is objected to?

7          MS. KAESEBERG:  Yes.

8          THE COURT:  Okay.

9          MS. BONAMICI:  28 was agreed.

08:35:16  10          THE COURT:  29?

11          MS. BONAMICI:  Agreed.

12          THE COURT:  30?

13          MS. BONAMICI:  Agreed.

14          THE COURT:  31?

08:35:26  15          MS. BONAMICI:  Agreed.

16          THE COURT:  32?

17          MS. BONAMICI:  Agreed.  And there's no objection to

18  the summary of charges or the verdict form.

19          THE COURT:  Let's go back to 8 and 12 so I understand

08:35:54  20  what it is we're waiting for.

21          MS. BONAMICI:  Okay.

22          THE COURT:  8 is obvious.

23          MS. BONAMICI:  Right.

24          THE COURT:  So let me make a note here.

08:36:21  25          And then 12?

1    MS. BONAMICI:  That's also dependent on the

2  defendant's decision to whether he testifies or not.

3    THE COURT:  Okay.  13, we need names of witnesses, is

4  that all we're waiting for or is this some other objection?

08:36:55  5    MS. BONAMICI:  There's no objection right now.  We are

6  holding this until we see where we're at with the expert.

7    THE COURT:  Okay.  So my list is 17 -- I'm leaving 20

8  on the list even though it seems to be just contingent on the

9  circumstance, but I want to go through it.

08:37:35  10    21, 25, 26, 26 A and 27, that's what we have.  Okay.

11  Let us start with 17 which I will read into the record:

12    "If a defendant knowingly causes the acts of another,

13     then the defendant is responsible for those acts as

14     though he personally committed them."

08:38:01  15    Now the government is going to say something which

16  would cause them to want this instruction.

17    MS. BONAMICI:  I'm sorry, Your Honor?

18    THE COURT:  I'm assuming that the prosecution is going

19  to say something in closing argument --

08:38:18  20    MS. BONAMICI:  Right, Your Honor.

21    THE COURT:  -- which makes this instruction desirable

22  to the prosecution.

23    MS. BONAMICI:  That's correct.

24    THE COURT:  Enlighten me.

08:38:26  25    MS. BONAMICI:  And what we're going to say is that the

1    defendant is responsible for the acts of his tax preparer, as

2    well as the treasurers who prepared the D-2's and the other

3    documentation that was relied upon by the government during the

4    trial.

08:38:46    5    MS. KAESEBERG:  And our position on this is that the

6    elements instruction includes a clause that states that if the

7    defendant caused to be filed the income tax returns and that

8    that's sufficient, that this places undue emphasis on this

9    noncriminal act.

08:39:05    10    THE COURT:  What is the insertion that you are

11    referring to, by number?

12    MS. KAESEBERG:  So it would be number 22.

13    THE COURT:  Okay.

14    MS. KAESEBERG:  Paragraphs 1 and 5.

08:39:33    15    (Brief pause).

16    THE COURT:  Does this leave out the D-2's, is that a

17    source of your concern?

18    MS. BONAMICI:  Yes, Your Honor.  The treasurer has

19    filled out the check stubs, they filled out the D-2's.

08:40:37    20    THE COURT:  Yeah.  I'm overruling the objection.  So

21    17 is given over objection.

22    Okay.  Number 20, you want to see what they say?

23    MS. BONAMICI:  Exactly.  So this one we would ask to

24    reserve a discussion on until after we have gotten through the

08:41:18    25    defense case and the arguments.

1       THE COURT:  Okay.  The next one I have in my list is

2  21.

3       MS. KAESEBERG:  Our objection here is that, first,

4  that there's no unanimity requirement.  That the jurors may

08:41:54  5  disagree as to which act they believe is part of the corrupt

6  endeavor and that that's improper, and as well as that the

7  cases cited referenced duplicity problems and that it's our

8  belief that this instruction does not solve that problem.

9  Yeah, that's our objection.

08:42:33  10       THE COURT:  I found this.

11    (Brief pause).

12       THE COURT:  So these are issuance of checks from

13  campaign committees to defendant, false representation, then

14  falsely represented the use of the checks, falsely represented

08:43:09  15  checks were used to pay campaign expenses that were incurred

16  later, defendant masked his personal use to campaign committee,

17  masked personal use to increase pension annuity, false campaign

18  records, failed to report his personal use of discretionary

19  Cook County funds filed post tax returns.  So that is 1, 2, 3,

08:43:49  20  4, 5, 6, 7 acts, is that correct?

21       MS. BONAMICI:  I think that might be right.  I didn't

22  count them, Judge.

23       The government's position is that those acts are means

24  by which the defendant could commit the crime rather than

08:44:10  25  specific alternative options for satisfying --

1    THE COURT:  So unanimity is not required.

2    MS. BONAMICI:  Correct, Your Honor.  And, therefore,

3    it is proper for the jury to be instructed that they need not

4    find all of them and it is proper for the jury not to be

08:44:27    5    instructed that --

6    THE COURT:  Is this discussed in the decided

7    instructions -- in decided cases?

8    MS. BONAMICI:  In Pansier the case involved the

9    question of whether there was duplicity caused by the fact that

08:44:41    10    the government had charged both of the branches of 7212, the

11    retaliation branch and the omnibus clause, which is the only

12    thing that's charged in this case.  And the Court held that

13    there was no problem with duplicity because only the omnibus

14    clause was pursued at trial and those were multiple acts

08:45:05    15    associated with the omnibus clause.  The fact that there was

16    not a charge of both retaliation and a charge of conduct under

17    the omnibus clause, there was no problem.

18    THE COURT:  You have a competing precedent?

19    MS. KAESEBERG:  No.

08:45:21    20    THE COURT:  Okay.  Let me read it.

21    MS. BONAMICI:  Also I think you're probably familiar,

22    Judge, with U.S. v. Davis which discusses the distinction

23    between elements and means.

24    THE COURT:  Right.  So we're talking about 21.

08:45:40    25    MS. KAESEBERG:  While we're on this one, I just want

1   to alert the Court that we're going to move to strike portions

2   of the indictment and some of those means may be things that we

3   mean to strike.  And I know the government was going to prepare

4   a redacted indictment, potentially.  I'm not sure if that's

08:46:00  5   been done.  So if that influences the Court's determination --

6         THE COURT:  You want to tip your hand as to which one

7   of them you are going to --

8         MS. KAESEBERG:  We honestly don't have that completed

9   yet, but can give it to you soon; early this morning.

08:46:10  10         THE COURT:  Fine.

11         MS. BONAMICI:  This is a proposed redacted indictment,

12   Judge, and we have not redacted conduct from the 7212.  So if

13   that's an issue for the defendant, we're going to have to

14   discuss it.

08:46:26  15         THE COURT:  Yeah.  Right.

16         And why do we have this (indicating)?

17         MS. BONAMICI:  That's the redacted one.

18         THE COURT:  Oh, that's the redacted one.  Okay.  I

19   see.  Sorry.

08:46:59  20         The next thing I have is 25, instruction number 25.

21         MS. KAESEBERG:  We discussed this yesterday.  When we

22   left, it was left as if the government provided an instruction

23   regarding loans and income that this may still be okay, but we

24   are going to object to this instruction number 25.  It's still

08:47:24  25   too broad.  We don't think that the other instructions that

1   have been provided cure the problem here.  It may even include

2   the term "broad" in this instruction, "income is broadly

3   defined and it includes such items as wages, profits from

4   business and other financial gains."  So this is vague and

08:47:40   5   broad and it doesn't necessarily aid the jury.

6          THE COURT:  Well, the guys who wrote the tax code --

7   and, historically, I don't remember much about the drafting of

8   the tax code, but I believe that most of the original work done

9   was done before I was born, and some of this stuff that

08:48:18   10   followed World War II was not yet able to read.  But I remember

11   having occasion to read in great detail the income tax law that

12   was passed by one vote in the State House and one vote in the

13   State Senate and signed by Governor Ogilvie.  And the one thing

14   that is characteristic of pretty much everyone and every state

08:48:58   15   is, income is broadly defined.  The whole purpose of it was to

16   get as much money as they possibly could.

17          And, basically, if you take a look at most of the

18   cases and the statutes, almost anything that comes into your

19   hand is income unless it's specifically exempted out.  So it is

08:49:34   20   classically the broad definition.

21          If it's of any interest to you, I'm going to do

22   something that is characteristic of older judges, I'm going to

23   tell a story that actually has a point and some relevance to

24   this, but ten years ago I wouldn't have told the story:  There

08:49:56   25   was something still happening in the state called a circuit

1   breaker.  You occupied property and there's a benefit given to

2   you if you're poor.  It turned out for a certain class of

3   people it was better if they didn't take the circuit breaker.

4   And the director of Public Aid, who later became Chief of

08:50:29   5   Staff, Arthur Quern, came to me and said "can we pass this law

6   that says they can give it back and it's not income to them."

7   My response to that was is if ever a government said to someone

8   that you could divest yourself of income even if your

9   possession of that income lasted one or two seconds, the entire

08:50:58   10   income tax structure would collapse because there would be

11   other legislation and people could give money back and say it's

12   not income.

13         So I think you realize that this is leading to my

14   acceptance of income as broadly defined, which is actually the

08:51:17   15   single most important four words of this instruction.

16         MS. BONAMICI:  Yes.

17         MR. GOLDSTEIN:  Just one note to that, Your Honor.  We

18   do have a sort of exclusive definitions, but we do have

19   definitions of income in the tax code in Section 61 and 63

08:51:34   20   talking about gross income and then, you know, minus deductions

21   and then it gives a list of what is not income.  In many ways,

22   I think that would be more accurate than to say it's just

23   broadly defined.

24         THE COURT:  And you are offering an instruction of

08:51:51   25   that?

1    MR. GOLDSTEIN:  Well, as far as --

2    THE COURT:  Do you mention this in your instructions?

3    MS. BONAMICI:  Do I -- I'm sorry?

4    THE COURT:  Do we have a proposed instruction?

08:52:04   5    MR. GOLDSTEIN:  I don't have a proposed instruction.

6    It's more of an added argument to the objection of this

7    instruction.  This instruction just says income broadly defined

8    and we do have in Section 61 and 63 that specifically lays out

9    what income isn't.

08:52:22   10    MS. BONAMICI:  Potentially, this statement comes from

11    the first line of Section 61 which defines income.  And what

12    I've done, actually, is reduced the number of examples given to

13    things that are just more, you know --

14    THE COURT:  I know you've reduced it.

08:52:41   15    MS. KAESEBERG:  Maybe if I could suggest that we draft

16    a proposed modification of this instruction?

17    THE COURT:  Yeah, why don't you.

18    MS. KAESEBERG:  Okay.

19    THE COURT:  You can modify yours if you would like to

08:52:53   20    as well.

21    26?

22    MS. BONAMICI:  This is the instruction erroneously

23    referred to as 25.

24    THE COURT:  Right.  I crossed out the 25 and written

08:53:15   25    26.  I know it is not the official submission.

1    MS. BONAMICI:  Okay.  You know, we were planning on

2 filing this electronically.  Would you like me to change it on

3 the electronic filing?

4         THE COURT:  Yeah.

08:53:29    5         MS. BONAMICI:  Okay.

6         THE COURT:  Okay.  I'll read it for the record:

7    "Money spent by a political organization, committee,

8     or a fund for an exempt function does not constitute

9     taxable income.  An exempt function means the

08:53:43   10     function of influencing or attempting to influence

11     the selection, election, nomination or appointment of

12     any individual to federal, state or local public

13     office.  On the other hand, if a defendant diverts

14     money belonging to a political organization,

08:53:57   15     committee or fund is diverted to his own personal

16     use, it is taxable income to him.  Personal use means

17     the use to which the individual receives a direct or

18     indirect financial benefit.  For example, if a

19     political organization pays a personal obligation of

08:54:19   20     a candidate for public office, such as the

21     candidate's personal credit card debt, the amount

22     paid is income to the candidate."

23         Okay.  Your objection?

24         MS. KAESEBERG:  Yes -- well, go head.

08:54:33   25         MS. BONAMICI:  Your Honor, there's some grammatical

1     errors in that as you read it out and also there is an

2     inconsistency between what you are reading and what I'm looking

3     at, so I'm a little confused by this.

4              THE COURT:  You want me to read it again?

08:54:48   5              MS. BONAMICI:  May I make a suggestion?

6              THE COURT:  Sure.

7              MS. BONAMICI:  Why don't I read it?

8              THE COURT:  Go ahead.

9              MS. BONAMICI:  (Reading:)

08:54:57  10        "... money spent by a political organization,

11         committee, or fund for an exempt function does not

12         constitute taxable income.  An exempt function means

13         the function of influencing or attempting to

14         influence the selection, election, nomination, or

08:55:11  15         appointment of any individual to any federal, state

16         or local public office.  On the other hand, money

17         belonging to --" "... if money belonging to a

18         political organization --"

19              THE COURT:  Okay.  Stop.

08:55:23  20     (Brief pause.)

21              THE COURT:  Okay.  Keep going.

22              MS. BONAMICI:  (Reading:)

23        "...  if money belonging to a political organization,

24         committee or fund is diverted to a candidate's own

08:55:41  25         personal use --"

1    THE COURT:  Wait.  Stop.

2    (Brief pause).

3    THE COURT:  Go ahead.

4    MS. BONAMICI:  (Reading:)

08:55:52    5    "... it is taxable income to him.  'Personal use'

6    means a use from which the individual receives a

7    direct or indirect financial benefit.  For example,

8    if a political organization pays a personal

9    obligation of a candidate for public office, such as

08:56:07    10    the candidate's personal credit card debt, the amount

11    paid is income to the candidate."

12    THE COURT:  Okay.  It doesn't change.  What I did is I

13    took out four words and inserted "a" and "candidates" in the

14    second line.  I don't think it makes a difference.  So that's

08:56:32    15    the offered instruction.

16    Now?

17    MS. KAESEBERG:  We object to this instruction.  We

18    would request some time to just look at these cases and see if

19    we can come back to the Court with language that we would might

08:56:45    20    change.

21    THE COURT:  You are welcome to try.

22    MS. KAESEBERG:  Okay.

23    THE COURT:  26 A, this is the loan instruction.  I'll

24    read this for the record, too:

08:57:18    25    "When a taxpayer receives a loan, incurs an obligation

08:57:36

1    to repay that loan.  Because of that obligation,
2    proceeds of a genuine loan do not constitute income.
3    The transfer of money from one party to another
4    constitutes a genuine loan only if the parties to the
5    transaction intend that the person who receives the
6    money be genuinely obligated to repay it.  In
7    determining whether the defendant has received
8    particular funds as a loan or as income, you should
9    consider all the surrounding facts and

08:57:54

10    circumstances."
11         I have this vision of the defendant deposing himself
12    when he's on both sides of the case, but let's leave that to
13    one side.
14         MS. BONAMICI:  Is that true?

08:58:14

15         MS. KAESEBERG:  It's a mirror.  All a mirror.
16         THE COURT:  Yeah, a vision.  There was -- I think Jim
17    Carrey had a movie --
18         MR. GOLDSTEIN:  Liar liar.
19         THE COURT:  -- where he was the lawyer or he's

08:58:27

20    cross-examining himself.
21         MS. KAESEBERG:  We are going to object to this and
22    would like time to --
23         THE COURT:  Submit an alternate?
24         MS. KAESEBERG:  Yes.  And just to flag what I think

08:58:39

25    our issue is is the use of the word "genuine."  So that's

 1    probably what our issue will be, but we'll submit something to

 2    the Court.

 3         MR. GOLDSTEIN:  The Tufts case is the case that we

 4    will be citing on.  The government has indicated that Tufts or

 5    CIR case that we want to look at, but this isn't -- in Tufts, I

 6    don't believe genuineness was the language used.

 7         MS. BONAMICI:  I think "bona fide" is the language

 8    used in Tufts.  When I had a choice of "bona fide" and

 9    "genuine," I thought "genuine" was more juror-friendly.

10         THE COURT:  If that's what you wind up with, I'll

11    think about it, but I'm not going to think about it until I get

12    a proposal from you.

13         MS. BONAMICI:  Your Honor, just so that we know,

14    obviously the loan instruction is going to be potentially

15    affected by the defense case and the arguments that we see.

16         THE COURT:  Right.  Yes.

17         MS. BONAMICI:  So the only thing the government would

18    say is that we would like to reserve the right to come back to

19    this ourselves if something happens later in the case changes

20    our view of what's needed here.

21         THE COURT:  Okay.  No, that's fine.

22         Okay.  In fact, the last thing I have on the list of

23    things to discuss is 27 which reads:

24         "In order to prove a charge of filing a false tax

25           return, the government does not need to prove the

1 existence of tax deficiency or a loss to the

2 governmental."

3  MS. KAESEBERG:  Our objection, for the record, on this

4 one is that the elements instructions sufficiently tell the

5 jury what the government needs to prove and it's not necessary

6 to tell the jury what the government need not prove in this

7 instruction, and that's our objection on this one.

8  THE COURT:  The answer is, I will give this

9 instruction depending on what is said in closing argument.  So,

10 basically, unless -- or to put it another way, unless the

11 defense makes a closing argument of the kind that I don't

12 anticipate it would make, I'm giving this.  In other words, I

13 think that the defense has to -- "has to" is the wrong word.

14 It is desirable I think for the defense in the context of this

15 case to suggest that we're not talking about money here, we're

16 talking about some return that was filed and all of this was an

17 honest mistake, and you can tell it was an honest mistake

18 because it didn't put any money in his pocket, which is exactly

19 what they're trying to tell you in this instruction is not a

20 defense.  Terrific thing to say if you're sentencing somebody,

21 but it doesn't work very well for the elements of the offense.

22 It's possible that the defense might not approach that, but I'm

23 thinking they will and we can address it at the time.

24  MS. BONAMICI:  Right.  The government would like to

25 speak to that because we also think that there's been things

1  that have been said already that suggests need for it

2  regardless of what is actually said in closing.

3       THE COURT:  All right.  So I think we're in pretty

4  good shape here.

09:02:36  5       MS. KAESEBERG:  Thank you, Your Honor.

6       MS. BONAMICI:  Thank you.

7       THE COURT:  Anything else we have to deal with?

8       MR. COLE:  We would like to deal with their expert's

9  scope of the testimony, Your Honor.

09:02:52  10       MR. GOLDSTEIN:  Your Honor, on the issue of the

11  expert, Mr. Henderson is the one that will be doing the direct

12  examination.  He's just down the hall.  Can I go get him and we

13  can discuss it?

14       THE COURT:  Absolutely.

09:03:04  15       MR. GOLDSTEIN:  Thank you.

16     (Brief pause).

17       MR. COLE:  I think we're ready now.

18       THE COURT:  Okay.

19       MR. COLE:  I think a couple of issues, Your Honor,

09:07:00  20  with respect to the potential testimony of their expert.  First

21  of all, most basically is what we have already discussed, which

22  is whether he will discuss what the defendant told him,

23  specifically that the defendant told him these were loans.  I

24  think Your Honor has already indicated that was out of bounds.

09:07:19  25       MR. HENDERSON:  He does not intend to testify, as far

1  as his opinion, what Commissioner Beavers told him about how

2  certain transactions should be viewed or reported.

3        MR. COLE:  No, I heard a caveat of, that that was part

4  of his opinion.  I assume he just means it all.

09:07:40   5        MR. HENDERSON:  No, I didn't say it all.  He has an

6  opinion about whether they're loans, it's just not based on

7  whether -- not based on --

8        THE COURT:  Okay.  Which is what you said to me when

9  we met outside the presence of the prosecution.  What's he

09:07:54  10  going to base it on?

11        MR. HENDERSON:  Based on his review of records, based

12  on what he see, based on what he doesn't see, based on his

13  experience, based on the difference between loan and based on

14  income.  They have different characteristics.

09:08:09  15        THE COURT:  And he's doing this solely on the basis of

16  what he sees in paper?

17        MR. HENDERSON:  No; A, based on his experience; B, on

18  what he sees in paper; C, in terms of what he does not see.

19  Also what he sees and doesn't see based on his experience.

09:08:27  20        MR. COLE:  We don't know what that experience means.

21  He never -- it was not anything that came out in his report

22  or --

23        THE COURT:  I got that part.

24        What's he going to say?

09:08:36  25        MR. HENDERSON:  What's he --

1      THE COURT:  How is he going to say it?

2      MR. HENDERSON:  He's going to say that based on

3  everything that he has reviewed and what he has not seen, in

4  his experience, that he believes --

09:08:45    5      THE COURT:  Right.  But how is he going to get to that

6  conclusion?

7      MR. HENDERSON:  Well, any number of ways.  Number one,

8  and I'll just give some simple examples, when get paid from

9  your employer and you get a check at the end of the week, you

09:09:01   10  don't give that back, so therefore that is characterized as

11  income and it goes on your W-2.  Conversely, if your employer

12  gives you $200 because you're going to go buy things for a

13  campaign, then either, A, you have to return the money back or,

14  B, you have to return the expense -- I'm sorry, the receipts.

09:09:24   15  So, therefore, that would be either a loan or an advance.

16      So it's not just -- so based on the way the

17  transaction looks is what the expert will view to make a

18  determination as to whether it's a loan or an advance.

19      Here is another example, a gift.  So the Internal

09:09:53   20  Revenue Code defines income in the negative, meaning that

21  there's a specific section in the tax code that says income is

22  everything but these things.  So income does not include a

23  gift, income does not include a loan, income does not include

24  an advance.  And so then you have to indicate what's a loan or

09:10:14   25  what's a gift or what's an advance, and they all look certain

1  ways.

2         THE COURT:  Okay.  Now, we're not dealing with a gift

3  here, he's not going to testify that anything is a gift, is

4  that right?

09:10:26  5         MR. HENDERSON:  Well, he's not going to testify that

6  is a gift, however, he is going to indicate that, just

7  generally speaking, that a cash transaction can be any number

8  of things, not just income, not just loan --

9         THE COURT:  Okay.  So he says it could be a gift, it

09:10:38  10  could be a loan, it could be an advance.

11         MR. HENDERSON:  Correct.

12         THE COURT:  And --

13         MR. HENDERSON:  Or it can be income.

14         THE COURT:  Yeah, or income.

09:10:46  15         And in this case, he's going to say things were either

16  loans or advances?

17         MR. HENDERSON:  Correct.

18         THE COURT:  Is he going to say that anything was a

19  gift?

09:10:56  20         MR. HENDERSON:  No.

21         THE COURT:  Okay.  And he's going to reach the

22  conclusion that it is a loan because?

23         MR. HENDERSON:  Loan or an advance.

24         THE COURT:  Yeah, but it's loan or advance because?

09:11:14  25  What are his factors?

1        MR. HENDERSON:  What are his factors?

2        THE COURT:  Yeah.

3        MR. HENDERSON:  What makes it a loan or an advance --

4  what would make it an advance would be the return of receipts.

09:11:24    5  What would make it a loan -- and, again, Judge, I'm not the

6  expert, so I'm just giving you my best understanding.

7        THE COURT:  Yeah.  Because I'm only asking you what

8  he's going to say.

9        MR. HENDERSON:  Right.  What would make it a loan

09:11:35   10  would be the return of money, what would make it income would

11  be the money is not returned.  What would make it income is the

12  provision of the W-2's.  What would make it a loan, it would be

13  any number of things that could make it a loan.  A loan would

14  indicate that is a loan, the return of money could indicate

09:11:53   15  that is a loan, an oral agreement between parties would make it

16  a loan.  What would make an advance would be the provision of

17  cash with specific expenses when money comes back, what would

18  make it income is cash for services rendered.  So all of those

19  things are things just not the form, it's also the substance.

09:12:17   20        THE COURT:  Okay.  Just to make it a little more

21  specific, what I'm asking is, on what is he going to rely to

22  opine that probably most, if not all, of the transactions were

23  loans in this case?  Not in theory, but in this particular case

24  what are the facts he relies upon to reach that opinion?

09:12:50   25        MR. HENDERSON:  Well, Judge, at least three things.

1      THE COURT:  Okay.

2      MR. HENDERSON:  One, the checkbook; two, the checks;

3  three, bank statements from both the Commissioner and the

4  campaign; four, the government's calculations as provided by

09:13:14   5  Mr. Ponzo that there were money flowing back and forth between

6  accounts or parties, none of which has to do with anything that

7  the Commissioner said.  You look at the books and records and

8  make a determination at what he believes they are based on the

9  documents supporting the transactions.

09:13:38  10      THE COURT:  And what does he use the checkbook for?

11      MR. HENDERSON:   The checkbook includes notations on

12  the stubs.

13      THE COURT:  So it's the stub notations.

14      MR. HENDERSON:  Stub notations.  What's on the check.

09:13:56  15      THE COURT:  Face of the check.

16      MR. HENDERSON:  Bank statements, both for a campaign

17  and for the Commissioner, so separate bank accounts.

18      THE COURT:  Okay.  And money flowing back and forth,

19  what's that refer to?

09:14:30  20      MR. HENDERSON:  If there was an advance or money given

21  to the Commissioner in any form, then either, A, he returned

22  the receipts, or B, he returned the cash.  So the receipts

23  would make it an advance -- or even cash would make it an

24  advance.  So, for example, if the campaign gives you $1,000 to

09:14:52  25  go and buy food for campaign workers and you come back with a

1  receipt for $900 and you give back $100 cash, then that's

2  indicative of an advance because, again, you had a purpose in

3  mind.  Conversely, a loan is the campaign gives you $1,000, you

4  don't really specify what it's for, and then you give it back.

09:15:13  5  THE COURT:  Okay.  My final question is this, maybe

6  the government will have other ones:  Is he going to speak as

7  someone who says "based on stub notations, face of the check, I

8  have determined with respect to each specific transaction that

9  this was a loan," or I guess, in theory, not a loan, but I

09:15:49  10  don't think he's going to say that, or is he going to opine

11  that this is the way the jury ought to approach it?

12  MR. HENDERSON:  No, I don't think that he's going to

13  opine that the jury should approach it that way, I think he's

14  just going to indicate that that's his opinion.  I mean, it

09:16:10  15  goes further than that, but that's just step one.

16  THE COURT:  Okay.  Well, tell me about the further

17  stuff.

18  MR. HENDERSON:  Well, then the issue becomes, because

19  this is, ostensibly, a tax case, then the issue becomes what's

09:16:21  20  the tax treatment for a loan versus an advance versus a gift

21  versus income.  The tax treatment for all of them is different.

22  THE COURT:  Yeah, but that's like a minute of

23  testimony.

24  MR. HENDERSON:  Well, the whole point is that the

09:16:35  25  government's contention is that the tax return was improperly

1   filled out for an untoward advantage and so therefore the

2   characterization of the --

3         THE COURT:  What's actually fairly important for me to

4   know is is he going to go through each check?

09:16:52   5         MR. HENDERSON:  No.

6         THE COURT:  Okay.  You have questions?

7         MR. COLE:  I think we have a pretty clear idea of what

8   he intends the expert to do, which is essentially give an

9   opinion which is really the ultimate question for the jury,

09:17:10   10   which is whether or not these are loans.  The government would

11   object to that.

12         MR. HENDERSON:  That's not the ultimate question for

13   the jury.  The ultimate question for the jury is whether or not

14   Mr. Beavers intended to improperly fill out his tax returns to

09:17:24   15   get some unfair advantage.  People make mistakes on tax returns

16   all the time.  There're honest mistakes, they're innocent

17   mistakes, mistakes made from not knowing --

18         THE COURT:  Well, we'll hear what the expert has to

19   say, the jury can hear what the expert has to say.  I'm not

09:17:43   20   exactly sure what the expert has to add to the general

21   statement that a loan is not income.  He's not going to get

22   specific with each check.  So he's basically talking about a

23   guide, and when he's doing that he can be cross-examined as to

24   whether he's got an opinion as to any specific transaction.

09:18:32   25         MS. BONAMICI:  Your Honor, the one thing that I would

1      point out is that a substantial part of what is being relied on

2      here is really nothing more than hearsay statements of the

3      defendant, sometimes double hearsay, where they're repeated by

4      the treasurers.  So, basically, what's happening here is by

09:18:51    5      doing this, the expert is able to relay these hearsay

6      statements which might be all right, I mean, it's not that an

7      expert can't rely on hearsay, but in this particular case he's

8      doing that, number one, to get in the defendant's defense, but

9      number two, and more importantly, he's doing it in the way that

09:19:14   10      is no better than what the jury can do.

11           So this really isn't a question of specialized

12      knowledge.  As far as specialize knowledge and what his

13      experience is, it's my recollection that the expert testified

14      during the voir dire that his experience was this is the way

09:19:31   15      small businesses and politicians do it.  There was no -- there

16      is no basis for that view, even, and it doesn't strike the

17      government as being reliable in any way.

18           THE COURT:  But does he intend to say that?

19           MR. HENDERSON:  Does he intend to say what, Your

09:19:48   20      Honor?

21           THE COURT:  That this is the way politicians and small

22      businesses do it?

23           MR. HENDERSON:  Well, Your Honor, let me respond any

24      number of ways.  I can tell you from my own experience as a

09:20:02   25      former auditor and CPA, that the way the government keeps its

1   books, the way the hospital keeps its books, the way huge oil

2   and gas company keeps its books, the way, you know, some

3   Fortune 500 companies keeps its books, and the way a small mom

4   and pop operation keeps their books are different, and so,

09:20:23   5   therefore, the difference he would know from having either

6   audited and/or provide tax services to any number of clients

7   over a 25-year period.  So the assertion that a small mom and

8   pop operation might keep their books differently is something

9   that goes to the specialized knowledge of an expert.

09:20:44   10        THE COURT:  Might keep their books differently is

11   fine.  To say that the way these books were kept is, in fact,

12   the way that small businesses and politicians account for it is

13   beyond the scope of his expertise.

14        MR. HENDERSON:  Well, Judge, I don't know that to be

09:21:02   15   true, because this particular expert has also prepared D-2's,

16   he's also done books for politicians, and so, therefore --

17        THE COURT:  But what you got here is whatever his

18   personal experience is with particular.  This is not an example

19   for what might happen if --

09:21:21   20        MR. HENDERSON:  Well, Judge, that's not a big point,

21   it's not a huge point, but also I don't want to say that it's

22   not something that --

23        THE COURT:  Yeah, but I'm not going to let him say it,

24   and the reason I'm not going to let him say it is, to establish

09:21:34   25   that is the case you have to have some kind of study that

09:21:56

1  you've done other than your personal experience.  And I have

2  heard testimony from experts, usually people from some school

3  of accounting, and here that tends to be somebody from the

4  University of Illinois, who says we've studied the way these

5  transactions are handled by these kinds of businesses; in my

6  particular case, hog farmers.  That was based not -- that was

7  based on studies that were done, that this is what's done in

8  the majority of cases.  We have no idea of what percentage of

9  these cases has been done, this is -- this is the kind of

09:22:23

10  opinion that makes judges doubt the admissibility of the

11  witness' testimony.

12       MR. HENDERSON:  Well, Your Honor, I think that there

13  is some generalized acceptance that there's a cost benefit

14  analysis to how much time and effort you put into keeping

09:22:36

15  books.  And so I think it is fairly well established that the

16  larger the entity and the more money that's involved, the more

17  attention in detail is paid to the books, and the smaller the

18  entity and the less money that's involved, as a general rule,

19  the less attention is paid to the books and how they're kept.

09:22:56

20       THE COURT:  Maybe that's the case, but I'm not letting

21  him testify as an expert to that.

22       MS. BONAMICI:  Well, the other thing, Your Honor, that

23  we would point out is that we would doubt the relevance of

24  small businesses.  It's one thing to talk about campaign

09:23:07

25  committees --

1      THE COURT:  Yeah, leaving that aside.

2      MS. BONAMICI:  Okay.

3      THE COURT:  The truth is is he has not done the

4  studies, he has not cited the studies.  He is, at best, a

09:23:23   5  marginal expert in the sense that he just barely reaches those

6  points, and most of what he says is the subject of instructions

7  anyway.

8      To the extent that he relies on the check book and the

9  stubs and a variety of other things, he is, as you can bring

09:23:53  10  out on cross examination, making assumptions about how the stub

11  entry was made.  He doesn't know, he wasn't there, he didn't

12  interview the people who made them, and if he didn't interview

13  the people who made them, they're not on the witness stand,

14  he's not drawing a conclusion.

09:24:11  15      So what deeply concerns you, I think, you can cover on

16  cross-examination.  And honestly, when I heard his testimony, I

17  give him credit, actually, for doing what you said he was going

18  to do, which was to say this is what he's encountered.  And,

19  you know, he said it that way.  He didn't say, you know, these

09:24:43  20  massive studies, I've done a lot of work here, I've read a

21  million articles and this is what political campaigns do.  He

22  didn't say that, he's clearly speaking from his own personal

23  experience and it's not enough for his expertise.  So that's

24  where we are.

09:25:01  25      MR. COLE:  A couple other issues with respect to the

1    expert, Your Honor.  Another is his opinion about the

2    deductibility of the $68,000 of the pension contribution.  He

3    provided us really no basis for that.  And I don't think there

4    is basis for it.  I can't find one.  This opinion that he

09:25:20    5    offered, and we asked him how he got that, and his answer is he

6    did not provide any specificity as to how he got that

7    deductible and I think the answer is there isn't a basis for

8    it.

9         MR. HENDERSON:  That's completely false, Your Honor.

09:25:41    10    The $68,000 is a non-routine tax occurrence.  There are routine

11    tax occurrences and there are non-routine tax occurrences.  So

12    the testimony is going to be, number one, that the City goofed.

13    And the government already has the indication that the City

14    makes mistakes.  And they know that in their 302, they know

09:26:01    15    that.  They know that the City botched the 68-thousand-dollar

16    transaction because they were -- and they have a 302 report

17    that they just gave us last week, Thursday or Friday, which

18    indicates that Jane Tessaro said that they botched the W-2's,

19    they know that.

09:26:15    20         So part of the basis -- part of the use of the W-2's

21    that the City is supposed to provide is to enable the taxpayer

22    to properly account for the transaction, and they know that.

23    So this is not the type of transaction that a layman would

24    necessarily understand how to handle.  They're ultimate

09:26:32    25    responsibility is to prove that there was intent to improperly

1  handle this transaction and they can't get there and they know

2  that.  So now instead of being able to deal with the facts as

3  they are, what they're trying to do now is keep evidence out

4  which favors the commission.  The fact of the matter is, the

09:26:49  5  tax transaction was fumbled by the City.  Ms. Tessaro sat on

6  the witness stand and said left hand didn't know what the right

7  hand was doing and now they want to make the Commissioner

8  responsible for it.

9       MR. COLE:  I should also add, Your Honor, that what is

09:27:00  10  the relevance of this?  You know, the basic point --

11       THE COURT:  What is the relevance of this is a

12  different issue.  Do you want to deal with what he said before

13  we get to the relevance?

14       MR. COLE:  Yes.  First of all, the City did not botch

09:27:14  15  this whatsoever.  I think the issue what Mr. Henderson is

16  pointing to you was how the pension fund, which is not the

17  City, of how the pension fund treated it on the 1099 R and they

18  may have made a mistake on that.  But that has nothing to do,

19  that mistake on the 1099 R is entirely irrelevant.  That 1099 R

09:27:27  20  comes at the end of the tax year, nothing to do with how the

21  City, the City of Chicago, treated that pension contribution on

22  the W-2.  And that was the opinion that the expert was giving,

23  he was saying that somehow the City of Chicago did something

24  wrong on the W-2 form and there's no foundation for that

09:27:55  25  whatsoever.

1     MR. HENDERSON:  We'll do an offer of proof, they gave

2     it to us in the 302's last Thursday or Friday that the City

3     did, in fact, botched the W-2.  The W-2 is the starting point

4     for the taxpayer in order to learn how to treat the

09:28:07  5     transaction.

6     THE COURT:  The 302 is a report by an FBI agent.

7     MR. HENDERSON:  Yes.

8     THE COURT:  And the FBI agent opined himself or he

9     related something that somebody else opined?

09:28:18  10     MR. HENDERSON:  If we need to bring in Jane Tessaro,

11     if we need to bring her back in to indicate that she made the

12     mistake, Your Honor, we ask permission to do that.

13     The FBI agent interviewed Jane Tessaro last week

14     Thursday or Friday, they gave us the 302's Monday or Tuesday,

09:28:33  15     and Jane Tessaro indicated to the government.  And I think

16     Mr. Cole was there and they gave us the report that the City

17     botched or the pension fund boxed the $68,000 --

18     THE COURT:  Wait.  You said City and then you said

19     pension fund.

09:28:47  20     MR. HENDERSON:  The MEA&B should have communicated the

21     arrival of the checks to the department that prepares the W-2,

22     so --

23     THE COURT:  So it's the pension fund that botched it?

24     MR. HENDERSON:  I can't tell you whether the -- the

09:29:10  25     pension fund has acknowledged the W-2 is botched, I don't know

1    that if they said that they botched it.  We have the report

2    from them that indicates that the W-2 was botched.

3           MR. COLE:  The pension fund never said that.  That

4    just wasn't --

09:29:19    5      MR. HENDERSON:  Jane Tessaro indicated it in the last

6    paragraph of the document --

7           THE COURT:  Let me see it.  Let me see the report.

8           MR. COLE:  The bigger issue, Your Honor, is the expert

9    said?

09:29:34    10      MS. BONAMICI:  We don't have a copy up here, Judge.

11          MR. HENDERSON:  I'll have to get a copy, Judge.

12          MR. COLE:  The $68,000 check was taxable, that was

13   what he said, that it should have appeared on the defendant's

14   W-2.  And I think that's a big point is it should have appeared

09:29:51    15   in the W-2 and whether or not it's a deductible is an entirely

16   separate and not relevant issue.

17          MS. HAMILTON:  I have it.

18      (Document tendered to the Court.)

19          MS. BONAMICI:  Your Honor, remember that we discussed

09:30:48    20   this, that if it wasn't a loan, it was taxable.

21          THE COURT:  Yeah, we discussed this.

22          This is the report you are referring to (indicating)?

23          MR. HENDERSON:  I haven't seen that.

24          No, this is --

09:31:00    25          MS. HAMILTON:  That's a copy, that's a copy of what I

1    gave the Judge (indicating).

2          MR. HENDERSON:  I'm looking at paragraph 3, Your

3    Honor.

4          THE COURT:  Yeah.

09:31:07    5          MR. HENDERSON:  May I read it into the record?

6          THE COURT:  Okay.  Now how does this help the

7    defendant?

8          MR. HENDERSON:  Well, Your Honor, may I read paragraph

9    3 into the record?

09:31:28    10          THE COURT:  Yeah.  This is a letter from the MEA&BF to

11   William Beavers, dated January 22, 2007, that listed his

12   investment income as $15,639.92, and this is dated March 14,

13   2003, memorandum of interview, participants Jane Tessaro,

14   Matthew Getter, Carrie Hamilton, Sam Cole and others:

09:31:51    15      "... Tessaro stated that this amount should have been

16       larger in the approximate dollar amount of $65,372;

17       therefore, the 2007 and 2008 form 1099 R sent to

18       William Beavers are inaccurate regarding the taxable

19       amount of the distribution."

09:32:10    20          THE COURT:  Now, how does this help?

21          MR. HENDERSON:  How this helps is that the taxpayer

22   will use the 1099 R in the same way that a taxpayer would use

23   the W-2 to compute taxable income.

24          THE COURT:  How did he happen to wind up with a

09:32:28    25   $65,000 check?  Usually you do that because you ask somebody or

1    you send the check yourself.

2          MR. HENDERSON:  What transpired was, and I spoke to

3    Ms. Tessaro briefly, when the November 14, 2006 letter which

4    enabled Commissioner Beavers to make the payment of 65,000, was

5    apparently added to the 15- that was already in there and then

6    there were some distributions, because I asked her myself where

7    did the $65,372 come from.

8          The point is that the pension folks made a mistake on

9    the 1099 R and the 1099 R is a document that the taxpayer uses

10   in order to prepare taxes just like a W-2.  So the point is

11   that if the pension people don't know what they're doing, you

12   certainly can't expect the Commissioner to know.

13         I would also make one additional point, we don't argue

14   that the $68,000 isn't taxable.  Of course it is.  The issue is

15   when it's taxable.  Not that is taxable, the issue is when is

16   it taxable.  And the government takes the position that the

17   $68,000 was taxable the minute it came out of the campaign fund

18   and they're wrong about it.

19         THE COURT:  Okay, now I understand what his position

20   is, now you can respond.

21         MR. COLE:  The 1099 R 2007 was given to the defendant

22   in 2008 right after the 2007 tax year.  It has no relevance to

23   what the defendant put on his 2006 tax return with respect to

24   the taxability of the $68,000 pension contribution.  There's

25   just no relevance to it whatsoever.

1          MS. BONAMICI:  And, Your Honor, I would add that it is

2     not a proper argument to make that because one person made a

3     mistake then naturally somebody else made a mistake.  I mean,

4     that is absolutely an improper argument.

09:34:10    5          In addition to that, as you remember, we talked about

6     this.  This relates to the taxability of distributions and

7     there's no relevance connecting any of these issues with the

8     defendant's state of mind, none whatsoever.

9          MR. HENDERSON:  Judge, the Government is--

09:34:24   10          THE COURT:  Is she right about when he got the 1099

11    R's?

12          MR. HENDERSON:  No, he's not arguing about that.  The

13    government is completely wrong.  The Government's position is

14    that a taxpayer doesn't have a right --

09:34:33   15          THE COURT:  No, no, no, we're not talking about that,

16    we're talking about timing.

17          MR. HENDERSON:  Again, Judge, the expert will testify

18    it's not that the $68,000 is not taxable, we agree with that --

19          THE COURT:  I'm talking about receiving the 1099 R.  I

09:34:49   20    think the prosecutor just said he gets the 1099 R after he

21    files the return in question.

22          MR. HENDERSON:  Well, then, that even speaks to it,

23    again, that the taxpayer would not have known how to treat the

24    tax transactions if the 1099 didn't come, that's makes it even

09:35:07   25    worse.  So not only did they send it late, the government's

1  position is they sent it late and they sent it wrong and the

2  taxpayer is not supposed to rely on that.

3       MS. HAMILTON:  Judge, it wasn't late.  There were no

4  distributions for tax year 2006 --

09:35:20  5       THE COURT:  I'm taking it out.  It serves no useful

6  purpose in this case except to confuse the jury.

7       MR. HENDERSON:  No, Your Honor --

8       THE COURT:  That's my ruling.  I made my ruling.

9       MR. HENDERSON:  Your Honor, may I just make one

09:35:39  10  comment for the record?

11       THE COURT:  Sure.

12       MR. HENDERSON:  The point again is that any taxpayer

13  is going to rely on the documents from third-parties, whether

14  it's a W-2 or 1099, in the preparation of their return.  It

09:35:50  15  goes directly to the state of mind issue.  And so, therefore,

16  whether you -- when you get your W-2 or when you don't get it,

17  and what it says on it or what it doesn't say on it does have

18  an impact on how you prepare your return.

19       THE COURT:  It's an interesting premise but I don't

09:36:07  20  think that's true.  I'm sure there are taxpayers, and I'm one

21  of them, who will look at what the W-2 says.  I've found errors

22  in 1099, I found errors in W-2's.  You can have somebody who

23  gets up on the witness stand and says I don't examine anything,

24  I never would've found out, I just relied blindly on that

09:36:34  25  return, on what I get on the W-2's and 1099 's.  Although it

1    appears from some of the testimony from his accountant that

2    what he gets from the defendant is a bunch of papers, there's

3    no testimony as to whether the defendant examines them or

4    doesn't examine them.  So you're basing this on a premise, like

09:37:01    5    the accountant is basing it on a premise, of an assumption that

6    is unproven.

7         MR. HENDERSON:  Your Honor, I think the accountant

8    said that Mr. Beavers gives him a stack of documents --

9         THE COURT:  It's unproven.  I'm not letting this stuff

09:37:15    10    in.

11         MR. COLE:  Another issue, Your Honor, is with respect

12    to the mistake that Cook County did make on his W-2's with

13    respect to the $1200 checks.  Their accountant testified, and

14    it's true, that Cook County should've included the $1200 checks

09:37:31    15    on the W-2's, but that fact, in and of itself, is of no

16    levance, not relevant at all, there's no basis to admit that

17    issue.

18         MR. HENDERSON:  Your Honor, it's completely relevant

19    because the taxpayer, again, relies on statements that --

09:37:50    20         THE COURT:  How do we know that?

21         MR. HENDERSON:  Because you take them and give them to

22    your accountant.

23         THE COURT:  But how do you know he relied on it?

24         MR. HENDERSON:  Because he gave it to the accountant.

09:37:57    25         THE COURT:  But how you do you know this particular

1    defendant relied on that?

2         MR. HENDERSON:  Because he took the W-2 from the City

3    and --

4         THE COURT:  No, you don't know whether he examined

09:38:07    5    them, you don't know whether he looked at them, you don't if he

6    said to himself, "this is terrific, they forgot to put down a

7    report that I got a lot of extra money."  You got a missing

8    element here.

9         MR. HENDERSON:  Your Honor --

09:38:21    10        THE COURT:  Believe me, I'm keeping it out unless a

11    foundation is laid.  And the assumptions you are making are

12    assumptions which you are not permitted to make unless you got

13    evidence to back them up, and, presumably, that evidence is

14    available to you.

09:38:39    15        MR. HENDERSON:  Your Honor, the evidence is that the

16    accountant has already been here and indicated that Mr. Beavers

17    gives him 1099 R's, W-2's --

18        THE COURT:  But he doesn't know anything about what

19    Beavers did with them, he doesn't know anything about what's in

09:38:54    20    Beavers' mind, and there's a way to get that in and it's not

21    with these assumptions you're making.  So I'm keeping it out

22    absent some change in evidence or something I hear from the

23    witness stand.  But, no.

24        MR. HENDERSON:  Just so we're clear, Your Honor, the

09:39:13    25    ruling is that despite the fact the accountant testified that

1   he used the W-2Gs, the W-2's, the 1099's and any other

2   documents that the taxpayer gave him to prepare his return,

3   that we haven't establish the foundation that the taxpayer gave

4   them to the accountant to prepare his returns?

09:39:34   5   THE COURT:  No, we have not established what was in

6   the mind of the defendant when he gave them.  We don't know

7   what he knows, we don't know a variety of things which could

8   subject him to liability.  This witness, this accountant,

9   cannot testify as to what his state of mind was or his motives.

09:39:56   10   All he can testify to is that he got an envelope with a lot of

11   papers that was delivered by the defendant.  We don't actually

12   know that the defendant put them in the envelope.  All we know

13   from this witness, of which there's direct proof, that the

14   defendant handed him an envelope which when he opened the

09:40:22   15   envelope he saw lots of tax records, that's all we have.

16   That's the only thing he can say.  He cannot say, for example,

17   that the defendant put the things in the envelope.

18   MR. HENDERSON:  But he can say, though, that the tax

19   code requires the employer to put the funds on the W-2, he can

09:40:45   20   say that?

21   THE COURT:  Why would he say that?

22   MR. HENDERSON:  Because the tax code requires it, and

23   because the employer is required to do it.  All that is saying

24   is the employer is required to put money that you earn on the

09:41:01   25   W-2.

1      THE COURT:  You want to answer this for the record?

2      MR. COLE:  That has no relevance as to the state of

3 mind of the defendant, and that's the issue.

4      MR. HENDERSON:  The state of mind is whether the

09:41:10  5 intended -- Mr. Beavers intended to do anything wrong, that's

6 the state of mind.  He doesn't have to -- their case is not

7 going to intend to do things right, rather, they have to

8 establish that he intended to do something wrong.  And it's not

9 unreasonable to take the documents that you're given by your

09:41:26 10 employer to use for your tax returns.

11      THE COURT:  The thing is is you can't base your

12 argument on the state of the evidence as it exists now, because

13 what you want to argue is specifically as to a declared state

14 of mind and you don't have that.  And there are circumstances

09:41:47 15 where you might have that, but the answer is I'm sustaining

16 their objection, you can't do it.

17      MR. HENDERSON:  Your Honor, may I make one final point

18 --

19      THE COURT:  No, I did one final point already.

09:42:01 20      MR. HENDERSON:  On this issue though, Your Honor?

21      THE COURT:  Yeah.  Sure.

22      MR. HENDERSON:  It's not about -- the government has

23 the burden of proving state of mind.  What we've done is we've

24 shifted it and making the defendant have to -- or making the

09:42:17 25 Commissioner have to establish what was in his state of mind,

1    that's the government's burden --

2         THE COURT:  No, you don't have to shift anything.

3    What you want to do is you want to make an argument for which

4    you do not now have evidence that this is what somebody

09:42:31    5    thought.  A specific act and what somebody thought in

6    connection with that specific act, that's something you cannot

7    argue on the basis of the evidence that is currently in the

8    record.  And it has nothing to do with the government's burden

9    of proof.  They have the burden of proof, but the question is

09:42:55    10    is what evidence do you use in making the argument.  And the

11    evidence has to be in the record, and as the record stands now

12    it's not there.

13         Anything else?

14         MR. COLE:  Yes, Your Honor.  The defendant's expert's

09:43:12    15    report included information of events occurring on the amended

16    returns filed by the defendant.  I asked Mr. Henderson if he

17    intends to get into the amended returns with the expert and he

18    stated he might.  But Your Honor has already ruled that the

19    amended returns filed by the defendant are not relevant unless

09:43:30    20    and until the time the defendant testifies or some other

21    evidence is presented.

22         THE COURT:  Yes or no?

23         MR. HENDERSON:  We don't have any plans right on the

24    amended returns.

09:43:38    25         THE COURT:  If you do somehow have plans, you must

1    tell me before you try it.

2          MR. HENDERSON:  I would not intentionally ask about

3    the amended returns.

4          THE COURT:  Okay.  That's fine.

09:43:47    5    MR. COLE:  And that includes the figures that were on

6    the report, which is the amount of subsequently --

7    subsequently -- amount of income tax subsequently paid, you're

8    not getting into that?

9          MR. HENDERSON:  We don't intend to get into that.

09:44:04    10    THE COURT:  Good.

11          MR. COLE:  The only other issue, Your Honor, is the

12   issue of my expert sitting in on the testimony of their expert.

13   I've been in situations where it's kind of awkward where we

14   have two experts sitting in the courtroom.  In this case, just

09:44:09    15   because of who they are, our expert is a guy at the IRS, tax

16   lawyer at the IRS, doesn't really know his expert.

17          THE COURT:  It's okay if he sits in the back row.

18          Anything else?

19          MS. KAESEBERG:  There is one more issue that applies

09:44:29    20   to the jury instructions which is we will be submitting a good

21   faith instruction and we need you to know that.

22          THE COURT:  Fine.  Excellent.

23          We'll have the morning call.

24        (Recess.)

10:10:34    25        THE MARSHAL:  All rise.

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 51 of 121 PageID #:1580
Gershinzon - direct by Henderson
921

1      (The following proceedings were had in the presence of

2       the jury in open court:)

3           THE COURT:  Please be seated.

4           Over there.

10:11:23   5    (Brief pause).

6           THE COURT:  Face me and raise your right hand, please.

7      (Witness sworn.)

8           THE COURT:  Please be seated.

9           BARRY GERSHINZON, DEFENDANT'S WITNESS, SWORN

10:11:33  10                   DIRECT EXAMINATION

11     BY MR. HENDERSON:

12     Q.  Sir, would you be kind enough to state your name and spell

13     it for the court reporter, please.

14     A.  My name is Barry, B-a-r-r-y, G-e-r-s-h-i-n-z-o-n, CPA.

10:12:01  15     Q.  Mr. Gershinzon, you noted before the Court and for the jury

16     that you're a CPA.  What is a CPA?

17     A.  A CPA is a licensed professional accountant who's passed

18     the CPA exam and continue with his education throughout his

19     career.

10:12:24  20     Q.  And so you are licensed here in the State of Illinois?

21     A.  Yes, I am.

22     Q.  Okay.  And when did you become licensed?

23     A.  I became licensed, I believed, in 1980.  I was previously

24     licensed in Michigan.

10:12:38  25     Q.  As a CPA, as well?

1    A.  As a CPA, yes.

2    Q.  And did you have to take an exam to become a CPA?

3    A.  Yes, there's a unified exam that's given nationwide to be a

4    CPA.

10:12:48    5    Q.  And just tell us a little bit about the exam.

6    A.  Well, when I took it it was a four-part exam dealing with

7    law, theory, a practice in auditing.  And it was a three-day

8    exam in generally a giant auditorium.  We got three pencils and

9    a test booklet and you sat down and you took the exam.  And

10:13:14    10    probably 10 or 15 percent of the people passed the exam the

11    first time, which is what I did, and you were allowed to retake

12    the exam and keep your passing scores if you had passed two or

13    more parts.  And now today you take it electronically, of

14    course, and there are more parts and it's less time, but it's

10:13:41    15    essentially the same exam.

16    Q.  And so you said only about 10 or 15 percent of people pass

17    the first time?

18    A.  Yes.

19    Q.  And you also indicated that there were sections on the

10:13:53    20    exam, including law and theory?

21    A.  Yes.

22    Q.  And briefly for the jury, why was it important or how do

23    you make use of the law and theory in your practice as a CPA?

24    A.  Well, I'm not an attorney, I don't practice law, but I

10:14:12    25    could be familiar with the Uniform Commercial Code, and as far

1  as dealing with contracts and negotiable instruments and tax

2  law.

3          Theory?  Well, theory is the bad of being an

4  accountant.  There are so many rules, there are so many types

10:14:37   5  of transactions and there are new ones coming up every day and

6  new problems every day.  So you have to have a framework in

7  which to apply the rules to new situations.  And that's why you

8  have to know your accounting theory, because although it may

9  seem to be the same to some people, no two transactions are

10:15:03  10  exactly duplicative unless you're in a retail situation where

11  they're selling Starbucks Coffee every day, every day, every

12  day.  But there's always something new under the sun that

13  people ought to do.

14  Q.  And so I want to pick up two words you just talked about.

10:15:22  15  You used the term or word "framework" and you used the word

16  "rules."  And so you said you have to be able to use the

17  framework, or take rules and use them within a certain

18  framework, what do you mean now?

19  A.  Well, fortunately now, generally accepted accounting

10:15:40  20  principles have been -- all been unified and codified.  It used

21  to be that we had several sources for what were the rules.  We

22  had the FASBI, which is the financial accounting statements

23  board, we had the APB which is accounting principles board, we

24  had -- just a number of them.  They have unified and codified

10:16:09  25  those rules and now there's just one standard set of rules they

1       are supposed to be applied.

2              Of course, there's one exception to that, and that

3       exception would be for the SEC, for the publicly traded

4       companies.  They not only have my set of rules, they have their

10:16:29   5  own set of rules that lay on top of that.

6       Q.  Tell us about your practice today as a CPA.  What's the

7       bulk or the meat of your practice today?

8       A.  I've a partner and five employees.  The meat of our

9       practice are 500 individuals and companies.  We do their tax

10:16:54  10  returns, we help them comply with their monthly and quarterly

11      and annually reporting requirements.

12             We help them prepare their financial statements.  We

13      either compile, review, or audit those.  And we help them

14      comply with the new rules that come up daily for tax reporting.

10:17:21  15  And the rules change and then they change again, and so we have

16      to be on top of that.

17             I would say we primarily are a tax compliance practice

18      with -- offering the financial reporting services as a -- as an

19      additional service if the client requires it.

10:17:49  20  Q.  So you're involved on an annual basis with approximately

21      500 returns per year?

22      A.  I have 500 business and individual tax returns a year.

23      Q.  And what's the individual tax return referred to as?

24      A.  That's a form 1040.

10:18:02  25  Q.  And what about the business ones?

A.   They are in a variety of forms.  There's an 1120, an 1120

S, a 1065.

Q.   And how many 1040's per year are you involved in,

approximately?

10:18:15   A.   350, 350 a year.

Q.   And how long have you been involved with approximately

350 --

A.   Well, I've been a partner with this for over 15 years, but

I've been in practice as a CPA preparing tax returns for almost

10:18:33   35 years now, that's what I do for a living.

Q.   And so your function as a CPA requires you do more than

just add and subtract and to do percentages and things of that

nature?

A.   Yes.   Yes.   Generally what happens now is my partner and

10:18:50   myself, the five employees, prepare returns.   Then I review the

returns that I didn't prepare because you need a second set of

eyes.   Mistakes can always happen.   It's done in the computer,

so you need to review that.

Once the returns are prepared, we go through the

10:19:11   filing process, which today involves sending a consent form and

a draft copy of the return to the taxpayer so they can review

it to see if they see any problems with it.   They sign off the

consent form and then we electronically file with the IRS and

obtain evidence of that electronic filing, and then present the

10:19:37   taxpayer with an electronic copy of their return unless they

Gershinzon - direct by Henderson

1   want a paper copy and the acknowledgement from the IRS that a

2   return has been filed.  In the old days I just used to prepare

3   the return and they would be responsible for mailing it in, but

4   now I'm responsible for filing it also.

10:19:56   5   Q.  Now, you also indicated that you will review the returns of

6   the employees that your firm prepared, is that correct?

7   A.  Yes.

8   Q.  And so you said it needs a second set eyes?

9   A.  Yes.

10:20:07   10   Q.  Why is that necessary?

11   A.  That's because there's so much information that goes on the

12   tax return that simple key punch errors can occur.  There are

13   also facts and circumstances that the younger preparers may not

14   be aware of in the preparation for the return with the client,

10:20:33   15   or rules and laws that they may not be aware of.

16        Today what we do is we get the documents that you use

17   to prepare our tax return, your W-2's, 1099's, your 1098's from

18   the client.  And then we scan them into software which reads

19   them and puts them on the return and then we have to make sure

10:20:58   20   that that software is functioning correctly.

21        So it does save us time in terms of inputting all, you

22   know, the 14 items from the W-2, all the 6 items from the 1099,

23   but we have to check that.  Once we get that done, inevitably

24   the client has not answered all the questions on the organizer,

10:21:24   25   and so then we must ask the questions, get the answers, get the

1    documents, and finalize the return.

2         It's always better to have a second set of eyes on

3    everything because there's a filing with the government and you

4    want to make sure you're as correct as you possibly can be.

10:21:46    5    Q.  Now, you make reference to a W-2.  What is a W-2?

6    A.  A W-2 is a wage statement that is prepared by the employer

7    as a record of the wages and the withholdings and the pre-tax

8    benefits and -- and that represents the paychecks that the

9    taxpayer has gotten over the year.

10:22:23   10         Typically, the employer provides that by January 31st,

11   at the same time they send an electronic paper to the IRS that

12   matches that information.  So now the IRS has something to

13   match up to the return when I electronically file the return.

14   Q.  And you said there were 14 items on the W-2?

10:22:46   15   A.  There's probably many more.

16   Q.  And you then take the information on the W-2.  Now, does

17   all of that information on the W-2 find its way to a 1040 or

18   some does and some doesn't?

19   A.  Most of it does, some does not.

10:22:58   20   Q.  So some does and some does not.

21        And the 1099, what's a 1099?

22   A.  A 1099 is for income that is not of -- from labor.  So it

23   would be interest, dividends, pension distributions, or to an

24   independent contractor.  Let's say like someone that you pay to

10:23:26   25   put a new roof on the business' building or to somebody who is

Gershinzon - direct by Henderson

1  standing at your wedding, if you paid them more than $600 and

2  they were not a corporation.

3  Q.  I'm going to highlight one thing you said.  You said that

4  the employer by January 31st not only sends information to the

10:23:49  5  taxpayer but also to the IRS?

6  A.  Yes.  The way the system works is, the 1099's the W-2's are

7  given to all of us as taxpayers and copies are given to the IRS

8  so that the IRS can see that -- how the people that got these

9  things filed their returns, or if there were differences in the

10:24:20  10  amounts that their taxpayer put down versus what the employer

11  reported would cause a letter to come from the IRS to a

12  taxpayer saying something is different, tell me why.

13  Q.  So you said that there's a difference between what the

14  taxpayer puts on his return or her return or any of us puts on

10:24:40  15  our return and what the employer has to report to the IRS and a

16  letter is generated?

17  A.  Yeah, generally a letter will be forthcoming within the

18  first year of filing the return saying this information that we

19  have does not match the information you put on your return.

10:24:59  20  Generally, either send us that reason why, that's generally

21  called a bench audit where you mail in your information and the

22  IRS looks at it in their office, or if the difference is big

23  enough they send you a letter saying you're under audit, we

24  want to meet with you or your representative, please have these

10:25:20  25  documents available, call this phone number.

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 59 of 121 PageID #:1588
Gershinzon - direct by Henderson
929

1    Q.   Have you participated in such audits with the IRS?

2    A.   On many, many times, yes.

3    Q.   And then tell us about that.  What happens then?

4    A.   Generally, I get the client to sign a power of attorney so

10:25:33    5    I can talk to the IRS, because they require that.  Get the

6    documents from the client if I don't have them.  And the IRS

7    auditor comes to the office.

8            We present them the documents, they write up a report.

9    If I agree with that, I suggest to the client that they sign

10:25:56    10   off on the report and pay a miscellaneous difference in tax.

11   If I don't think that the IRS is right, I ask to speak to the

12   auditor's supervisor, and if that doesn't work I go up the

13   chain of command until I hit appeals or the tax -- there's a

14   tax advocate that deals with problems with the IRS if the IRS

10:26:23    15   isn't being reasonable.

16   Q.   So is your point, then, that by going up the food chain,

17   that not everybody always agrees on the tax treatment on

18   certain transactions?

19   A.   There's a wide variety of interpretations for almost every

10:26:40    20   transaction.  Certain things are crystal clear.  You got a 1099

21   from -- from the riverboat gambling, you put it on your return,

22   you pay the tax on it, there's no problems on that.  But a good

23   example would be there's been an error on -- on something that

24   fed into your return, which would be a 1099, a W-2, or a K 1,

10:27:14    25   and we would like to make an adjustment because of that or --

1   or the way you treated that item on your return, we would like

2   to make an adjustment because of that, so then that becomes

3   open for discussion.

4   Q. I want to ask you some questions about books and records

10:27:38   5   that relate to Commissioner Beavers's books, but before I get

6   there, tell us, generally speaking, what bookkeeping is?

7   A. (Laughing). Well, what it's supposed to be is a set of

8   records that, in my opinion, is made with double-entry

9   accounting. It's a little too complicated to go into right

10:28:04   10   now, but double-entry accounting was invented by an Italian

11   count in the 14th century and it works very well because the

12   check and balance means that certain control numbers always tie

13   out to zero versus single-entry accounting which would just be

14   I got some money in, I got some money out, put those together.

10:28:29   15       So what it does is for each transaction it creates two

16   entries. So I got money in, plus the cash, and then I have it

17   offset. In the case of a politician's campaign, it would be a

18   plus to campaign contributions received income. So cash went

19   up, income went up, so at the end of the day I would be able to

10:28:54   20   say that -- that I got $100 cash, minus $100 income, oh, that

21   goes to zero, I'm good. And because I'm doing the transaction

22   twice and at any point in time you can subtract those and go to

23   zero, that's something that hasn't gone awry.

24       So that's bookkeeping. And what you're trying to do

10:29:17   25   in bookkeeping is keep a record of the assets you have and the

1    income that you got and the liabilities you have and the

2    expenses being incurred, and depending on whether cash or

3    accrual depends on what kind of records you have.

4    Q.  Now, Mr. Gershinzon, are some transactions--and I heard you

10:29:41    5    refer to a term "crystal clear" before we actually get to the

6    books--are some transactions easy to record and others are more

7    complex?

8    A.  Yes.  Like I said before, there's certainly a lot of

9    repetitive transactions in bookkeeping, those are generally

10:30:06    10    easier to record.  Certain transactions are difficult to record

11    just because of their nature.

12        I'll give you a perfect example where most bookkeepers

13    have a problem.  When they record payroll, a person earns

14    $1,000 but they take home 700.  So the check is $700, so now

10:30:29    15    they have to make a journal entry getting back up to the

16    $1,000.  So they go, oh, I gave that person cash of $300, I owe

17    withholding of $200, I owe health insurance of $100, I owe, you

18    know, child support of $50, and that adds back up to the gross.

19    That's a little difficult to do, especially when you have to do

10:30:50    20    it on a payroll with 300 people on it.  One is easy, but now

21    you've got them all.  So, generally, in those areas, that's

22    where I find mistakes.

23    Q.  Now, you had an opportunity to review a lot of documents in

24    this case, correct?

10:31:09    25    A.  Yes, I did.

1    Q.  And, generally speaking, tell us, what did you review?

2    A.  I reviewed -- well, I reviewed copies of documents, and the

3    copies of documents that I saw were in the bank statements, the

4    checks, the check stubs from the Friends For Beavers campaign

10:31:31    5    account, and the Citizens For Beavers campaign account, and I

6    reviewed the IRS's analysis of how those checks flowed, you

7    know, how they flowed out and how they flowed back in.  I

8    reviewed the D-2's, which is the report that the campaigns have

9    prepared to show what their cash balance was, saying this is

10:32:01    10    our beginning balance, these are the contributions that we got,

11    these are the expenses that we had, this is our ending cash

12    balance.

13        I reviewed alderman -- I mean, well at that time

14    alderman Beavers' 2006, 2007, 2008 income tax returns and the

10:32:26    15    documents to support those.  And I reviewed a lot of documents

16    dealing with this trial, so ....

17    Q.  You mentioned D-2's, have you ever -- you reviewed the

18    D-2's in this case, correct?

19    A.  Yes, I looked at that.

10:32:49    20    Q.  Have you ever prepared D-2's?

21    A.  Yes, we --

22    Q.  And how many years back have you been preparing D-2's?

23    A.  Well, someone in my office actually prepares them and I

24    review them.  And we've been doing that for the last, I think,

10:33:05    25    6 or 7 years for a couple of public officials.

1  Q.  Now, you said you reviewed several charts that were

2  prepared by the government, correct?

3  A.  Pardon?

4  Q.  You said you reviewed several charts that were prepared by

10:33:27  5  the government and Mr. Ponzo, correct?

6  A.  Yes; schedules and charts, yes.

7  Q.  Let me go to the first issue which was, in general terms,

8  money going from the campaign to Mr. Beavers; did you see that?

9  A.  Yes.

10:33:42  10  Q.  And then did you see money going from Mr. Beavers back to

11  the campaign?

12  A.  Yes.

13  Q.  Okay.  And did you draw a conclusion about what those

14  transactions were?

10:33:51  15  A.  Yes, it looked to me that what they were is petty cash

16  advances.  When you're a politician, you either use a charge

17  order or a cash, because some people need cash for cab rides or

18  parking, or for whatever.  And so you draw down cash and you

19  come back, you return with receipts.  And if you don't bring

10:34:22  20  the receipts back, you bring back the cash.

21        And many times there's -- just like you would go into

22  your -- in the old days in your office and say I need $1,000

23  worth of petty cash, they would write a check to cash and they

24  hand it to you.  These days with the new bank requirements

10:34:42  25  because of Homeland Security, banks don't like checks written

10:35:01

1   to cash, they want checks written to people.  And when you get

2   a check, they don't like the cash and they want you to deposit

3   them and then withdraw cash because they like many sides to the

4   same transaction, too.  So you can't just take a check written

5   to cash, go down to the party store, cash it, and, you know,

6   shuffle the cash.

7        So all the checks were written on to William Beavers,

8   they were cashed, or actually deposited into his account, and

9   then from his account he took a cash withdrawal, and later on

10:35:20

10   in the -- later on in the month, the expenses would be returned

11   and an accounting would be done.

12        To the extent that he did not return all the cash that

13   had been taken or all the receipts that were made, they looked,

14   apparently to me, that the cash that was being reported on the

10:35:40

15   D-2 was the cash that was in the bank and the cash that still

16   had not been returned by Commissioner Beavers because that

17   would be the petty cash fund in his pocket, and then in the

18   next month he would return more receipts.  The schedules from

19   the IRS show whether he owed excess cash still in William

10:36:06

20   Beavers' possession.  So those numbers were representative of

21   at a time in time of the activity that had not finished at --

22        MR. COLE:  Your Honor, the government would object.

23   There's no question pending at this point.

24        THE COURT:  The objection is sustained.

10:36:27

25        Ask another question.

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 65 of 121 PageID #:1594
Gershinzon - direct by Henderson
935

BY MR. HENDERSON:

Q.   In the accounting world, there are terms of art, correct?

A.   Yeah, there are certain nomenclature.

Q.   Okay.  And so is an advance different from income,
different from a loan?

A.   Yes.

Q.   And they all -- so in your world, in the CPA world, they
look different, correct?

A.   They are different.  They are expressly the same number,
but income would be an expense that a person giving the income
to the other person and income to that person.  An advance
would be an asset to the person giving the advance and a
liability taking the advance.  And a loan would be at the end
of assets to the person making the loan and a liability to the
person getting the loan.

Q.   So in -- the books and records of the campaign that you
reviewed, you already indicated that you saw evidence of
advances, correct?

A.   Yes.

Q.   Okay.  And did you see any evidence of loans?

A.   Well, there was a large disbursement.  What was it?  The
city pension fund for Alderman Beavers of $68,000, and that was
not treated as an expense, and on the D-2's it wasn't reported
as a distribution, and it wasn't picked up as income on
Commissioner Beavers 2006 tax return, and from the history of

1  him putting money in and taking money out, it looked like

2  another loan to me.

3  Q.  Tell me what documents you would look for to establish that

4  something is income?

10:38:26  5  A.  Well, generally, okay, the term "income" you have to apply

6  labor, services, material, so -- or -- or have -- have provided

7  a service, you can earn income off of investing, you could earn

8  income -- that would be it.

9  Q.  Now, did you see anything in any of the D-2's which

10:39:02  10  indicated to you that there were any paid staff members?

11  A.  Those are payroll.  I didn't see any payroll or payments

12  for consultants, or no payroll for staff members to Alderman

13  Beavers for services provided, no W-2's, no 1099's.

14  Q.  So did you see anything in the campaign records that

10:39:28  15  indicated that there was income to anybody?

16  A.  No, I saw no indication that there was an expense to them,

17  campaign or income to the recipient of any of the disbursements

18  from the campaign funds.

19  Q.  And so did the conclusion that you drew about the $68,000

10:39:45  20  being a loan to the Commissioner, is that based on both what

21  you saw and what you didn't see?

22  A.  Well, yes, it would be based upon the fact that although it

23  was an unusual transaction because it was large and it wasn't

24  written to Commissioner Beavers, there was no reason to think

10:40:13  25  that it was anything but a loan because there wasn't any

1  evidence that indicated that he was going to keep the money

2  permanently, that he wasn't going to repay it.

3  Q.  Let's go to the tax return for 2006.

4      Now, there is something called tax treatment, right?

10:40:52  5  Or in tax world, tax treatment, is that term there or not?

6  A.  You could use that phraseology, yes.

7  Q.  And what would you understand that phraseology to mean?

8  A.  That means that you're either going to treat the item as

9  income or as expense or as a non-reportable item.

10:41:15  10  Q.  So with respect to the $68,000, the money that went into

11  the pension fund, have you developed an opinion on how that

12  transaction should've been treated on the tax return?

13  A.  Well, if it was a loan, it would not appear at all.

14  Q.  Okay.  Let's take that step by step.  So you're saying that

10:41:40  15  if the $68,000 was a loan, it would not appear on the tax

16  return at all?

17  A.  No.

18  Q.  Okay.  And why is that?

19  A.  Because when you go borrow money from anybody, the bank or

10:41:53  20  your aunt or your campaign fund, it's not income to you.  You

21  don't pay tax on it.

22  Q.  So if it was a loan, it wouldn't be on the return?

23  A.  No.

24  Q.  Okay.  And, in your opinion, the $68,000 was a loan,

10:42:10  25  correct?

1   A.  Yes.

2   Q.  Now, the government has advanced the theory that it wasn't

3   a loan; you're aware of that, correct?

4   A.  Yes, I am.

10:42:20   5   Q.  And the government has advanced the theory that the $68,000

6   is income; you're aware of that?

7   A.  Yes, I am.

8   Q.  So now under the government's theory, if somehow, some way,

9   the $68,000 was income, walk us through the steps in terms of

10:42:42   10   how it would have been reported to the IRS?

11   A.  Well --

12          MR. COLE:  Your Honor, objection.

13          THE COURT:  The objection is sustained.

14   BY MR. HENDERSON:

10:42:55   15   Q.  Let me ask the question -- let me go in a different

16   direction for a second.

17          The $68,000 payment that was from the Commissioner,

18   the one we've been talking about, that payment went from the

19   Commissioner to the pension funds, correct?

10:43:20   20   A.  Yes, it --

21          MR. COLE:  Objection, Your Honor.

22          THE COURT:  The objection is sustained.

23   BY MR. HENDERSON:

24   Q.  Do you -- based on your review of the books and records, do

10:43:33   25   you have an opinion about what happened with the $68,000?

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 69 of 121 PageID #:1598
Gershinzon - direct by Henderson
939

1    MR. COLE:  Objection.

2    THE COURT:  Objection sustained.

3    BY MR. HENDERSON:

4    Q.  To the extent that the $68,000 should have been treated as

10:43:47    5    income, on what line would it have gone?

6    MR. COLE:  Objection.

7    THE WITNESS:  Answer?

8    THE COURT:  No, I'm thinking.

9    (Brief pause).

10:44:11    10    THE COURT:  Based on purpose, the objection is

11    sustained.

12    BY MR. HENDERSON:

13    Q.  Tell me the tax treatment of the $68,000 on the form?

14    MR. COLE:  Objection.

10:44:22    15    THE COURT:  Objection sustained.

16    BY MR. HENDERSON:

17    Q.  Should the $68,000 have been treated on the tax return?

18    MR. COLE:  Objection.

19    THE COURT:  Sustained.

10:44:31    20    BY MR. HENDERSON:

21    Q.  Tell me what categories when the $68,000 came from the

22    campaign out of the campaign, what categories could it have

23    fallen into?

24    MR. COLE:  Objection.

10:44:50    25    THE COURT:  With respect to this subject matter, it's

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 70 of 121 PageID #:1599
Gershinzon - direct by Henderson
940

1   sustained.

2         MR. HENDERSON:  Your Honor, may I have a sidebar?

3         THE COURT:  No, we had a long discussion about this

4   before.  I understand your position and I'm sustaining the

10:45:05  5   objection.

6         MR. HENDERSON:  Okay.

7   BY MR. HENDERSON:

8   Q.  You are familiar with the term, Mr. Gershinzon,

9   "deduction"?

10:45:19  10  A.  Yes.

11   Q.  And there's also income?

12   A.  Yes.

13   Q.  And you talked about in accounting sometimes there are two

14   sides to a transaction, the Italian bookkeeper one side and the

10:45:31  15  other side, do you remember we talked about that?

16   A.  Yes --

17         MR. COLE:  Objection to relevance, Your Honor.

18         THE COURT:  The objection is sustained.

19   BY MR. HENDERSON:

10:45:37  20  Q.  And so in that moving away from the Italian bookkeeper but

21   in terms of treatment, generally now, not specifically, but

22   generally, generally speaking, when there is a contribution

23   made to a pension fund, generally speaking, not in this

24   transaction but generally speaking, how does that transaction

10:45:53  25  appear?

Gershinzon - direct by Henderson

941

| | |
|---|---|
| 1 | MR. COLE:  Objection, Your Honor. |
| 2 | THE COURT:  The objection is sustained. |
| 3 | BY MR. HENDERSON: |
| 4 | Q.  We'll come back to the 68,000. |
10:46:06 | 5 | Do you know the difference between an accountable plan |
| 6 | versus a non-accountable plan? |
| 7 | MR. COLE:  Objection. |
| 8 | THE COURT:  Sustained. |
| 9 | BY MR. HENDERSON: |
10:46:19 | 10 | Q.  Did you review in the documents -- you said you reviewed |
| 11 | Mr. Beavers' tax returns, correct? |
| 12 | A.  Yes. |
| 13 | Q.  And you saw -- what type of documents did you use to |
| 14 | support his tax return? |
10:46:33 | 15 | A.  I saw his W-2's, his 1099's, his W-2Gs, his 1098 that is |
| 16 | mortgage interest expense, that's -- and the tax return. |
| 17 | Q.  What goes on a 1098? |
| 18 | A.  That would be mortgage interest. |
| 19 | Q.  So that is if you own a home the bank, whoever you borrowed |
10:47:11 | 20 | the money from, reports -- |
| 21 | A.  The interest that you paid. |
| 22 | MR. COLE:  Objection, Your Honor. |
| 23 | MR. HENDERSON:  This is his tax return, Your Honor. |
| 24 | THE COURT:  The objection is sustained on relevance |
10:47:19 | 25 | grounds. |

BY MR. HENDERSON:

Q. You saw W-2Gs, correct?

A. Yes.

Q. And what is a W-2G?

10:47:26  A. The W-2G would be income from gambling winnings.

Q. And what's your understanding of what a W-2G does report
and does not report?

A. The W-2G is issued by the casino for slot machine winnings
in excess of -- in excess of $1199.99. So if you win $1199 you
10:47:55  don't get a W-2G. If you win $1,200 you get a W-2G, or if you
win 1201 or $1300, anything over $1200 would be on the W-2G.

Q. So what you explained to us is there is information that's
not -- some gambling activity that is not captured on the W-2G?

A. Well, there's a lot of information that's not on the W-2G.
10:48:33  There's the loss information. Loss information is typically
provided by a win/loss statement from the casino. On this
win/loss statement, on the left-hand side, it will have the sum
total of your winnings on the W-2G. They will not include your
winnings under $1200 because, according to them, the law, all
10:49:03  you have to report is the winnings of $1200 and above.

          On the other side of the page they have your losses.
Included in those losses is when you won the $1199 and you lost
it again. So it keeps on adding up.

          An example would be you would go in with a dollar --
10:49:26          MR. COLE: Objection, Your Honor. There's no question

1    pending.

2            THE COURT:  The objection is sustained.

3            MR. HENDERSON:  Your Honor, when Mr. Ponzo testified

4    yesterday we didn't object.  And so I understand that, you

10:49:37    5    know, the government has a right to object, but I would ask

6    that we get the same courtesy in terms of our witnesses that we

7    extended to the government's witnesses.

8            THE COURT:  I think it is not the issue that you think

9    it is.  What I think concerns them and is a slight concern to

10:49:54   10    me is that the witness tends to view questions as open-ended

11    and answers questions that aren't asked.

12            MR. HENDERSON:  I'll accept responsibility for that,

13    Judge, and I'll try to be a little more direct in my questions.

14    BY MR. HENDERSON:

10:50:08   15    Q.  Mr. Gershinzon, I'm sorry that my questions have been

16    inartful, so I'll try to make them a bit more narrow.

17            With respect to the W-2G what information -- because

18    that's also a document that you saw that was used in connection

19    with Mr. Beavers' return, correct?

10:50:22   20    A.  Pardon?  I didn't understand what you asked.

21    Q.  You also examined W-2's, is that correct?

22    A.  Yes.

23    Q.  And you looked at W-2's that were used to support the tax

24    returns filed by Mr. Beavers?

10:50:35   25    A.  Yes.

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 74 of 121 PageID #:1603
Gershinzon - direct by Henderson
944

1  Q.  And what type of information are you looking for on the

2  W-2, in general?

3  A.  I'm looking for gross wages, taxable wages, withholdings,

4  federal and state.  I'm looking to see if there is a pension

10:50:59  5  contribution that reduces the gross wages down to taxable

6  wages.  I'm looking to see if there's any HSA plan, or 125 K

7  plan, or any sort of health insurance plan on there.  There's a

8  myriad of information that can be included on the W-2 and that

9  tells me if the return reflected that information properly.

10:51:31  10  Q.  And then you take that information and use it to prepare a

11  return?

12  A.  Right.  Or to check to see if a return was prepared

13  correctly.

14  Q.  Is a W-2 also a place where you find information from a

10:51:42  15  non-accountable plan?

16       MR. COLE:  Objection.

17       THE COURT:  The objection is sustained.

18  BY MR. HENDERSON:

19  Q.  Is the W-2 the place where you would find information on a

10:51:49  20  pension contribution?

21       MR. COLE:  Objection.

22       THE COURT:  Sustained.

23  BY MR. HENDERSON:

24  Q.  You indicated earlier that a W-2 was a document that's used

10:51:59  25  and so the information is simultaneously given to the taxpayer

Gershinzon - direct by Henderson

1  and to the IRS, is that what you told us earlier?

2           MR. GETTER:  Objection.

3           THE COURT:  Overruled.

4  BY MR. HENDERSON:

10:52:17  5  Q.  You can answer.

6  A.  Yeah, a duplicative copy is sent to the taxpayer and to the

7  IRS.  I don't know if they happen at the same time.

8  Q.  And so then, therefore, that duplicative information, as

9  you told us earlier, can be used by both the taxpayer and the

10:52:36  10  IRS to make sure that the return is correct?

11  A.  Yes.

12  Q.  Okay.  Now, has it been your experience where there are

13  items omitted from a W-2?

14           MR. COLE:  Objection.

10:52:47  15           THE COURT:  Sustained.

16  BY MS. HAMILTON:

17  Q.  Has it ever been your experience where a W-2 is wrong?

18           MR. COLE:  Objection.

19           THE COURT:  Sustained.

10:52:53  20  BY MR. HENDERSON:

21  Q.  Is it your experience that W-2's are always right?

22           MR. COLE:  Objection.

23           THE COURT:  Sustained.

24  BY MS. HAMILTON:

10:53:01  25  Q.  Does the IRS ever make mistakes?

| | |
|---|---|
| 1 | MR. COLE:  Objection. |
| 2 | THE COURT:  Sustained. |
| 3 | BY MR. HENDERSON: |
| 4 | Q.  Do CPA's always agree with the way an individual tax return |
| 10:53:19   5 | should be prepared? |
| 6 | MR. COLE:  Objection. |
| 7 | THE COURT:  Sustained. |
| 8 | BY MR. HENDERSON: |
| 9 | Q.  Is it fair to characterize sometimes some tax transactions |
| 10:53:35   10 | as either being routine or non-routine? |
| 11 | MR. COLE:  Objection. |
| 12 | THE COURT:  The question might be okay but it's got to |
| 13 | come a little later.  The objection is sustained. |
| 14 | BY MR. HENDERSON: |
| 10:53:52   15 | Q.  The tax -- the returns that you reviewed for Mr. Beavers |
| 16 | for 2006, '7, and '8, were all the transactions routine or were |
| 17 | there some non-routine?  Tell us what you saw? |
| 18 | MR. COLE:  Objection. |
| 19 | THE COURT:  I don't think his opinion of routine and |
| 10:54:15   20 | non-routine is germane, so I'm sustaining the objection. |
| 21 | BY MR. HENDERSON: |
| 22 | Q.  Tell us what you saw when you reviewed the returns, in |
| 23 | general? |
| 24 | MR. COLE:  Objection. |
| 10:54:26   25 | THE COURT:  If he's going to describe a return as a |

1  whole, he's going to be covering issues that are not relevant

2  here, so I'm sustaining the objection.

3  BY MR. HENDERSON:

4  Q.  Were there some specific items in the return that stuck out

10:54:42  5  to you when you reviewed Mr. Beavers' return?

6  A.  Excuse me for a second.

7      (Brief pause).

8  BY MR. HENDERSON:

9  Q.  Well, strike that question.

10:55:06  10      Were there some things that struck you about -- let's

11  start with the 2006 return.  Based on all the records that you

12  reviewed, the D-2's, the loans, the check stubs, the checks,

13  the bank statements, was there anything that struck you as

14  being unusual as it relates to the 2006 return, given all that

10:55:27  15  you had reviewed?

16  A.  Yes.

17  Q.  And what was that?

18  A.  What struck me as odd was the omission --

19      MR. COLE:  Objection, Your Honor.

10:55:46  20      THE COURT:  Yeah, because you are going beyond the

21  return, the objection is sustained.

22      MR. HENDERSON:  Your Honor, the question derives from

23  the return.

24      THE COURT:  The objection is sustained.

10:56:00  25  BY MR. HENDERSON:

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 78 of 121 PageID #:1607
Gershinzon - direct by Henderson
948

|  |  |  |
|---|---|---|
| | 1 | Q.  From looking at the return, did you determine that it |
| | 2 | was -- based on your review of checks, check stubs, D-2's, and |
| | 3 | everything you saw, did you form an opinion about the |
| | 4 | correctness of the 2006 return? |
| 10:56:22 | 5 | MR. COLE:  Objection, Your Honor. |
| | 6 | THE COURT:  It's non-specific.  The objection is |
| | 7 | sustained.  You're not looking to a general opinion here.  You |
| | 8 | might be talking about elements on this return that have |
| | 9 | absolutely nothing to do in this case. |
| 10:56:40 | 10 | BY MR. HENDERSON: |
| | 11 | Q.  Let's go to Line 16 A. |
| | 12 | If we can make that a little bigger. |
| | 13 | (Brief pause). |
| | 14 | MR. COLE:  Your Honor, I object to this. |
| 10:56:58 | 15 | MR. HENDERSON:  I haven't asked the question. |
| | 16 | MR. COLE:  Could we have a sidebar on this, Your |
| | 17 | Honor? |
| | 18 | THE COURT:  Sure. |
| | 19 | (Proceedings heard at sidebar on the record.) |
| 10:57:34 | 20 | MR. HENDERSON:  Judge, the whole point, the whole case |
| | 21 | is that something that's not on the return that should be |
| | 22 | there.  So I want to ask the expert if he sees something that's |
| | 23 | not on the return that should be there. |
| | 24 | MR. COLE:  He's pointing to the pension money and |
| 10:57:46 | 25 | going under that $68,000 -- |

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 79 of 121 PageID #:1608
Gershinzon - direct by Henderson
949

1     THE COURT:  The objection is sustained.  This is not a

2  correct question.  It's designed to try to get evidence from

3  this guy about what he thought about certain things, not what

4  wasn't there, particularly because he did not make it.

10:58:07    5     MR. HENDERSON:  I'm sorry, Your Honor?

6     THE COURT:  He did not make the return, this was not

7  his return.  That something should or should not have been

8  there, I don't think he's got an adequate foundation to do

9  this.  And besides, what you're dealing with is the return as

10:58:19  10  filed, and that's all.  This is a rhetorical examination.

11  You're asking about what his state of mind is, "were you

12  surprised to see this."  Basically, what was his emotional

13  reaction, his return, and the answer is no, you can't do that.

14     MR. HENDERSON:  Well, Judge, the government's position

10:58:37  15  is that the $68,000 should have been accounted for in the

16  return.  And so what I'm trying to drive at and to dig out is,

17  if, in fact, that's true, where would it have been.

18     THE COURT:  No.  You know, you got a point there to

19  make and maybe you should stick to the point.  This is not an

10:59:01  20  examination of expert testimony, this is an examination of a

21  personal reaction to an auditor.

22     MS. HAMILTON:  And it's in direct violation of your

23  order.

24     THE COURT:  Apart from that.

10:59:12  25     MR. HENDERSON:  Judge, may I have a five-minute break?

1      THE COURT:  Sure.

2      MR. HENDERSON:  Okay.  Thank you.

3  (Proceedings resumed within the hearing of the jury:)

4      THE COURT:  Short break.

10:59:46  5      THE MARSHAL:  All rise.

6  (The following proceedings were had out of the

7   presence of the jury in open court:)

8      THE COURT:  I've been asked for a five-minute break

9  but I have now come to the conclusion that five-minute break is

11:00:00  10  physically impossible in the context of this case.  Ten

11  minutes.

12  (Recess.)

13      THE MARSHAL:  All rise.

14  (The following proceedings were had in the presence of

11:23:07  15   the jury in open court:)

16      THE COURT:  Please be seated.

17      You're free to resume.

18      MR. HENDERSON:  Thank you, Your Honor.

19  BY MR. HENDERSON:

11:23:23  20  Q.  Mr. Gershinzon, I want to return your attention to some of

21  the government's exhibits that they used yesterday and maybe

22  the day before.

23      MR. HENDERSON:  Your Honor, I'd like to publish

24  page 203 that was already admitted into evidence and reviewed

11:23:46  25  yesterday.

1        MR. COLE:  We object to this chart being used with

2   this witness.  It has to do with the $1200 check.

3        MR. HENDERSON:  Your Honor, this is the chart the

4   government used yesterday and I want to ask --

11:23:56   5        THE COURT:  Let me look at it.  Put it on my screen.

6        (Brief pause) contingency --

7        THE COURT:  I'm sustaining the objection.

8   BY MR. HENDERSON:

9   Q.  Mr. Gershinzon, you indicated that you formed an opinion

11:24:37  10   that the 2006 tax return, at least based on the books and

11   records that you reviewed, was substantially correct, is that

12   right?

13   A.  No, that's not correct.

14   Q.  Tell me how I'm wrong.

11:24:54  15   A.  Ah, the 2006 tax return had a number of errors in it.

16   These errors were apparent from the documents that were

17   presented to the taxpayer, the W-2, or the 1098's --

18        MR. COLE:  Your Honor, objection.

19        THE COURT:  I think I'm going to have a voir dire on

11:25:37  20   this point, in which case I'm going to ask that the jury be

21   excused until I hear where this is going, because I can see why

22   it might be appropriate, I can also see why it might not be.

23   So I'd like to know the details.

24        THE MARSHAL:  All rise.

11:25:59  25        (The following proceedings were had out of the

1       presence of the jury in open court:)

2              THE COURT:  Please be seated.

3              Give me a second.

4       (Brief pause).

11:26:51    5       THE COURT:  The reason I'm doing this is, we did have

6   a discussion before this witness testified and I think I had a

7   fairly good idea of what purpose this witness is opposed to

8   fulfill for the defense, but I had some concerns that it was

9   not specific enough, and I think it isn't specific enough.

11:27:18    10       I can imagine some things that this witness could say

11  that would be highly relevant and some might be out of bounds,

12  so I'm going to hear it first.

13              You want to put the question to him again.

14                    VOIR DIRE EXAMINATION

11:27:33    15  BY MR. HENDERSON:

16  Q.  You reviewed the 2006 tax return and I asked you whether or

17  not you thought it was substantially correct and your answer

18  was?

19  A.  No, it was incorrect.

11:27:46    20  Q.  Okay.  And then you started to elaborate -- or you

21  indicated that they were not based on things that the taxpayer

22  would have known, is that correct?

23  A.  Yes.

24  Q.  Okay.  And why is that?

11:27:57    25  A.  Ah --

1  Q.  The tax preparer meaning Mr. Achusim.

2  A.  Yes.

3  Q.  Why is that?

4  A.  Because tax preparers rely on W-2's and documents as

11:28:14  5  presented to them by the taxpayer who relies upon his employer

6  or provider.  These documents, obviously, upon further

7  investigation, have errors in them.

8  Q.  What documents specifically have errors?

9  A.  The W-2 from the County should have had the stipend in the

11:28:40  10  gross wages.  Had it been there, that money would not have been

11  left off the return.  So, obviously, if you're preparing a

12  return with an incorrect W-2, you're going to have an incorrect

13  return.

14  Q.  And what do you base your opinion on the fact that the

11:29:00  15  County should have included the $1200 month stipend on the W-2?

16  A.  Because there's two kinds of expense allowance plans,

17  accountable and non-accountable.

18  Q.  What is an accountable plan?

19  A.  An accountable plan is when you hand in an expense report

11:29:19  20  with the log-in receipt telling the person who is being

21  reimbursed, you know, what you spent the money on, that is not

22  includable in a W-2.  A non-accountable plan is when they write

23  you a check every month for the same amount and ask for no

24  receipts or don't require any.

11:29:39  25  Q.  And that amount is supposed to be included in a W-2?

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 84 of 121 PageID #:1613
Gershinzon - voir dire by Henderson
954

1   A.  Yes.

2   Q.  And you base that opinion on what?

3   A.  The instructions on the W-2 forms clearly state that, and

4   the detailed instructions in IRS publication for travel and

11:29:54  5   entertainment clearly state.

6   Q.  So it's the law that the employer is required to put the

7   amount from an non-accountable plan on the W-2?

8   A.  On the W-2.

9   Q.  So that's the law as you understand it?

11:30:09  10   A.  The law as I understand it, yes.

11   Q.  And it's also your opinion, as an expert, that the taxpayer

12   has the right to rely on what's provided by the employer?

13   A.  Yeah, I think he has a right to rely on it.  Most of my

14   clients don't have the ability to audit their W-2, it's too

11:30:34  15   complex.  Most of my clients don't even open the envelope that

16   the W-2 comes in before they transmit it to you.  They send me

17   the W-2 in the envelope from employer with ADP put in across

18   the back.  They don't look at it.

19   Q.  And then what does the taxpayer, meaning you, do with the

11:30:55  20   information that you receive?

21   A.  I open the envelope and I input it into the tax return.

22   There's no way I could audit that either.

23   Q.  Were there any other areas where you believed that the tax

24   return for either 2006 or '7 or '8 was not substantially

11:31:20  25   correct?

1   A.  Yes.

2   Q.  Okay.

3   A.  I believe that the W-2 from the City is incorrect.

4   Q.  Okay.  And tell us why you think the W-2 from the City is

11:31:29   5   incorrect.

6   A.  Because it doesn't reflect the payment to the pension fund

7   as a reduction of taxable wages.

8   Q.  And when you say "the payment," you're talking about the

9   $68,000 payment?

11:31:41   10   A.  Yes.

11   Q.  And so you believe that the City's W-2's is also an error?

12   A.  Yes, I did.

13   Q.  And in your experience, what would -- so is it the same

14   process that the taxpayer would then have taken the W-2 and

11:31:52   15   given it to the tax preparer?

16   A.  Yes; exactly the same.

17   Q.  The preparer would have been used it to --

18   A.  To prepare the return not knowing that there was a

19   missing -- that there was $68,000 missing as a reduction of

11:32:08   20   income on that W-2.  It's hard to detect omission.

21   Q.  And how, for tax purposes, would that $68,000 have been

22   treated on the 2006 return?

23   A.  There would've been a reduction in taxable wages on Line 1

24   of the tax return.

11:32:27   25   Q.  So from a practical at standpoint --

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 86 of 121 PageID #:1615
Gershinzon - voir dire by Henderson
956

1      MR. HENDERSON:  If we could put up a 2006 tax return.

2    (Brief pause).

3  BY MR. HENDERSON:

4  Q.  So where would the $68,000 be reflected?

11:33:18   5  A.  Line 1.

6  Q.  Line 1.  So Line 1 now reads $89,419, correct?

7      MR. COLE:  Objection.

8  BY THE WITNESS:

9  A.  I'm sorry.  I can't see.

11:33:33  10  BY MR. HENDERSON:

11  Q.  Line 7 is 89,419, correct?

12  A.  Yes.  On Line 1, you're correct, it's Line 7, taxable wages

13  would have been reduced by the $68,000.

14  Q.  So you're saying that the 89,419 would have been reduced by

11:33:50  15  the 68 grand, approximately, which would have resulted in a

16  wages, salaries, tips on Line 7 of approximately 21,419,

17  approximately?

18  A.  Yes.

19  Q.  Okay.  Now, let's go to page 2.

11:34:04  20      So, in other words, before we move forward, the change

21  on Line 7 flows all the way through the return, correct?

22  A.  Yes.

23  Q.  And so let's go to line -- let's go to page 2.

24      So the bottom line for 2006, Line 76, was that the

11:34:33  25  commissioner owed 15,088, do you see that?

1  A.  Yes.

2  Q.  Do you have an opinion as to how the proper reflection on

3  Line 7 would have affected his return?

4  A.  Yes.

11:34:42  5  Q.  And what is that opinion?

6  A.  It would have been $1,000 refund.

7  Q.  So it's your opinion that the government owes him money?

8  A.  Yes.

9  Q.  Now, at the -- -- so that's for 2006?

11:35:00  10  A.  Yes.

11  Q.  And where should that -- and you told us earlier that the

12  68,000 should have been reflected on the W-2, correct?

13  A.  Yes.

14  Q.  All right.  Now, in subsequent years, would there be a

11:35:18  15  taxable event or taxable income as it relates to the 68-?

16  A.  The $68,000 would come back, as taxable income through the

17  retirement distributions aren't taxable.

18  Q.  And what form is that?

19  A.  That's a 1099 R.

11:35:40  20  Q.  And so the 1099 R is the money that you get from your

21  pension in future years?

22  A.  Yes.

23  Q.  Until you transition on to next life?

24  A.  Yes.

11:35:53  25  Q.  And so --

1   A.  That's taxism.

2   Q.  Okay.  Right.

3       So of the 68-, how would you anticipate that that

4   would be taxed in future years, 2007, 2008, ad infinitum.

11:36:21   5   A.  It's taxed as ordinary income as if it were wages because

6   that's essentially -- you get a -- well, I don't want to go on.

7   As ordinary income.

8   Q.  If you have a little bit of an explanation, you can give

9   it.

11:36:40   10  A.  Contribution to a pension plan is non-taxed in the year the

11  contribution is made in exchange for it and the income on it

12  being taxed in the future or if it is paid out of the pension

13  plan.

14  Q.  So similar to a 401K that you get to put money one year but

11:37:08   15  that you don't pay the taxes on it until future years?

16  A.  Yes.

17  Q.  And is the rationale behind that because in your senior

18  years your tax rate is lower?

19  A.  That would be the rationale for making the contribution,

11:37:22   20  yes.

21  Q.  Okay.  Are there other rationales for the law, as you

22  understand it?

23  A.  The law is there to provide a retirement funding mechanism

24  for the citizens of the United States of America.  Most people

11:37:49   25  either have a pension plan or a profit sharing plan or a 401K

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 89 of 121 PageID #:1618
Gershinzon - voir dire by Henderson
959

1  or 401 C3.  Most people, they'll save for their old age and

2  this is the mechanism that is best to do so because the

3  earnings on it are tax free while being earned.

4        MR. HENDERSON:  One moment.

11:38:21  5     (Brief pause).

6  BY MR. HENDERSON:

7  Q.  Mr. Gershinzon, I guess one final line of questioning.  For

8  individuals, not for corporations, but for individuals, there's

9  a basic concept that you can't be taxed the same money twice,

11:38:55  10  is that correct?  For income, I should say.

11  A.  Actually you have it in the reverse order.

12  Q.  Okay, why don't you explain it to us, then.

13  A.  In general, income is the subject of double taxation from

14  the same tax.  Actually, there is double taxation in the sense

11:39:16  15  that the state taxes you owe, so .... but in most cases, if you

16  have paid tax on a piece of income, the IRS does not require

17  you to repay the income tax on it.  There's an exception in

18  that C corporations pay taxes at their level, and then when

19  they make dividend distributions, sometimes it's the

11:39:55  20  individual -- the individual will then pay tax on previously

21  taxed income.  In general, that, you know -- in recent years it

22  has been minimized by a lower tax on dividends on the 15 or 10

23  percent.

24  Q.  You had an opportunity to review a chart prepared by Ponzo,

11:40:19  25  Mr. Ponzo, about when the $68,000 should be taxed, is that

1  correct?

2  A.  Yes.

3  Q.  And did you agree or disagree with his presentment of when

4  the $68,000 should be taxed?

11:40:32  5  A.  I disagreed.

6  Q.  And tell us why you disagreed?

7  A.  There are two transactions here dealing with the same

8  $68,000.  The first transaction is the money that came out of

9  the campaign account.  Mr. Ponzo, has shown that on his

11:41:03  10  schedule to be a taxable event in 2006.  Okay, my opinion is

11  that I don't think that that was a distribution of income to

12  Commissioner Beavers.

13       The second transaction that involves the same $68,000

14  is what Mr. Beavers did with the money.  He took the money and

11:41:35  15  he made a contribution to a pension plan.  Okay, this

16  contribution to a pension plan, in my opinion, is a deductible

17  event.

18  Q.  That goes back to --

19  A.  Line 7.

11:41:54  20  Q.  Line 7.

21  A.  Incorrect W-2.

22       And so in my opinion, rather than having an additional

23  piece of income, the $68,000 on the return in fact there should

24  be a deduction of the $68,000, this would be an approximate

11:42:17  25  $140,000 in income to what I think is appropriately taxable

1   income and what the IRS adjustment shows as taxable income.

2   Q.  So on this chart, Mr. Ponzo is adding approximately Line 7,

3   68-, and you're doing just the opposite, you're reducing it?

4   A.  Yes.

11:42:39   5         MR. COLE:  Objection, Your Honor.

6   BY MR. HENDERSON:

7   Q.  What was your understanding of what Mr. Ponzo did?

8   A.  He added it just an adjustment to income, I'm assuming it

9   would be other income.

11:42:50   10  Q.  Mr. Ponzo, in other words, said it should be taxed back in

11  in 2006?

12  A.  Yes.

13  Q.  And your conclusion is just the opposite, that it should be

14  deducted from the 89,419?

11:43:03   15  A.  I don't think Mr. Ponzo's 68,000 should be added and I

16  think that that contribution to the pension plan should be

17  deducted.  The confusion lies in, there's two transactions

18  here, one transaction is a withdrawal of funds from the pension

19  plan, the question the IRS has posited that that is includable

11:43:25   20  as income.  My opinion is, that's a loan, and that's not

21  income.  The second transaction is the contribution to the

22  pension plan, okay.  None of Mr. Ponzo's schedules address that

23  issue.

24  Q.  And so it should have been addressed in the W-2?

11:43:47   25  A.  The W-2 should have reflected that a contribution was made

1   to this plan and reduced gross wages to a new taxable wage

2   amount reduced by $68,000 on Line 7 of the 2006 return.

3   Q.  Are there any other elements to your opinion as it relates

4   to the 68,000?

11:44:13   5   A.  Well, one of the things that I was shown subsequent to my

6   voir dire testimony when I first posited this theory was an

7   opinion that the direct payment to this pension plan would have

8   been a post-tax deduction and that pension people said that the

9   only way a pre-tax deduction could occur would be through a

11:44:50   10   withholding, a roll-over, another roll-over.

11         Well, okay, but more important, was that -- was that

12   the subsequent 1099 R's that were issued by his pension plan,

13   okay, were therefore incorrect because they never reflected

14   that this was a post-retirement contribution.  They said, "oh,"

11:45:19   15   which is how an accountant would read a 1099 R, there's a

16   nontaxable portion of the distribution, there's a taxable

17   portion of the distribution, the nontaxable portion of the

18   distribution is the investment in contract on an annuity, that

19   number was 15,000, far less than 69,000 or 68,000.  That's

11:45:40   20   showing that until they were asked, the City thought and

21   treated it as a pre-tax contribution which would've made it

22   deductible in 2006, because certainly you don't pay tax on it

23   in 2007 and 2008 and 2009 and 2010 and 2011 and 2012 because

24   they don't have that $69,000 in the investment contract or

11:46:14   25   post-tax contribution line.  So how many times does he have --

Gershinzon - voir dire by Cole

963

1  well ....

2  Q.  So, first of all, the bottom line opinion is that the City

3  dropped the ball on the W-2?

4  A.  Yes.

11:46:29  5  Q.  And then you also made reference to a 1099, and there's a

6  Line 1 and a Line 2 A which speaks to gross distribution versus

7  taxable amount, do you see that?

8  A.  Uh-huh.

9  Q.  And is that some information that the taxpayer uses to get

11:46:49  10  input on the 1040?

11  A.  Yes.

12  Q.  So just because you received money from your pension plan,

13  as in Line 1, doesn't necessarily mean that it gets taxed on

14  the 1040, correct?

11:46:59  15  A.  Correct.

16        MR. HENDERSON:  No further questions, Your Honor.

17        MR. COLE:  Your Honor, the government cited objections

18  to this testimony.

19        THE COURT:  Why don't you see if you might want to ask

11:47:17  20  a couple of questions.

21

22

23                    VOIR DIRE EXAMINATION

24  BY MR. COLE:

11:47:23  25  Q.  What is the basis of your opinion that the $68,000 was

1  deductible?

2  A.  The basis of my opinion is that in the 35 years of public

3  accounting in preparing tax returns, I have seen very few

4  nondeductible contributions to pension plans.

11:47:52  5          Furthermore, the letter requiring the contributions to

6  the pension plan from the City did not say this, this, okay, is

7  a post-tax contribution.  One would think that would be

8  important enough to include in the letter requiring a $69,000

9  payment.

11:48:10  10         Third, the amount that was nontaxable on the '07 and

11  '08, 1099's was clearly to me too small to include the $69,000

12  as a post-contribution -- a post-tax contribution.  So at that

13  point, okay, all evidence seems to me that it would be like

14  most pension contributions and deductible.

11:48:47  15  Q.  You would agree, correct, that assuming that the $68,000

16  check to the pension fund was not a loan, just assume that he

17  took the money without an intent to repay, fair enough?  Can

18  you just go through that assumption for now?

19  A.  I can assume that, yes.

11:49:06  20  Q.  You would agree, then, that that $68,000 check would wind

21  up, should be put on the tax return for 2006, isn't that

22  correct?  It would go on Line 21?

23  A.  It's more likely than not that it should.

24  Q.  It should because it's income, right?

11:49:41  25  A.  If you're saying it's not a loan, that it would be income.

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 95 of 121 PageID #:1624
Gershinzon - further voir dire by Henderson
965

1  Q.  And it should go on the 2006 tax return, correct?

2  A.  It should go on the 2006 tax return.

3      MR. COLE:  Your Honor, I can ask more questions about

4  the deductibility of the $68,000 if you'd like, but I don't

11:50:04  5  think we need to make anymore record on that.

6      MR. HENDERSON:  Judge, I have a follow-up.

7      THE COURT:  Go ahead.

8              FURTHER VOIR DIRE EXAMINATION

9  BY MR. HENDERSON:

11:50:26  10  Q.  So now, Mr. Cole asked you does the 68- -- so you answered

11  his question narrowly which is that the 68,000 does go on -- if

12  it was income, if it was income, it would appear on -- let's do

13  --

14      MR. HENDERSON:  Let's pull the 2006 return.

11:50:48  15      (Brief pause).

16  BY MR. HENDERSON:

17  Q.  So taking Mr. Cole's hypothetical, if the $68,000 was

18  income, where would you put it?

19  A.  I would put it under other income.

11:51:16  20  Q.  So that's line number 21?

21  A.  Yes.

22  Q.  Okay.  Now, would you also put that same $68,000 another

23  place on that return as a deduction?

24  A.  If I was -- the W-2 would have been $68,000 less.  Line 14

11:51:39  25  would have been $68,000 more if it was income, and the return,

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 96 of 121 PageID #:1625
Gershinzon - further voir dire by Henderson
966

1  as taxable income, would have remained unchanged.

2  Q.  So the net effect of the hypothetical that Mr. Cole gave

3  you was that --

4       MR. HENDERSON:  Let's go to page 2.

11:51:58  5     (Brief pause).

6  BY MR. HENDERSON:

7  Q.  So the net effect is that the commissioner still would have

8  owed the same 1588?

9  A.  Yes, so there wouldn't have been any change to taxable

11:52:10  10  income, the adjustments, or anything else.

11  Q.  So walk us through that one more time, if you can.  Let's

12  go to page 1.

13  A.  Line 7, the W-2 incorrectly reflected the contribution of

14  the pension plan and the taxable wages had been reduced by

11:52:32  15  $68,000.

16  Q.  So Line 7 would have been lowered?

17  A.  Lowered by 68-.  Line 21 would've been higher if the

18  payment from the campaign fund was considered income, taxable

19  income would have been the same, and the tax would have been

11:52:52  20  the same as originally reported.

21  Q.  Okay.  So then to summarize your opinion, if it was a

22  loan --  if the $68,000 was treated as a loan in 2006 -- let's

23  go to page 2.

24     (Brief pause).

11:53:09  25  BY MR. HENDERSON:

Gershinzon - voir dire by Cole

1   Q.   Then the government would have owed money to the

2   commissioner, correct?

3   A.   Yes.

4   Q.   Now, let's go back to page 1.

11:53:25   5        Under the government's theory that if the $68,000 had

6   been income, then Line 7 would be lower, Line 21 would be

7   higher.

8        And then let's go back to page 2.

9        (Brief pause).

11:53:44   10   BY MR. HENDERSON:

11   Q.   The net payment would have been the same, is that correct?

12   A.   Well, the net tax.

13   Q.   Yes, the net tax would have been the same.

14        And taking it a step further, when, then, if at all,

11:53:59   15   would the Commissioner have paid the tax on the 68- since the

16   net effect in 2006 is the same?

17   A.   He would've paid taxes on $68,000 as returned to him by the

18   pension plan over his life.  The $68,000 I consider a loan,

19   okay, wouldn't have been taxable to him as long as it stayed a

11:54:38   20   loan.

21        MR. HENDERSON:  No further questions.

22             FURTHER VOIR DIRE EXAMINATION

23   BY MR. COLE:

24   Q.   Now, the $68,000 contribution, that was a contribution that

11:55:01   25   the defendant decided to make, correct?

1    A.  (No answer.)

2    Q.  I think this is a hard question, right?

3            It was voluntary.

4    A.  Well, most contributions to pension plans are voluntary,

11:55:26    5    but yes.

6    Q.  But not all, right?

7            THE WITNESS:  Excuse me, Your Honor, if I could have

8    clarification?

9            THE COURT:  As him.

11:55:34    10           THE WITNESS:  I was told I couldn't testify as to

11   anything that was Commissioner Beavers' opinion because he

12   hasn't testified, so how would I know?

13   BY MR. COLE:

14   Q.  Well, you know based on a letter that Commissioner Beavers

11:55:45    15   received from --

16   A.  Well, I don't know if he did a voluntary or not.  The

17   letter said you have 14 days to pay this if you want this

18   money.

19   Q.  You read the letter?

11:55:52    20   A.  Yes.

21   Q.  The letter had three options, right?  Do you remember that?

22   A.  I do remember it.

23   Q.  And the first option was, he could do nothing, do you

24   remember that?

11:56:01    25   A.  Yes.

Gershinzon - voir dire by Cole

1  Q. And if he did nothing, he'd still get a pension but it

2  would be 2800 a month, do you remember that?

3  A. Yes.

4  Q. Okay. And the second and third options were options he had

11:56:13  5  to make a voluntary contribution to the pension fund, do you

6  remember that?

7  A. Yes.

8  Q. So he chose to make a voluntary contribution to the pension

9  plan, right?

11:56:25  10  A. I can't testify as to what he chose. I can testify as to

11  what happened.

12  Q. Okay.

13  A. A contribution was made to the plan.

14  Q. But it was a voluntary contribution, right?

11:56:39  15  A. He wasn't compelled to do it.

16  Q. And so it was a voluntary contribution?

17  A. I cannot agree with that.

18  Q. Why not?

19  A. Because I can't testify as to his state of mind.

11:56:49  20  Q. I'm not asking you to. I'm asking you about the letter

21  that he received, right? The letter he received said he did

22  not have to make a contribution to the pension plan, correct?

23  A. Would you read me the letter, please.

24          MR. COLE: Sure. Let's put it on the board.

11:57:12  25      (Brief pause).

BY MR. COLE:

Q.  Let's look at option 1.

A.  I can't see it.

Q.  Option 1?

11:57:37    A.  Could I see the first paragraph, please.

Q.  Absolutely.

(Brief pause).

A.  I don't see "voluntary" in there.

Q.  I'm not asking whether you see the word "voluntary," I'm

11:58:04   asking you whether it was a mandatory contribution to his

pension plan.

A.  No, it was not a mandatory.

Q.  So if it was not mandatory, it was a voluntary

contribution, right?

11:58:15         MR. HENDERSON:  Your Honor, we'll just stipulate that

the Commissioner chose option three so we can -- for purposes

of this line of questioning, we'll stipulate that the

commissioner chose option three.

THE COURT:  I don't understand what the witness'

11:58:28   confusion is.

MR. HENDERSON:  And that's --

THE COURT:  A step which is not compelled is a step

which is voluntary.

MR. HENDERSON:  We had some discussions, Your Honor,

11:58:39   so I cautioned Mr. Gershinzon, based on your admonition to me,

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 101 of 121 PageID #:1630
Gershinzon - voir dire by Cole
971

1    hes not supposed to get into Mr. Beavers' state of mind.

2         THE COURT:  We're not talking about his state of mind,

3    we're talking about that which is not compelled as a voluntary

4    choice under the law.

11:58:56    5         MR. HENDERSON:  I made the mistake in cautioning

6    Mr. Gershinzon not to talk about anything that the commissioner

7    did because I told him that was out of bounds, but we'll --

8    again, we'll stipulate that the commissioner chose payment 3.

9         THE COURT:  Fine.

11:59:11    10    BY MR. COLE:

11    Q.  You ever hear of the Tax Reform Act of 1986?

12    A.  Yes.

13    Q.  And it changed a lot of tax law, right?

14    A.  Yes.

11:59:18    15    Q.  Let me show you one provision from the Tax Reform Act of

16    1986.

17         I'm going to highlight it for you.  Can you please

18    read what that says.

19    A.  It says:

11:59:45    20      "Repeal deductions for qualified voluntary employee

21        contributions."

22    Q.  Okay.  Have you ever heard of something called the 2006

23    Pension Answer Book?

24    A.  No.

11:59:56    25    Q.  Have you ever heard of the Answer Book series?

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 102 of 121 PageID #:1631
Gershinzon - voir dire by Cole
972

1  A.  Yes.

2  Q.  What is that?

3  A.  It's the IRS's position of commonly asked questions.

4  Q.  And let me show you --

12:00:21  5  A.  Pardon me.  See, this is a perfect example of the

6  difference of the meaning of "voluntary."

7  Q.  Your entire testimony depends on the fact that it was not a

8  voluntary contribution, isn't that right?

9  A.  No.

12:00:34  10  Q.  Let me show you the 2006 Pension Answer Book.

11      MR. HENDERSON:  Your Honor, we would only make a brief

12  objection to this so far as what is contained in the book was

13  not law, per se, nor does it include all of the facts that

14  would be involved in the hypothetical that would necessarily

12:01:03  15  lead to an answer under this line of questioning, but with

16  those objections, we're fine.

17      THE COURT:  I'm permitting this because the witness

18  has a non-standard definition of "voluntary" and this is a way

19  to maybe get some understanding of what his thought process is.

12:01:20  20  BY MR. COLE:

21  Q.  So I'm going to show you number 629 here.  The question is:

22      "What tax advantages are gained when a qualified

23       retirement plan permits participants to make

24       voluntary contributions."

12:01:35  25      And I'm just going to read the first clause

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 103 of 121 PageID #:1632
Gershinzon - voir dire by Cole
973

| | | |
|---|---|---|
| | 1 | there: |
| | 2 | ".. although participants cannot deduct their |
| | 3 | voluntary contributions to the plan." |
| | 4 | Did you see that?  Did I read that right? |
| 12:01:45 | 5 | A.  Yes. |
| | 6 | Q.  Okay.  And I'm going to go under question 630: |
| | 7 | "... may a qualified retirement plan permit deductible |
| | 8 | employee contributions." |
| | 9 | Do you see that? |
| 12:01:56 | 10 | A.  Yes. |
| | 11 | Q.  And can you read the next sentence underneath that. |
| | 12 | A.  (Reading:) |
| | 13 | "... law permitting deductible employee contributions |
| | 14 | was repealed." |
| 12:02:07 | 15 | Q.  And it cites the Tax Reform Act of 1986, right? |
| | 16 | A.  Yes. |
| | 17 | Q.  And it's also the basis of your opinion that the law does |
| | 18 | not tax him twice under contributions, right?  They're taxed |
| | 19 | either on the way in or on the way out, correct? |
| 12:02:24 | 20 | A.  Yes. |
| | 21 | Q.  Let's look at the 1099 R for 2007. |
| | 22 | Let's focus in on the 2007 tax return, 10.  Let's |
| | 23 | focus in on the gross amount. |
| | 24 | A.  Uh-huh. |
| 12:03:04 | 25 | Q.  Okay, so gross distribution of 87,000 and change, right? |

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 104 of 121 PageID #:1633
Gershinzon - voir dire by Cole
974

1   A.  Correct.

2   Q.  And there's a taxable distribution of $86,000 a month and

3   change, right?

4   A.  Right.

12:03:17   5   Q.  So there's a difference between the taxable amounts and the

6   gross distribution, isn't that correct?

7   A.  Correct.

8   Q.  And let's look at Box 5.

9       And this says, Box 5, "EMP. Contri," do you see that?

12:03:28   10   A.  Uh-huh.

11   Q.  And there's $1,270.75, do you see that?

12   A.  Right.

13   Q.  And that was the difference between the gross distribution

14   and the taxable distribution, right?

12:03:44   15   A.  Correct.

16   Q.  This is the amount that was not taxed on in 2007, right?

17   A.  Correct.

18   Q.  And this is the amount -- this should be the prorated

19   amount of the amount that he made in his after tax voluntary

12:03:56   20   contribution, correct?

21   A.  That's what it's supposed to represent, yes.

22   Q.  So he's not taxed on his voluntary contributions to the

23   pension plan when it comes out because he's taxed already

24   before it goes in, isn't that right?

12:04:11   25   A.  He was using the word "voluntary."

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 105 of 121 PageID #:1634
Gershinzon - voir dire by Henderson
975

1    Q.  Okay.

2    A.  For example --

3    Q.  I don't there are any other questions pending.

4         MR. HENDERSON:  Your Honor, I have two.

12:04:26    5         MR. COLE:  Hold on.  Hold on.  I might not be

6    finished.

7         MR. HENDERSON:  Sorry.

8       (Brief pause).

9         MR. COLE:  Okay.

12:04:35   10              FURTHER VOIR DIRE EXAMINATION

11   BY MR. HENDERSON:

12   Q.  Now, can we put the exhibit back up.

13        So, Mr. Gershinzon, let's go to option 3 -- no, let's

14   go to the first paragraph.

12:05:18   15         MR. HENDERSON:  Would you highlight the first

16   paragraph for me, please.

17   BY MR. HENDERSON:

18   Q.  Now, you had an opportunity to review this letter, correct?

19   A.  Yes.

12:05:30   20   Q.  And the language is, the second sentence:

21       "... you can establish an additional 8 and a half

22        years of service credit in this fund by paying for

23        your allowable temporary service from April 16, 1983,

24        to October 31, 1999."

12:05:49   25          Do you see that?

Case: 1:12-cr-00124 Document #: 123 Filed: 04/03/14 Page 106 of 121 PageID #:1635
Gershinzon - voir dire by Henderson
976

1    A.  Yes.

2    Q.  And you understood that there was a lawsuit down in

3    Springfield that had to do with the aldermen here in the City

4    of Chicago who were not allowed to make contributions to their

12:06:00    5    pension plans during that time period, correct?

6    A.  Yes.

7    Q.  So you knew that this was, at least as this letter went to

8    Mr. Beavers, there were just a few people in the entire City,

9    much less the entire state, who were able to take advantage of

12:06:13    10   that particular provision as communicated to by the pension

11   people, correct?

12   A.  Yes.

13   Q.  And so, in effect, because the law changed, Mr. Beavers was

14   allowed to make a catch-up, correct?

12:06:26    15   A.  (No response.)

16   Q.  That was the justice of the 68,000 or a significant portion

17   of the payment.

18   A.  Yes.  They offered the letter to make a catch-up.

19   Q.  Now, this language that Mr. Cole showed you for the average

12:06:53    20   person, as far as you know, did or did not apply to the

21   transaction involving the Commissioner?

22   A.  The term "voluntary contribution" in the context of this

23   exhibit means a voluntary post-tax contribution.  It does not

24   mean whether the person had volunteered to make of their own

12:07:26    25   free will.  It's a specific term.

1          During the time prior to this law, people were allowed

2    to make contributions to their pension plans in excess of the

3    amount that could be deferred and not paid tax on.  So if they

4    could only put in $10,000 and defer that much income to later,

12:07:52    5    they could voluntarily contribute additional funds that while

6    it didn't go in pre-tax, certainly earned income pre-tax.

7          This prohibition was to stop that kind of voluntary

8    contribution, not the type of voluntary contribution that is

9    reflected on your W-2 that says, gee, you put $14,000 in your

12:08:20   10    Ira or your 401K this year, your gross wages, taxable wages,

11    have been reduced by 14,000, which is just as voluntary in

12    terms of "I volunteer."  This is a work of art, a term specific

13    to a type of transaction that said "post-tax," it's been taken

14    out of context, okay, and intended to mislead.

12:08:48   15          What we have here is, under the alderman situation,

16    was a situation where he was prohibited from making a

17    contribution as an employee to a plan that would've been

18    pre-taxed because for some reason someone didn't think he

19    worked for the City.  And, of course, justice prevailed and

12:09:15   20    they said no, he was an employee and he gets to make it up.

21    And he should be able to make it up pre-tax, because he

22    would've made the pre-tax or he could have except he was denied

23    the opportunity to.  And so --

24    Q.  How -- I'm sorry.

12:09:37   25    A.  These are very complicated issues, unless you're familiar

1    with them, to ask me a question and say "wouldn't you say

2    this?"  No, I wouldn't say half the stuff you people are

3    saying.

4    Q.  So the bottom line is that the $68,000 was not some every

12:10:03  5    day routine transactions that the average taxpayer --

6    A.  No, it certainly is not referred to by the statute of the

7    fact that he did it of his own free will and cognizance.  A

8    voluntary contribution was specifically limited to a post-tax

9    contribution that you could make your pension plan, not one you

12:10:31  10   made of your own free will.

11                 MR. HENDERSON:  No further questions.

12                 MR. COLE:  I've no other questions, Your Honor.

13                 THE COURT:  I have some concern with the witness'

14   competency to testify in light of some assumptions he seems to

12:10:57  15   be making, in one case, despite clear direction by the Court,

16   and in another case seemingly unjustified.

17                 When he testified on voir dire, he was, according to

18   him, told by the defendant some things about why he did stuff.

19   And he was instructed that he could not consider that, but in

12:11:44  20   answering questions and showing his reluctance based on what

21   the alderman said, something he was supposed to take out of the

22   calculus, he didn't take it out of the calculus.  His answer

23   was, I'm not going to answer that question because I can't take

24   what I think the alderman said to me out of the equation.  And

12:12:10  25   that's a difficult thing to deal with with the witness.

1    The other thing is is in the course of his answer

2    about W-2's, he made an interesting statement.  He said that,

3    look, what happens with a lot of his clients, they can't

4    understand the W-2, they don't know how it was arrived at, and

5    when they come in to see me they give me the envelope, the W-2

6    envelope.  And I can understand that there is significant

7    number of taxpayers who think that that is the case, but he

8    does not seem to have concerned himself with the fact that it

9    is possible that someone who served as a former alderman in the

10   City of Chicago, was a current Commissioner of Cook County,

11   that this individual could not get a detailed explanation from

12   high ranking City and County officials as to what was in his

13   W-2 and how it was arrived at.

14   And I'm not accusing this witness of trying to sneak

15   this in.  He's not trying to sneak this in.  He said it openly.

16   But I find that he is not careful with his assumptions.  The

17   one assumption that I just pointed to is one that may not be

18   justifiable under the circumstances, so we don't know what his

19   basis is, and this is a source of serious concern to me.

20   The consequence of that is is we are going to take the

21   break now and we may have to make further inquires.  The

22   witness will remain on the stand, but I'm letting the jury go

23   to lunch.

24   Have them come back in an hour.

25   You can step down, but you don't have to leave the

12:12:38

12:12:59

12:13:29

12:13:59

12:14:29

1    courtroom.

2           Counsel, come to the lectern.

3        (Brief pause).

4           THE COURT:  I'll hear from the prosecution first.

12:15:08   5           MR. GETTER:  If we could confer for a moment, Your

6    Honor?

7           THE COURT:  Yeah.

8        (Whereupon, there was a conference had between

9         counsel.)

12:15:43  10           MR. COLE:  The government would renew our objection,

11   Your Honor.  These opinions are certainly not relevant, as this

12   Court has repeatedly held, and there's clearly no basis for

13   these opinions, and he certainly hasn't articulated the basis

14   for these experiences other than his experience of 30 years as

12:16:06  15   a taxable preparer.  So I think Mr. Henderson has fully

16   exhausted his permissible topics of this witness already on his

17   direct examination.  I don't know what else there is to do.

18           MR. HENDERSON:  Your Honor, my response would be that

19   what has been testified to by Mr. Gershinzon is not only well

12:16:25  20   supported by the tax code but by his experience, and also, by

21   extension, by experiences of many, not necessarily all but many

22   tax preparers.  And what Mr. Gershinzon has to say goes to the

23   heart of the government's case, which is, you know, if there

24   were errors made on the W-2's, then that's something that the

12:16:47  25   jury should be able to know and that they should be able to

1    consider.

2         And what the government wants to do is attempt to

3    prejudice Mr. Beavers or even convict him for something that he

4    wasn't in charge of or wasn't in control of.  And they're able

12:17:06    5    to make the argument at closing and throughout the course of

6    trial that he could have known, should have known, would have

7    known, and did know, but, simultaneously, the jury should know

8    that, at a minimum, that there were mistakes made by the City,

9    as the government has found out from interviewing County the

12:17:25    10   City employees, they now know that themselves.  And so that is

11   part of the transaction that took place in 2006, 2007, 2008.

12   They interviewed the City witnesses, they interviewed the

13   County witnesses, they know the W-2's were incorrectly prepared

14   and that information should, at a minimum, reach the jury.

12:17:41    15        MR. SOROSKY:  If I may also add, Your Honor.  The

16   defendant has two theories of defense here, one is that these

17   items were a loan.  Secondly, in the alternative, it is income

18   based on the tax laws, just let me use that phrase.  As

19   described by CPA Gershinzon, Mr. Beavers may not owe any money.

12:18:15    20   If Mr. Gershinzon cannot testify to these things, you're

21   depriving the defendant of presenting his defenses to the jury,

22   and you also demean the defendant's testimony.  If the

23   defendant were to testify and say those things, he would have

24   the benefit that this is corroborated by an independent expert

12:18:40    25   witness, because Mr. Gershinzon was not, in fact, his

1    accountant.  And the defendant would then be subject, should he

2    testify, to the government's comments, "well, anyone could get

3    up and say they were a loan now, you're accused of a crime,

4    that's your defense."  However, if Mr. Gershinzon testifies,

12:19:07    5    they can't quite say that because this is corroborated by an

6    independent expert witness.

7         THE COURT:  The government's view on proof that he

8    didn't owe any money, is this a defense to the counts?

9         MR. GETTER:  Judge, the issue is whether the

12:19:39    10   defendant's representations in the tax returns were false,

11   that's the issue.  The defense keeps working on the back end of

12   the transaction and not the front of the transaction.  The

13   question is whether the defendant made false representations in

14   the tax return.

12:19:53    15        MR. HENDERSON:  Your Honor, that's not the issue in

16   the case.  The issue in the case is whether Mr. Beavers

17   intentionally falsified the tax returns to gain a benefit.

18   False could mean that his name was spelled wrong, false could

19   mean that his social security number was transposed, that's not

12:20:13    20   what this case is about.  What the case is about did Mr.

21   Beavers intentionally either include or omit information on his

22   tax returns to gain an advantage, on other words to make money,

23   or to get money that he wasn't entitled to.  Simply having the

24   return to be false by a name misspelled or a number being wrong

12:20:32    25   or a number being transposed, that's not what this is about.

1  MS. KAES BERG:  And, Your Honor, if I may, the

2  representation that are made in the tax returns are what are at

3  issue.  What they're based on is really what's at issue.  Are

4  they based on a corrupt intent by someone to defraud the IRS or

12:20:55  5  are those representations based on documentations that

6  corroborates his good faith.  So how can you circumstantially

7  prove good faith in this case without these underlying facts?

8  That can't be done.  And the good faith instruction that the

9  jury is going to get needs to be corroborated by those facts

12:21:08  10  and we're entitled to be able to put this in our defense.

11  THE COURT:  But this is what leads to one of my

12  principal problems with this witness, and that is he does not

13  seem to be able to get out of his mind and take out of the

14  calculus what he was told by the defendant in this case.  He's

12:21:28  15  relying on a piece of evidence for which the government has yet

16  to have an opportunity to confront the course of that.

17  MR. SOROSKY:  I don't think that's the case --

18  THE COURT:  My basic problem is, I have serious

19  questions with the reliability of this witness and his

12:21:50  20  qualification as an expert.  Maybe it would have been better

21  off if he had not spoken to the defendant and could just take

22  this on the basis of what he knows, but it seems to have

23  penetrated his mind.  I mean, he really fought on that

24  voluntary issue and, frankly, misconstrued it in a tax context

12:22:23  25  but --

1    MR. SOROSKY:  If I may explain.

2    THE COURT:  -- that was, to me, an enormous problem.

3    MR. HENDERSON:  But, Your Honor, and I believe that,

4  first of all, we admonished Mr. Gershinzon about what he could

12:22:35  5  and couldn't do.  But secondarily, I believe that what

6  Mr. Gershinzon said is that the term "voluntarily" in the tax

7  code, in the context of the tax code, does not have the meaning

8  that Mr. Cole was trying to ascribe to, which is why we went to

9  the document that shows the catch-up.  So the point was that it

12:22:54  10  was not a voluntary contribution in the context that he was

11  prohibited -- the Commissioner had been prohibited or prevented

12  from doing it in the first place.

13    THE COURT:  That's not what I heard in his testimony.

14  What I heard in his testimony was that he is not going to talk

12:23:09  15  about voluntariness because he was told he can't rely on

16  anything the defendant said.  And that conclusion that it's not

17  voluntary is clearly based and it's -- I don't think he can get

18  rid of it, I don't think he can get it out of his mind.

19    Now, lots of experts -- there are occasional experts

12:23:34  20  who can't do that, they can't -- you ask them to assume certain

21  things and they can't get by it.  And the reason I cited the

22  example of the people who handed him W-2's in envelopes is,

23  that he's making a series of assumptions unconsciously, from

24  what I can see, and I'm concerned, deeply concerned, about his

12:23:59  25  reliability as a witness.

1        And when you're an expert witness, everybody knows you

2  get everybody in the jury room know that you get put on the

3  witness stand by a lawyer for one side and therefore you assume

4  the witness might be a little biased in favor of that lawyer's

12:24:22    5  client.  They shouldn't be, but the jury might assume that.  In

6  this case, and in most cases, we tolerate the fact that a

7  witness gets up and being presented with a series of questions

8  will rely only on what he's entitled to rely on and reach

9  conclusions accordingly.  I don't think this witness can do

12:24:51  10  that.  And I said "can," I don't think he can do that, which

11  makes him untrustworthy as a witness, particularly in this

12  crucial area.

13        Now, let's get back a moment to the nature of the

14  charges --

12:25:10  15        MR. HENDERSON:  Your Honor, just so we make the record

16  clear in terms -- with respect to Mr. Gershinzon.

17        THE COURT:  Yes.

18        MR. HENDERSON:  Number one, there are multiple options

19  to address the concern.  Number one -- first of all, I believe

12:25:23  20  that the nature of his testimony before the jury is different

21  during voir dire, and so Mr. Gershinzon can simply be

22  instructed to narrow the testimony that he gives in front of

23  the jury versus the one that he gave to Mr. Cole, number one --

24        THE COURT:  He would be put on the stand without

12:25:41  25  knowing?  That's a little hard to believe.

1    MR. HENDERSON:  Well, Your Honor, secondarily, to the

2    extent that Mr. Gershinzon does not testify in the manner that,

3    you know, the instruction to the jury about, of course, all as

4    an option.

12:25:54    5    And then, third, the government in this particular

6    case has their own expert who also is a certified public

7    accountant.  And so, therefore, you know, it's very proper for

8    it to become, as an option, a battle of the experts such that

9    the jury is able the see the demeanor and the testimony of

12:26:13    10    Mr. Gershinzon.  I don't think anybody yesterday thought

11    Mr. Ponzo was necessarily there testifying for Mr. Beavers.  I

12    think it was pretty clear that he was testifying for the

13    government.  And so, you know, our position is that the jury is

14    able to make the distinctions between Mr. Ponzo, Mr. Gershinzon

12:26:28    15    and how they're presenting themselves.

16    THE COURT:  Mr. Ponzo is a very different witness.

17    First of all, Mr. Ponzo is dealing with numbers which he put up

18    on the board.  And secondly, where there were gaps in what

19    Mr. Ponzo said, on cross-examination he freely admitted them.

12:26:47    20    Then on top of that, when he was describing what he did in

21    terms of calculating the nature of the purpose of some checks,

22    he took the position that whether the check was backed up as an

23    appropriate contribution or not, "I didn't care.  If the stub

24    said it's a contribution, I'm treating it as a contribution."

12:27:16    25    So it was very clear what Ponzo was doing and what the

1    basis for those charts was.  And to the extent that

2    cross-examination revealed certain aspects of it that may not

3    have been entirely consistent with his methodology, it was up

4    there, it was candid, and he answered the questions.

12:27:43    5    What I have now before me is a witness who seems, for

6    a variety of reasons, to be committed to making assumptions

7    which you hear for the first time when he's up there.  I was

8    really struck by his comment about people with W-2's and doing

9    this in the envelope.  I think he did better, much better on

12:28:11    10    voir dire.  On voir dire he seemed to understand what his role

11    is.  Here, his assumptions have overtaken at least the *minimum*

12    neutrality an expert is supposed to have and absolutely

13    certainly about a variety of things based on assumptions that,

14    in one particular case, he was specifically told not to make,

12:28:44    15    and something he was specifically told not to rely on and he's

16    clearly relying on it.

17    He can't get it out of his mind.  He can't just write

18    down "I am relying on A, B, and C because of D."  It is always

19    there.  And this is one of the reasons you make determinations

12:29:07    20    to whether you qualify someone as an expert or not.  And he

21    seemed to me, perhaps on the margins, but to be okay in voir

22    dire.  This testimony is pretty convincing to me that I

23    shouldn't have allowed him to testify.  He can't follow the

24    rules.

12:29:27    25    MR. SOROSKY:  Your Honor, with all due respect, I

1    think you're incorrect.  I think this man is following the

2    rules.  It was Your Honor who told us and we told

3    Mr. Gershinzon that should he testify prior to the defendant

4    testifying, that he could only testify as an expert to what he

12:29:51    5    observed and what he noticed and what he knew from his

6    experience and expertise as the CPA in examining these tax

7    returns, that he could not testify as to what Commissioner

8    Beavers told him.  And that was Your Honor's ruling and we

9    related that to the witness.  And the witness, I think,

12:30:18    10    complied with that order.

11          What the witness failed to understand, and perhaps it

12    was our fault, was that that was the rule for being in front of

13    the jury and that was not the rule in the voir dire

14    presentation outside the presence of the jury.  So when the

12:30:43    15    Assistant United States Attorney asked the witness was this a

16    voluntary contribution by Commissioner Beavers, the only way

17    Mr. Gershinzon would know if it was a voluntary contribution by

18    Commissioner Beavers is perhaps Commissioner Beavers told him

19    this was a voluntary contribution and the witness thought that

12:30:59    20    he could not say what Commissioner Beavers told him and this is

21    the only reason why the witness said "I can't say whether it's

22    a voluntary contribution," not because the witness didn't know

23    whether it was a voluntary contribution.  There is no impugning

24    of his integrity or his ability when he said "I can't say."  He

12:31:25    25    said, the witness testified, "I can't say whether it was a

1      voluntary contribution" because the witness was merely trying

2      to comply with the directive that you gave to us and we gave to

3      him that he, the witness, could not say what Commissioner

4      Beavers told him.

12:31:41    5      So this is the only reason why this witness said "I

6      can't say," not because he is disingenuous, not because he's

7      not capable, and not because he meant to deceive anyone, he was

8      merely following the directive that we gave him that we

9      received from you.  And we're not faulting that directive, that

12:32:03    10     he, the witness, could not say what Commissioner Beavers told

11     him.

12             THE COURT:  I got that point, but the funny thing is

13     is when he gave that answer this time, there was no jury in the

14     box.

12:32:15    15            MR. SOROSKY:  He didn't know there was -- that's the

16     point --

17            THE COURT:  But it was exactly the same circumstance

18     at the voir dire.  He was in exactly the same role as he was in

19     the voir dire.  And the truth of the matter is -- well, we'll

12:32:30    20     go to something else.

21            Does the government have anything to add?

22            MR. HENDERSON:  I didn't -- I'm sorry, Your Honor.

23            MS. BONAMICI:  Your Honor, the point that you're

24     making is that there is a distinction between being told and

12:32:43    25     acting on that direction not to testify about something, and

1    being told and acting on the direction as he testified.  And

2    what you're talking about strikes me, from listening to what

3    was testified to, between what the witness seems to be able to

4    do and unable to do.

12:33:03  5    THE COURT:  And we're not talking here about whether

6    in a specific case he was attempting to follow my order or not

7    follow my order.  We are talking about the fact that it is my

8    judgment he cannot let go of his conviction that what the

9    defendant said to him is a determining factor, an important

12:33:34  10   factor, he cannot let go of that.  And I don't think that he's

11   a reliable witness.

12        And I don't think there's anything too mysterious

13   about the difference, for tax purposes, about what is

14   voluntary, what is involuntary.  We're not talking about moral

12:34:00  15   voluntariness and involuntariness, what we are talking about is

16   whether somebody is acting contrary to law by making a specific

17   choice.  There was nothing that compelled this choice, legally,

18   that's the question he was asked.

19        And interestingly enough, he was willing to say he

12:34:27  20   wasn't compelled, but that voluntariness that is what I think a

21   profound normative significance in terms of this witness'

22   judgment, makes it, I think, doubtful that he can accept and

23   offer opinions based on assumptions, that this happened, that

24   happened, that something else happened, he's acting as a jury,

12:35:04  25   not as an expert.  He is committed and under these

1  circumstances, I don't think he is a reliable witness on a lot

2  of these questions.  So the issue I have is, what's left to ask

3  him about that might be trustworthy?

4          MR. HENDERSON:  Well, Your Honor, give us a few

12:35:33  5  moments to consider that during the lunch break and we'll

6  address it when we return?

7          THE COURT:  Sure.

8          MR. HENDERSON:  Okay.

9          THE COURT:  And you can possibly give me a list of

12:35:46  10  what it is that is not going to stress this witness' ability to

11  follow the rules.

12          MR. HENDERSON:  Thank you, Judge.

13          MS. BONAMICI:  What time do we come back, Your Honor?

14  THE COURT:  1:15.

12:36:08  15          THE CLERK:  All rise.

16

17          (Luncheon recess taken from 12:40 o'clock p.m. to 1:15

18           o'clock p.m.)

19

20                  *     *     *     *     *     *     *     *

21

22  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

23          RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

24

25          S/Blanca I. Lara                    date