1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2    EASTERN DIVISION

3    UNITED STATES OF AMERICA,     )
                                   )    No.  12 CR 124
4              Government,         )
                                   )
5    Vs.                           )    Chicago, Illinois
                                   )
6    WILLIAM BEAVERS,              )    March 20, 2013, 2013
                                   )
7              Defendant.          )    1:29 o'clock p.m.

8                        VOLUME 5
                TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE JAMES B. ZAGEL
                    AND A JURY
10

11   For the Government:

12             THE HONORABLE GARY S. SHAPIRO,
               UNITED STATES ATTORNEY
13             BY: Matthew Michael Getter
                   Carrie E. Hamilton
14                 Debra Riggs Bonamici
                   Samuel B. Cole
15             Assistant United States Attorneys
               219 South Dearborn Street
16             Suite 500
               Chicago, Illinois   60604
17

18   For the Defendant:
               KAPLAN & SOROSKY
19             BY:  Sheldon M. Sorosky
               158 West Erie
20             Chicago, Illinois 60610
               (312) 640-1776
21

22        Court Reporter:

23             KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
               219 South Dearborn Street
24                    Room 2144-A
               Chicago, Illinois 60604
25                  (312) 435-5569

```
1    Appearances (continued:)

2

3    For the defendant:

4                        OFFICES OF AARON B. GOLDSTEIN
                         BY: Aaron Benjamin Goldstein
5                        6133 South Ellis
                         Chicago, Illinois 60637
6                        (773) 752-6950

7                        OFFICES OF LAUREN FAUST KAESEBERG
                         BY:  Lauren Faust Kaeseberg
8                        2140 N. Lincoln Park West
                         Suite 307
9                        Chicago, Illinois 60614
                         (773) 517-0622
10
                         LAW OFFICE OF SAMUEL E. ADAM
11                       BY:   Samuel Forbes Adam
                               Samuel Adam, Jr.
12                       6133 South Ellis Avenue
                         Suite 200
13                       Chicago, Illinois 60637
                         (312) 726-2326
14

15
                         Henderson Adam, LLC
16                       BY:  Victor P. Henderson
                         The Insurance Center Building
17                       330 South Wells, Suite 1401
                         Chicago, Illinois 60606
18                       (312) 262-2900

19

20

21

22

23

24

25
```

<span style="text-align:center">I N D E X</span>

PAGE

BARRY GERSHINZON

Direct Examination (Resumed)  By Mr. Henderson        1007
Cross Examination  By Mr. Cole                        1013
Redirect Examination By Mr. Henderson                 1017

PHILIP ACHUSIM

Direct Examination  By Mr. Henderson                  1019

DAVID WEINER

Voir Dire Direct Examination By Mr. Cole              1035
Voir Dire Cross Examination By Mr. Henderson          1041
Voir Dire Redirect Examination By Mr. Cole            1050
Voir Dire Recross Examination By Mr. Henderson        1052
Further Voir Dire Redirect Examination By Mr.         1058
Cole
Further Voir Dire Recross Examination By Mr.          1058
Henderson

Direct Examination By Mr. Cole                        1061
Cross Examination  By Mr. Henderson                   1068

<span style="text-align:center">INDEX TO EXHIBITS</span>

GOVERNMENT EXHIBIT                                RECEIVED

 Government Exhibit 7th Ward 2005 Checks              1116
 Government  Exhibit D-2 7 Ward-2                     1116

DEFENDANT'S EXHIBIT                               RECEIVED

 Defendant Beavers Exhibit No. 1                     1116
 Check 3374                                          1116
 Check 522                                           1116
 Check 523                                           1116

1    (Proceedings heard in open court.  Jury not present.)

2         THE COURT:  Come to the lectern.

3         We can start with my list, or we can start with your

4    list.  Anybody have a preference?

01:29:05    5         MR. HENDERSON:  I'm sorry, say that again, Judge?

6         THE COURT:  We can start with my list of what you can

7    do or we can start with your list.

8         MR. HENDERSON:  As it relates to Mr. Gershinzon?

9         THE COURT:  Yeah.

01:29:16    10        MR. HENDERSON:  We're going to rest, your Honor, and

11   let the government cross him.

12        THE COURT:  Well, before you do that, let me tell you

13   what you may be able to ask him.

14        MR. HENDERSON:  Oh, okay.

01:29:33    15        THE COURT:  You're really looking very serious with

16   that book.

17        (Laughter.)

18        MR. S. ADAM, JR.:  Only for your Honor.  Yes, sir.

19        THE COURT:  Clutching it.

01:29:43    20        My view is is that what I believed from the very

21   beginning, and I confirmed this, is that an expert in this

22   context is not permitted -- this is 704(b)  -- is not

23   permitted to state an opinion or inference as to whether the

24   defendant did or did not have a mental state or condition

01:30:17    25   constituting an element of the crime charged.

1       In this case, the relevant state of mind is that he

2   has more than one state of mind.  The relevant state of mind

3   is whether defendant intended to treat withdrawals from his

4   campaign coffers as income or as loans.  The expert cannot

01:30:37    5   state an opinion on this issue.

6       What the expert can testify to is what indicators he

7   would look for in determining whether someone intended to

8   treat such a withdrawal as income or as a loan, and whether

9   and to what extent any of these indicators were present in the

01:30:59   10   documents that he examined in this case, which includes

11   transactional documents.

12       That is to say, you're not limited to having him say

13   there was a formal loan agreement.  Say that this papers, this

14   set of transactions, and this is what leads me to believe that

01:31:20   15   this was -- would support the proposition -- that it would be

16   considered in determining whether someone intended to treat a

17   withdrawal as a loan and other factual observations made in

18   examining whatever documents there were, but cannot draw

19   inferences about the state of mind based on his observations.

01:31:51   20       For example, he could testify that the defendant's

21   W-2 from the City contained errors, which I think is not in

22   dispute, but he can't testify as to whether the defendant was

23   or was not aware of these errors.

24       And none of his testimony can be based on statements

01:32:12   25   that the defendant made to the expert about the defendant's

1    own state of mind.

2         That's what I think he's permitted to do.  If you

3    have anything else you want to talk about, you can do it now.

4    Or you can decide whether, now knowing what I will permit.

01:32:34    5         You can think about it.  Take a few minutes.

6         MR. S. ADAM, JR.:  Yes, your Honor.

7       (Pause.)

8         MR. S. ADAM, JR.:  We understand your Honor's ruling,

9    and we will abide by that, your Honor.

01:34:31    10        THE COURT:  That actually was not -- I assumed you

11   would abide by it.

12      (Laughter.)

13        THE COURT:  My question is do you want to call him?

14        MR. S. ADAM, JR.:  We do.

01:34:39    15        THE COURT:  Okay.  Now, you can speak.

16        MR. COLE:  Can we get a clarification, your Honor, on

17   what you just said?

18        There's one issue I wasn't quite understanding, which

19   is testimony about the errors, I think you said, in the 1099

01:34:54    20   from the City.  Are you talking about the 1099 from the

21   pension fund with respect to the $1,200?

22        THE COURT:  No.  I was talking about -- hold on a

23   second.  Where am I?  I was talking about the pension fund.

24        MR. COLE:  So the 1099-Rs that come from the pension

01:35:19    25   fund --

1        THE COURT:  Yeah.

2        MR. COLE:  -- that have to do with the 2007 and 2008?

3        THE COURT:  Yeah.

4        MR. HENDERSON:  As well as the W-2 that's related to

01:35:28  5  the 69,000 --

6        THE COURT:  With respect to the 69,000, as opposed to

7  the 1,200 a month.

8        MR. HENDERSON:  The 69 is supposed to be reflected in

9  the W-2.

01:35:37  10        THE COURT:  Okay.

11        MR. HENDERSON:  And the 1,200 is also supposed to be

12  reflected in the W-2.  One W-2 comes from the City.  The other

13  comes from the County.

14        MS. HAMILTON:  I think the concern is that based on

01:35:46  15  the voir dire we just heard, the defendant's opinion that the

16  W-2 is in error is based on unreliable information, and it's

17  also based on apparently what the defendant told him about

18  whether it was voluntary or involuntary.

19        So I think the concern is I don't know how he gets to

01:36:08  20  say the W-2 is in error without explaining why.

21        THE COURT:  If he's relying entirely on what he was

22  told, then it's not admissible.

23        MS. HAMILTON:  My understanding, though, is he's

24  interpreting the code section in a way based on his

01:36:27  25  understanding of why Mr. Beavers did or didn't do something.

1        THE COURT:  If -- if that is the case, then we will

2  not permit it.  I thought the situation was somewhat

3  different, and you want to talk to the --

4        MR. HENDERSON:  Yes, Judge.  We're going to make use

01:36:46   5  of the document that declares the $1,200-a-month income that

6  the City has already had admitted that was signed by the

7  commissioner.

8        THE COURT:  Wait.

9        MS. HAMILTON:  That's a different issue.

01:37:01  10        THE COURT:  It's a different issue.

11        MR. HENDERSON:  We're going to the 69 or the 1,200?

12        THE COURT:  Let's start with the 68-something.  We'll

13  call it 69,000, whatever.

14        MR. HENDERSON:  $68,000 transaction, your Honor, we

01:37:14  15  can rely on the document that came from the pension fund which

16  was admitted by the government because Jane Tessaro testified

17  about it, and that that transaction should have been reflected

18  on the W-2.

19        MS. HAMILTON:  And that's not relevant.

01:37:31  20        The expert's opinion interpreting what that letter

21  did or didn't say to the defendant is irrelevant.  And there's

22  no foundation for him to testify to that unless and until

23  there's testimony from the defendant.

24        The expert's opinion interpreting that letter is not

01:37:52  25  relevant.

1          THE COURT:  No, no, what we were talking about is

2   whether this expert had an opinion based not on what he was

3   told, but based on a transaction that the $68,000 should have

4   been in the W-2.

01:38:13   5          If he can make that conclusion, having nothing to do

6   with what he was told but simply the fact -- well, the

7   undisputed fact that the -- that the defendant made -- oh, I

8   see where you're getting.

9          MR. HENDERSON:  Judge, there's an undisputed fact

01:38:37  10   that the government has entered into evidence that a payment

11   was made.

12          There's an undisputed fact that the payment was made

13   in connection with the letter that was presented by the lady

14   from the pension, Jane Tessaro.

01:38:48  15          There's an undisputed fact that the money was

16   actually received by the -- by the pension people.  And so

17   based on those facts, the issue is simply whether or not that

18   transaction should have been reflected in the W-2, and the

19   answer to that is yes.

01:39:05  20          THE COURT:  And the reason the answer -- his

21   reasoning that it's yes is?

22          MR. HENDERSON:  Based on the documents that he

23   reviewed, the check, the letter from -- the letter from the

24   pension people prompted the check.  The check was then

01:39:19  25   deposited.  Jane Tessaro said that she received it, that the

1    check was not only deposited but cleared.

2         So you have the check going through a bank, that it

3    was cleared; and so, therefore, how should that transaction

4    have been documented by the City?  They're the ones that

01:39:36    5    issued the W-2.

6         THE COURT:  Okay.  But if that's the case, then I

7    don't need his testimony.

8         MR. HENDERSON:  You don't need --

9         THE COURT:  I don't need Gershinzon's testimony.

01:39:46   10         MR. HENDERSON:  Well, you need his testimony to

11    indicate that the W-2 should have reflected that transaction.

12         MS. HAMILTON:  What's the relevance of that?

13         MR. HENDERSON:  The relevance of it is that then you

14    have the accountant who indicates that they used or

01:40:05   15    Mr. Achusim will then say, as the government has already

16    established, that the W-2s are used by the tax preparer to

17    prepare the returns.

18         Now, as the Court has correctly pointed out, it

19    doesn't go to the defendant's state of mind, but it does go to

01:40:21   20    the reliance that the taxpayer is allowed to place on the W-2

21    which goes to the instruction that we'll have about good

22    faith.

23         THE COURT:  No.  It is a state of mind issue.  It is

24    a state of mind issue.  I'm wrong about that.  But that there

01:40:38   25    are indicia that it was a loan, he can testify to.

1    MS. HAMILTON:  He already did.

2    THE COURT:  We'll do it again just in case, since I

3    kicked him off the stand fairly unceremoniously.

4    MS. HAMILTON:  Your Honor, can I point out one

01:40:53    5    concern for the government --

6    THE COURT:  Yeah.

7    MS. HAMILTON:  -- based on what he's already

8    testified to and what happened on the voir dire?

9    THE COURT:  Yes.

01:41:00    10    MS. HAMILTON:  Just on the $68,000 check being a

11    loan --

12    THE COURT:  Yeah.

13    MS. HAMILTON:  -- he indicated a number of things he

14    based it on.  One, what he saw and didn't see, and the second

01:41:07    15    thing was based on this being an unusual transaction, that it

16    was large and not written to the defendant, and I think he

17    said it wasn't on the tax return, and he saw no evidence that

18    he was going to keep the money permanently and not repay it.

19    There were then a series of objectionable questions

01:41:24    20    by defense counsel clearly trying to get to this point of what

21    was an unusual transaction.  Those questions were precisely

22    what led us to the voir dire that just happened.

23    THE COURT:  Yeah.

24    MS. HAMILTON:  And so the government's concern is

01:41:40    25    that part of what he's basing just that testimony on is

1  problematic.

2        THE COURT:  It is problematic, but I -- if you're

3  telling me and telling them that they shouldn't go to unusual

4  transaction, that's correct for a variety of reasons, not the

01:42:00  5  least of which is you have to get into a long definition of

6  unusual.

7        Whatever point they want to make is it's a large

8  amount of money.  There's no dispute with respect to that.  So

9  they can just ask him what indicia there was that these --

01:42:17  10  that this -- these funds, and other funds for that matter,

11  were treated as loans.  That's what he can testify to without

12  any reliance at all on anything that the defendant may or may

13  not have said to him.

14        MS. BONAMICI:  Your Honor, I'm still struggling with

01:42:36  15  the relevance of the mistake on the W-2.  The mistake on

16  the --

17        THE COURT:  But we're not going to do that with this

18  witness.

19        MS. BONAMICI:  Oh, we're not.

01:42:45  20        THE COURT:  We're not doing that with this witness.

21  The issue with the come up with respect to that is what use

22  they can make of it, and we're not talking then about

23  evidence.  We're talking about argument.

24        MS. BONAMICI:  Okay.

01:42:59  25        MR. COLE:  Your Honor, what about further testimony

1    from the witness about his opinion as to whether or not they

2    are loans?  I think your Honor said that is not permitted; is

3    that correct?

4         THE COURT:  He -- the -- the reason that is out is I

01:43:11    5    do not trust this witness's ability to separate that opinion

6    from what he was told.

7         If he's talking about what indicia, apart from what

8    he was told, that there was that this was a loan because of

9    some practice or because of some notation or because of

01:43:38    10   something else that happened, he's entitled to give that

11   opinion.

12        Now, you may very well call an expert and say that

13   that's full of hot air, but he's entitled to say it.

14        MR. HENDERSON:  And, Judge, with respect to the

01:43:52    15   $1,200 a month that should have been on the W-2, we can go

16   into that as well?

17        THE COURT:  No.

18        MR. HENDERSON:  Okay.

19        MS. HAMILTON:  Judge, regarding -- the witness has

01:44:05    20   obviously already testified that his opinion was that the

21   $68,000 check was a loan.

22        Is your Honor intending to strike the testimony that

23   the jury's already heard and start over from scratch?

24        THE COURT:  I'm -- I have not made up my mind about

01:44:18    25   that.  I may very well do so, but I have not made up my

1 mind about -- oh, you mean that it was a loan?

2    MS. HAMILTON: Yes.

3    THE COURT: Yeah, I will strike that testimony, but

4 I'll wait till -- or they can withdraw it. It's up to them.

01:44:32 5    MR. HENDERSON: Well, Judge, can we wait until he

6 testifies and then --

7    THE COURT: Yes, you can.

8    MR. HENDERSON: -- make a decision about what to do?

9    THE COURT: Yes, you can.

01:44:40 10    MR. HENDERSON: Okay.

11    MS. BONAMICI: We need a decision before you cross.

12    Judge, our concern is what to cover on cross. Can we

13 discuss that before we cross?

14    THE COURT: I am going to strike that opinion.

01:44:50 15    MS. BONAMICI: Okay.

16    MS. HAMILTON: So I guess, Judge, we're not clear in

17 terms of where that leaves us. Is the defense tendering him,

18 or do they have further questions?

19    THE COURT: They have further questions. Not many.

01:45:07 20    MR. HENDERSON: Right. We have some additional

21 questions, not many.

22    THE COURT: Okay. Additional other than what I

23 talked about?

24    MR. HENDERSON: I don't believe so, your Honor.

01:45:28 25    THE COURT: Good. So this will be very short.

1006

1    MS. HAMILTON:  Thank you.

2    THE COURT:  The witness should be on the stand.

3    Okay.  Get the jury.

4    COURT SECURITY OFFICER:  All rise.

01:46:56    5    (Jury enters courtroom.)

6    THE COURT:  Please be seated.

7    MR. HENDERSON:  Judge, this is the exhibit that I'd

8    like to publish which should be on the screen.

9    MR. COLE:  The government has an objection to this.

01:48:07    10    MR. HENDERSON:  This is a government's exhibit, your

11    Honor.

12    MR. COLE:  It's not relevant for this witness.

13    THE COURT:  I'm sustaining the objection.  To the

14    extent that what you want is what's encircled, we can deal

01:48:50    15    with that separately.

16    MR. HENDERSON:  Okay.  I'll get another exhibit then.

17    I'd like to go to another government exhibit then,

18    your Honor.

19    THE COURT:  Okay.  Let me look at it as soon as it's

01:49:06    20    up.

21    MR. HENDERSON:  That's Government Exhibit No. --

22    THE COURT:  I see it on the screen.

23    MR. HENDERSON:  Oh, okay.

24    MR. COLE:  I guess it depends on what he's going to

01:49:20    25    do with it, your Honor.  It seems like it goes to the exact

Gershinzon - direct by Henderson

1007

1  same issue as to what was circled on the last document.

2      MR. HENDERSON:  It's a different exhibit, your Honor,

3  that there's much less information.  It's just a canceled

4  check that they admitted into evidence.

01:49:30  5      THE COURT:  The canceled check's fine.

6      MR. HENDERSON:  We can publish it, your Honor?

7      THE COURT:  Yes.

8  BARRY GERSHINZON, DEFENDANT'S WITNESS, PREVIOUSLY DULY SWORN,

9         DIRECT EXAMINATION (RESUMED)

01:49:38  10  BY MR. HENDERSON:

11  Q.  Mr. Gershinzon, this is a Government Exhibit Pension

12  Check.  Have you had an opportunity to review the check?

13  A.  Yes.

14  Q.  And you see that the check is dated November 14, 2006?

01:50:09  15  A.  Yes.

16  Q.  And that you also see on the bottom half of the document

17  that that particular check was deposited and cleared the bank?

18  A.  Yes.

19  Q.  And before the lunch break, you indicated that your

01:50:24  20  opinion was that Commissioner Beavers had borrowed that money.

21      MR. COLE:  Objection, your Honor.

22      THE COURT:  Objection sustained.

23  BY MR. HENDERSON:

24  Q.  You indicated that you believed that that check reflected

01:50:36  25  a loan?

Gershinzon - direct by Henderson

1008

1         MR. COLE:  Objection, your Honor.

2         THE COURT:  Objection sustained.

3         MR. COLE:  Move to strike, your Honor.

4         THE COURT:  I'm striking.  The jury's instructed to

01:50:45    5  disregard it.

6    BY MR. HENDERSON:

7    Q.  Did you draw the conclusion that the commissioner -- you

8    drew the conclusion that the commissioner had taken loans from

9    the campaign?

01:50:55   10         MR. COLE:  Objection, your Honor.  Move to strike.

11         THE COURT:  To the form of the question, I'm

12    sustaining the objection.

13    BY MR. HENDERSON:

14    Q.  Did you draw any conclusions about the nature of the

01:51:10   15  transactions between the commissioner and the campaign?

16         MR. COLE:  Objection.

17         THE COURT:  You're talking about essentially all the

18    funds?  Did you draw -- yes, you can answer this question yes

19    or no.

01:51:30   20         THE WITNESS:  Could you repeat the question, please?

21       (The last question was read.)

22    BY THE WITNESS:

23    A.  Yes.

24    BY MR. HENDERSON:

01:51:44   25  Q.  And what conclusions did you draw?

Gershinzon - direct by Henderson

1009

1    MR. COLE:  Objection.

2    THE COURT:  You can answer this question in as few

3    words as possible.

4    BY THE WITNESS:

01:52:00    5    A.  I'm not allowed to say.

6    THE COURT:  Okay.  The question's not answered.

7    BY MR. HENDERSON:

8    Q.  Did you -- in reaching your conclusion, did you -- how did

9    you reach your conclusion?

01:52:19    10    A.  I examined the documents that were provided to me by you

11    and your law firm that were from various sources, including

12    the government.

13    Q.  Okay, and so let's go over it again.  So you say you

14    reviewed documents from the government, correct?

01:52:44    15    A.  Yes.

16    Q.  Okay.  What other documents did you review?

17    A.  I reviewed documents from the government.  I reviewed

18    documents from the campaign funds.  I reviewed documents from

19    Commissioner Beavers.

01:53:02    20    And I reviewed the documents, and based upon the

21    information in the documents, my experience in accounting, I

22    made some conclusions.

23    Q.  Okay.

24    (Counsel conferring.)

01:53:30    25    BY MR. HENDERSON:

Gershinzon - direct by Henderson

1010

1    Q.  And based on your review of documents from the government,

2    the campaign fund, Commissioner Beavers -- does that include

3    bank records?

4    A.  Yes.

01:53:37    5    Q.  Okay.  And bank records from where?

6    A.  It would be bank records from the bank that was used by

7    Citizens For Beavers and Friends For Beavers.  I don't recall

8    the bank's actual name.

9    Q.  Okay.  And based on the review of the government's

01:53:54   10    documents and the bank statements and the campaign checks and

11    the things that you reviewed, you said you drew a conclusion,

12    right?

13    A.  Yes.

14    Q.  And that conclusion was based on your review of the

01:54:05   15    documents?

16    A.  My review of all the documents, and on my experience, I

17    drew conclusions and inferred conclusions and deduced

18    conclusions based upon all the information that I had.

19    Q.  And what conclusion was that?

01:54:27   20            MR. COLE:  Objection, your Honor.

21            THE COURT:  Objection is sustained.  In light of the

22    previous answer, I'm sustaining the objection.

23    BY MR. HENDERSON:

24    Q.  Earlier you spoke to us about what an advance is, correct?

01:54:55   25    A.  Yes.

Gershinzon - direct by Henderson

1   Q.  And you also told us in general terms what a loan is,
2   correct?
3   A.  Yes.
4   Q.  Okay.  Why don't you tell us in general terms what you
01:55:09   5   look for to determine whether something is an advance?
6   A.  An indicia of an advance would be a check of an even
7   amount -- 500, a thousand, $2,000 -- written to a person and
8   then the subsequent return by that same person of expense
9   receipts and cash equal to that amount of the original
01:55:41   10  advance.
11  Q.  And why do those things -- even amount, written out to a
12  person, with receipts and/or money returned -- indicate an
13  advance to you?
14  A.  It makes bookkeeping easier if you write a check for a
01:55:58   15  hundred dollars or a thousand dollars and a person comes back
16  and says here's $88 for copying, a bill from Kinko's, and $12
17  change.  That adds up to the hundred dollars that I got.
18         It's much easier to do the accounting and the
19  bookkeeping for that versus saying, oh, take $73.13, and when
01:56:18   20  they come back with $69.48 receipt, I don't know what the
21  difference is, $8.16 of change, it's just easier if the
22  amounts are rounded on one side of the transaction.
23  Q.  And based on the information that you reviewed in the
24  campaign, did it appear to you as if the commissioner took any
01:56:40   25  advances?

Gershinzon - direct by Henderson

1012

| | |
|---|---|
| | 1  MR. COLE:  Objection, your Honor. |
| | 2  THE COURT:  Objection is sustained. |
| | 3  BY MR. HENDERSON: |
| | 4  Q.  Did you -- in the records, irrespective of who may have |
| 01:56:49 | 5  taken them, did you see evidence of advances in the records? |
| | 6  MR. COLE:  Same objection, your Honor. |
| | 7  THE COURT:  Overruled. |
| | 8  BY THE WITNESS: |
| | 9  A.  Yes. |
| 01:57:02 | 10  BY MR. HENDERSON: |
| | 11  Q.  Now let's go to loans.  Tell us in very general terms what |
| | 12  a loan looks like. |
| | 13  A.  Loans take on many forms, but a good indicia of a loan is |
| | 14  that it would not be in an even amount.  A loan would be for a |
| 01:57:35 | 15  specific thing, for a car or for a home or for another |
| | 16  purpose, and so it would be rounded -- it wouldn't be rounded, |
| | 17  it would be to a certain penny, this is how much you'd have to |
| | 18  get. |
| | 19  And, in general, that loan would not go to the person |
| 01:57:55 | 20  receiving the benefit of the loan, that check would be written |
| | 21  to the third party, like the car dealership or the mortgage |
| | 22  company or whoever you're -- you're getting the thing from |
| | 23  that you got the loan for.  They skip you.  They go straight |
| | 24  to that. |
| 01:58:18 | 25  Q.  Now, based on your review of the campaign records, the |

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 22 of 125 PageID #:1672
Gershinzon - cross by Cole
1013

1  checks, the documents, the stubs, things of that nature, did

2  you conclude that there were any loans made from the campaign

3  account?

4          MR. COLE:  Objection.

01:58:36   5          THE COURT:  Objection is sustained.

6  BY MR. HENDERSON:

7  Q.  Did you conclude that there were any loans at all based on

8  the documents you saw?

9          MR. COLE:  Objection.

01:58:48  10          THE COURT:  He may answer.

11  BY THE WITNESS:

12  A.  Yes.

13          MR. HENDERSON:  No further questions.

14                    CROSS EXAMINATION

01:58:56  15  BY MR. COLE:

16  Q.  Good afternoon, Mr. Gershinzon.

17          So you testified about your review of the various

18  campaign records, correct?

19  A.  Yes.

01:59:07  20  Q.  About your review of the D-2s, you looked at those?

21  A.  Yes.

22  Q.  The stubs of the checks from the campaign accounts,

23  correct?

24  A.  Yes.

01:59:17  25  Q.  The canceled checks, correct?

Gershinzon - cross by Cole

1    A.  Yes.

2    Q.  Now, in reviewing the campaign and bank records, did any

3    of the 100 campaign checks have anything written on the memo

4    line saying that the check was a loan to the defendant?

01:59:31    5    A.  No.

6    Q.  Now, did any of the check stubs for those 100 checks say

7    that the check was a loan to the defendant?

8    A.  No.

9    Q.  Did any of the campaign disclosure statements -- you know

01:59:50    10    what a campaign disclosure statement is?

11    A.  Yes.

12    Q.  -- list any of the 100 checks as loans to the defendant?

13    A.  No.

14    Q.  Did any of the campaign disclosure statements for any of

02:00:04    15    the three campaign committees between 2006 and 2008 use the

16    word "loan" at all?

17    A.  Not to my recollection.

18    Q.  Now, did you find any loan agreements between Mr. Beavers

19    and any of the campaign committees?

02:00:21    20    A.  No.

21    Q.  Did you find any promissory notes between Mr. Beavers and

22    any of the campaign committees?

23    A.  No.

24    Q.  Did you find any document indicating that Mr. Beavers paid

02:00:37    25    interest on any campaign money that he took?

Gershinzon - cross by Cole

1015

1    A.  No.

2    Q.  Did you find any document reflecting a commitment from

3    Mr. Beavers to pay back the campaign money within a certain

4    period of time made at the time the defendant took the money?

02:00:53    5    A.  No.

6    Q.  Did you find any document at all that reflected a

7    commitment by the defendant to pay back money from any of the

8    100 campaign checks made at the time the defendant took the

9    money?

02:01:06    10    A.  Could you ask that again, please?

11    Q.  Absolutely.

12            Did you find any document at all that reflected a

13    commitment by the defendant to pay back money from any of the

14    100 campaign checks made at the time the defendant took the

02:01:21    15    money?

16    A.  No.

17    Q.  Now, you testified that you had some opinions about

18    whether things were loans or advances, correct?

19    A.  Yes.

02:01:47    20    Q.  And that was based on your review of certain campaign

21    records, right?

22    A.  Yes.

23    Q.  Like D-2s?

24    A.  Yes.

02:01:58    25    Q.  Like -- like the check stubs, right?

Gershinzon - cross by Cole

1016

1   A.  Yes.

2   Q.  The canceled checks; is that right?

3   A.  Yes.

4   Q.  And you relied on those documents; isn't that correct?

02:02:08   5   A.  Yes.

6   Q.  And the information in those documents was something that

7   was important to you; is that right?

8   A.  Yes.

9   Q.  And the accuracy of the D-2s was one of the things that

02:02:24   10  you relied on; isn't that right?

11  A.  No.

12  Q.  It wasn't?

13  A.  (Nodding.)

14  Q.  You assumed they were not accurate?

02:02:29   15  A.  Yes.

16  Q.  What about the check stubs, did you rely on the accuracy

17  of the check stubs?

18  A.  No.

19  Q.  You assumed the check stubs were not accurate?

02:02:37   20  A.  Correct.

21  Q.  In fact, you have no way of knowing if any of the campaign

22  documents are accurate or not; isn't that right?

23  A.  Pardon?

24  Q.  You have no way of knowing if any of the campaign

02:02:59   25  documents are accurate or not; isn't that correct?

Gershinzon - redirect by Henderson

1017

1   A.   That's correct.

2   Q.   Because you weren't there.

3   A.   I wasn't there.

4         MR. COLE:   May I have a moment, your Honor?

02:03:14    5      (Counsel conferring.)

6         MR. COLE:   That's all, your Honor.

7         MR. HENDERSON:   Your Honor, just a couple questions

8   on redirect.

9                   REDIRECT EXAMINATION

02:03:21    10   BY MR. HENDERSON:

11   Q.   Mr. Gershinzon, Attorney Cole asked you a series of

12   questions about what you did or did not find in the campaign

13   records, so I want to ask you those same questions, but we're

14   going to take it just one step further.

02:03:38    15         Did you see any checks in the campaign records that

16   said income to Commissioner Beavers?

17   A.   No.

18   Q.   Did you see any marks on the check stubs that said income

19   to Mr. Beavers?

02:03:53    20   A.   No.

21   Q.   Did you see any campaign disclosure forms that said income

22   to Mr. Beavers?

23   A.   No.

24   Q.   Did you see anything in the records related to 2006 that

02:04:04    25   said income to Mr. Beavers?

Gershinzon - redirect by Henderson

1018

1   A.  No.

2   Q.  Did you see anything in the records for 2007 that said

3   income to Mr. Beavers?

4   A.  No.

02:04:10   5   Q.  What about 2008?  Did you see anything in the records for

6   2008 that said income to Mr. Beavers?

7   A.  No, sir.

8   Q.  Did you see any documents that you reviewed that said the

9   campaign can't loan money to anybody?  Did you see anything

02:04:23   10   like that?

11   A.  No, sir.

12   Q.  Did you see anything in the documents that said that you

13   can't make advances from the campaign for legitimate campaign

14   purposes?  Did you see anything that said that?

02:04:32   15   A.  No, sir.

16   Q.  Did you see any W-2s in the campaign records to

17   Mr. Beavers?

18   A.  No.

19         MR. COLE:  Objection.

02:04:38   20         THE COURT:  Sustained.

21   BY MR. HENDERSON:

22   Q.  Did you see any document that said interest had to be paid

23   on loans by anybody?

24         MR. COLE:  Objection.

02:04:46   25         THE COURT:  Sustained.

Gershinzon - redirect by Henderson

1019

1   BY MR. HENDERSON:

2   Q.  Did you see any documents that said loans were prohibited?

3           MR. COLE:  Objection.

4           THE COURT:  Sustained.

02:04:55   5           MR. HENDERSON:  No further questions.

6           Oh --

7           MR. COLE:  No further questions.

8           THE COURT:  Are you done?

9           MR. HENDERSON:  One final question, your Honor.

02:05:08   10           THE COURT:  Okay.

11   BY MR. HENDERSON:

12   Q.  But you did tell us earlier based on your review of the

13   government's records that there was money going from the

14   commissioner back to the campaign, correct?

02:05:18   15   A.  Yes.

16           MR. HENDERSON:  No further questions.

17           THE COURT:  You can step down.

18      (Witness excused.)

19           MR. HENDERSON:  Next witness is coming.

02:06:57   20           THE COURT:  Do you understand that you are still

21   under oath?

22           THE WITNESS:  Yes, sir.

23           THE COURT:  You may be seated.

24      PHILIP ACHUSIM, DEFENDANT'S WITNESS, PREVIOUSLY DULY SWORN,

02:07:05   25                       DIRECT EXAMINATION

Achusim - direct by Henderson

1020

1    BY MR. HENDERSON:

2    Q.  Sir, for those who may not have been in the courtroom the

3    other day, would you be kind enough again to state your name

4    for the court reporter, the Judge and the jury.

02:07:15    5    A.  My name is Philip Achusim, P-H-I-L-I-P, A-C-H-U-S-I-M.

6    Q.  Mr. Achusim, you told us the other day that you prepared

7    the tax returns for Mr. Beavers for 2006, correct?

8    A.  Yes, I did.

9    Q.  And 2007?

02:07:36    10    A.  Yes.

11    Q.  And 2008?

12    A.  Yes.

13    Q.  Now, I want to ask you a general question, and then I'll

14    ask you a specific question.

02:07:45    15         In general, when your clients give you materials to

16    prepare a tax return, are there -- you get W-2s, right?

17              MR. COLE:  Objection, your Honor.

18              THE COURT:  Objection sustained.

19    BY MR. HENDERSON:

02:08:04    20    Q.  Let's go to Mr. Beavers' return.

21         You received documents from Mr. Beavers in 2006 to

22    help you prepare his return, correct?

23    A.  Yes, I did.

24    Q.  And tell us in general what you can recall receiving from

02:08:23    25    the commissioner for 2006?

Achusim - direct by Henderson

1021

1  A.  I received W-2, K-1, W-2G, 1099-R, and 1099, I believe,

2  and, gee, I'm trying to see what else.

3         MR. S. ADAM, JR.:  Excuse me, your Honor, could we

4  just have the witness move the microphone closer?  We can't

02:08:54  5  hear.

6         THE COURT:  Yes.

7         THE WITNESS:  Sorry.

8  BY MR. HENDERSON:

9  Q.  So you said you received from the commissioner W-2s, K-1s,

02:09:01  10  W-2Gs, 1099-Rs, 1099s?

11  A.  Right, believe so.

12  Q.  Do you recall receiving anything else from him for 2006?

13  A.  Gee, if I look at the return, I can tell.  Whatever I

14  received was used to prepare the tax return.

02:09:17  15         MR. HENDERSON:  Your Honor, permission to publish the

16  2006 return?

17         MR. COLE:  No objection.

18         THE COURT:  Granted.

19  BY MR. HENDERSON:

02:10:09  20  Q.  Mr. Achusim, that's the return that you prepared?

21  A.  Right.

22  Q.  Okay.  And let's look at the second --

23  A.  Yeah.

24  Q.  -- page if you would, please.

02:10:19  25  A.  Look -- this is the correct page.

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 31 of 125 PageID #:1681
Achusim - direct by Henderson
1022

1   Q.  Do you need to see the second page to see what else you

2   received to prepare the return?

3   A.  No, this is the page.

4   Q.  That's enough?

02:10:27   5   A.  W-2, 1099, 1099 -- 1099-R, 1099 from -- and W-2Gs for this

6   particular one I'm looking at.

7   Q.  Now, so you used the documents that the commissioner gave

8   you to prepare that return?

9   A.  Yes, I did.

02:11:06   10   Q.  Do you remember approximately how many attachments there

11   were, you know, meaning the W-2s, the K-1s, the W-2Gs, the

12   1099s, do you remember how many there were?

13   A.  The W-2Gs there's quite a good number, so I can't remember

14   by count, but I know all this listed here I got, but I don't

02:11:34   15   know -- as far as 10 W -- as far as W-2G is concerned, I don't

16   know the number offhand.  I have to count.

17   Q.  Was it kind of like a stack sort of like this?

18   A.  Right, right.

19   Q.  So you got a stack of stuff like this and some other stuff

02:11:53   20   as well?

21   A.  Right, yes.

22   Q.  Now, do you remember whether or not each and every one of

23   the documents that the commissioner gave you were opened or

24   unopened?

02:12:05   25   A.  Gee, I can't -- I can't say for sure they are opened or

Achusim - direct by Henderson

1023

1  not opened.  But generally some -- I receive documents from

2  clients, some are in the original third-party envelopes and

3  some are opened.

4          MR. COLE:  Your Honor, government objects to this.

02:12:24  5          THE WITNESS:  Oh, I'm sorry.

6          THE COURT:  The objection is sustained.

7  BY MR. HENDERSON:

8  Q.  So you don't remember whether or not the ones that you got

9  from Mr. Beavers were open or unopened?

02:12:33  10  A.  No, I don't.

11  Q.  Okay.  So whether they were opened or unopened, at some

12  point, you opened them all to use them for the return,

13  correct?

14          MR. COLE:  Objection.

02:12:44  15  BY THE WITNESS:

16  A.  Yes.

17          THE COURT:  Objection is sustained.

18  BY MR. HENDERSON:

19  Q.  Did you use the documents that the commissioner gave you?

02:12:53  20  A.  Of course.  Yes, I did, yeah.

21  Q.  And why did you use the documents?

22  A.  Because I have to rely on the documents to prepare the

23  return.

24  Q.  Now, what does it mean that you have to rely on the

02:13:05  25  documents to prepare the return?

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 33 of 125 PageID #:1683
Achusim - direct by Henderson
1024

              1    MR. COLE:  Objection.

              2    THE COURT:  Objection to the form of the question is

              3  sustained.

              4  BY MR. HENDERSON:

02:13:19      5  Q.  Did you use the documents to prepare the return?

              6  A.  Yes, I did.

              7  Q.  Well, what does it mean to use the documents to prepare a

              8  return?

              9    MR. COLE:  Objection.

02:13:31     10    THE COURT:  Form of the question, sustained.

             11  BY MR. HENDERSON:

             12  Q.  Did you prepare the return?

             13  A.  Yes, I did.

             14  Q.  How did you prepare the return?

02:13:38     15  A.  I used the documents I was given, entered them in my

             16  system and then produced the tax return.

             17  Q.  So when you say you used the documents to enter numbers

             18  into the system, why don't you break that down for us and

             19  explain what you mean by that.

02:14:01     20    MR. COLE:  Objection.

             21    THE COURT:  I actually thought he testified to this

             22  once already.  I thought he said -- I think I'm hearing the

             23  same testimony.

             24    MR. HENDERSON:  Then we'll move through it a little

02:14:16     25  bit more briefly.

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 34 of 125 PageID #:1684
Achusim - direct by Henderson
1025

1  BY MR. HENDERSON:

2  Q.  How do you use the documents to prepare the return?

3          MR. COLE:  Objection.

4          MR. HENDERSON:  Judge, this is two days ago.  We're

02:14:24  5  just trying to get back up to speed.

6          THE COURT:  I think he said what he did is he took

7  documents and entered numbers.

8  BY MR. HENDERSON:

9  Q.  So you take the numbers off the documents that you're

02:14:32  10  given and enter those into the computer?

11  A.  Right.

12  Q.  And then that's what's used to generate the 1040?

13  A.  Right.

14  Q.  And is it your expectation that the documents that you're

02:14:43  15  given are accurate?

16          MR. COLE:  Objection.

17          THE COURT:  You're talking about he's treating them

18  on the assumption that they're accurate?

19          MR. HENDERSON:  Yes, Judge.

02:14:58  20          THE COURT:  Ask him if he assumes they're accurate.

21  BY MR. HENDERSON:

22  Q.  Do you assume that the documents that you get are accurate

23  when you use them to prepare the return?

24  A.  Yes, I do.

02:15:15  25  Q.  And as far as you know, were they accurate?

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 35 of 125 PageID #:1685
Achusim - direct by Henderson
1026

1        MR. COLE:  Objection.

2        THE COURT:  Sustained.

3        MR. HENDERSON:  No further questions, your Honor.

4        MR. COLE:  May I have one moment, your Honor?

02:15:32  5     (Counsel conferring.)

6        MR. COLE:  Your Honor, I have no questions.

7        THE COURT:  You can step down.

8     (Witness excused.)

9        MR. GOLDSTEIN:  Your Honor, may we have a sidebar?

02:16:15  10       THE COURT:  Absolutely.

11     (Proceedings heard at sidebar:)

12        THE COURT:  Off the record.

13     (Discussion held off the record.)

14        THE COURT:  Okay.

02:16:50  15       MR. SOROSKY:  Well, there are some exhibits, your

16  Honor.  I think we can work that out.

17        THE COURT:  Right.  Yes, you can.  Are you done?

18        MR. SOROSKY:  What?  Are we done?

19        Well, I shocked you once --

02:17:00  20       THE COURT:  Yeah.

21        MR. SOROSKY:  -- so the team says I should do it

22  again.

23        THE COURT:  Yes.

24        MR. SOROSKY:  And I think we're done with our case.

02:17:09  25  We rest.

1       THE COURT:  You're done?  Okay.  I'm going to send

2   the jury out because I have to tell them because it's his

3   decision.

4       Okay.

02:17:22    5       MR. GETTER:  Off the record.

6       (Discussion held off the record.)

7       THE COURT:  We'll take a break.

8       (Proceedings heard in open court:)

9       THE COURT:  We're going to take a short break now.

02:17:47    10      COURT SECURITY OFFICER:  All rise.

11      (Jury exits courtroom.)

12      THE COURT:  Please be seated.

13      Counsel approach.

14      Apart from straightening out exhibits, is there

02:18:41    15  anything else?

16      MR. GOLDSTEIN:  As far as what we spoke about at

17  sidebar?

18      THE COURT:  Yeah.

19      MR. GOLDSTEIN:  We'll be resting, your Honor, apart

02:18:48    20  from exhibits.

21      THE COURT:  Apart from exhibits.

22      MR. GOLDSTEIN:  Correct.

23      THE COURT:  So in a moment or two, I will enter an

24  order that the defense rests subject to offering further

02:18:59    25  exhibits.

1    I need to speak to the defendant.

2    MR. GOLDSTEIN:  Certainly.  Do you want him to

3  approach?

4    THE COURT:  Yeah, please.

02:19:12    5    Commissioner Beavers, I understand from what your

6  lawyer says that it is your decision not to take the witness

7  stand in your own defense, is that true?

8    THE DEFENDANT:  That's correct, your Honor.

9    Will you speak a little louder so I can hear you?

02:19:34   10    THE COURT:  Okay.

11    THE DEFENDANT:  Will you speak a little louder so I

12  can hear you?

13    THE COURT:  Oh, yeah, sure.

14    THE DEFENDANT:  All right.

02:19:39   15    THE COURT:  The reason you're called up here is

16  generally defendants don't get to make a lot of decisions, the

17  lawyers do, but one of the decisions which the law vests

18  entirely in the defendant is the decision whether or not to

19  testify in his or her own defense, so the decision whether or

02:19:59   20  not to testify is yours to make.

21    Do you understand that?

22    THE DEFENDANT:  That's a decision I made, your Honor.

23    THE COURT:  Okay.  And did you make this after full

24  consultation with your attorney?

02:20:10   25    THE DEFENDANT:  I didn't hear you.

1      THE COURT: Did you make that decision after fully
2  consulting with your attorney on the decision?
3      THE DEFENDANT: Yes, I did, yes.
4      THE COURT: And that's still your decision now?
02:20:19    5      THE DEFENDANT: That's still my decision not to
6  testify.
7      THE COURT: Thank you.
8      THE DEFENDANT: Okay.
9      MR. SOROSKY: Your Honor, there is one point we would
02:20:30   10  like to make for the record.
11      Your Honor's decisions in not allowing the
12  accountant, Mr. Gershinzon, to testify strongly affected the
13  decision made by the defense and the defendant that he should
14  not testify because the defendant had planned to testify with
02:21:01   15  the thought that the -- and belief that Accountant Gershinzon
16  would be able to testify to certain facts and beliefs and
17  opinions, and that the defendant planned to testify thereafter
18  with the support and buttress of Mr. Gershinzon's expert
19  testimony.
02:21:24   20      And by the Court not allowing Mr. Gershinzon to
21  testify to the facts that we were precluded from testifying
22  to -- and there's no need to -- to repeat those now -- this
23  not only -- this was controlling in Mr. Beavers' final
24  decision not to testify, and we believe that your Honor's
02:21:48   25  rulings concerning Mr. Gershinzon also affected and deprived

1  Mr. Beavers of his opportunity to testify before the jury, and

2  for that reason, we think --

3  THE COURT:  I think it is very clear that my decision

4  which with some exceptions stopped any further testimony,

02:22:15  5  because the witness did testify at some length, is an issue

6  that you are not waiving for any purposes at all, and unless

7  the government has anything further to say --

8  MR. GETTER:  On that particular issue, no, your

9  Honor, we don't.

02:22:36  10  THE COURT:  Okay.  That's fine.

11  Exhibits, you want to do exhibits now?

12  MR. SOROSKY:  Exhibits.

13  MR. S. ADAM, JR.:  Yes, we've got to have this.

14  (Counsel conferring.)

02:22:51  15  MR. S. ADAM, JR.:  Yes, your Honor, we move into

16  evidence or we ask your Honor if we can strike the identifying

17  marks and move into evidence I think it's Defendant's No. 1.

18  I think that's what this was.

19  MR. GETTER:  Judge, the only -- I'm sorry.

02:23:03  20  THE COURT:  Go ahead.

21  MR. GETTER:  The only issue I have is we need an

22  opportunity to check these against the returns to make sure

23  these are --

24  THE COURT:  Is that it?  Is that all you're offering?

02:23:11  25  MR. GOLDSTEIN:  There are additional.  We'll get the

1  paper documents.

2      THE COURT:  Tell you what to do.  I'll come back here

3  in ten minutes, and you'll tell me what you're doing about

4  exhibits, but I still have one last question.  Are you going

02:23:24  5  to call anybody in rebuttal?

6      MR. GETTER:  Yes.

7      THE COURT:  Okay.  So we'll proceed with that, but we

8  should get done with your exhibits.

9      MS. KAESEBERG:  Just so the Court is aware, I did

02:23:35  10  file a couple of defendant's jury instructions and objections,

11  so if you want to take a look at those, that may make things

12  easier as well.

13      THE COURT:  Do I have them?

14      MS. KAESEBERG:  I'm not able to get a paper copy once

02:23:47  15  I'm here in the building, but they're filed online.

16      THE COURT:  We'll find them.  We'll be back in

17  15 minutes.

18      COURT SECURITY OFFICER:  All rise.

19      (Recess from 2:24 to 2:49 p.m.)

02:51:06  20      THE COURT:  Please be seated.

21      Exhibits?

22      MR. GOLDSTEIN:  Yes, your Honor.

23      Oh, exhibits.  We have for defense Beavers Exhibit

24  Check 3374, Beavers Exhibit Check 522, Beavers Exhibit Check

02:51:35  25  523 that we are asking to admit.  We've spoken to the

1 government.  I believe since there was, in essence, rebuttal

2 evidence corresponding these exhibits, they are going to admit

3 other exhibits as well.  We have no objection to that.

4          MS. HAMILTON:  That's right.

02:51:49   5          THE COURT:  Okay.

6          MR. GOLDSTEIN:  There was, I believe we marked it as

7 Beavers Exhibit just No. 1, which were the stack of W-2Gs.  I

8 don't know if the government's reached a position.

9          MS. HAMILTON:  We're in the process of still

02:52:02  10 reviewing those.  We've never seen them before, so I think

11 what we're trying to do is check and make sure that --

12          THE COURT:  Fine.

13          MS. HAMILTON:  All right.

14          THE COURT:  What else on exhibits?  Are we done with

02:52:12  15 exhibits?

16          MR. GOLDSTEIN:  Done with exhibits.

17          THE COURT:  Okay.  What's next?

18          MS. HAMILTON:  I think there's some issues on the

19 instructions.

02:52:18  20          MR. GOLDSTEIN:  Oh, yeah.  Before we --

21          THE COURT:  What about rebuttal?

22          MS. HAMILTON:  We do have a witness on rebuttal.

23          MR. COLE:  We do have one rebuttal witness, your

24 Honor.  He is an attorney with the IRS.  He's going to testify

02:52:29  25 about just the factors the IRS considers --

1    THE COURT:  Time?  How much time?

2    MR. COLE:  Short.  Ten minutes.

3    THE COURT:  Short.

4    MR. COLE:  15 minutes, very short.

02:52:37    5    THE COURT:  Okay.

6    MR. GOLDSTEIN:  Your Honor, as I understand, this

7    individual will offer some expertise as rebuttal.  We have

8    been provided this individual's CV.  We have been provided a

9    summary of an interview that they had with him.

02:52:52    10    We haven't been provided in any documentation his

11    opinions, the bases for his opinions, anything as far as

12    Rule 16.

13    Based on that and comparing our expert and what the

14    rigors he had to go through as far as his testimony, we would

02:53:11    15    ask to voir dire this witness outside of the presence of the

16    jury before he testifies before the jury.

17    THE COURT:  Sure.

18    MR. GOLDSTEIN:  Thank you.

19    THE COURT:  It's not going to take very long.

02:53:24    20    MR. GOLDSTEIN:  And then I think we have jury

21    instructions issues.

22    MS. BONAMICI:  And, your Honor, it helps us a little

23    bit to have each of those same instructions that we've made.

24    THE COURT:  We are getting to that point in the day

02:53:42    25    where I think it would be difficult to have the case argued,

1    but maybe not.  So my question is how long?  How much time
2    does the government want?

3         MS. HAMILTON:  For the opening closing argument, my
4    argument is an hour and some change, not more than an hour and
02:54:03   5    15.

6         THE COURT:  For the defense?

7         MR. S. ADAM, JR.:  About an hour and a half, your
8    Honor.

9         THE COURT:  Okay.  We're going to argue it tomorrow.
02:54:10   10        MS. HAMILTON:  Okay.

11        THE COURT:  So what we're going to do is deal with
12   the rebuttal, the voir dire and then if the voir dire is
13   successful from the government's point of view, we'll have the
14   testimony, then I am sending the jurors home and finish with
02:54:40   15   the discussions and whatever final list there is on exhibits.
16   Sound okay with everybody?

17        MS. HAMILTON:  Yes, your Honor.

18        (Pause.)

19        MR. COLE:  Your Honor, there's one other issue that
02:58:51   20   occurred to me.  I think you had indicated before that you
21   were going to instruct the jury to disregard some part of
22   their expert's testimony and strike some part of the testimony
23   dealing with his opinion that certain transactions were loans.

24        THE COURT:  Write it out so that I don't make errors
02:59:18   25   in telling this, and it will give the defense a chance to

Weiner - voir dire direct by Cole

1035

1    look.

2              MR. COLE:  Okay.  We can do this overnight for

3    tomorrow morning?

4              THE COURT:  Yeah.

02:59:26    5              MR. COLE:  Okay.

6         (Pause.)

7              MR. COLE:  Your Honor, our expert is ready to do the

8    voir dire.

9              THE COURT:  Bring him in.

03:01:07   10              MR. COLE:  Say that again?

11              THE COURT:  What?

12              MR. GOLDSTEIN:  I'm sorry?

13              THE COURT:  I said have him come in.

14              MR. COLE:  He's here.

03:01:26   15              THE COURT:  Face me and raise your right hand.

16         (Witness sworn.)

17              THE COURT:  Please be seated.

18              Give me one minute.

19         (Pause.)

03:01:48   20              THE COURT:  Okay.

21         DAVID WEINER, GOVERNMENT'S REBUTTAL WITNESS, DULY SWORN,

22                   VOIR DIRE DIRECT EXAMINATION

23    BY MR. COLE:

24    Q.  Can you please state your name and spell it.

03:01:52   25    A.  My name is David Weiner, W-E-I-N-E-R.

Weiner - voir dire direct by Cole

1036

1    Q.  Mr. Weiner, where do you work?

2    A.  I'm an attorney for the Internal Revenue Service.

3    Q.  And before I get into your jobs with the IRS, can you just

4    tell the jury, or I guess this case the Court, your

03:02:09    5    educational background?

6    A.  I have a Bachelor of Science in accounting from the

7    University of Illinois.  I have a JD from the Chicago Kent

8    College of Law.  I'm a CPA, and I'm an attorney licensed in

9    Illinois and Arizona.

03:02:28    10    Q.  And how long have you been a CPA?

11    A.  Since 1978.

12    Q.  What part of the IRS do you work in?

13    A.  Well, I work in the office of chief counsel, but

14    specifically, I work in the office of tax exempt and

03:02:45    15    government entities.

16    Q.  And how long have you worked in the office of chief

17    counsel?

18    A.  Since 1994.

19    Q.  What's your title?

03:02:52    20    A.  My title now is senior counsel.

21    Q.  And since when did you have that title?

22    A.  Since December of 2007.

23    Q.  And what, can you just tell the Court what your job

24    actually entails?

03:03:03    25    A.  My job entails trying cases in tax court and advising

Weiner - voir dire direct by Cole

1037

1  agents who need legal assistance on their cases.

2  Q.  So prior to being a senior counsel, what was your position

3  with the IRS?

4  A.  I was a docket attorney.  I did the same work, but on

5  smaller cases.

6  Q.  And when did you join the office of the chief counsel?

7  A.  In either late 1993, early 1994.

8  Q.  And what did you do prior to that?

9  A.  Prior to that, I was an appeals officer for the IRS.

10  Q.  What does that mean?

11  A.  After somebody is audited and doesn't agree with the

12  results of the audit, there's an administrative appeal, and as

13  an appeals officer, my job was attempting to -- to attempt to

14  settle that case prior to litigation.

15  Q.  And how long were you in appeals?

16  A.  I believe approximately seven years.

17  Q.  And so prior to being in appeals, what did you do?

18  A.  Prior to that, I was a revenue agent for the Internal

19  Revenue Service, and I audited small businesses.

20  Q.  Now, in preparation for your testimony today, you did not

21  review any records of the -- of any of the campaign

22  committees; is that correct?

23  A.  I did not.

24  Q.  Now, in your work with the IRS, do you have occasion to

25  consider whether the transfer of money is considered a loan or

03:03:24

03:03:39

03:04:01

03:04:16

03:04:29

Weiner - voir dire direct by Cole

1038

1    is considered to be income?

2    A.  I have.

3    Q.  How often does that come up?

4    A.  Over the last several years, I've had approximately a

03:04:45    5    hundred cases involving that issue.

6    Q.  Okay.  Now, can you in general describe for the jury what

7    is income?

8    A.  Well, income is everything you receive unless there's a

9    specific exemption or exception in the Internal Revenue Code.

03:05:04    10   Q.  And what about a loan?  Can you describe what a loan

11   means?

12   A.  Well, a loan is not income because there's an obligation

13   to repay the loan.

14   Q.  Now, is this obligation to repay the main distinction

03:05:16    15   between something that's income, a transfer that's income and

16   a transfer that's a loan?

17   A.  Yes, it is.

18   Q.  Now, at what point is this obligation to repay considered?

19   A.  At the time that the transfer is made, at the time that

03:05:32    20   the borrower receives the money.

21   Q.  Now, can you describe what facts you would look at to

22   determine whether a transfer of money was, in fact, a genuine

23   loan or was income?

24   A.  Well, there's several facts that I've looked at in the

03:05:46    25   cases that I've worked on.  The first fact that I usually look

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 48 of 125 PageID #:1698
Weiner - voir dire direct by Cole
1039

1   for is whether or not there's a written note.

2   Q.  Why is that important?

3   A.  It shows evidence that there's an obligation to repay the

4   loan.

03:06:01   5   Q.  What other factors?

6   A.  I'm also going to look at whether or not there's some

7   allowance for the payment of interest.

8   Q.  What does that mean?

9   A.  Well, since the borrower's using the lender's money, a

03:06:17   10   genuine loan often has the borrower paying for the right to

11   use the lender's money.

12   Q.  What about -- what other facts would you look at?

13   A.  I'd also look at whether there's a repayment schedule.

14   Some -- some document that would show dates and amounts that

03:06:37   15   are going to be repaid on the loan.

16          I also am going to look at if there are actual

17   repayments.

18   Q.  What type of repayments are you talking about?

19   A.  Well, I think I'm talking about any repayments, but

03:06:54   20   specifically I'd like to see repayments of the specific loan

21   amount.

22   Q.  Okay.  You've talked about a note, repayment schedule,

23   interest and actual repayments.  Are there other facts that

24   you would look at?

03:07:04   25   A.  Well, I also like to see how the lender enters the loan on

Weiner - voir dire direct by Cole

1040

1  its books and records.  I want to see that the lender is

2  actually treating it as a loan on its books, so there's some

3  entry that shows that it's a loan.

4  Q.  Okay.  Well, what other factors would you look at?

03:07:25    5  A.  Well, I also want to look at how the parties treat the

6  transaction.  I want to make sure that, especially to the

7  extent that the borrower doesn't repay the loan, that the

8  lender is going to try to enforce repayment.

9       Are there demand notes?  Are there, excuse me, demand

03:07:47   10  letters?  Is there a lawsuit?  If there's no hope of ever

11  getting repayment, has the loan been forgiven?  Have the

12  documents been filed with the IRS showing that there's been

13  loan forgiveness?  I'm looking at those kinds of documents as

14  well.

03:08:04   15  Q.  Now, how does it matter if the same party is both sides of

16  the transaction?  Do you know what I mean by that?

17  A.  Yes, I understand.

18  Q.  Is that considered -- one of the considerations?

19  A.  Well, it's something to consider.  I think that if you

03:08:16   20  have the same party on both sides of a transaction, you need

21  to scrutinize the transaction a little more carefully.

22       I think you're still looking at the same factors, but

23  you may need a little more evidence to show that it's a loan

24  if you have the same parties on both sides of a transaction.

03:08:37   25       MR. COLE:  One moment, your Honor.

Weiner - voir dire cross by Henderson

1041

1      (Counsel conferring.)

2              MR. COLE:  That's all.

3              THE COURT:  Voir dire.

4                   VOIR DIRE CROSS EXAMINATION

03:08:47   5   BY MR. HENDERSON:

6   Q.  Mr. Weiner, my name is Victor Henderson.  How are you

7   doing this afternoon?

8   A.  Good.  How are you?

9   Q.  I'm doing great.

03:08:56   10          So you're both a CPA and an attorney, correct?

11   A.  Yes.

12   Q.  Now, I've had an opportunity to look at your resumé or CV,

13   and you graduated from law school in 1981, correct?

14   A.  Excuse me?

03:09:07   15   Q.  You graduated from law school in '81?

16   A.  In '81, yes.

17   Q.  And you started working for the IRS in '84, correct?

18   A.  That's correct.

19   Q.  What did you do between '81 and '84?

03:09:18   20   A.  I was working for a small accounting firm.

21   Q.  Okay.  Which firm was that?

22   A.  It was called Barry Steiner, Ltd.

23   Q.  You worked for Barry?

24          (Laughter.)

03:09:28   25   BY THE WITNESS:

1    A.  No, I didn't work for this Barry.

2    BY MR. HENDERSON:

3    Q.  Oh, okay.  But you worked at a CPA firm.

4    A.  I worked at a CPA firm doing accounting and tax work.

03:09:36    5    Q.  And were you an auditor as well?

6    A.  I was not an auditor at that firm.  We didn't do audit

7    work.

8    Q.  And beyond those three years, you've worked for the IRS.

9    A.  Yes.

03:09:46    10    Q.  Consistently since that time.

11    A.  Yes.

12    Q.  Okay.  And one of the things that you spoke with Mr. Cole

13    about was that you were an appeals officer, correct?

14    A.  I was, yes.

03:09:56    15    Q.  And as an appeals officer, you negotiated settlements on

16    tax cases prior to litigation, correct?

17    A.  Yes.

18    Q.  So by virtue of the fact that there was litigation, it

19    meant that there were times when the IRS and the taxpayer did

03:10:08    20    not agree on how a certain transaction should be treated; is

21    that correct?

22    A.  That's correct.

23    Q.  And so, therefore, they went to a place called tax court.

24    A.  Yes.

03:10:15    25    Q.  Okay.  And the IRS won those cases sometimes, correct?

Weiner - voir dire cross by Henderson

1043

1   A.   Sometimes we win; sometimes we lose.

2   Q.   And sometimes you lose, right?

3   A.   Yes.

4   Q.   Which means that there's a gray area sometimes when it

03:10:25   5   comes to how you treat taxes, isn't there?

6   A.   Yes.

7   Q.   Okay.  So it's not just black and white.

8   A.   It's not always black and white.

9   Q.   It's not always about just adding numbers and adding

03:10:34   10   figures, correct?

11   A.   That's correct.

12   Q.   And then when you became a CPA, you learned about concepts

13   and theories, correct?

14   A.   Yes.

03:10:41   15   Q.   And you learned about, for example, about the matching

16   principle, right?

17   A.   Yes.

18   Q.   What's the matching principle?

19   A.   The matching principle, at least there's a goal in

03:10:50   20   accounting to match expenses with the year that the income is

21   going to be reported and recognized in income.

22   Q.   And there are other principles as well that you have to

23   apply either as a CPA or as a tax agent, correct?

24   A.   Yes.

03:11:05   25   Q.   So it involves quite a bit of interpretation.

Weiner - voir dire cross by Henderson

1044

1    A.  Yes, it does.

2    Q.  Okay.  When did you first get involved in this particular

3    case?

4    A.  Last Friday.

03:11:14    5    Q.  So after the case started, the government lawyers came to

6    you?

7    A.  Actually, I don't think I spoke to any of the government

8    lawyers in this case until this week, but I spoke to at least

9    some of the -- at least one revenue agent last Friday.

03:11:33    10    Q.  But in terms of the lawyers themselves, they didn't even

11    get to you in until this week; is that correct?

12    A.  That's correct.

13    Q.  Okay.  And you met with them last night.

14    A.  I met with them on the phone last night.

03:11:43    15    Q.  Did you meet with them in person?

16    A.  For a short time, yes.

17    Q.  And you met with them the night before.

18    A.  Again, I think on the phone, but not in person.

19    Q.  So really your work on this case just started this week,

03:11:56    20    right?

21    A.  Yes, it -- yes.

22    Q.  Okay.  Now, you indicated that you did not review any tax

23    records; is that correct?

24    A.  That's correct.

03:12:09    25    Q.  And you did not review any campaign records; is that

1 correct?

2 A.  That's correct.

3 Q.  Okay.  So you have not had an opportunity to look at the

4 books and records of the campaign to make your own

03:12:22  5 determination as to whether or not some of the transactions

6 were loans or income; is that correct?

7 A.  I have not.

8 Q.  And you also told us that the tax code says that there's

9 income, but then it makes exceptions, correct?

03:12:36  10 A.  Yes.

11 Q.  Okay.  And one of those exceptions is whether or not a

12 transaction is a loan, right?

13 A.  Well, that's not actually in the Internal Revenue Code.

14 Q.  Well, it's actually referred to as debt forgiveness?

03:12:46  15 A.  Debt forgiveness is in the code, but whether or not

16 something is a loan and not income is really outside of the

17 Internal Revenue Code.  It's just not income because there's

18 an obligation to repay.

19 Q.  And I know you don't have it in front of you, but how does

03:13:01  20 the tax code define income?  It says XYZ is income except,

21 correct?

22 A.  I believe the term is that income is from all sources

23 derived unless otherwise provided for.

24 Q.  And what are some of those otherwise provided for?

03:13:19  25 A.  Gifts are not income.  Inheritances are not income.

Weiner - voir dire cross by Henderson

1046

1    Employer provided health insurance is not income.

2    Q.  And loans are not -- generally not considered income, is

3    that correct?

4    A.  Loans are not income.

03:13:35    5    Q.  So if I were hypothetically to -- or, for example, when

6    you buy a house and you borrow money from the bank, the money

7    that you borrow from the bank does not go on your 1040; is

8    that correct?

9    A.  That's correct.

03:13:46    10    Q.  Okay.  And if I go to a buddy of mine and borrow $2,000, I

11    don't list that $2,000 on my tax return as income; is that

12    correct?

13    A.  That's correct.

14    Q.  Okay.  Now, you spoke, too, about the fact that -- you're

03:14:00    15    familiar with the term closely held business?

16    A.  Yes.

17    Q.  Okay.  And that's not an anomaly under the tax code,

18    right?

19    A.  It is not.

03:14:07    20    Q.  Okay.  And so, therefore, there are revenue agents who at

21    times have to spend time looking at closely held businesses,

22    right?

23    A.  Yes.

24    Q.  Because the documents and the way that the transactions

03:14:15    25    are accounted for are not the same as they would be in the

1  arm's length transaction, correct?

2  A.  Okay.

3  Q.  Would you agree --

4  A.  Yes.

03:14:23  5  Q.  -- or disagree?

6  A.  That's possible.

7  Q.  And would you also agree that small businesses tend not to

8  have as elaborate accounting systems as larger businesses; is

9  that correct?

03:14:34  10  A.  Again, that's possible, yes.

11  Q.  In your experience, is that true?

12  A.  In my experience, there are all kinds of accounting

13  systems out there, and some businesses are better at it than

14  others.

03:14:46  15  Q.  But would you agree with me as a general rule that Fortune

16  500 companies, for example, have more elaborate accounting

17  systems than some business that has gross revenues of a

18  hundred thousand dollars or less?

19  A.  I'd be speculating, but I guess the answer is yes.

03:15:00  20  Q.  And so in response to a question that Mr. Cole asked you,

21  you said that you would look for certain documents to

22  determine whether or not something was a loan, right?

23  A.  Yes.

24  Q.  And you said you would look for a note, correct?

03:15:18  25  A.  Yes.

Weiner - voir dire cross by Henderson

1048

1    Q.  Payment of interest, right?

2    A.  Yes.

3    Q.  A repayment schedule?

4    A.  Yes.

03:15:23    5    Q.  Loan repaid?

6    A.  Yes.

7    Q.  Okay.  Let me take loan repaid off of it.

8           If there is no written note, that doesn't mean

9    automatically that it's not a loan; is that correct?

03:15:33    10   A.  That's correct.

11   Q.  Okay.  And if there is no payment of interest, that does

12   not automatically mean there's not a loan; is that correct?

13   A.  That's correct.

14   Q.  Because sometimes people can get interest-free loans,

03:15:42    15   correct?

16   A.  Absolutely.

17   Q.  And not all loans are documented; isn't that correct?

18   A.  Not all loans are documented, that's correct.

19   Q.  But, in fact, it could be a loan, it's just not a

03:15:49    20   documented loan, correct?

21   A.  Correct.

22   Q.  All right.  And so if there was a demand letter, then that

23   might indicate, for example, as you said, that there was a

24   loan; in other words, pay me back the money that I asked for,

03:16:05    25   correct?

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 58 of 125 PageID #:1708
Weiner - voir dire cross by Henderson
1049

1    A.  Yes.

2    Q.  Okay.  And would you agree or disagree that smaller

3    businesses tend not to keep records the same way larger ones

4    do?

03:16:32    5    A.  I guess so.

6    Q.  Okay.  Because there's like a cost/benefit analysis to

7    recordkeeping, isn't there?

8    A.  Well, the IRS requires a certain level of recordkeeping.

9    You have to at least meet the minimum.

03:16:51    10    Q.  And when that doesn't happen, then the taxpayer gets an

11    opportunity to go and meet the IRS to discuss whatever

12    concerns the IRS has about the tax formation, correct?

13    A.  As I've seen in my career, when somebody doesn't have

14    adequate records, we often consider penalties.

03:17:12    15    Q.  Okay.  And last but not least, the government lawyers

16    asked you to do some research into this -- the pension payment

17    made by the commissioner, correct?

18    A.  I wasn't asked to do research on this issue.

19    Q.  You didn't take a look at Internal Revenue Code 404 and

03:17:32    20    Internal Revenue Code 414(h)(1)?

21    A.  Oh, you're talking about the pension issue --

22    Q.  Yes.

23    A.  -- as opposed to -- yes, I did do some research on the

24    pension issue.

03:17:42    25    Q.  Okay.  And so when they told you what the issue was, you

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 59 of 125 PageID #:1709
Weiner - voir dire redirect by Cole
1050

1  had to go look in the books, right?

2  A.  No, I knew what the answer was.  I just wanted to confirm

3  what I believed the answer was.

4  Q.  So you went to the tax code to confirm your belief of what

03:17:58  5  you thought the answer was?

6  A.  Yes.

7  Q.  And as we indicated earlier, not all CPAs or not all

8  lawyers would always agree on what the answer is to a

9  particular tax problem; is that correct?

03:18:09  10  A.  It depends on the tax issue; but, yes, there are times we

11  don't agree.

12            MR. HENDERSON:  Okay.  Thank you.

13            MR. COLE:  Your Honor, I just probably want to ask

14  him a couple follow-ups on that pension issue just to put in

03:18:22  15  the record what his opinion on that is.

16            THE COURT:  Okay.

17                VOIR DIRE REDIRECT EXAMINATION

18  BY MR. COLE:

19  Q.  Do you have opinion as to whether or not the defendant --

03:18:30  20  the check from the campaign account to the pension fund was

21  deductible to the defendant?

22  A.  My opinion is that the check paid from the campaign fund

23  to the City of Chicago pension fund was not deductible.

24  Q.  Should the City of Chicago have taken it out of the W-2

03:18:54  25  wages that it paid to the defendant?

Weiner - voir dire redirect by Cole

1051

1    A.   No.

2    Q.   Can you just explain why not?

3    A.   The only time salary on a W-2 would be reduced for pension

4         contributions is if the pension contribution is paid by what's

03:19:13    5    called salary reduction, and under 401(k) or in the weird,

6         limited case of a -- of a municipal employer, there's

7         something called a pick-up under 414(h)(2), and I don't know

8         if the City of Chicago has made an election to have a

9         414(h)(2) pick-up, but that would be another case where salary

03:19:41    10   could be reduced for a pension contribution.  But a

11        contribution by a participant to the plan would not cause the

12        W-2 wages to be reduced.

13             MR. HENDERSON:  Your Honor, we're not going to object

14        to this line of questioning for voir dire; but we were

03:20:00    15   prevented and prohibited from going into this line of

16        questioning with Mr. Gershinzon, so we're working under the

17        assumption that this is not a line of questioning that the

18        government will be able to go into especially on rebuttal.

19             MR. COLE:  No, we are staying far away from this,

03:20:15    20   your Honor.  We just wanted to put this in the record.

21             THE COURT:  Sure, that's fine.

22   BY MR. COLE:

23   Q.   And was there a time in the past when such a contribution

24        would have been deductible?

03:20:26    25   A.   Well, the law changed in 1986, so prior to that law change

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 61 of 125 PageID #:1711
Weiner - voir dire recross by Henderson

1052

1   in 1986, there was a limited deduction allowable under

2   Section 219 of the Internal Revenue Code for voluntary

3   employee contributions.  That was repealed in 1986.

4   Q.  So for over 25 years, that has not been deductible?

03:20:52   5   A.  That's correct.

6      (Counsel conferring.)

7   BY MR. COLE:

8   Q.  Now, I'm going to go back to the loan issue.

9      You named certain factors that you would consider in

03:21:52   10   determining whether a transfer was a genuine loan or income.

11   Remember that?

12   A.  Yes.

13   Q.  Okay.  Now, have you been called upon to look at those

14   factors in the context of a claim by a taxpayer that a certain

03:22:05   15   transfer was a loan?

16   A.  I have.

17   Q.  How often would that come up?

18   A.  In the last several years, maybe about a hundred times.

19      MR. COLE:  I have no other questions, your Honor.

03:22:19   20         VOIR DIRE RECROSS EXAMINATION

21   BY MR. HENDERSON:

22   Q.  Mr. Weiner, the first thing Mr. Cole asked you, and I

23   listened to your answer carefully, you told Mr. Cole that in

24   your opinion, the $68,000 was not something that should have

03:22:37   25   been deductible from wages; is that correct?

Weiner - voir dire recross by Henderson

1053

1  A.  Yes.

2  Q.  Okay.  But when you use the term opinion, does that

3  recognize that another CPA or another attorney might view that

4  same transaction differently?

03:22:53  5  A.  I reviewed the law on this issue, and that's my opinion of

6  how the transaction would be taxed based upon how I see the

7  code sections.

8  Q.  Okay.  But my question is does your opinion also take into

9  account that another tax professional or an attorney or CPA

03:23:15  10  might have a different view of how that transaction should be

11  handled?

12  A.  Somebody could have another opinion.

13  Q.  As it relates to the $68,000 payment to the City, do you

14  have an opinion as to whether or not that payment should have

03:23:34  15  been reflected on the W-2?

16          MR. COLE:  You mean the payment to the pension fund?

17          MR. HENDERSON:  Yes, I'm sorry.  The payment to the

18  pension fund.

19  BY THE WITNESS:

03:23:42  20  A.  Could you clarify that question?

21  BY MR. HENDERSON:

22  Q.  There was a $68,000 check that came from the commissioner,

23  and it went to his pension fund.

24  A.  Yes.

03:23:49  25  Q.  Okay.  And that $68,000 went into his account, correct?

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 63 of 125 PageID #:1713
Weiner - voir dire recross by Henderson
1054

1  A.  Yes.

2  Q.  At some point, should that $68,000 have been reflected on

3  the W-2?

4  A.  The answer is no.

03:24:01  5  Q.  Okay.  Should the $68,000 have been reflected on a 1099-R?

6  A.  Again, you're going to have to clarify that question.

7  Q.  Money went into the pension account, correct?

8  A.  Yes.

9  Q.  Should the pension people ever communicate to let me start

03:24:22  10  off with the IRS that that money is in the account at any

11  time?

12  A.  Again, I'm not -- I'm not sure I -- I think I understand

13  what you're saying.  I'm not sure that I understand the way

14  you're asking it.

03:24:37  15  Q.  Well, let me ask it another way.

16  A.  But, I guess, I believe what you're asking, and I probably

17  should never do this as a witness, at the time when

18  distributions are made from the plan --

19  Q.  Yes.

03:24:56  20  A.  -- those employee contributions which were not previously

21  deducted should be reflected as the nontaxable portion of

22  those distributions, and there are several methods under

23  Section 72 that allow for determining what portion of those

24  distributions are taxable and which portions are not taxable.

03:25:21  25  Q.  So then at some point then when the 68,000 starts coming

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 64 of 125 PageID #:1714
Weiner - voir dire recross by Henderson

1055

1        out, it gets reflected on a 1099-R, correct?

2        A.  I believe there's a box on the 1099-R for employee

3        contributions, but I don't recall that for sure.

4        Q.  Okay.  And so, therefore, as you said on the 1099-R,

03:25:41   5        there's a box that says distributions and then there's a box

6        that speaks to the taxable portion of the distribution, right?

7        A.  Yes.

8        Q.  So is it your opinion then that the $68,000 -- if it was a

9        loan, would the $68,000 have been taxable in 2006?

03:26:00   10             Assuming it was a genuine loan, would the $68,000

11       have been taxed in 2006?

12       A.  Assuming it was a genuine loan, it would not have been

13       includable in income in 2006.

14       Q.  All right.  Now, let's go to whether or not it was income.

03:26:15   15             Assuming it was income in 2006, should it have showed

16       up on the 1040?

17       A.  Yes.

18       Q.  Where?

19       A.  Other income.

03:26:29   20       Q.  All right.  Should it have also showed up someplace else

21       on the 1040?

22       A.  I don't believe so.

23       Q.  So -- well, now, what you said is that the taxpayer -- so

24       your position is that the taxpayer would have paid the taxes

03:26:47   25       on 2006 and not when the money was distributed in later years?

Weiner - voir dire recross by Henderson

1056

1   A.  If the $68,000 was not a loan, it was includable in income
2   in 2006.

3          When the defendant later receives a distribution from
4   the pension plan, that portion that's a return of that $68,000
03:27:12  5   would not be includable in income.

6   Q.  Are you familiar with -- you and Mr. Cole talked about a
7   1986 law, I guess it was TEFRA?

8   A.  I don't believe that was the TEFRA.  That was the Tax
9   Reform Act of 1986.

03:27:31  10  Q.  Which act was '86?

11  A.  It's just called the Tax Reform Act of '86.  I believe
12  TEFRA was in 1982.

13  Q.  Okay.  So with the '86 law change, do you know whether or
14  not that law was intended to capture the transaction that
03:27:46  15  Mr. Beavers was involved in in 2006, whereby he was allowed to
16  do a catch-up for his pension?

17  A.  Well, I'm a little uncomfortable with the use of the term
18  catch-up because that's a term of art in the Internal Revenue
19  Code, and this is not a catch-up contribution.

03:28:02  20          This was, as I understood from reading the letter
21  from the City, this was a purchase of past service credits.

22  Q.  Well, by definition, whatever took place in 1986 was not
23  intended to address what transpired with the commissioner in
24  2006.  Wouldn't you agree with me on that?

03:28:21  25  A.  I would not agree with you.

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 66 of 125 PageID #:1716
Weiner - voir dire recross by Henderson
1057

1  Q.  Okay.  But by definition, whatever took place in 1986 was

2  taking -- taking into account what had transpired before that

3  law was passed, don't you agree?

4  A.  Well, prior to 1986, certain types of transactions caused

03:28:38   5  a tax deduction; and after 1986, they would no longer be

6  allowed a deduction.

7  Q.  And it's not your position that whatever the legislators

8  did in 1986 was meant to capture by definition what the

9  commissioner was able to do in 2006.  That's not what you're

03:28:54  10  saying, are you?

11  A.  What I'm saying is that after 1986, a voluntary employee

12  contribution would not be deductible.

13  Q.  And all employee contributions are not voluntary.  Would

14  you agree or disagree?

03:29:09  15  A.  Well, I'm not sure I agree -- I'm not sure I understand

16  the question.

17  Q.  Well, you just said -- used the term voluntary employee

18  contribution, right?

19  A.  Well, for example, in the City pension, every employee's

03:29:24  20  required to make a 6.5 percent contribution out of salary.

21  That is not voluntary.  You must make that contribution.

22  Q.  So -- so then you agree with me then that all -- all

23  employee contributions to pension plans are not voluntary,

24  correct?

03:29:43  25  A.  I would agree that not all -- not all employee

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 67 of 125 PageID #:1717
Weiner - voir dire further redirect by Cole
1058

1  contributions are voluntary.

2  Q.  And sometimes even the tax experts have a challenge

3  figuring out what's voluntary and what's involuntary; is that

4  correct?

03:29:58  5  A.  Again, you're asking me to speculate, so, yes, I suppose.

6  Q.  Well, voluntary is a term of art in the context of how

7  it's used in the Internal Revenue Code, correct?

8  A.  Yes.

9        MR. HENDERSON:  Okay.  No further questions.

03:30:12  10        MR. COLE:  Just a little bit, your Honor.

11        FURTHER VOIR DIRE REDIRECT EXAMINATION

12  BY MR. COLE:

13  Q.  I think you had said before with respect to an earlier

14  question by Mr. Henderson that someone could have a different

03:30:20  15  opinion about the deductibility of the $68,000?

16  A.  I guess somebody could have a different opinion.  I don't

17  believe that that would be a proper opinion.

18  Q.  So this is not a gray area, is it?

19  A.  No, it is not.

03:30:35  20  Q.  It's black and white?

21  A.  Yes.

22  Q.  It's not deductible?

23  A.  It is not deductible.

24        FURTHER VOIR DIRE RECROSS EXAMINATION

03:30:43  25  BY MR. HENDERSON:

Weiner - voir dire further recross by Henderson

1059

1  Q.  Two final questions:  Number one, the area that we were

2  just talking about, is that something that you would expect

3  the average taxpayer to understand and know?

4          MR. COLE:  I'm going to just object.

03:30:57    5          THE COURT:  Sustained.

6  BY MR. HENDERSON:

7  Q.  Is that something that you, based on the documents and

8  records that you've reviewed in your discussions with the

9  government, is that something that you believe that

03:31:05   10  Mr. Beavers should know?

11          MR. COLE:  Same objection.

12          THE COURT:  Sustained.

13  BY MR. HENDERSON:

14  Q.  Is the tax treatment that you just talked about in

03:31:14   15  Section 401 and 401 -- 401 and 404, is that an everyday,

16  plain-vanilla tax transaction?

17          MR. COLE:  Objection.

18          THE COURT:  Sustained.

19  BY MR. HENDERSON:

03:31:25   20  Q.  In fact, what you're talking about is actually rather

21  complex, isn't it?

22          MR. COLE:  Objection.

23          THE COURT:  Sustained.

24  BY MR. HENDERSON:

03:31:41   25  Q.  One last line of questioning.

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 69 of 125 PageID #:1719
Weiner - voir dire further recross by Henderson
1060

1    You seem to -- or at least my impression was that

2    you're not completely comfortable with the term voluntary

3    versus involuntary versus -- in the context of contributions

4    to employee pensions; is that correct or is that incorrect?

03:31:59    5    MR. COLE: Objection.

6    BY THE WITNESS:

7    A. That's incorrect.

8    BY MR. HENDERSON:

9    Q. Okay. But you do recognize that not all contributions

03:32:06    10    again are voluntary, correct?

11    A. I recognize that some contributions are not voluntary.

12    Q. And last but not least, you do agree with the general

13    principle that income from a taxpayer should not be taxed --

14    the same income should not be taxed two times. Do you agree

03:32:30    15    with that?

16    A. I agree with that.

17    Q. So, therefore, if, for example, if --

18    MR. HENDERSON: You know, I'll withdraw that. I'm

19    going to strike that last question.

03:32:41    20    Thank you, Judge.

21    THE COURT: We're going to line the jury up.

22    MR. COLE: Can I -- can we have a moment, your Honor,

23    just to discuss?

24    THE COURT: Yes, you can have a moment, but I would

03:32:52    25    like to see you and Mr. Henderson at the side off the record.

Weiner - rebuttal direct by Cole

1061

```
              1        (Discussion held off the record at sidebar.)

              2             COURT SECURITY OFFICER:  All rise.

              3        (Jury enters courtroom.)

              4             THE COURT:  Please be seated.

03:35:20      5             For the defense?

              6             MR. SOROSKY:  Your Honor, ladies and gentlemen of the

              7   jury, at this time, the defense would rest.

              8             THE COURT:  Do you have any rebuttal?

              9             MR. COLE:  Yes, your Honor.  The government has a

03:35:35     10   rebuttal witness.

             11             THE COURT:  Would you stand, please.

             12        (Witness sworn.)

             13             THE COURT:  Please be seated.

             14             You may begin.

03:35:48     15     DAVID WEINER, GOVERNMENT'S REBUTTAL WITNESS, DULY SWORN,

             16                      DIRECT EXAMINATION

             17   BY MR. COLE:

             18   Q.  Can you please state your name and spell it.

             19   A.  My name is David Weiner, W-E-I-N-E-R.

03:35:55     20   Q.  Mr. Weiner, can you please tell the jury where you work?

             21   A.  I am an attorney for the Internal Revenue Service.

             22   Q.  And before I get into your job at the IRS, I want to just

             23   have you tell the jury what your educational background is.

             24   A.  I have a Bachelor of Science in accounting from the

03:36:13     25   University of Illinois.  I have a juris doctor from the
```

Weiner - rebuttal direct by Cole

1062

1　Chicago Kent College of Law.  I am a CPA, and I am a licensed

2　attorney in the states of Illinois and Arizona.

3　Q.  How long have you been a CPA?

4　A.  Since 1978 or 1979.  I don't remember the exact date.

03:36:34　5　Q.  Okay.  How long have you worked for the IRS?

6　A.  I've worked for the IRS for 29 years, beginning in 1984.

7　Q.  So what part of the IRS do you work in now?

8　A.  I currently work in the office of chief counsel of the

9　IRS.  And specifically, I work in the office of tax exempt and

03:36:57　10　government entities.

11　Q.  How long have you been in the office of chief counsel?

12　A.  Since 1994.

13　Q.  And what's your current title there?

14　A.  My current title is senior counsel.

03:37:11　15　Q.  How long have you been a senior counsel?

16　A.  Since December of 2007.

17　Q.  Can you tell the jury what you do for the IRS as senior

18　counsel?

19　A.  As a senior counsel, I try cases in tax court.  If there's

03:37:24　20　a tax controversy, I represent the IRS in tax court.

21　　　　I also provide advice to agents who are working on

22　cases.  If they have any legal issues, they'll come to me for

23　advice.

24　Q.  So by trying cases in tax court, does that mean you're

03:37:45　25　normally the one asking the questions?

Weiner - rebuttal direct by Cole

1063

1   A.   I'm normally the one asking the questions, yes.

2   Q.   So prior to being a senior counsel, what title did you

3   have?

4   A.   Before that, I was just an attorney for the IRS.

03:37:56   5   Q.   And what were your responsibilities as an attorney?

6   A.   They were the same, although I tried smaller cases back

7   then.

8   Q.   Did you still give advice?

9   A.   I still gave advice to agents.

03:38:07   10   Q.   And prior to being an attorney, what did you do at the

11   IRS?

12   A.   Prior to being an attorney, I was an appeals officer for

13   the IRS.

14   Q.   And what does that mean?

03:38:19   15   A.   As an appeals officer, my job was to take cases where

16   taxpayers had been audited and didn't agree with the results

17   of the audit.  I would attempt to settle the case short of

18   litigation.

19   Q.   How long -- when did you start your work as an appeals

03:38:37   20   officer?

21   A.   I was an appeals officer from 1987 until I became -- went

22   to the counsel office in 1994.

23   Q.   And prior to being an appeals officer, what did you do?

24   A.   Prior to being an appeals officer, I was an agent, an

03:38:56   25   internal revenue agent.  I audited small businesses for

1    determining their proper tax liability.

2    Q.  Now, prior to your testimony here today, did you review

3    any campaign records of any of the three campaign committees?

4    A.  I did not.

03:39:13    5    Q.  And when was the first time you became involved in this

6    case?

7    A.  I received a call from an agent Friday evening, talking

8    about this case.

9    Q.  Okay.  So, now, in your work with the IRS, do you have an

03:39:32    10    occasion to consider whether the transfer of money is a loan

11    or is income?

12    A.  I have, yes.

13    Q.  How often does this come up?

14    A.  In the last few years, I've had maybe a hundred cases

03:39:44    15    involving that issue.

16    Q.  Now, can you just in general describe for the jury what is

17    income?

18    A.  Well, the Internal Revenue Code says that income is

19    everything that you receive unless there's some specific

03:40:01    20    exception in the Internal Revenue Code.

21    Q.  Now, what is a loan?

22    A.  Well, a loan is not income because there's an obligation

23    to repay the loan.

24    Q.  Now, is this obligation to repay the main distinction

03:40:15    25    between income and a loan?

Weiner - rebuttal direct by Cole

1065

1   A.  Yes.

2   Q.  Now, at what point is this obligation important?

3   A.  Well, you're going to look -- you look for the obligation

4   to repay the loan at the time that the loan is made, at the

03:40:32   5   time that the borrower receives the funds.

6   Q.  Now, can you tell the jury what evidence you would look at

7   to determine whether a transfer of money was, in fact, a

8   genuine loan?

9   A.  Well, there's several factors that I would look to.  The

03:40:50   10   first is I would look to whether or not there's a written

11   note.

12   Q.  Now, why is a note important?

13   A.  Well, a note's going to evidence -- is going to show that

14   there is, in fact, an obligation to repay the loan.

03:41:03   15   Q.  Does the note have to be written by a lawyer on a piece of

16   paper, or can it be just scribbled on a napkin?

17   A.  It can be on any kind of piece of paper.  I think you can

18   even go to a form store and buy a note.

19   Q.  Okay.  So a note is one, one piece of evidence you would

03:41:19   20   look to.  What other evidence would you look to?

21   A.  Some payment or allowance for interest to be paid.

22   Q.  What does that mean?

23   A.  Well, since the lender -- since the borrower's using the

24   lender's money, often the borrower will pay for the right to

03:41:39   25   use that money, and so that's evidence of a loan, or one --

Weiner - rebuttal direct by Cole

1066

1    one factor in looking at a loan.

2    Q.  What are other factors?

3    A.  A repayment schedule, something showing when payments are

4    going to be made.  Actual repayments.

03:42:00    5    Q.  So let me stop you there.

6    A.  Okay.

7    Q.  So you mentioned a note?

8    A.  Yes.

9    Q.  You mentioned interest to be paid.

03:42:08    10    A.  Yes.

11    Q.  A repayment schedule.

12    A.  Yes.

13    Q.  And then the fourth one you mentioned was actual

14    repayments.

03:42:13    15    A.  Actual repayments, yes.

16    Q.  What type of repayments are you talking about?

17    A.  Well, again, if we're looking at facts showing whether or

18    not this is a genuine loan, payments on the actual loan would

19    be what I would hope to find if I wanted -- if -- to show that

03:42:33    20    it's a loan, but repayments are repayments.

21    Q.  Okay.  So what about other factors?

22    A.  Well, I'd like to see how the lender puts the loan on its

23    books and records.  How does it treat the loan?  Does it show

24    that this borrower owes money?

03:42:56    25    Q.  So let me just stop you there.  So in this case, you

1  understand that the transfers at issue come from the campaign

2  committee to the defendant; is that correct?

3  A.  Yes.

4  Q.  So who would be the lender here whose books you would look

03:43:07  5  at?

6  A.  I'd like to look at the campaign fund's books and records

7  and see how the transactions are indicated, are shown in the

8  campaign fund's books.

9  Q.  In other words, look to see whether it's called or treated

03:43:24  10  as a loan --

11  A.  Yes.

12  Q.  -- is that correct?

13       Okay.  What other evidence would you look to?

14  A.  Well, one thing I would look to is how the parties treat

03:43:34  15  the transaction.

16  Q.  What does that mean?

17  A.  And what I'm really looking for is if the borrower doesn't

18  repay the loan, what does the lender do?  Does the lender send

19  a demand letter, demanding repayment?

03:43:53  20       If the borrower doesn't pay, does -- does the lender

21  sue?

22       If the loan can't be repaid, does the lender forgive

23  the loan and file the proper documents with the IRS saying the

24  loan's been forgiven?

03:44:20  25       Does -- and maybe even does the borrower treat on its

1      records that it has a loan?

2      Q.  Now, does it matter whether the -- if the same party or

3      entity is on both sides of the transaction?

4      A.  Well, since this is a factual question, if you have the

03:44:43    5      same party on both sides of a transaction, you just have to

6      give the transaction a little more scrutiny.  You need to be a

7      little more careful in looking at all the facts to make sure

8      that it is, in fact, a loan because you got the same party on

9      both sides.

03:45:01   10              MR. COLE:  One moment, your Honor.

11          (Counsel conferring.)

12              MR. COLE:  I have no other questions, your Honor.

13                      CROSS EXAMINATION

14      BY MR. HENDERSON:

03:45:22   15      Q.  Mr. Weiner, again, my name is Victor Henderson.  Let me

16      ask just a few questions.

17              Number one, I've had an opportunity to review your

18      resumé, curriculum vitae, and it indicates that you were at

19      one time a certified public accountant, correct?

03:45:38   20      A.  I was -- I am -- I am still a certified public accountant.

21      I -- my license in the State of Illinois is now on inactive

22      status.

23      Q.  Okay.  And so you are not a -- currently, you're not

24      currently a licensed CPA; is that correct?

03:45:54   25      A.  I am not currently a licensed CPA in Illinois.

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 78 of 125 PageID #:1728
Weiner - rebuttal cross by Henderson
1069

1    Q.  Okay.  And so because you are not currently licensed in

2    this state, right now, you don't have the ability to issue,

3    for example, an audit opinion; is that correct?

4    A.  That's correct.

03:46:06    5    Q.  And so there are things that a licensed CPA can do that

6    you can't do, correct?

7    A.  Well, I believe that's about the only thing that a

8    licensed CPA can do that I can't do.

9    Q.  And a licensed CPA would also be able to conduct an audit,

03:46:22    10    right?

11    A.  A certified audit?  Yes.

12    Q.  Yes.  And that's not something that you can do, correct?

13    A.  Well, yeah -- yes, that's correct.  I believe -- part of

14    your first question as well.

03:46:34    15    Q.  But there are things that a licensed CPA can do that you

16    cannot do; is that correct?

17    A.  That's correct.

18    Q.  All right.  And you've been with the IRS for approximately

19    the last 25 years?

03:46:48    20    A.  29 years.

21    Q.  Okay.  And you do not prepare returns in connection with

22    your duties at the IRS, at least not for taxpayers; is that

23    correct?

24    A.  I do not prepare returns.

03:46:59    25    Q.  And in answer to some of the questions that Mr. Cole asked

1    you, you were at one point an appeals officer, correct?

2    A.  I was.

3    Q.  And so an appeals officer hears disputes between a

4    taxpayer and a lower-level IRS agent, correct?

03:47:18    5    A.  That's correct.

6    Q.  And so if the low-level IRS agent and the taxpayer have a

7    dispute on how, for example, a 1040 or how something in the

8    1040 should be handled, then when you were the appeals

9    officer, they could come up and talk to you, correct?

03:47:34   10    A.  That's correct.

11    Q.  And you did that for about seven years?

12    A.  I believe that's correct, yes.

13    Q.  Okay.  And in that process, sometimes you agreed with the

14    person you were supervising; is that correct?

03:47:49   15    A.  I -- I was -- I don't supervise the agent.

16    Q.  Okay.  Well, then when you had the appeal, sometimes you

17    agreed with the position of the agent, correct?

18    A.  That's correct.

19    Q.  And sometimes you agreed with the position of the

03:48:02   20    taxpayer, correct?

21    A.  Yes.

22    Q.  So the agent was not always right, correct?

23    A.  The agent was not always right.

24    Q.  And then after you left and became -- left as an appeals

03:48:14   25    officer, you then started litigating cases in tax court,

Weiner - rebuttal cross by Henderson

1071

1    correct?

2    A.  That's correct.

3    Q.  And where is the tax court?

4    A.  The tax court is actually in Washington, D.C., but it

03:48:24   5    travels around the country, comes to Chicago maybe three, four

6    times a year.

7    Q.  And what happens in tax court is that taxpayers then have

8    disputes with the IRS, correct?

9    A.  That is correct.

03:48:37   10   Q.  And there is a judge who rules on for one party or the

11   other; is that correct?

12   A.  That's correct.

13   Q.  And the issues that are raised in tax court tend to be

14   bigger, correct?

03:48:50   15   A.  Yes.

16   Q.  And they tend to be more complicated, correct?  As a

17   general rule.

18   A.  As a general rule, yes.

19   Q.  Okay.  And sometimes the IRS wins, right?

03:49:00   20   A.  Sometimes the IRS wins.

21   Q.  And sometimes they lose, right?

22   A.  And sometimes the IRS loses.

23   Q.  So the IRS is not always right, correct?

24   A.  The IRS is not always right.

03:49:09   25   Q.  Now, Mr. Cole asked you questions about what a loan looks

Weiner - rebuttal cross by Henderson

1072

1 like, correct?

2 A. Yes.

3 Q. And you talked about how there might be a loan agreement,

4 correct?

03:49:41 5 A. Yes.

6 Q. But it's not always necessary to have a loan agreement in

7 order to have a legitimate loan.  Would you agree with me?

8 A. Yes, I agree with you.

9 Q. Okay.  And then Mr. Cole asked you about whether or not

03:49:57 10 there was a document that reflected if interest was going to

11 be paid on the loan.

12        Do you remember that?

13 A. Yes.

14 Q. Okay.  And it's not always necessary to have interest on a

03:50:05 15 loan for a loan to be legitimate.  Would you agree with me?

16 A. I would agree with you.

17 Q. And, in fact, it's not unusual for there to be things

18 called no-interest loans, correct?

19 A. There are such things as low-interest -- no-interest

03:50:18 20 loans.

21 Q. No-interest loans and low-interest loans, right?

22 A. Yes.

23 Q. And in this particular case, you did not have an

24 opportunity to review the books and records of the campaign,

03:50:29 25 is that correct?

1 A. That's correct.

2 Q. So you don't have an opinion about whether or not there

3 was a loan in this particular case, correct?

4 A. I do not have an opinion on that.

03:50:39  5 Q. Because you didn't see the books and records.

6 A. Correct.

7 Q. And you didn't speak to any of the campaign people, right?

8 A. I did not.

9 Q. And as a matter of fact, the first time you spoke to the

03:50:47  10 government lawyers was just two or three days ago, right?

11 A. That's correct.

12 Q. So after this case started, then they called you.

13 A. Yes.

14 Q. Did you speak to Agent Ponzo as well?

03:50:59  15 A. I did not.

16 Q. Now, you also --

17 A. Excuse me a second.

18     I was on a phone call two nights ago where he might

19 have been present.  It was -- there were a lot of people on

03:51:18  20 the call.  He may have been one of the people on the other

21 side.

22 Q. So a couple of nights ago, a lot of the government lawyers

23 and Mr. Ponzo were on the telephone talking to you?

24 A. Yes.

03:51:26  25 Q. And they were asking you about tax transactions?

Weiner - rebuttal cross by Henderson

1074

1   A.  They were.

2   Q.  Just two nights ago.

3   A.  Yes.

4   Q.  And before that, you weren't involved in this case, were

03:51:36   5   you?

6   A.  That's correct.

7   Q.  Now, you also talked about a document that speaks to when

8   a loan, for example, is created, and so you'd want to look at

9   the time of the transaction to see whether or not there was a

03:51:54   10   document evidencing that transaction, correct?

11   A.  That's correct.

12   Q.  But isn't it also true that sometimes documents can arise

13   much later to evidence a transaction?

14   A.  They could, but I don't think that they would be as

03:52:07   15   reliable as loans on contemporaneous -- documents that are

16   contemporaneous with the time the payment is made.

17   Q.  Well, it may be preferable to have a document created at

18   the loan -- at the time the loan is made, but it's not

19   mandatory, right?

03:52:22   20   A.  It's not mandatory.

21   Q.  In fact, it's not mandatory to have a document evidencing

22   the loan at all; is that correct?

23   A.  That's correct.

24   Q.  Okay.  And so sometimes loans get converted; isn't that

03:52:32   25   true?

Case: 1:12-cr-00124 Document #: 124 Filed: 04/03/14 Page 84 of 125 PageID #:1734
Weiner - rebuttal cross by Henderson
1075

1 A. Yes.

2 Q. Sometimes loans are forgiven?

3 A. Sometimes loans are forgiven.

4 Q. And sometimes later on in the transaction, it may be

03:52:41 5 determined that interest should be applied, correct?

6 A. That's possible, yes.

7 Q. Oh, and it's also possible that later on in the

8 transaction the parties decide that there's not going to be

9 any interest at all, right?

03:52:51 10 A. They might decide that.

11 Q. Right.

12    So in other words, what happens at the time of the

13 transaction can change over time, correct?

14 A. It could.

03:52:59 15 Q. Okay. Now, Mr. Cole asked you something about repayments.

16 Do you remember that?

17 A. Yes.

18 Q. And would it be fair to say that income is the thing that

19 most of us get when we go to our jobs?

03:53:27 20 A. Yes.

21 Q. And at the end of the year, our employers give us W-2s,

22 right?

23 A. Yes.

24 Q. And the W-2s reflect the income that we got during the

03:53:44 25 course of the year, right?

Weiner - rebuttal cross by Henderson

1076

1     A.  Yes.

2              MR. COLE:  Your Honor, I'll object.

3              THE COURT:  Objection is sustained.

4     BY MR. HENDERSON:

03:53:55    5     Q.  Generally speaking, people don't take the income that they

6     got from their job and give it back to their employer,

7     correct?

8              MR. COLE:  Objection.

9              THE COURT:  Objection is sustained.

03:54:06    10    BY MR. HENDERSON:

11    Q.  Income and loans are different, right?

12    A.  Yes.

13    Q.  Loans you pay back, right?

14    A.  You're supposed to pay them back.

03:54:17    15    Q.  And income you don't pay back, right?

16    A.  Yes.

17         (Counsel conferring.)

18    BY MR. HENDERSON:

19    Q.  And you would agree with me that at the end of the day,

03:54:50    20    the real question about whether or not something is a loan is

21    the intent of the parties.

22              Would you agree?

23    A.  Yes.

24              MR. HENDERSON:  Okay.  No further questions.

03:55:06    25              MR. COLE:  I have no questions, your Honor.

1    THE COURT:  You may step down.

2    (Witness excused.)

3    MR. GETTER:  Judge, we have a couple of exhibits that

4    we need to --

03:55:31    5    THE COURT:  Apart from exhibits?

6    MR. GETTER:  Sorry?

7    THE COURT:  Apart from exhibits?

8    MR. GETTER:  Yes.

9    THE COURT:  Are you resting?

03:55:40    10    MR. GETTER:  Oh, no, no, no, I'm sorry.  I

11    misunderstood you.  Apart from the exhibits, we have nothing

12    further.

13    THE COURT:  Any surrebuttal?

14    MR. S. ADAM, JR.:  We do not, your Honor.

03:55:50    15    THE COURT:  Both sides have rested.  You've now heard

16    all of the evidence you're going to hear in this case.  I'm

17    going to ask you to come back tomorrow morning at

18    9:00 o'clock.

19    What you will hear when you come here tomorrow

03:56:05    20    morning is the closing argument of the parties, after which I

21    will instruct you.

22    I know I've emphasized this to you before, but again

23    I'm emphasizing to you to avoid any contact with any kind of

24    news reports regarding this case.  This is particularly true

03:56:24    25    because all of the evidence is in, and sometimes there tends

1078

1    to be more coverage when this occurs, sometimes not, but you

2    should be very vigilant to avoid any contact with news

3    reports.

4          With that, I will see you in the morning.

03:56:41   5          COURT SECURITY OFFICER:  All rise.

6      (Jury exits courtroom.)

7          THE COURT:  Please be seated.  We'll resume the

8    instruction conference.

9          After the instruction conference, we will hear what I

03:57:43  10    believe will be the customary motion by the defense.

11      (Pause.)

12          THE COURT:  Okay.  We'll begin with the government's

13    modified jury instruction, and there some stuff we have to go

14    back to.

04:01:35  15          MS. BONAMICI:  That's right, your Honor.

16          THE COURT:  The first is 8, which I'm assuming is

17    given unless the defendant objects.

18          MS. KAESEBERG:  No.  No objection.

19          THE COURT:  Then a related issue -- oh, 11's

04:02:00  20    withdrawn.

21          MS. BONAMICI:  Right.

22          THE COURT:  12 is withdrawn --

23          MS. BONAMICI:  That's correct.

24          THE COURT:  -- I'm assuming.

04:02:15  25          13.  This is a fill in the names.

1    MS. BONAMICI:  It is a fill in the names, but also,

2  your Honor, in this particular case, I mean, we would have to

3  look back over the testimony to be sure, but it doesn't

4  really -- I don't believe that any opinions were actually

04:02:37    5  offered by these experts.  They gave testimony on these

6  subjects.

7        I think the -- I think the instruction is still

8  important to give because it advises the jury that they don't

9  have to accept the testimony of an expert simply because he

04:02:56   10  had --

11        THE COURT:  The testimony's fine because to the

12  extent that there's an opinion lurking there, the testimony is

13  all we need.

14        So we have to insert names.  We have to strike

04:03:17   15  "opinions and".  I'm striking "opinions" throughout which

16  leaves me with only one question.

17        In the first sentence it's "about" and then in

18  brackets specify the subject, and I think when we said we have

19  heard a witness, I think we need more than one name.

04:03:41   20        MS. BONAMICI:  Right.

21        THE COURT:  Okay.  So let's see if we get -- I

22  don't -- you don't have to prepare this immediately, but who

23  are the names we are talking to -- about?

24        MS. BONAMICI:  David Weiner, W-E-I-N-E-R.

04:04:05   25        MS. KAESEBERG:  And Barry Gershinzon.  I think it's

1   G-E-R-S-H-I-N-Z-O-N.

2              MR. GOLDSTEIN:  Correct.

3              THE COURT:  Anybody else?

4              MS. BONAMICI:  No, your Honor.

04:04:41   5              THE COURT:  Specify the subjects.

6              MS. BONAMICI:  Well, that's a little confusing now.

7              THE COURT:  Well, my one theory is just eliminate it.

8   Forget specify the subjects.  Who gave testimony.  You do not

9   have to accept this witness's testimony.

04:05:00   10             MS. BONAMICI:  Sounds good to me.

11             MS. KAESEBERG:  The only issue is that then it sort

12  of -- I think when you list the subjects, it's identifying

13  that they were -- I mean, the purpose is because it's an

14  expert witness who's testifying about a particular subject.

04:05:14   15  Otherwise, without that clarification, I think it just pulls

16  special attention and undue emphasis on those witnesses

17  without, I think, the jury understanding -- I mean, why name

18  only those witnesses?  Why not every witness?

19             THE COURT:  And what subjects would you specify?

04:05:43   20             MS. KAESEBERG:  Accounting principles, tax

21  principles, if you want to keep it general, or we can just

22  omit the entire instruction.

23             MS. BONAMICI:  Maybe this is something that we should

24  try to hash out briefly and see if we can come up with

04:05:58   25  something and then submit it to you tonight.  Does that seem

1 reasonable?  I feel like it -- I feel like it would be

2 appropriate to look back over the testimony.

3         THE COURT:  Yeah, or you could simply say about

4 taxation.

04:06:12  5         MS. BONAMICI:  Okay.

6         THE COURT:  And use something simple like that, but

7 think about it --

8         MS. BONAMICI:  Okay.

9         THE COURT:  -- and come in.  We will again meet

04:06:19  10 early.

11         MS. BONAMICI:  Okay.

12         THE COURT:  So 13, fill in names is okay.

13         Passing over everything until we hit 17 -- no,

14 passing over that.  That was granted.  I gave that.  I'm

04:06:45  15 giving that instruction, but it's over objection.

16         MS. KAESEBERG:  Right.

17         MS. BONAMICI:  I think we go to 20 now, Judge.

18         THE COURT:  20 was withdrawn by the defense or not?

19         MS. BONAMICI:  We held it, but we will withdraw it at

04:07:06  20 this time.

21         THE COURT:  Withdrawn.

22         This is the instruction that says, "For the purpose

23 of Count 1, the government does not have to prove"?

24         MS. BONAMICI:  Yes.

04:07:17  25         THE COURT:  Sole purpose?

1    MS. BONAMICI:  Yes.

2    THE COURT:  So this instruction is withdrawn?

3    MS. BONAMICI:  Yes.

4    THE COURT:  Okay.  21.

04:07:30    5    MS. BONAMICI:  Is this the one you were going to

6    review, Judge?

7    THE COURT:  I took a very brief look at this on

8    the -- on the computer.  I think -- I think I'm likely to give

9    it, but I can't tell you until tomorrow morning.

04:07:47    10    MS. KAESEBERG:  Okay.

11    THE COURT:  Okay.  22 is given without objection.

12    23 is given without objection.

13    24 is given without objection.

14    25 there's an issue about modifying it.

04:08:23    15    MS. BONAMICI:  There is an objection by the

16    defendant.  They had talked about possibly offering a

17    substitute, but they've elected not to do that.  They just

18    rested on objection.

19    THE COURT:  So this is okay?

04:08:34    20    MS. KAESEBERG:  We're objecting to it based on --

21    THE COURT:  In principle as opposed to giving me an

22    alternative.

23    MS. KAESEBERG:  Correct.

24    THE COURT:  Because you're entitled to do that.

04:08:43    25    MS. KAESEBERG:  Correct.

1    THE COURT:  Let me read it again.

2    Given over objection.

3    26.  There was an issue about modifying this.

4    MS. BONAMICI:  Yes, your Honor.  Instead the

04:09:05    5    government elects to withdraw it.

6    THE COURT:  Say that again to me?

7    MS. BONAMICI:  We're electing to withdraw the

8    instruction.

9    THE COURT:  26 is withdrawn.

04:09:14    10    Is this fine with everybody?

11    MR. GOLDSTEIN:  Yes.

12    MS. KAESEBERG:  Yes.

13    THE COURT:  26A.

14    MS. BONAMICI:  I'm sorry, your Honor.  I just want to

04:09:26    15    make sure that we've got the numbering right.

16    THE COURT:  Okay.  26 is the one that begins with:

17    "Money spent by a political organization, committee or fund

18    for an exempt function does not constitute taxable income."

19    MS. BONAMICI:  That's the one that we're withdrawing,

04:09:41    20    and the income one is the one you're giving over objection.

21    THE COURT:  Right, 26A.

22    MS. KAESEBERG:  So 26A we've requested in our filing

23    on Page 4, it's Defendant's Instruction No. 2, a modification

24    where we propose that the language from *Tufts* versus the

04:10:01    25    language we cited as our Instruction No. 2 is an exact quote

1084

1    from that Supreme Court case.

2         Our request is that that paragraph that we suggested

3    replace the first paragraph of the Government's 26A, and then

4    we do not object to the government's second paragraph.

04:10:19    5         THE COURT:  Okay.  So these are our two

6    competing candidates.

7         MS. BONAMICI:  Well, except that theirs also would

8    have the second paragraph of the government's attached.

9         THE COURT:  Right.

04:10:31    10        MR. GOLDSTEIN:  Correct.

11        THE COURT:  We understand that.

12        MS. BONAMICI:  Okay.

13        THE COURT:  When a tax -- this is the government's --

14   "When a taxpayer receives a loan, he incurs an obligation to

04:10:44    15   repay that loan.  Because of that obligation, proceeds of a

16   genuine loan do not constitute income.  The transfer of money

17   from one party to another constitutes a genuine loan only if

18   the parties to the transaction intend that the person who

19   received the money be genuinely obligated to repay it."

04:11:06    20        A prize for most times used a single word in an

21   instruction.

22        MS. BONAMICI:  Oh, no, I'm sure we can find something

23   to beat that.

24        THE COURT:  The defense version:  "When a taxpayer

04:11:18    25   receives a loan, he incurs an obligation to repay that loan at

1  some future date.  Because of that obligation, the loan

2  proceeds do not qualify as income to the taxpayer."

3  Principally that eliminates the "genuine."

4          MS. KAESEBERG:  Right.

04:11:55  5          THE COURT:  Then the government's is:  "The transfer

6  of money from one party to another constitutes a genuine loan

7  only if the parties to the transaction intended the person who

8  receives the money be genuinely obligated to repay it."

9  When -- and the government says:  "When he fulfills the

04:12:13  10  obligation" -- the government.

11          The defense says:  "When he fulfills the obligation,

12  the repayment of the loan likewise has no effect on his tax

13  liability."

14          And then the agreed-to language is:  "In determining

04:12:27  15  whether the defendant has received particular funds as a loan

16  or as income, you should consider all the surrounding facts

17  and circumstances."

18          Okay.  The government can speak first.

19          MS. BONAMICI:  Your Honor, can I -- I'm going to

04:12:43  20  begin at the end of the defendant's proposed substitute

21  Paragraph 1.

22          The government objects to including the phrase "when

23  he fulfills the obligation.  The repayment of the loan

24  likewise has no effect on his tax liability."

04:12:57  25          There's no reason to include that information.  The

1    question here is whether certain transfers of money were

2    loans, not whether certain paybacks should be taxed or not

3    taxed.  That gets us off on a completely different track, and

4    it's not appropriate to be included in what we're really

04:13:23    5    serving here is a definition of loan.

6        MS. KAESEBERG:  We would agree to remove that last

7    sentence.

8        THE COURT:  Yeah.

9        MS. KAESEBERG:  We just weren't sure of the exact --

04:13:30    10        THE COURT:  Yeah, that's fine.  Okay.  So now we're

11    down to --

12        MS. BONAMICI:  Your Honor, I have another objection

13    to the substitute.

14        THE COURT:  Yeah, I thought you would.

04:13:40    15        MS. BONAMICI:  Okay.

16        THE COURT:  But what we're down to, there's agreement

17    of about the first 14 words of both instructions.

18        MS. KAESEBERG:  Yes.

19        MS. BONAMICI:  The first 14 words of the

04:14:08    20    government's.

21        THE COURT:  Okay.  So the contrast is:  "When a

22    taxpayer receives a loan, he incurs an obligation to repay

23    that loan," which is identical language to the defense

24    language.  The defense adds "at some future date."

04:14:33    25        MS. BONAMICI:  That's right.  The government objects

1   to that.  In the context of the case that it's removed from,

2   that the date was established and this was just talking.  It

3   didn't have any significance.

4          But in this case, that language tends to suggest that

04:14:48   5   there doesn't have to be any set date, any schedule of

6   payments or anything else, and suggests even further that

7   those facts are irrelevant, which is not accurate.

8          THE COURT:  So you're objecting to their instruction?

9          MS. BONAMICI:  I'm objecting to -- yes, "at some

04:15:07   10   future date."  I thought that's what we're talking about.

11          THE COURT:  Isn't there an argument that you might

12   want that instruction since nobody ever set a date?

13          MS. BONAMICI:  Well, if we change the word to "at a

14   future date," the government would not object.  It's the

04:15:23   15   "some" that we're having a problem with.  It's too amorphous.

16          THE COURT:  At a future date?  Yes?  No?  Maybe?

17          MS. KAESEBERG:  We were quoting the exact language

18   from the Supreme Court, so this is the exact definition

19   offered by the Supreme Court -- or the language offered by the

04:15:40   20   Supreme Court, so our position is that it should remain the

21   same.

22          MS. BONAMICI:  The only thing I would say about that,

23   your Honor, is that it's frequently the case that language

24   from a case doesn't make very good jury instruction.

04:15:53   25          THE COURT:  "A future date" is better for a variety

1    of reasons, not the least of which is some repayment dates are

2    based on events which don't have a specific date attached to

3    them.

4            MS. KAESEBERG:  I think our position would be if the

5    language is going to be changed from -- from the *Tufts* case,

6    that we would just rather omit that part of the sentence.  So

7    we could just agree on those first 14 words and have a period

8    there and just take out that last clause of the sentence then.

9            MS. BONAMICI:  I think -- I now am convinced that

10   since they offered that great language that "at a future date"

11   would be better for the reasons you may have been suggesting.

12           THE COURT:  How about "in the future"?

13           MS. BONAMICI:  In the future?

14           THE COURT:  "When a taxpayer receives a loan, he

15   incurs an obligation to repay that loan in the future."

16           MS. BONAMICI:  I think that that -- again, that

17   sounds a lot more like the "some" language.  It's too

18   amorphous.  It's too out there.

19           MS. KAESEBERG:  But I think that is what -- I mean,

20   that's what *Tufts* says; so that may not necessarily fit their

21   fact pattern, but that doesn't mean that that's what the

22   instruction needs to be.

23           This is the exact language from *Tufts.*  It's an

24   accurate statement of the law.  So to put "a future date" does

25   the opposite and makes it a much more narrow definition.  So I

04:16:09

04:16:27

04:16:40

04:16:54

04:17:07

1    think to stay true to this Supreme Court decision and what

2    this actually means, then it should either be removed or it

3    should be either "at some future date" or I agree with "in the

4    future."

04:17:25   5    THE COURT:  There's also "at some time in the

6    future."

7    MS. BONAMICI:  "Some time in the future."

8    THE COURT:  The reason I'm concerned about date is

9    there really is no date here.

04:17:41   10    MS. KAESEBERG:  I think we'd be okay with "at some

11    time in the future."

12    THE COURT:  Or I can make it very precise, "When a

13    taxpayer receives a loan, he incurs an obligation to pay that

14    loan later."

04:17:56   15    MS. KAESEBERG:  I'm sorry?

16    MR. GOLDSTEIN:  Later.

17    THE COURT:  Later.

18    MS. KAESEBERG:  Later?

19    THE COURT:  I'm not -- it does seem to work, but it's

04:18:03   20    too fraught with danger.

21    MS. BONAMICI:  I think at this point if we're going

22    to continue to use that mushy language, we'd prefer to go back

23    to our proposal because the mushy language is just -- it's not

24    appropriate.

04:18:16   25    MR. GOLDSTEIN:  Which one?  Which original?

1090

1  THE COURT:  When a taxpayer receives a loan, he

2  incurs an obligation to repay that loan, period.

3  MS. BONAMICI:  Correct.

4  MS. KAESEBERG:  Okay.

04:18:26  5  THE COURT:  Okay.

6  Okay.  The second sentence.  "Because of that

7  obligation," which is the same in both.

8  MS. BONAMICI:  Actually, it's "this" in the

9  defendant's formulation.

04:18:44  10  THE COURT:  What?

11  MS. BONAMICI:  The defendant's formulation uses the

12  word "this" rather than "that."  It's critical, Judge.

13  THE COURT:  Do you like "this"?

14  MS. BONAMICI:  I think "that" is better, but believe

04:18:59  15  me, this is not where we're going to hang our hat.

16  THE COURT:  Right.

17  MS. BONAMICI:  "That" is better than "this."

18  THE COURT:  "Because of this or that obligation" --

19  MS. BONAMICI:  Do you care?

04:19:07  20  THE COURT:  -- "the loan proceeds do not qualify as

21  income to the taxpayer," and the government's version is:

22  "Because of this or that obligation, proceeds of a genuine

23  loan do not constitute income."

24  MS. BONAMICI:  We can -- as long as genuine appears

04:19:28  25  somewhere, we don't need it in that sentence, Judge.

1        MR. GOLDSTEIN:  I think we've narrowed the issue.  I

2  object.

3        THE COURT:  So "that obligation" is actually better

4  grammatically.

04:19:46  5        MS. BONAMICI:  What?  I'm sorry?

6        THE COURT:  "That," I'm using "that."

7        "Because of that obligation, proceeds of a loan do

8  not constitute income" as opposed to "loan proceeds do not

9  qualify as income to the taxpayer."

04:20:06  10        MS. KAESEBERG:  Right, that's fine.

11        THE COURT:  Which one?

12        MS. KAESEBERG:  We're fine with that, as long as

13  "genuine" is gone.

14        THE COURT:  So yours?

04:20:15  15        MS. BONAMICI:  Yes.

16        THE COURT:  Then this is the government's extra

17  language:  "The transfer of money from one party to another

18  constitutes a genuine loan only if the parties to the

19  transaction intend that the person who receives the money be

04:20:40  20  genuinely obligated to pay it."

21        I'm striking the "genuine" because you don't need it

22  there.  Where you need it is "who receives the money be

23  genuinely obligated to pay repay it."

24        MS. BONAMICI:  That sounds fine.

04:21:08  25        THE COURT:  So now the proposal on the table is:

1    "The transfer of money from one party to another constitutes a

2    loan only if the parties to the transaction intend that the

3    person who receives the money be genuinely obligated to repay

4    it."

04:21:23    5    MS. KAESEBERG:  We'd still object to the use of

6    "genuinely."  I don't think it requires a descriptive word for

7    "obligated."  I think if the statement reads "obligated to

8    repay it" without genuinely that that's sufficient, and also

9    in line with *Tufts*, the Supreme Court case, so --

04:21:41    10    THE COURT:  So the only issue is "genuinely" there.

11    MS. KAESEBERG:  Correct.

12    MR. GOLDSTEIN:  Correct.

13    MS. BONAMICI:  Your Honor, the government would

14    simply offer that this is the meaning of *Tufts*, that this --

04:22:43    15    the one sentence or paragraph that's been pulled from *Tufts*

16    does not reflect the full meaning of the case.  The case is

17    all about the difference between a genuine loan or a bona fide

18    loan and a sham loan.

19    This is -- to include the language that the money be

04:23:00    20    genuine -- or that the person be genuinely obligated to repay

21    it is to accurately reflect what that case stands for, and

22    it's an important piece.

23    MS. KAESEBERG:  Would you like a response on that?

24    THE COURT:  Did *Tufts* use the word "genuine"?

04:23:20    25    MS. BONAMICI:  I think they used "bona fide."

1       MS. KAESEBERG:  I actually don't think they did.

2           No, but I did do a search on the case earlier to the

3   extent that I could on my computer, and I don't believe they

4   used bona fide or genuine.

04:23:32   5       The quote that is on our proposal is the exact quote,

6   and clearly they could have used it throughout the case, but I

7   did do a search for the word "bona fide" or "bona" or

8   "genuine" in my file in my computer in the entire case of

9   *Tufts*, and it did not come up.

04:23:48  10       MS. BONAMICI:  Then perhaps I'm thinking about *Tide*.

11  I mean, I looked at many, many cases.

12          THE COURT:  There are two other words.

13          MS. BONAMICI:  What are they?

14          THE COURT:  Well, "truly" is one.  "Legally" is

04:24:00  15  another.

16          MS. BONAMICI:  Okay.

17          MS. KAESEBERG:  It just seems like if what the jury

18  is told is that the transfer of money from one party to

19  another constitutes a loan only if the parties to the

04:24:14  20  transaction intend that the person who receives the money be

21  obligated to repay it, that is sufficient.  That's an accurate

22  statement of the law from the Supreme Court case, and to add

23  "genuinely" in there just adds an extra level that just isn't

24  necessary.

04:24:31  25          MR. GOLDSTEIN:  Obligation I think includes

1    genuineness to it.

2         THE COURT:  Yeah.

3         MR. GOLDSTEIN:  You wouldn't be obligated if it was

4    disingenuine, if it was not bona fide, whatever term you use.

04:24:43    5    The definition of obligation really includes genuine.

6         MS. BONAMICI:  Another option would be "actually."

7         THE COURT:  What?

8         MS. BONAMICI:  "Actually"?  I'm struggling.  I'm

9    looking for something, but what we want to get to --

04:24:56    10         THE COURT:  Is anybody going to object to the use of

11   the word plural parties --

12         MS. KAESEBERG:  I thought about it.

13         THE COURT:  -- in the instruction?

14         MS. KAESEBERG:  I thought about it.

04:25:06    15         MS. BONAMICI:  They shouldn't.

16         THE COURT:  Okay.  I have another slightly different

17   version, and I'm leaving the adjective out for a second.  I

18   will come to the -- I'm going to use the word "actually" just

19   for the hell of it.  It runs this way:

04:28:53    20         "When a taxpayer receives a loan, he incurs an

21   obligation to repay that loan.  Because of that obligation to

22   repay, proceeds of a loan do not constitute income if, and

23   only if, the person who receives the money is actually

24   obligated to repay."

04:29:24    25         I think it works better as one sentence.  Whether the

1    words could be improved, I'm open to suggestion.

2         MS. BONAMICI:  Are you taking out the rest -- the

3    rest of the last sentence?  Because --

4         THE COURT:  Yes, yes, yes.

04:29:40    5    MS. BONAMICI:  Well, we would object to that because

6    it is important that the parties to the transaction, that both

7    sides of the transaction intend that the person who receives

8    the money be obligated to repay it.  That's a portion of the

9    legal requirement.

04:29:53    10   And that's particularly important in a case such as

11   this one, where the defendant sits on both sides of the

12   transaction.

13        MS. KAESEBERG:  If it matters to your Honor, I think

14   we would also prefer the old language as opposed to your --

04:31:12    15   THE COURT:  Which old language?

16        MS. KAESEBERG:  To keep the extra sentence in there

17   instead of --

18        THE COURT:  "The transfer of the money from one party

19   to another constitutes a loan only if the parties to the

04:31:25    20   transaction intend that the person who receives the loan

21   be" -- do we need "genuine"?

22        MS. BONAMICI:  Pardon?

23        THE COURT:  Do we need "genuine"?

24        MS. BONAMICI:  As opposed to "actually"?

04:31:41    25   THE COURT:  "Actually" or nothing.

1       MS. BONAMICI:  "Actually" would be fine.

2       MS. KAESEBERG:  I don't actually think we need any of

3    them.  I mean, I don't -- honestly, the case that this comes

4    from, which is a Supreme Court case, specifically uses the

04:31:54    5    word "obligated."

6       Obligated has a meaning.  It's very clear what that

7    meaning is, and to add an adjective in front of it, a

8    descriptor, just is not necessary and I do think goes beyond

9    what is actually required that the government prove, so to

04:32:14   10    speak.

11       MS. BONAMICI:  I'm making -- here's what I think.

12    We're struggling with this so much, I think it would be useful

13    if I pulled these cases and pulled some more cases and see if

14    I can find some language.  And since we've got some issues

04:32:30   15    that we need to address in the morning, I would propose that

16    we come back to you with something.

17       MS. KAESEBERG:  I mean, I think we all agree that

18    *Tufts* is the leading Supreme Court case on this issue.  All

19    we're really arguing about is "genuinely" and --

04:32:43   20       MS. BONAMICI:  We're also arguing about whether one

21    particular paragraph of *Tufts* should be used as an

22    instruction, whether something else is needed to convey the

23    importance of the case, which is why I think it would be

24    useful to --

04:32:55   25       THE COURT:  Okay, you can do that, although the word

1    that I think is best for the prosecutor, which the defense

2    will object to, instead of "genuinely," "clearly."

3              MS. BONAMICI:  "Clearly."

4              MS. KAESEBERG:  Well, what is -- okay.

04:33:19    5    THE COURT:  It means that -- clearly basically says

6    it's not vague, it's not uncertain.

7              MS. BONAMICI:  Right.  That's what we're -- it's not

8    vague.

9              THE COURT:  So see what you can find.

04:33:30   10    MS. BONAMICI:  Okay.

11             THE COURT:  Since we're down to one word.

12             MS. BONAMICI:  That sounds good.

13             THE COURT:  Of many.

14             Okay.

04:33:39   15    MS. BONAMICI:  We have one more instruction, and that

16   is the defendant's --

17             THE COURT:  Wait, but I want to go back -- no, we

18   don't have to go back.

19             MS. BONAMICI:  I'm sorry?

04:33:49   20    THE COURT:  I was going to go back to Defendant's

21   No. 1.  We can do Defendant's No. 1 any time.

22             MS. BONAMICI:  But I think that's all we have left.

23             THE COURT:  What?

24             MS. BONAMICI:  I believe that is all we have left.

04:34:00   25   Am I wrong?

1       THE COURT:  That's already what?

2       MS. KAESEBERG:  I think that's the only outstanding

3    instruction.

4       MS. BONAMICI:  That's the only --

04:34:06    5       THE COURT:  Wait, wait, wait.

6       MS. BONAMICI:  I think --

7       THE COURT:  You're right.  You're right.  So that's

8    the only one left.

9       Just let me go back here.

04:34:34   10       MS. KAESEBERG:  So what we've provided is the

11   good-faith instruction, the exact language from the pattern

12   instruction that follows the 7212 elements instruction and the

13   7th Circuit pattern instructions, and it's the exact language

14   that's in the pattern instructions, and we believe it should

04:34:55   15   be given.

16       THE COURT:  Okay.  Okay, the government can be heard

17   on this.

18       MS. BONAMICI:  We object to the use of this

19   instruction in this particular case, given the evidence that's

04:35:34   20   been presented at this trial.  There is no evidence that -- of

21   any kind of objectively reasonable belief.

22       This would just be making up issues that are not

23   represented by the facts; and, of course, the 7th Circuit has

24   urged the court to refrain from giving unnecessary

04:35:57   25   instructions because they become confusing.

1       The issue of good faith is treated specifically and

2   expressly in a good-faith instruction given with respect to

3   Counts 2, 3 and 4, the false statements.  That deals with the

4   issue of whether the defendant believed in good faith that the

04:36:19    5   statements that were made on the returns were true, which is

6   really the only kind of gray-area, disagreement-type issue

7   that's present on our evidence.

8       THE COURT:  Did you say we have a good-faith

9   instruction?

04:36:39    10      MS. BONAMICI:  We do.  Where is that?

11      MS. KAESEBERG:  I believe it's Instruction 23, which

12  is Page 26 of the modified, which is -- the instruction that

13  they've given does follow the 7206 instructions also in the

14  pattern instructions.

04:37:05    15      So, you know, I think our position is that -- and

16  maybe I should ask a question.  Would you object if we removed

17  the sentence "This is so, even if defendant's belief is not

18  objectively reasonable"?

19      MS. BONAMICI:  We object because the way -- we think

04:37:21    20  that the issue of good faith, the idea -- on these facts and

21  this evidence, the issue of good faith is necessarily

22  incorporated in the elements instruction in Government

23  Instruction No. 18, and there is no possible way that the jury

24  could find good faith on the part of the defendant and also

04:37:42    25  find that the defendant committed the charged offense.  It's

1    not possible.

2         And in that kind of context, the courts have held

3    over and over again good-faith instruction is not necessary.

4    We would say that it's -- with no facts really to support it,

04:38:01    5    it's completely confusing.

6         The instruction he believes in good faith that he is

7    acting within the law or that his actions complied with the

8    law.  I mean, what -- what precisely would that go to in the

9    context of the 7212?  I mean, he either did the things that we

04:38:24   10    charge him with doing in the 7212 count or he didn't.  It's

11    not really a matter of good faith.

12         And because the issue of good faith is dealt with

13    someplace else, you know, albeit with respect to the willfully

14    instruction, the concept is there, and obviously that's going

04:38:47   15    to be -- we can tell already those are the arguments that are

16    going to be made by the defense now that the jury isn't going

17    to be able to consider it.

18         Judge, the mere fact -- I think that defense is

19    putting too much weight on the mere fact that this instruction

04:39:01   20    is offered, you know, as one of the instructions that may be

21    given in a 7212 case.

22         THE COURT:  And you're offering it to 2, 3 and 4?

23         MS. BONAMICI:  I'm sorry?

24         THE COURT:  You're offering it for 2, 3 and 4?

04:39:15   25         MS. BONAMICI:  Yeah.

1          MS. KAESEBERG:  A somewhat different -- I mean, here

2     the issue is that the mental state required in Count 1 is

3     knowingly and acting corruptly.  So good faith is inconsistent

4     with acting corruptly, and I believe I've stood before you in

5     a previous case, you've given that exact instruction on a

6     corrupt state of mind requirement.

7          You know, I think one problem is if the good-faith

8     instruction is given after Counts 2, 3 and 4 and not after

9     Count 1 where it does apply and it is a pattern instruction,

10    it makes it appear as though good faith is not relevant to or

11    is not a defense to that first count and it absolutely is.

12    And we do not agree with the government in that -- in their

13    argument that there is no evidence of that in the record,

14    which there is, and we're entitled to the instruction.

15         If the government would like -- we'd be happy to

16    modify this to a more, you know, palatable phraseology if

17    that's what they're looking for, but --

18         MS. BONAMICI:  You know, here's the problem, Judge.

19    I mean, this is something, you're right, we did talk about

20    this before, all of us together, but the problem with good

21    faith is that it's a term that really has no meaning, and what

22    this instruction has attempted to do and would be appropriate

23    under certain facts, I suppose, although I honestly can't

24    think of what they would be, is to put some meat on the bones

25    of the concept of good faith, and that's why they add he

04:39:28

04:39:48

04:40:11

04:40:26

04:40:44

1    cannot be said to have acted corruptly or with a purpose to

2    obtain an unlawful benefit for himself or someone else even if

3    his belief, whatever belief that might have been -- or his

4    belief that he complied with the law.

04:41:02  5       I mean, the nature of the charges in this case

6    present the jury with a question:  Did he act in a way that --

7    where he intended to get a benefit that he was not entitled to

8    under the law?  Did he act corruptly?  That's the question

9    that's presented.

04:41:24  10      The elements instruction clearly gives the jury a

11   choice between those two things.  There's not a third choice.

12   There's not -- this doesn't add anything to the elements

13   instruction on the facts of this case.

14              MS. KAESEBERG:  I mean, our position is that it

04:41:41  15   actually -- it does.  I mean, the elements instruction does

16   not incorporate a good-faith element.  The Instruction 18,

17   which is the elements instruction, just, you know, recites the

18   mental states required, which are knowingly and then, you

19   know, Paragraph 4 is the defendant acted corruptly, that is,

04:41:59  20   with the purpose to obtain an unlawful benefit for himself.

21              So it's almost like the government wants it both

22   ways, where they get that definition in this elements

23   instruction; but then when it can be used as a contrast to

24   good faith, you know, in the good-faith instruction, all of a

04:42:15  25   sudden it's inappropriate to have that definition there?

1    I guess I'm just confused.  There is sufficient

2  evidence in the record to support this instruction.  It's a

3  pattern instruction, and it belongs in these instructions.

4    And we are happy to go back and do a modified

04:42:36   5  instruction if there's particular language that's offensive --

6    THE COURT:  Where's your good faith?

7    MS. BONAMICI:  Pardon me?

8    THE COURT:  What number is your good faith?

9    MS. BONAMICI:  This one?  It's under 7212.

04:42:46  10    THE COURT:  What number instruction?

11    MS. BONAMICI:  Oh, I'm sorry.  My good faith is 23 I

12  think we said.

13    MS. KAESEBERG:  Yes.

14    THE COURT:  So you're doing good faith for -- to

04:43:11  15  cancel willfulness --

16    MS. BONAMICI:  Correct.

17    THE COURT:  -- on 2, 3 and 4.

18    MS. BONAMICI:  Correct, because as a factual matter,

19  the defendant's theory is that he --

04:43:27  20    THE COURT:  Wait a second.

21    MS. BONAMICI:  The defendant believed that the items

22  were loans and did not need to be reported.

23    MS. KAESEBERG:  I mean, Count 1 incorporates the same

24  facts as Counts 2, 3 and 4.  I mean, Count 1 is the corrupt

04:43:42  25  endeavor count, so if you could have good faith on the filing

1      of the false tax returns on 2, 3 and 4, then the same facts

2      apply to the corrupt endeavor, at least with respect to those,

3      you know, the checks and the particular facts.  It's

4      applicable here.

04:44:02    5          MS. BONAMICI:  That's an argument for not including

6      it, I think, your Honor, because that means it's covered.

7              THE COURT:  Speak a little louder.

8              MS. BONAMICI:  Pardon me?  I would say that's an

9      argument for not including it because that means the concept

04:44:11   10      is covered.

11             MS. KAESEBERG:  But the Instruction 23, the good

12      faith that's currently in the instruction specifically

13      outlines that it applies only to Counts 2, 3 and 4, which then

14      the inference there is that it does not apply to Count 1.  So

04:44:25   15      good faith does not have anything to do with Count 1.

16             That's not the law.  That's not what the pattern

17      instructions are.

18             THE COURT:  I think maybe the government is right

19      because of the phrasing of the elements, but we can talk about

04:44:46   20      this in the morning.  Somebody can bring me cases.

21             MS. BONAMICI:  Okay.

22             THE COURT:  And, obviously, the government is correct

23      with respect to 2, 3 and 4, but that has to do with the

24      structure of 2, 3 and 4, which is largely creating a piece of

04:45:26   25      paper.

1    MS. KAESEBERG:  Largely what, your Honor?

2    THE COURT:  Largely creating a piece of paper.  The

3    offense is committed actually by writing stuff down and

4    sending them in --

04:45:41    5    MS. BONAMICI:  Right.

6    THE COURT:  -- in which case if you have a good-faith

7    belief that this stuff's okay --

8    MS. KAESEBERG:  I think a lot of that --

9    THE COURT:  I admit it's not as easy a fit, but you

04:45:52    10   can both talk about it.

11   MS. KAESEBERG:  Okay.

12   MS. BONAMICI:  Okay.

13   THE COURT:  Okay.  I think we can deal with the rest

14   of this in the morning except for the motion.

04:46:15    15   Want to make a brief statement as to why I should

16   pitch this case out now?

17   MS. KAESEBERG:  Yes, and you should, your Honor.  I

18   would just like to point your attention towards a few cases,

19   if I could just very quickly recite some cases.

04:46:29    20   And, you know, we obviously understand that the Court

21   must view the evidence in the light most favorable to the

22   government.  However, the standard is not so heavily weighted

23   in favor of the prosecution that in ruling on this motion, the

24   Court must blindly and uncritically accept that every

04:46:44    25   inference the prosecution argues can reasonably be drawn from

1  the circumstantial evidence in the record.

2       The 7th Circuit has held that the court -- this Court

3  must enter judgment of acquittal if the trier of fact is

4  called upon to choose between reasonable probabilities of

04:46:57  5  equal weight, one innocent and the other guilty.

6       And there's been at least one district court which

7  has held that the Court has a duty to direct an acquittal

8  where there's equally strong inferences to innocence as there

9  is to guilt.

04:47:14  10       You know, the evidence here that's come out is that

11  Mr. Beavers, you know, we would argue did not act knowingly,

12  corruptly or willfully as required -- you know, the government

13  is required to prove.  You know, we could go through all of

14  the evidence, but just to point out a few highlights, you

04:47:31  15  know, what has come out is that 86 percent of the $200,000

16  from the checks that were written out to Mr. Beavers were

17  repaid or accounted for.

18       A lot of his own money was taken out at the casinos.

19  It was not just checks that were cashed.  There's no evidence,

04:47:48  20  as alleged in the indictment, that Mr. Beavers caused any

21  campaign staff to maintain false or misleading records if you

22  pay attention to Ms. Coleman's testimony.

23       So viewing the evidence in the way that you must

24  right now, which is in the light most favorable to the

04:48:02  25  government, I think there's still an equal probability of

1    innocence here as there is of guilt; and based on the fact

2    that you must find intent that Mr. Beavers knowingly,

3    corruptly and willfully acted, that doesn't exist.  And, you

4    know, the evidence of innocence is just as strong as what the

04:48:20    5    government has presented, and because of that, you have a duty

6    to direct an acquittal in this case.

7         THE COURT:  The government want to make a response in

8    the next two minutes or so?

9         MR. GETTER:  Sure, Judge.  I'll make it faster than

04:48:36    10    that.

11         There are essentially three buckets to the 7206(1)

12    charges:  First the $68,000 pension check; second, the hundred

13    checks to Mr. Beavers from the campaign; and, third, the Cook

14    County contingency fees -- expense accounts, rather.

04:48:55    15         With regard to the $68,000 check, the defense's

16    primary defense is that this is a loan.  The evidence that the

17    government has put forth shows clearly that there is no

18    indication that this money was a loan.  There's no record that

19    it was a loan.  There's no indication of repayment prior to

04:49:17    20    the time the defendant filed his 2008 tax returns in April

21    of 2009.

22         The check, the pension check -- excuse me -- the

23    campaign check to the pension fund benefited the defendant

24    personally, and there's no campaign-related -- no conceivable

04:49:33    25    campaign-related expense that could be associated with that

1    check.

2           The money was clearly converted to the defendant's

3    use, and it was not reported on his 2006 tax return.

4           As far as the hundred checks are concerned, in

04:49:47   5    response to defense counsel's argument that Mr. Beavers was

6    not the one who was controlling what was going on, in fact,

7    the evidence showed to the contrary.

8           Mr. Beavers was the chairman of the campaign funds.

9    Mr. Beavers was the one who the treasurers went to to ask for

04:50:04  10    explanations for these checks.  He's the one that wrote the

11    checks.  He's the one that cashed the checks.  He's the one

12    that used the cash.  He's the only one who knew what happened

13    to the money,

14           So to the extent that there was any -- there were

04:50:20  15    shenanigans, for lack of a better word, with the check stubs,

16    it's on account of Mr. Beavers.  And when Ms. Coleman said

17    that -- you know, when Ms. Coleman testified, she made it

18    clear.  The last question that she was asked was did

19    Mr. Beavers ever tell you it was a loan, and she said no.

04:50:35  20           So Ms. Coleman did the best she could.  She was in a

21    difficult situation.  She was having to deal with the fact

22    that she wasn't given full information by Mr. Beavers, and the

23    evidence suggests that it was because Mr. Beavers didn't want

24    the records to show what he was actually using the money for.

04:50:49  25           As far as the Cook County contingency funds are

1    concerned, Mr. Beavers admitted in both of the expense reports

2    that he filed with the County Board that he used the money

3    personally, and he -- his blank expense reports are proof of

4    the fact that there were no campaign-related, or not campaign

04:51:09    5    necessarily, or office-related expenses associated with those

6    checks.  He used the money for himself, and it wasn't reported

7    on his 2006, '7 or '8 tax returns.

8         For all those reasons, Judge, the 7206(1) counts,

9    there's more than enough evidence to survive this motion.

04:51:25    10        As far as the 7212 count is concerned, again, I go

11    back to the fact that Mr. Beavers was the one who had all the

12    information about the checks.  He's the one that knew where

13    the money was going.

14        When -- the evidence shows that when the treasurers

04:51:42    15    were filling out these -- these check stubs, they would do it

16    based on what Mr. Beavers told them.  What's significant is

17    even when they're reimbursement -- check stubs that say

18    reimbursement on them, it says reimbursement per check, for

19    instance, 3664.

04:51:59    20        That check stub had to have been blank at the time

21    Mr. Beavers wrote the check because check 3664 didn't exist at

22    that point.  So the check stubs were left blank because

23    Mr. Beavers didn't know how he wanted to characterize these

24    checks later on.

04:52:15    25        So Mr. Beavers knew what he was doing with the money

1    and looked for ways to mischaracterize those checks in order

2    to evade detection and prevent the IRS, or anyone else for

3    that matter, from knowing what was done with the cash from the

4    campaign funds.

04:52:28    5    The most telling example, though, the fact that

6    Mr. Beavers knew exactly what was going on and caused this

7    activity to occur was the April 15th, I believe, 2008 letter

8    that Mr. Beavers signed to Andy Nauman at the Illinois State

9    Board of Elections, where, in responding to Mr. Nauman's

04:52:48    10    request for information about the $18,000 that was reimbursed

11    to the campaign, Mr. Beavers said that this was for campaign

12    expenses.

13    The records clearly showed that that money was used

14    for gambling.  It was a lie he told him.  So there is plenty

04:53:01    15    of evidence here to show through the blank stubs, through the

16    purported reimbursements, through the check stubs attributed

17    to invoices that weren't incurred until ten months later, that

18    Mr. Beavers was personally enjoying the use of his money.  He

19    converted it to his dominion and control and then later tried

04:53:19    20    to come up with rationales to justify and conceal his use of

21    the money.

22    THE COURT:  Your motion for judgment of acquittal is

23    entered and continued.  I always like to see what the jury

24    thinks first.

04:54:13    25    See you in the morning.  We have -- I thought we had

1    a third issue here.  Yeah, we do.

2           Defense Instruction 1, 21 and 26A are what's left for

3    tweaking, I think.

4           MS. BONAMICI:  And 13.  We were going to come back

04:54:47   5    with a determination about what to do about the testimony --

6    what the testimony was regarding.

7           MR. GOLDSTEIN:  Regarding the experts.

8           THE COURT:  Oh, regarding the experts, right.

9           MS. BONAMICI:  And we were also to prepare for your

04:55:04   10   review an instruction regarding striking the experts.

11          THE COURT:  Right.

12          MS. BONAMICI:  So I have five things on my list.

13          THE COURT:  So what are your numbers?

14          MS. BONAMICI:  What are my numbers?  I didn't write

04:55:18   15   them down by number.

16          The Defense 1.

17          THE COURT:  Right.

18          MS. BONAMICI:  Government 13, Government 21,

19   Government 26A.

04:55:30   20          THE COURT:  Right.

21          MS. BONAMICI:  And then the new instruction.

22          And then I did want --

23          THE COURT:  What new instruction?

24          MS. BONAMICI:  Striking the opinion testimony of the

04:55:40   25   expert.  Remember we were going to do that.

1    THE COURT:  Right, right, right, okay.

2    MS. BONAMICI:  That doesn't have a number.

3    And I did want to ask, your Honor, if you would -- if

4    you will request that the government prepare the clean set or

04:55:57    5    will you do that in chambers?  I don't remember, I'm sorry.

6    THE COURT:  Clean set from you.

7    MS. BONAMICI:  Okay.

8    THE COURT:  You're closer.

9    MS. BONAMICI:  Okay.  Fine.

04:56:06    10    THE COURT:  Anything else we have to do?

11    MR. GOLDSTEIN:  Your Honor, I have one issue

12    concerning the jury.  I don't know if you want to do it at

13    sidebar.  We do just have the parties here in court right now.

14    THE COURT:  Yeah, there's nobody else here.

04:56:16    15    MR. GOLDSTEIN:  We had discussed a few days back

16    regarding some potential jurors as to the potential issues.  I

17    thought where we left is it was you were going to inquire of

18    the jurors as to their particular issues.  I believe it was

19    No. 19 as well as No. 29.

04:56:36    20    Actually, I apologize, I believe it was 22 and 19.

21    THE COURT:  I believe -- yeah, those -- the only

22    thing is no one raised the issue.

23    MR. GOLDSTEIN:  Okay.

24    THE COURT:  They -- you know, there was some talk

04:56:51    25    about it.  They may have spoken to Ted or Ted may have

1   overheard them, but then no one ever asked.

2        The only person who ever asked was Jessica Maya, and

3   I told her I wasn't going to excuse her and I told her why,

4   and I told her in the presence of counsel for defense, one for

04:57:14  5   defense and one for the prosecution, because I didn't want the

6   juror to start blaming either lawyer.

7        So they never asked.  And if they don't ask, I don't

8   pursue it any further because my experience has been is that

9   people frequently start talking about I want to go home, I

04:57:36  10  want to do this, I want to do that, and then the case grabs

11  them.

12       So what I've heard in the beginning just never came

13  down to -- nobody ever asked.  And the one that I would have

14  been willing to consider was the one who had exams at school,

04:57:54  15  and she never asked.

16       MR. GOLDSTEIN:  But there was no inquiry, I guess?

17       THE COURT:  No, we made no inquiry at all of her.

18       MR. GOLDSTEIN:  You mentioned there was a discussion

19  with Ms. Maya?

04:58:06  20       THE COURT:  That's the one --

21       MR. S. ADAM, JR.:  I was there.

22       THE COURT:  -- he was there.

23       MR. GOLDSTEIN:  Okay.  Sorry.

24       THE COURT:  He knows absolutely everything.

04:58:13  25       MR. GOLDSTEIN:  You can't trust anything.

1      (Laughter.)

2           MR. S. ADAM, JR.:  We have to be alone for you to say

3      that about me, Judge.

4      (Laughter.)

04:58:20    5           MS. HAMILTON:  That's under seal.

6           MS. BONAMICI:  We assume that the person with exams

7      got them rescheduled.

8           THE COURT:  Yeah, that's what I'm assuming; but my

9      experience is if it really matters to somebody, they say it.

04:58:32   10  And I've had a few occasions where somebody said it because it

11  really mattered to them, and they said it with regret because

12  the case had gotten to them.

13          MR. S. ADAM, JR.:  Right.

14          THE COURT:  And they didn't want to leave, but they

04:58:44   15  had to leave.

16          And, first of all, if you get a juror like that, you

17  know that their need to leave is quite sincere.  But it

18  doesn't happen very often, and anything -- any case that gets

19  more or less done within two weeks is -- people work through

04:59:05   20  it somehow.  Maybe the lawyers have a little trouble.

21          Anything else?

22          MR. GETTER:  Judge, we have received requests for

23  exhibits.  Specifically some of the summary charts which I

24  know we raised the other day but your Honor told us to hold

04:59:24   25  off because I believe Mr. Ponzo was still on the stand.

1    THE COURT:  Do you care?

2    MR. GOLDSTEIN:  No, we do not.

3    THE COURT:  Sure.

4    MR. GETTER:  The charts are fine?  Okay.

04:59:32   5    I assume at this point everything that's been

6    admitted and published is okay?

7    THE COURT:  Everything has been admitted -- did I

8    have anything left over?

9    MR. GOLDSTEIN:  Actually, we did have the exhibits

04:59:41   10   regarding the defendant.  I believe we have agreements on the

11   defense exhibits.  It's those -- it's Beavers Exhibit No. 1,

12   which is a series of W-2G slips, as well as Beavers Exhibit

13   Check 3374, Beavers Exhibit Check 522, Beavers Exhibit Check

14   523.

05:00:10   15   The government in their redirect admitted other

16   documents that we have no objection to, and they can label

17   them for the record.

18   MR. GETTER:  Specifically, Judge, we put a label on

19   this, 7th Ward -- Government Exhibit 7th Ward 2005 Checks,

05:00:26   20   which include the checks and the check stubs from the 7th Ward

21   Democratic Organization, Check 1793, 1794, 1795, as well as

22   the 7th Ward Democratic Organization D-2 for the reporting

23   period second half of 2005 filed January 21, 2006.  We have a

24   label on it Government Exhibit D-2, 7th Ward-2.

05:00:56   25   If it's okay with your Honor, we would just take this

1116

1   and stick it into the 7th Ward Democratic binder that's

2   already in evidence.

3           MR. GOLDSTEIN:  That's fine.

4           MR. GETTER:  And we would just change the cover sheet

05:01:09   5   to include that D-2.  It's not listed there now.

6           THE COURT:  That's fine.  Anything else?

7       (Defendant Beavers Exhibit No. 1, Check 3374, Check 522

8         and Check 523 were received in evidence.)

9       (Government Exhibit 7th Ward 2005 Checks and Government

05:01:12   10       Exhibit D-2 7 Ward-2 were received in

11         evidence.)

12          MR. GOLDSTEIN:  What time tomorrow?

13          THE COURT:  9:00 o'clock, and if they all get here,

14  I'm going to try very hard to start at 9:00 o'clock.

05:01:21   15          MR. GETTER:  Thank you.

16      (Court adjourned, to reconvene at 9:00 a.m. on 3/21/13.)

17                      CERTIFICATE

18      I certify that the foregoing is a correct transcript from

19  the record of proceedings in the above-entitled matter.

20  /s/Kathleen M. Fennell          March 21, 2013

21  _____     _____

22  Kathleen M. Fennell                      Date
    Official Court Reporter

23

24

25