1    IN THE UNITED STATES DISTRICT COURT
      NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    UNITED STATES OF AMERICA,    )
                                  )    No.  12 CR 124
4             Government,         )
                                  )
5    Vs.                          )    Chicago, Illinois
                                  )
6    WILLIAM BEAVERS,             )    March 21, 2013
                                  )
7             Defendant.          )    9:14 o'clock a.m.

8                    VOLUME 6
              TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE JAMES B. ZAGEL
                  AND A JURY
10

11   For the Government:

12           THE HONORABLE GARY S. SHAPIRO,
             UNITED STATES ATTORNEY
13           BY: Matthew Michael Getter
                 Carrie E. Hamilton
                 Debra Riggs Bonamici
14               Samuel B. Cole
             Assistant United States Attorneys
15           219 South Dearborn Street
             Suite 500
16           Chicago, Illinois    60604
              (312) 353-5300
17

     For the Defendant:
18           KAPLAN & SOROSKY
             BY:  Sheldon M. Sorosky
19           158 West Erie
             Chicago, Illinois 60610
20           (312) 640-1776

21

             Court Reporter:
22

23           Blanca I. Lara, CSR, CP, RPR
             219 South Dearborn Street
                  Room 2504
24           Chicago, Illinois 60604
                (312) 435-5895
25

```
 1   Appearances (continued:)

 2

 3   For the defendant:

 4                        OFFICES OF AARON B. GOLDSTEIN
                          BY: Aaron Benjamin Goldstein
 5                        6133 South Ellis
                          Chicago, Illinois 60637
 6                        (773) 752-6950

 7                        OFFICES OF LAUREN FAUST KAESEBERG
                          BY:  Lauren Faust Kaeseberg
 8                        2140 N. Lincoln Park West
                          Suite 307
 9                        Chicago, Illinois 60614
                          (773) 517-0622
10
                         LAW OFFICE OF SAMUEL E. ADAM
11                        BY:  Samuel Forbes Adam
                               Samuel Adam, Jr.
12                        6133 South Ellis Avenue
                          Suite 200
13                        Chicago, Illinois 60637
                          (312) 726-2326
14

15
                         Henderson Adam, LLC
16                        BY:  Victor P. Henderson
                          The Insurance Center Building
17                        330 South Wells, Suite 1401
                          Chicago, Illinois 60606
18                        (312) 262-2900

19

20

21

22

23

24

25
```

1       INDEX OF EXAMINATION

2   WITNESS                                           PAGE

3

4   Opening Argument on Behalf of the Government By     1149

5   Ms. Hamilton.......................................

6   Closing Argument on Behalf of the Defendant By     1187

7   Mr. Adam, Jr.......................................

8   Closing Argument in Rebuttal By Mr. Getter..........1214

9   Jury Charge By the Court............................1231

10  Verdict............................................1253

11

12

13  EXHIBITS

14      ...................................................

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings taken in open court:)

2        THE COURT:  We have some instruction issues left?

3        MS. BONAMICI:  Yes, we do, Judge.

4        Judge, I provided you and the defense this morning

09:18:10   5  with a modified set of instructions that includes instructions

6  responsive to 3 of the 4 outstanding matters --- or, rather, 5

7  of the 6 outstanding matters.  One of the outstanding matters

8  not introduced in the instructions and that's number 21 that

9  you took under advisement.  Otherwise, if you'd like, I can go

09:18:37  10  through the outstanding matters in order.

11        THE COURT:  That's a great relief ....

12        MS. BONAMICI:  Pardon me?

13        THE COURT:  I found the pad on which I made my notes.

14        Actually, let's go back a little to make sure things

09:19:12  15  are in order, and that's the 13, which are the -- okay, 13, you

16  put that one in.  Are we okay with 13?

17        MS. BONAMICI:  Do you have a problem with it?

18        MR. GOLDSTEIN:  No.

19        THE COURT:  Okay.

09:19:34  20        Then the next one is 21.

21        MS. BONAMICI:  Correct.

22        THE COURT:  For the defense?  This is the one where

23  Pansier appears to be maybe the case.

24        MS. BONAMICI:  With respect to the statute, correct.

09:20:17  25  There are, of course, a lot of cases dealing with this issue in

1    the context of the statute.

2        THE COURT:  Right.

3        MR. GOLDSTEIN:  Your Honor, I mean, our issue is still

4    the same as far as the government not having proved all of

09:20:31    5    these issues.

6        THE COURT:  I'm overruling the objection.  I'm giving

7    the instruction.

8        MS. BONAMICI:  Okay.

9        THE COURT:  The next thing I have on my list is 26 A.

09:20:43    10        MS. BONAMICI:  Correct.  This is one, Judge, where we

11    have submitted a substitute and we've also added to the

12    description of the cases.

13        THE COURT:  Right.

14        MS. BONAMICI:  We were discussing this before.  What

09:20:57    15    we were talking about is the issue how to communicate the

16    concept of a bona fide or genuine loan.

17        THE COURT:  Right.  We had a lot of discussion with

18    the English word "genuine."

19        MS. BONAMICI:  Yes, we did.  We did.  So what we've

09:21:13    20    done is, I believe, we removed the word "genuine" except -- in

21    fact, I think we might've removed it entirely.

22        THE COURT:  You did.

23        MS. BONAMICI:  The goal was to give the concept

24    without using --

09:21:28    25        THE COURT:  I'll read the revised one into the record:

1    "... when a taxpayer receives a loan, he incurs an

2    obligation to repay that loan.  Because of that

3    obligation to repay, loan proceeds do not constitute

4    income.  The transfer of money from one party to

09:21:45    5    another constitutes a loan only if at the time of the

6    transfer the parties to the transaction intend that

7    the person who receives the money actually will be

8    obligated to repay it.  In determining whether the

9    defendant has received particular funds as a loan or

09:22:04    10   as income, you should consider all of the facts and

11   circumstances surrounding the defendant's receipt of

12   the funds."

13        MR. GOLDSTEIN:  We agree with everything except the

14   word "actually" which is where we left off yesterday.

09:22:22    15        THE COURT:  Exactly.  But it's --

16        MR. GOLDSTEIN:  Because, again, it's --

17        THE COURT:  The problem is that within the existing

18   tax law, you can have an undocumented loan, and it's a loan,

19   and what we have here is an undocumented loan claim.  So we

09:23:09    20   spent a fair amount of time trying to search what is it that

21   you tell the jury that if it's a loan, it's not income, but

22   there's no written evidence, one way or the other, on the

23   subject.  So you're trying to communicate to the jury that if

24   it is a loan, if they find it is a loan, but we don't have a

09:23:52    25   lot of guidance because there's no written loan document.

1     So the government proposed something in which they

2 spoke of the loan as being genuine, an instruction one does not

3 ordinarily see in criminal cases except perhaps counterfeiting

4 and other things.  And I don't think anybody who I see standing

5 before me today was terribly fond of the use of the word

6 "genuine," it's just what they had at the time.  This is a

7 better solution, the government's proposed solution:

8          "... constitutes a loan only if at the time of the

9          transfer the parties to the transaction intend that

10          the person who receives the money actually will be

11          obligated to repay it ... "

12           this is their phrase.  Speak to this.

13     MR. GOLDSTEIN:  The word "obligated" is already in

14 there.  The definition of "obligated" includes that you have an

15 actual need to repay this, you have an obligation.  So what

16 we've done with this word "actually" "genuine," any words, is a

17 problem.  It overemphasis, it almost sort of flags, "oh, you

18 need, you need certain proof."  It emphasizes something that

19 already is in the word.  So you're putting undue emphasis on

20 something that does not need to be emphasized.

21     We have the next paragraph which specifically says

22 that you're to consider all the facts and circumstances.  So

23 that really does address the issue that the Court has been

24 talking about which is, "well, it's undocumented."  And the

25 government put on an expert witness to say, well, here are the

1    factors that you look at or that he would look at, you know,

2    whether there's documentation, whether it's being paid back,

3    and all these types of things.  So we have that in the last

4    paragraph.

09:26:17    5    "Obligated" says when someone has an obligation, they

6    actually have a requirement, a responsibility, to do whatever

7    it is they're obligated to do.  So, actually, it just puts

8    undue emphasis when it is not needed.  And, quite frankly,

9    grammatically, it doesn't even make sense.

09:26:42    10    THE COURT:  Want to speak to this?

11    MS. BONAMICI:  Well, Your Honor, another option would

12    be to take out "actually "and to go back to the concept of

13    using a word that demonstrates that it is a true or bona fide

14    or genuine loan.  So in that case, we could add, in the first

09:27:01    15    line of the third sentence "the transfer of money from one

16    party to another constitutes a true loan."

17    The idea here is to--and I think this is completely

18    supported by the arguments of both the parties here--is to

19    distinguish between something that's merely called a loan by

09:27:20    20    one of the parties to the transaction and something that

21    actually is a loan.  That's what this whole case is about.

22    There are cases that say -- many cases that say just

23    calling it a loan doesn't make it a loan.  And, in fact, I

24    found one case where that sentence was actually included in the

09:27:38    25    jury instruction.  This is our way of not being that heavy

1    handed but still getting across the same concept.

2        MS. KAESEBERG:  If I could just speak to that very

3    quickly?  I think if you qualify the word "loan" and say

4    something is a true loan, or a genuine loan, or a bona fide

09:27:55  5    loan, it will be confusing and misleading to the jury because

6    there was testimony about things that are terms of art within

7    the income tax laws and then "loan" was used as a term that was

8    defined by witnesses or at least their understanding of what

9    that word meant was put into evidence.  So I think to

09:28:12  10    characterize "loan" with anything in front of it is misleading

11    and would be confusing, frankly, to the jury.

12        THE COURT:  In my view, it's a good instruction;

13    although, the way I get this is a little different.  We're not

14    really talking about a loan here.  It's not a definition of a

09:28:32  15    loan, it's a definition of a mental state.  And the operative

16    phrase is not "actually will be obligated," the operative

17    phrase here is "the parties to the transaction intend that the

18    person who receives the money actually will be obligated to

19    repay it."  That is, in the context of this case, a good and

09:29:04  20    valid description of the mental state.  So I'm overruling the

21    objection.

22        What's next?

23        MS. BONAMICI:  The next thing is good faith, Your

24    Honor.  The defendant had proposed -- well, let's step back.

09:29:24  25    The government has proposed good faith instruction with respect

1   to Counts 2, 3 and 4, the defendant proposed an additional good

2   faith instruction taken from the pattern to follow the elements

3   instruction for Count 1.

4           THE COURT:  And that's defendant's number 1.

09:29:41   5           MS. BONAMICI:  That's correct, Your Honor.

6           THE COURT:  Okay.

7           MS. BONAMICI:  What the government has done is

8   proposed a substitute good faith instruction which is present

9   in the new packet at 23 A.  And what this instruction does is

09:29:58   10  attempt to be a compromise.  It combines -- it's a combined

11  good faith instruction for all the counts.  It deals with the

12  two mental states that are involved.

13          We would note we've also included citations to a

14  number of authorities, and this is just a small sampling, which

09:30:23   15  I'm sure you're aware.  The authorities say that the defendant

16  is not actually entitled to do a good faith instruction if the

17  elements -- or if the other instructions convey all of the same

18  points, that's true in this case, but as a compromise we are

19  offering this proposal.  This would take the place of

09:30:45   20  government instruction 23 and defense 1.

21          THE COURT:  I'll read this into the record, too:

22      "If the defendant acted in good faith, then he lacked

23       the willfulness or corrupt intent required to prove

24       the charged offenses.  For purposes of Count 1, the

09:31:12   25       defendant acted in good faith if he did not act for

1    the purpose of obtaining an unlawful benefit for

2    himself.  And for purposes of Counts 2, 3, and 4, if

3    at the time he filed or caused his tax returns to be

4    filed defendant honestly believed the truthfulness

09:31:30   5    and correctness of the statements that the government

6    has charged as being false.  The defendant does not

7    have to prove his good faith; rather, the government

8    must prove beyond a reasonable doubt with respect to

9    Count 1 that the defendant acted with a purpose of

09:31:46   10    obtaining an unlawful benefit and with respect to

11    Counts 2, 3 and 4 that the defendant acted

12    willfully."

13         For the defense?

14         MS. KAESEBERG:  Sorry, Your Honor.  Looking at the

09:32:04   15    pattern.

16         THE COURT:  Take your time.  Take your time.

17         (Brief pause).

18         MS. KAESEBERG:  What I'm looking at here is, and I

19    don't know if you're willing to entertain any argument on a

09:32:31   20    break potentially, but on the issue I'm looking at here, does

21    the new instruction offer -- sort of put an extra burden on the

22    defendant to prove good faith?  I know the second paragraph

23    specifically says that the defendant does not have to prove his

24    good faith, but the way it's phrased in paragraph 1 is

09:32:49   25    different, it's sort of more than an active phrasing than the

1    phrasing in the pattern instruction, so I'm just worried that

2    it may put a little bit more of a burden on the defense to

3    prove that.  So that's where my concern lies.  I don't know if

4    you're willing to allow this to go -- if I could just have a

09:33:06    5    couple more minutes to look at it?

6           THE COURT:  What I think you're seeing is the fact

7    that good faith is something that a defendant has to bring up,

8    it's a defense that can or cannot be made.  So, basically,

9    you're going to tell the jury, based on what the defendant has

09:33:41   10    done or argued, that they have to consider whether he acted in

11    good faith, because they will not automatically have to

12    consider this.  Somebody has to say "I did it in good faith."

13           And I guess you can say the defendant has the burden

14    of raising his hand and saying "I did it in good faith" or

09:34:13   15    introducing evidence to that effect.  That's not the same thing

16    as saying he's got to prove good faith, and that's exactly what

17    the instruction says, he doesn't have to prove good faith, but

18    he raised it, and that's the only way it gets to the jury.

19           MS. KAESEBERG:  I think what we can do is, we'd object

09:34:39   20    to the giving of this instruction over our offered instruction

21    but as modified over objection.  Or we're better off with this

22    than not having the instruction.

23           THE COURT:  That's fine.  So 23 A will be given over

24    the objection as stated.

09:34:59   25           MS. KAESEBERG:  Thank you.

1   MS. BONAMICI:  Thank you.

2   THE COURT:  What else is there?

3   MS. BONAMICI:  Judge, according to my notes, the only

4   other thing that we have left on our plate is the special

09:35:08   5   instruction regarding striking the testimony.

6   THE COURT:  Oh, this is the new one.

7   MS. BONAMICI:  The new one, which isn't numbered in

8   any way.  It's just a separate instruction.

9   THE COURT:  We will --

09:35:21   10   MS. BONAMICI:  Do you have your copy?

11   THE COURT:  Yeah.  You want to call it 33?

12   MS. BONAMICI:  Sure.

13   THE COURT:  Government 33.  I'll read this one into

14   the record, as well:

09:35:38   15   "Yesterday you heard testimony from a defense witness

16   named Barry Gershinzon.  On direct examination

17   Mr. Gershinzon testified about his opinion as to

18   whether certain checks were loans, advances, or

19   income.  That testimony was not properly admitted.

09:35:56   20   I, therefore, strike and instruct you to disregard

21   Mr. Gershinzon's opinion regarding these checks.  You

22   may not consider any aspect of that opinion in

23   deciding this case.  You may, however, consider

24   Mr. Gershinzon's testimony, as well as the testimony

09:36:14   25   of the government's witness, David Weiner, regarding

1        the facts and circumstances relevant in deciding

2        whether a particular check is a loan, advance, or

3        income."

4            MS. KAESEBERG:  Well, we object to this entire

09:36:31  5   instruction on a number of grounds.  The first issue we have is

6   that it's our request that any instruction to strike portions

7   of testimony would be given orally to the jury and not in the

8   form of a written instruction, which just calls extra attention

9   to it, in my opinion.

09:36:48  10       THE COURT:  Well, yeah, that's something that I can

11   accommodate.  Basically, it would be the kind of thing that I

12   would say before closing argument begins.

13            MS. KAESEBERG:  Right.

14            THE COURT:  That part of it is easy.

09:37:02  15            MS. KAESEBERG:  So if you're willing or inclined to do

16   that, we would want to rework some of the language.  You know,

17   what this instruction does is essentially says to the jury

18   we're striking Mr. Gershinzon's opinion and you may not

19   consider that, however, look to the government's witness and

09:37:19  20   listen to what he said.  I mean, I know it's written well, but

21   what else it does is it tells the jury to do that.

22            There are instructions that the jury is already being

23   given to tell them what to consider with regard to witness

24   testimony and how to weigh witness testimony.  So they're

09:37:38  25   already being told that.  So, really, if the Court's ruling is

1  just that that testimony should be stricken and that's the only
2  instruction that seems to be given.

3      THE COURT:  But what you seem to be telling me is that
4  I shouldn't read the third paragraph and I don't know why you
5  would want me not to read it.

6      MR. GOLDSTEIN:  Judge, what we are telling you is not
7  to read any these paragraphs.

8      THE COURT:  I mean, but assuming that I do read the
9  first and second paragraph, I would think, although, you know,
10  I don't know where your argument is going to go, so I could be
11  wrong about this, but I would think that you would definitely
12  want the third paragraph read.

13      MS. KAESEBERG:  What we object to, aside from the
14  whole thing, I mean, in the third paragraph, the second clause
15  -- or the third clause of the sentence "as well as the
16  testimony of the government's witness, David Weiner" is
17  unnecessary and improper.  So without that phrase, that
18  paragraph could read:

19      "You may, however, consider Mr. Gershinzon's testimony
20      regarding the facts and circumstances relevant to
21      deciding whether a particular check is a loan,
22      advance, or income."

23      I mean, if the instruction is to strike the testimony
24  and telling the jury what they may not consider and then you
25  want to go further and tell them what they may consider, it's

1    inappropriate to include a government witness in that portion.

2    MS. BONAMICI:  Your Honor, having the need for this

3    instruction is adept to the government because, in our view,

4    without a reference to the other evidence on this topic and

09:39:24    5    unduly highlight the evidence they may consider on this

6    subject, in our view, we're definitely entitled to put this

7    into some sort of a perspective and not have the jury think

8    that the Court is instructing them that Mr. Gershinzon's

9    testimony is the only relevant testimony on that topic.

09:39:42    10    MS. KAESEBERG:  I think the timing is critical here,

11    which is immediately after giving this instruction to the jury

12    the government gets to do their closing argument, and that's

13    their argument and they get to say that directly to the jury

14    themselves.

09:39:54    15    MR. GOLDSTEIN:  And if there's concern, don't give the

16    instruction.  I mean, there's a fundamental problem here.  The

17    government could've cross-examined Mr. Gershinzon to every

18    issue that the Court had a problem with.  I mean,

19    cross-examination is an excellent tool in getting to the truth.

09:40:14    20    And the issue is, I think I understand the Court's problem with

21    his testimony, that was somehow, A, he couldn't somehow remove

22    this issue that supposedly Mr. Beavers told him from his mind

23    and his opinion, and B, it was the issue of voluntariness, but

24    the government's witness gets up there and they have the same

09:40:36    25    problem with voluntariness.  Mr. Henderson was cross-examining

1   him over and over and over again about voluntariness and their

2   exact expert wasn't clear on it either, and it was

3   cross-examination that got it out, cross-examination.

4        So what the government says, basically, is, nah, we're

09:40:56  5   not going to cross him, instead we'll just have the Court do

6   the job. And if they got up here and just cross-examined him

7   on any issue they wanted to, which I'm sure the Court would've

8   allowed, they could have possibly got out the issues they

9   wanted. Instead, now they have the Court saying "here's what's

09:41:16  10   going on."

11        An expert in defense of this man right here, he is

12   discussing issues relevant to the case. I mean, the entire

13   case was gambling, we finally get a witness that's actually

14   talking about the issues at hand, and we're going to tell the

09:41:32  15   jury "disregard it." It just -- it's actually, to use a formal

16   word "it's crazy." It makes no sense whatsoever. This is just

17   fundamentally wrong, this instruction.

18        THE COURT: Well, leaving aside my expressed view on

19   the appropriateness of Gershinzon as an expert on anything, I'm

09:42:05  20   going to give this instruction, and I'm going to give the third

21   paragraph as well because it is the only way the jury can

22   understand that there are some aspects, reluctant as they may

23   be to permit it, there are some aspects of Mr. Gershinzon's

24   testimony that can be considered and there are two experts who

09:43:05  25   spoke on it and the jury should be reminded of that. And bear

1  in mind, this is the oral instruction that would be given in

2  the course of a trial before we get to the formal instruction.

3  So I am giving it.  I think in light of Gershinzon and the

4  testimony that the jury did hear, this is the only appropriate

09:43:35   5  way to deal with this.  I'm doing this over objection stated by

6  the defense.

7  Anything left?

8  MS. KAESEBERG:  We're just discussing one point.  If

9  you would just give us a moment?

09:43:48   10  THE COURT:  Sure.  Go ahead.

11  (Brief pause).

12  MS. KAESEBERG:  Okay.  Same objection.  Nothing new to

13  add.

14  THE COURT:  Okay.

09:44:08   15  MS. BONAMICI:  Thank you, Your Honor.

16  THE COURT:  Do I have a clean --

17  MS. BONAMICI:  Now that we've got final rulings, we'll

18  make them right now.

19  THE COURT:  I think six copies for the jury and one

09:44:28   20  for me.

21  MS. BONAMICI:  Got it.

22  MR. GOLDSTEIN:  So it's Your Honor's intention to read

23  government's 33 as opposed to providing a hardcopy?

24  THE COURT:  Yeah.

09:44:49   25  MR. GOLDSTEIN:  Okay.

1        MR. COLE:  The government does want to make a couple

2  of issues known to the Court prior to closing.  I'll just raise

3  a couple of concerns.

4        THE COURT:  Before we get to that, one small matter.

09:45:39  5  When you give me the six copies for the jury, give me the

6  redacted indictment as well, a separate one.

7        Now.

8        MR. COLE:  Okay.  So, first of all, just in general,

9  the government wants to make a motion to exclude any defense

09:45:55  10  evidence and argument that the Court prohibited either before

11  trial or during trial from the defendant's closing.

12        And specifically, I know in the opening the defense

13  raised at the very end of the opening, in a cryptic manor, the

14  vindictive prosecution argument, saying "at the end of the

09:46:17  15  case, you'll know why the defendant is here and you're there

16  and it's got nothing to do with tax."  That was, clearly, a

17  stab at vindictive prosecution and I want to make sure that

18  does not come up again in the closing.

19        MR. S. ADAM, JR:  I can explain what I mean by that

09:46:31  20  and it's not vindictive prosecution.

21        THE COURT:  What is it that you want to say in closing

22  argument?

23        MR. S. ADAM, JR:  I'll say it again, Your Honor.  I

24  shouldn't be forced to give the government my theory now.  It

09:46:45  25  will not be vindictive prosecution.  I agree, Your Honor says

1   we're not to get into vindictive prosecution and I won't.

2           MR. COLE:  Well, whatever it is, it's motive of the

3   government.

4           THE COURT:  It is.  So you got to tell me what you're

09:46:57   5   going to say.  And if you don't tell me what you're going to

6   say, it creates, I think, significant problems.  So why don't

7   you tell me.

8           MR. S. ADAM, JR.:  I don't --

9           THE COURT:  Listen, if you think that you got this

09:47:12   10   absolutely fabulous thing you want to say and you're afraid

11   that if you tell the government they'll have a really good

12   answer to you where if it's revealed for the first time at the

13   end of your close they may not figure out the correct answer

14   and you want the advantage of the secrecy, you can write it out

09:47:42   15   for me, hand it to me, and I'll tell you whether you can do it.

16           MR. S. ADAM, JR:  Your Honor, I don't know if I'm

17   going to say anything.  What I'd like to do is hear the

18   government's opening statement before the jury is here and then

19   I'll tell you if I'm going to reply to it in that manner.  So

09:47:55   20   if the government wants to give me theirs first ....

21           THE COURT:  Okay, that's fine.

22           MR. S. ADAM, JR.:  Okay.

23           MR. COLE:  So another specific issue are the concepts

24   that the W-2 forms, the 1099 forms, were not properly completed

09:48:14   25   by whoever, the City of Chicago, Cook County or the pension

1    fund.  Again, that's something that this Court kept out and I

2    think it is something that is not fair game for the defense

3    closing.

4              MR. S. ADAM, JR:  I don't agree with that, Your Honor.

5    There are certain things I can talk about that were not on the

6    W-2's.  And I understand Your Honor kept out and we disagree

7    with it, but we understand Your Honor kept out that I cannot go

8    into the $68,000 being on the pension in the 1099's, Your

9    Honor, kept that out and I understand that, but to say that

10   something was not on the W-2, as long as I'm not lying blame on

11   anything, I can get into that.

12             THE COURT:  And tell me what it is you're going to

13   say.

14             MR. S. ADAM, JR:  Well, I mean, this one I can tell

15   you, it's very simple, Your Honor, that the W-2 did not contain

16   the contingency checks, it was just not on the W-2.  Now, that

17   came out in four or five different witnesses and --

18             THE COURT:  Wait.  Wait.  And is that what you want to

19   say?

20             MR. S. ADAM, JR:  Yes, sir.

21             MR. COLE:  We would have a problem with that because

22   they're trying to raise the inference that the defendant

23   understood it wasn't on the W-2, that should've been and was

24   not there, and there's no evidence of that.  They presented no

25   evidence of that and that will be improper argument.

1  MR. S. ADAM, JR:  Your Honor, the government has to

2  prove that he did know that they weren't there, and I can

3  certainly draw an inference that they weren't there and the

4  government didn't prove he knew that they weren't there.  Now,

09:49:35  5  that's a proper argument, Your Honor.  We seem to have this

6  thing flipped that we have to prove --

7  THE COURT:  Wait, wait, wait.  You're not going to say

8  that he didn't know he was getting 1200 a month.

9  MR. S. ADAM, JR:  Correct.

09:49:56  10  THE COURT:  So he knew he's got 1200 a month in his

11  pocket.

12  MR. S. ADAM, JR:  Correct, Your Honor.

13  THE COURT:  And then you're going to say that the 1200

14  wasn't on the W-2.

09:50:10  15  MR. S. ADAM, JR:  Which is in evidence, yes, Your

16  Honor.

17  THE COURT:  Okay.  And from that you're going to draw

18  the inference that?

19  MR. S. ADAM, JR:  We don't know whether he knew it or

09:50:19  20  not.  Now, that's a proper argument, Your Honor.  I agree with

21  you.  I don't agree that we shouldn't be allowed to do this,

22  but I understand Your Honor's argument.  I cannot get up there

23  since he did not testify and say he did not know, I understand

24  that, and I won't violate, but the government has to prove, in

09:50:40  25  my opinion here, that he didn't know beyond a reasonable doubt.

1 Now, I can point to the evidence here just like they want to

2 point what is loan and not a loan and those type of things, I

3 can point to the evidence that's in the record here that the

4 W-2 didn't show it.

09:50:52 5      THE COURT:  You can say that the W-2 didn't show it.

6      MR. S. ADAM, JR:  Yes, sir.

7      THE COURT:  But you have to be extremely careful --

8      MR. S. ADAM, JR:  Yes, sir.

9      THE COURT:  -- in making an assertion that he did not

09:51:17 10 know.

11      MR. S. ADAM, JR:  Yes, sir.

12      THE COURT:  Your assertion can only be that the

13 government has not proved that he did know.  The government has

14 some things they could say in rebuttal that might possibly

09:51:39 15 persuade the jury that he knew and knew well, but you're

16 entitled to say that it wasn't on the W-2.

17      MR. COLE:  Okay.  Another issue has to do with the

18 amended returns.  So they made some argument -- or asked some

19 questions of the government's IRS expert, Paul Ponzo, about?

09:52:06 20 Mr. Ponzo cutting off his analysis too soon and should've

21 looked further into 2009 repayment.  This really is directly to

22 the issue the Court has addressed in terms of the amended

23 returns and the payments that Mr. Beavers made to the IRS after

24 he was approached by the government about this tax case.

09:52:25 25      MR. S. ADAM, JR:  Well, I'm loath that I'm at this

1    issue.  I would never mention any amended returns.  It's not in

2    evidence.  I hadn't planned on mentioning amended returns, Your

3    Honor.

4          MR. COLE:  It's not just the amended returns, though,

09:52:37    5    it's the issue of Mr. Ponzo -- the questioning of Mr. Ponzo

6    about when he cut off his analysis.  It's the exact same issue.

7          THE COURT:  You are not going to argue, make any

8    argument with respect to when the government stopped looking,

9    because if you raise an issue about he stopped looking at a

09:53:06    10    certain date, you are implying to the jury or you want the jury

11    to infer that there was some act of redemption after a

12    specified date and it doesn't count here.

13          MR. S. ADAM, JR:  Well, if I may, Your Honor.  This is

14    evidence that it's in through their witnesses.  Not somebody we

09:53:31    15    called.  Their witness, Mr. Ponzo, testified he chose, and

16    that's all I plan on getting into, the dates were chosen by

17    him, he chose January 1st of '06 through April of '09.

18          THE COURT:  There are certain things that were charged

19    in this case, that's what's relevant.  What he picked where to

09:53:51    20    stop, where the government picked whore to stop, is not an

21    argument that could be made to the jury.  An argument that

22    could conceivably be made to me, but not to the jury.

23          MR. S. ADAM, JR:  I'm not allowed to mention 2009?

24          THE COURT:  No.

09:54:09    25          MR. S. ADAM, JR:  At all?

1    THE COURT:  What possible way would you mention 2009

2    that you think might be okay?

3    MR. S. ADAM, JR:  Well, Your Honor, during the cross

4    they brought out that he was given credit in 2008 for checks in

09:54:21    5    the beginning of 2009.  That's in evidence, Your Honor.  He was

6    crossed on that.  There were checks in January of 2009, they

7    gave him credit for 2008.

8    THE COURT:  No, it was not done for that purpose.  You

9    are going to use it completely out of context.  The answer is

09:54:34    10    no, you can't.

11    MR. COLE:  The fourth point, Your Honor, is, they made

12    some arguments both in their opening and asked questions about

13    things the IRS could have done.  They could've audited

14    Mr. Beavers, they never audited him, they never knocked on his

09:54:50    15    door, the Illinois State Board of Elections never knocked on

16    his door, they never audited him, again, I think those

17    questions -- or any argument based on things that they could've

18    done --

19    THE COURT:  You are going to say that?

09:55:01    20    MR. S. ADAM, JR:  I wasn't planning on using the

21    audit, no, Your Honor.

22    THE COURT:  Would you say anything about what the

23    government could have done?

24    MR. S. ADAM, JR:  Of course; yes.

09:55:11    25    THE COURT:  And from that you're going to draw the

1  inferences that?

2      MR. S. ADAM, JR:  On a couple of things that weren't

3  done in 2006 and now, I guess up to December 31st of 2008.

4      THE COURT:  And what are you going to say wasn't done?

09:55:26  5      MR. S. ADAM, JR:  Anything by the government other

6  than what was shown here.

7      THE COURT:  Okay.  No, you can't do it, and the reason

8  you can't do it is, the person who is on trial in this case is

9  the defendant.  You don't get to argue that -- well, first of

09:55:50  10  all, there's a certain level of ineffectiveness in this

11  argument because implicit in it, and I've seen rebuttal

12  arguments, you get the prosecutor that stands up and says:

13  Defense has made this argument that the government didn't do

14  this, the government didn't do that, this amounts to an

09:56:12  15  argument that they didn't catch him soon enough, and that's

16  basically what the defense counsel is saying to you, members of

17  the jury.  Not that his client wasn't proven guilty, but the

18  government should've caught him sooner, that's basically what

19  that is.

09:56:33  20      Now, if we get an exchange like this, it invites the

21  jury to consider things other than the evidence which is before

22  them.  It says to the jury consider these counterfactual

23  circumstances.  It puts the government on trial in a way in

24  terms of did they follow proper enforcement procedures.  None

09:57:06  25  of that is in the indictment.  The indictment says in certain

09:57:32

1  times, places, and dates this is what the defendant did.  If he

2  did it, if we have proved this, then they can ask the jury to

3  return a guilty verdict.  You can say they didn't prove it

4  therefore the verdict should be not guilty.  That something

5  else might have happened, I think, is just a distraction from

6  the issue that is before the jury.

7        We're not asking the jury to decide global issues.

8  And on top of it, the particular thing you want to do opens the

9  door to a response that I don't think you want to hear.  And

09:57:53

10  even if you did want to hear, it's an invitation to the jury to

11  decide cases on grounds other than whether the government has

12  proved beyond a reasonable doubt the specific charges alleged

13  against this defendant.  Don't go there, this is my order.

14        Anything else?

09:58:21

15        MR. COLE:  No other points, Your Honor.

16        THE COURT:  How long do you want?

17        MR. COLE:  I think about an hour and 15 minutes.

18        THE COURT:  An hour and 15 minutes for both?  Opening

19  and rebuttal?  What's the total time you want?

09:58:40

20        MR. COLE:  About an hour and 45 minutes.

21        MR. S. ADAM, JR:  An hour and a half, if needed.

22        THE COURT:  That's fine.  We'll break.

23        So, basically, we're ready?

24        MR. COLE:  I think we're ready, Your Honor.

09:59:10

25        MS. KAESEBERG:  Can I just make the record on this

1  issue regarding what the defense can get into on closing

2  argument with Mr. Ponzo?

3  THE COURT:  Sure.

4  MS. KAESEBERG:  In order for the jury to find

09:59:22  5  Mr. Beavers guilty they have to believe Agent Ponzo because he

6  is the fundamental witness, he is the one who went through all

7  the records from the IRS, he is the creator of this Summary

8  Chart, we have a right to get into the credibility, the

9  competency, the trustworthiness of him as a witness --

09:59:39  10  THE COURT:  Just tell me what it is specifically that

11  you want to get at.

12  MS. KAESEBERG:  Well, taking the question you asked

13  the jury, you're going to get into things he didn't do, things

14  he didn't look at, that's relevant.  And I would like to remind

09:59:52  15  the Court that the indictment charges that the scheme went

16  through 2011.  So Agent Ponzo's testimony is he stopped the

17  investigation at a particular time or that he didn't look at

18  records at a particular time that, apart from the indictment

19  the jury is going to get in the jury room, that's absolutely

10:00:07  20  relevant in testimony.

21  It also goes to his credibility as a witness and

22  competency to testify in this case.  I mean, they have to

23  believe him to find the defendant guilty.  It's a critical

24  point that we should be allowed to make and it's a

10:00:22  25  constitutional right of the defendant to have that argument in

1 closing argument.

2 THE COURT: And that's all you're saying to me now?

3 MS. KAESEBERG: At this time, yes.

4 THE COURT: I'm adhering to my ruling.

10:00:31 5 MR. SOROSKY: Your Honor, at the close of all the

6 evidence the defendant would make a motion for a request for a

7 finding of acquittal by the Court.

8 THE COURT: That motion is entered and continued.

9 MR. SOROSKY: Entered and continued?

10:00:44 10 THE COURT: Yeah.

11 MR. SOROSKY: Okay.

12 There's another motion that the defense would make.

13 Number one, substantively we, of course, disagree with Your

14 Honor's ruling on what the defense can and cannot say on

10:01:07 15 closing argument and we would say it deprives the defendant of

16 a fair trial. And procedurally, procedurally, the whole

17 process of the government of coming before the Court and saying

18 the defense can't do this, what is the defense going to do, and

19 we have to answer these questions, it clearly deprives the

10:01:28 20 defendant of a fair trial because it forces the defense to,

21 frankly, just show its hands to the government, and, therefore,

22 we say that also is improper because it deprives the defendant

23 of a fair trial.

24 THE COURT: I believe that the days of the claimed

10:01:47 25 right of lawyers to ambush the other side are gone. When you

1   make an offer, you don't want to put yourself in the position,

2   and it's not good for the interest of justice, in general, to

3   say, "we can say whatever we want to say and, Your Honor, you

4   can fix this by instructing the jury to disregard something."

10:02:16   5   This is generally a bad practice. We're not talking about

6   something that's happened before trial has started. We are

7   talking about evidence that was introduced, evidence that was

8   offered, we are talking about specific things that are now

9   matters of record and I made my ruling on that basis and I'm

10:02:43   10   entitled to do so.

11            The defense has the right to choose to make a motion

12   of one kind or another and to give as many or as few details as

13   it chooses to do. I rule on the basis of the details that are

14   given.

10:03:05   15            You want to say something?

16            MS. HAMILTON: The only thing that I would add is

17   that, throughout this entire trial, all the defense counsel

18   have asked questions that Your Honor specifically ruled before

19   trial were improper to bring before the jury. That is the

10:03:20   20   biggest reason why the government made the motions that they

21   made this morning about improper arguments in closing argument.

22   It's because of what defense counsel has already done in this

23   case.

24            MR. SOROSKY: If I may respond? I don't know of any

10:03:37   25   questions that I personally asked my witnesses that I was

1  prohibited from asking because I don't think I was ever asked

2  what are we going to ask.  So that is inaccurate as to myself,

3  I'll talk to my colleagues --

4      THE COURT:  No, no, you don't have to talk to anybody.

10:03:55  5  The truth is that if you -- and I'm not talking about a fine

6  tooth comb here.  I'm talking to a comb missing a lot of teeth.

7  If you combed through this record with that, you would find

8  several instances in which I was specifically asked to rule on

9  something on a question that could or could not be asked.  I

10:04:21  10  made an unambiguous ruling, and at least in one situation the

11  very first question from the mouth of defense counsel was a

12  question that any reasonable lawyer would have believed that I

13  had forbidden the question to be asked.

14      It's one of those things where the lawyer says "I can

10:04:44  15  say absolutely anything and that there's some remedy, the only

16  remedy is a mistrial," which is pointless, a waste of time, and

17  against the interest of justice.

18      I made these rulings for a reason.  If the worst

19  happens with respect to your client, then you can raise it in

10:05:10  20  another court.  I adhere to my rulings.

21      MR. SOROSKY:  Thank you.

22      MR. COLE:  Just to clarify, after the jury comes out

23  we'll read instruction 33 before closing argument?

24      THE COURT:  Right.

10:05:22  25      MR. GOLDSTEIN:  When you say "we" you mean --

1      MR. COLE:  The Court.

2      MR. GOLDSTEIN:  Okay.  You're not the Court.

3      MR. COLE:  No.

4    (Brief pause).

10:05:52   5      THE COURT:  We'll take a short break.  Please remain

6  seated in the courtroom.

7      All rise.

8    (The following proceedings were had in the presence of

9     the jury in open court:)

10:07:36  10      THE COURT:  Before we begin, I have one last thing

11  that has to do with some of the evidence you've heard and then

12  I'll give you an idea of what comes next.

13      Yesterday, toward the very end of the case, you heard

14  the testimony from a defense witness named Barry Gershinzon.

10:08:08  15  On direct examination Mr. Gershinzon testified about his

16  opinion as to whether certain checks were loans, advances, or

17  income.  That testimony was not properly admitted.  I,

18  therefore, strike that testimony and instruct you to disregard

19  Mr. Gershinzon' opinion regarding those checks.  You may not

10:08:29  20  consider any aspect of that opinion in deciding this case.  You

21  may, however, consider Mr. Gershinzon's testimony, as well as

22  the testimony of the government's witness, David Weiner,

23  regarding facts and circumstances relevant in deciding whether

24  a particular check is a loan, advance, or income.

10:08:52  25      You are now going to hear closing argument.  We will

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 33 of 143 PageID #:1808
opening argument - by Hamilton
1149

1  begin with the government which bears the burden of proof.

2  There will be a break after that argument has ended, then you

3  will hear the defense argument, and after that there will be a

4  short break, and then finally you will hear the rebuttal

10:09:22  5  argument of the government.  After that is done, I will read

6  you the instructions of the law.

7      I advise you now that you don't have to take notes on

8  those instructions because there will be at least six copies of

9  the instructions in writing given to you to have in the jury

10:09:49  10  room during that period of time.  I say this because it's

11  probably a good idea to listen with your ears as I'm reading

12  them and then you'll have a chance to read them later if you

13  need to do so.  There are time limits, which is why I'm marking

14  the time now.

10:10:23  15      The government may begin.

16      OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

17      BY MS. HAMILTON:  Thank you, Your Honor.

18      The defendant, William Beavers, has been an elected

19  public official for the last 30 years.  He understands and he

10:10:39  20  knows the importance of paying taxes.

21      In 2005 the defendant admitted that he had used

22  campaign funds personally, he reported that personal use on his

23  income tax return, and as a result he owed a lot of money.  It

24  took him a long time to pay off that bill.

10:11:07  25      From 2006 to 2008 the defendant continued to use

1 campaign funds personally.  He took almost $300,000 over those

2 3 years from his campaign funds and used them personally.  But

3 because of what had happened in 2005 on his tax returns, the

4 defendant made a decision.  He decided he wasn't going to

10:11:36  5 report his personal use of his campaign funds in 2006, 2007, or

6 2008.  When it benefited him, he wanted that money as his own,

7 but he did not want to claim it as his own on his income tax

8 returns.

9          In 2006 he wrote a $68,000 check from a campaign fund

10:12:05 10 to his personal pension fund.  That resulted in bumping up his

11 pension to over $6,000 a month.  From 2006 to 2008, he wrote

12 himself a hundred checks from the campaign funds totaling over

13 $226,000, and he also received $1200 a month from Cook County

14 to cover expenses, above and beyond his salary, and he just

10:12:40 15 took that money for himself.

16          Now, once the defendant took that money and used it as

17 his own, it became income to him, but he didn't put that money

18 on his tax returns.  He intentionally had that money off his

19 tax returns and he was able to do so, in part, because of the

10:13:04 20 way that he kept his books and records.  He kept his books and

21 records in a way that no one knew what he was doing with that

22 campaign money he was taking.  Because of this, the defendant

23 has been charged in a four-count indictment.

24          Now, there are two types of charges here, filing false

10:13:38 25 tax returns and impeding the IRS.  I'm actually going to first

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 35 of 143 PageID #:1810
opening argument - by Hamilton
1151

1    start with the filing of false tax returns, which are Counts 2,

2    3 and 4, and then I'm going to go back to impeding the IRS

3    which is Count 1.

4         Counts 2, 3 and 4 charge the defendant with willfully

10:14:01   5    underreporting his income.  Count 2 is the 2006 tax return,

6    Count 3 is the 2007 tax return, and Count 4 is the 2008 tax

7    return.

8         These are the elements the government needs to prove

9    beyond a reasonable doubt for you to find the defendant guilty

10:14:25   10    of these charges:  First, that he prepared or caused to be

11    prepared an income tax return.  Second, that that income tax

12    return was false about a material matter.  Third, that it was

13    signed under the penalty of perjury.  Next, that he acted

14    willfully, and last that those tax returns were actually filed

10:14:49   15    with the IRS.

16         Now, for each of these charges, 2, 3 and 4, the first

17    third and fifth element are really not in question.  You heard

18    the testimony from the defendant's accountant, Philip Achusim.

19    He testified that the defendant did cause him to prepare the

10:15:11   20    defendant's income tax return.  He testified the defendant

21    signed those returns and that they were under penalties of

22    perjuries and that they were filed with the IRS.

23         Here is the signature under the penalty of perjury for

24    the 2006 tax return signed by the defendant (indicating).  It

10:15:30   25    says:

1       "Under penalties of perjury, I declare that I have

2          examined this return and accompanied schedules and

3          statements and to the best of my knowledge and belief

4          they are true, correct, and complete."

10:15:42    5          This is 2007 and this is 2008 (indicating).  So for

6    each one of those years, for Counts 2, 3 and 4, these three

7    elements are not in question and have been proven beyond a

8    reasonable doubt.  So the issues for these three counts really

9    come down to those other two elements, were these returns false

10:16:08   10    about a material matter and did the defendant act willfully.

11          You are going to get an instruction that the law

12    defines a matter as material if it was capable of influencing

13    the IRS.  In this case, the material matter is the

14    underreporting of income.  And you heard from IRS revenue Paul

10:16:37   15    Ponzo that the amount of income a person claims on his tax

16    return directly affects the calculation of tax owed to the IRS.

17    And common sense tells you that how much the defendant claimed

18    as income on his personal tax return was capable of influencing

19    the IRS because it directly affected how much income tax he

10:17:00   20    owed.  So the evidence shows that underreporting of income is

21    material.

22          So then how do you know that the income tax returns

23    for the years in question were false and that the defendant

24    acted willfully when he filed those false returns?  As to

10:17:19   25    willfulness, you're going to get an instruction that

1    "willfulness" means that the defendant knew he had a legal duty

2    to file truthful tax return and that when he signed that return

3    he did not believe it was truthful as to a material matter.

4    Again, in this case the material matter is the underreporting

10:17:37     5    of income.

6         So what this comes down to is, did the defendant

7    intentionally fail to report all of the income that he had

8    received for 2006, 2007, and 2008. And the answer to all of

9    that, based on the evidence, is yes, he did intentionally fail

10:17:58    10    to report all of his income.

11         First, you know that he never reported the $68,000

12    pension check that he wrote from a campaign fund. Second, you

13    know that he never reported any of the hundred checks that he

14    wrote to himself from the campaign funds. And third, you know

10:18:24    15    that he did not claim the money he received in what was called

16    Cook County Contingency Funds to cover expenses.

17         Now, for the money that the defendant personally

18    received from the campaign funds, the evidence has shown that

19    he knew he was supposed to report that money on his income tax,

10:18:48    20    and the best evidence you have of this is what happened in

21    2005.  In 2005, the defendant admitted to both the Illinois

22    State Board of Elections on his D-2's and then to the IRS on

23    his tax returns that he had personally used the last of what is

24    called grandfathered money from one of his campaign funds.

10:19:13    25    Andy Nauman from the Illinois State Board of Elections

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 38 of 143 PageID #:1813
opening argument - by Hamilton
1154

1    testified that before June of 2008 politicians were able to use

2    money in campaign funds for personal uses.  In June -- I'm

3    sorry, June 1998, I think I said "2008," June 1998 the law in

4    Illinois changed, but it did allow politicians to continue to

10:19:32   5    use what's known as grandfathered money or money they already

6    had in their campaign funds as of the time the law changed for

7    personal use.

8            So, in 2005, the defendant admitted that he had used

9    the rest of his grandfathered money in the Citizens For Beavers

10:19:51   10   account.  He put that on his D-2 and he reported it as income

11   on his tax return.

12           Here is the D-2 (indicating).  Andy Nauman testified

13   about this.  The statute that is highlighted is the statute

14   allowing for the use of the grandfathered money, and this is

10:20:10   15   claim to the Illinois Board of Elections he's taking the last

16   of the grandfathered money.

17           Here is the letter that is part of the 2005 tax return

18   that you will have (indicating).  Philip Achusim testified he

19   did not draft this letter, he did not ask for this letter, that

10:20:27   20   the defendant included it in the tax materials that he provided

21   to Mr. Achusim.  The letter is written by the defendant and it

22   reads, it is telling the IRS that he received $43,000 in

23   campaign funds that year.  He personally used it, he put that

24   on his tax return.

10:20:50   25           What this shows you is that the defendant knew that

1  when he used campaign funds personally, he had to report it as

2  income on his income tax return.  So when he uses campaign

3  money in 2006, 2007, and 2008, and doesn't include that money,

4  you know it was not a mistake, it was not inadvertent, it was

10:21:21   5  intentional.  He knew he needed to claim that money and he did

6  not.

7  Now, the 2005 tax return also tells you why he decides

8  not to report any of this money in the later years.  Look at

9  how much tax he ended up owing in 2005 (indicating).

10:21:45  10  Now, you also heard from Shirley Ball, not only did he

11  owe this large amount of money, it took him a long time to pay

12  it back.  He was paying it back in 2006, he was paying it back

13  in 2007, he was paying it back in 2008, and in years beyond

14  that.  What that tells you is why he decides in 2006, when he

10:22:11  15  looks at that income tax return, he knows those campaign funds

16  he used are not on there, and the reason he doesn't include

17  them, he doesn't want to get hit with another tax bill like he

18  had in 2005.  He does the same thing in '07 and the same thing

19  in '08.  He's still paying off what he owes the IRS in 2005 and

10:22:33  20  he has no intention on paying them anything more.

21  So let's focus on how you know when he took those

22  campaign funds in '06, '07 and '08 that it was personal use to

23  him that should've been reported.

24  First we're going to start with the pension check.

10:22:57  25  What you know is that the defendant was an alderman in Chicago

opening argument - by Hamilton

1   from 1983 until the end of November 2006.  In November of 2006

2   he was elected as a Cook County Commissioner and he began that

3   position in December of 2006.  Before he officially stepped

4   down as an alderman and became a Commissioner, he was given the

10:23:20   5   option of substantially increasing the pension he would receive

6   from having been an alderman.

7   You saw this letter and you heard the testimony

8   (indicating).  He was able to increase his monthly pension up

9   to $6,541 a month for life.  The catch was, he needed to be

10:23:42   10   able to come up with the amount that is circled, $68,763.07 in

11   a short period of time.  He had about two weeks to do it.

12   So defendant found the money.  He took the money from

13   Citizens For Beavers.  He wrote this check from Citizens For

14   Beavers to his pension fund.  He wrote that check so that he

10:24:10   15   personally could start to receive a substantially increased

16   pension.  There are no documents to support that this was a

17   campaign expense.  No witness says it was a campaign expense.

18   The payout from his pension went into his personal account.

19   Common sense tells you this was not a campaign expense.  This

10:24:33   20   was personal for the defendant.

21   Now, what you also know is that this was never

22   included on his 2006 tax return.  Because he wrote that check

23   from his campaign account for his own personal benefit, that

24   was income to him that should have been included on his 2006

10:24:56   25   tax return and was not.  That is proof beyond a reasonable

opening argument - by Hamilton

1157

1   doubt that the defendant intentionally did not report that

2   $68,000 check from Citizens For Beavers and that's the first

3   way you know that the 2006 tax return was willfully false.

4        So now we're going to go to the 100 checks.  This is

10:25:23   5   the check way you know that the tax returns were willfully

6   false.  What you know from the bank records and from the

7   testimony is that the defendant controlled those accounts.  He

8   had the sole signature authority on those accounts.  He wrote,

9   signed, and cashed those 100 checks.

10:25:47   10       Now, you also heard testimony from the treasurers that

11  they relied on the defendant to give them an explanation of

12  what the checks were for.  They would regularly provide him

13  with lists of the checks he had written to himself that he had

14  not explained to them.  And what you know is that the defendant

10:26:07   15  was keeping everyone in the dark about what he was really doing

16  with those campaign checks.  They were not being used on

17  campaign expenses.

18       You now know from the testimony that they were being

19  cashed and used so that the defendant could go to the slot

10:26:30   20  machines.  That is a personal use.  That is not a campaign

21  expense.  Agent Ponzo summarized for you his comparison between

22  the cashing of those 100 checks and the defendant's gambling

23  activities.  And what he saw was that 73 of those checks were

24  cashed on the very same day that the defendant was gambling.

10:27:02   25  93 of the checks were cashed within a day.  So 73 on the day,

1  20 more either the day before or the day after.

2        Now, Agent Ponzo also didn't just look at the dates,

3  he looked at the times.  And you'll have all this back in the

4  jury room.  You have the gambling records.  You'll be able to

10:27:30  5  see when the defendant's player card went in and out of slot

6  machines.  Agent Ponzo did a comparison based on time, and you

7  will see in the summary records, you saw in his testimony,

8  there were a number of times that not only were checks cashed

9  right before the defendant starts gambling, there were checks

10:27:51  10  cashed during breaks on gambling.

11        Now, you heard about these three checks from

12  April 9th, 2007.  This is just an example of one of the days

13  when a check is cashed before gambling and then there are two

14  more cashed during gambling breaks.  It's summary chart 4.  I'm

10:28:14  15  not going to go through the whole thing with you.  You heard it

16  before a couple of times.  It's these three checks you were

17  shown how they figured out the time it was cashed and how they

18  figured out when the card player -- sorry, the player's card

19  went into the slot machine.  And again, what all of this

10:28:35  20  evidence tells you is what the defendant was doing with the

21  campaign checks.  He wasn't using them for campaign expenses,

22  he was using them to gamble.

23        And what you also heard testimony about was how much

24  he lost.  These are the figures for 2006, 2007, and 2008

10:29:04  25  (indicating).  What the records -- I talked about April 9th, I

1    want to talk about putting April 9th in the context of what

2    else happening of the other checks the defendant wrote in March

3    and April of 2007 so can you see it's not just April 9th.

4            And Agent Ponzo went through a lot of these checks,

5    but he wrote them down into different Summary Charts.  So two

6    of the other checks from March and April of 2007 are in Summary

7    Chart 7.  And what you can see from these is that these checks

8    were also cashed right before the defendant starts gambling.

9            Now, the check stubs on these say that this money was

10   used to pay Breaker Press.  I'm going to talk more about that

11   later when I talk about Count 1, impeding the IRS, but what you

12   know from the evidence that's before you these checks were not

13   used to pay Breaker Press.  These checks were cashed by the

14   defendant right before he went to gamble.  The Breaker Press

15   invoices came 8 and 10 months later.

16           Now, some of the other checks that the defendant

17   cashed in March and April of 2007 are contained in Summary

18   Exhibit 8.  And these were also checks that were cashed on days

19   when the defendant gambled.  Two of them, the ones that I've

20   highlighted, were actually cashed during gambling breaks

21   similar to what we saw on April 9th of 2007, and the others

22   were cashed right before gambling.

23           Now, if you put all of these checks on a calendar for

24   2007 -- March 2007 and April 2007, here's what you see:  The

25   slot machines are days that the gambling records show the

10:31:16

1  defendant was gambling at the Horseshoe Casino.  The check

2  marks are days when the defendant cashes campaign checks.  So

3  there are four in March of 2007 on the day he is gambling.

4  April of 2007, you see three checks from April 9th that we've

5  already talked about and then you see one, two, three, four,

6  five, six more, all but one cashed on the day he was gambling.

7  And, of course, you heard the testimony about the difference

8  between checks cashed on the weekend, whether they're processed

9  on a weekend or processed on Monday.  The one check not on the

10:31:41

10  same day as gambling was processed on a Monday.

11      Now, what you also know about these checks is that the

12  defendant lied to the Illinois State Board of Elections about

13  how he had used these checks.  Andy Nauman testified that the

14  D-2 report for the 7th Ward Organization showed this, that the

10:32:05

15  defendant had reimbursed unused funds with a list of checks.

16  And what he said is, he didn't see the money initially going

17  out to the defendant, he only saw all this money coming back

18  in.  And that didn't make any sense to him.  If he's

19  reimbursing funds, why didn't the D-2's show the money going

10:32:27

20  out in the first place.  So he wrote a letter and he said:

21      "The committee reflects 18,000 in contribution from

22       William Beavers for reimbursement of funds.  What is

23       this for?"

24          In response, what Andy Nauman said is, he spoke

10:32:44

25  directly to the defendant and he also received a letter signed

1     by the defendant giving the Illinois State Board of Election a

2     false explanation about what had happened.  The defendant wrote

3     back to Mr. Nauman, "in response to those checks we looked at

4     from March and April 2007" and he said:

10:33:06     5          "... this money was taken out of the campaign fund for

6               election expenses, which was not used but was

7               returned to the campaign committee in the form of

8               checks from William Beavers."

9          What you know is this was a lie.  That money was

10:33:25    10    cashed by the defendant and put into a slot machine.  It was

11    not taken out as election expenses and then somehow unused and

12    magically returned.  This is a lie to the Illinois State Board

13    of Elections.

14          And the fact that he's lying to the Illinois State

10:33:46    15    Board of Elections about what he's doing with that money tells

16    you so much.  He is lying because he doesn't want anyone to

17    know the truth, which is that he is taking that money

18    personally and using it, put aside that he's gambling with it,

19    he doesn't want them to know he's personally using the money.

10:34:11    20    And he knows, based on what happened in 2005, if he tells the

21    Illinois State Board of Elections he has taken that money

22    personally, guess what he has to do then?  He's got to tell the

23    IRS.  He's got to report it on his tax returns as income.  Once

24    he tells the Illinois State Board of Elections, he's stuck with

10:34:34    25    respect to the IRS.  So he lies.  He lies and says it was taken

1    out and unused for election expenses.

2         This also shows you, this is willfulness.  It's shows

3    you he's not mistaken when he fails to include those campaign

4    checks on his tax returns.  He didn't make a mistake and think

10:34:55     5    he had taken that money out for election expenses and not used

6    it, he knew exactly what he had used that money for and he lied

7    about it.  And, of course, it's not just March and April, it's

8    throughout 2006, 2007, 2008.  Let's look at August of 2008.

9         When you look at the checks the defendant wrote to

10:35:24    10    himself and cashed in August of 2008, here's what you're going

11    to see:  12 checks, just in August of 2008, taken from all

12    three of the campaign funds totaling $24,000, just for August

13    of 2008.  No explanation given.  The check stub either says

14    void or blank.  8 of those checks cashed on days he's gambling

10:35:52    15    and the other four within a day of gambling.

16         Here's what it looks like on the calendar

17    (indicating).  The red checks are where the check stub says

18    blank, the blue checks are where the check stub says void.

19         Now, Patrice Coleman testified that she wrote -- she

10:36:12    20    was the one who wrote "void" on the check stub.  Now, you know

21    from the bank records and from the checks and from her

22    testimony that these checks weren't voided in the way that a

23    bank thinks about voiding the check.  They were cashed and

24    cleared the bank.  She said that she wrote "void" because she

10:36:32    25    believed that the defendant had actually reimbursed those

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 47 of 143 PageID #:1822
opening argument - by Hamilton
1163

1   funds.  Well, what you know from Agent Ponzo's testimony is

2   Ms. Coleman is mistaken about that, because when you look at

3   what money goes back in to the campaign fund from the defendant

4   in 2008, that's not otherwise accounted for, it's $11,000.

5   Those voided checks totaled $17,000.  He did not reimburse that

6   money.

7               MR. S. ADAM, JR:  Objection, Your Honor.

8               THE COURT:  There will be occasional objections from

9   one side or the other.  I don't pause to rule on each and every

10  one of them.  If you believe that one of the lawyers or the

11  lawyer making the statement is mistaken based on your memory of

12  the evidence, then you should treat it as a misstatement and

13  disregard it.  And, basically, the objection signals to you

14  that this is something that you ought to pay attention to.

15              With that, without ruling, you may proceed with the

16  argument.

17              MR. S. ADAM, JR:  May we have a short sidebar?

18              THE COURT:  No, you may not.

19              MR. S. ADAM, JR:  Yes, Your Honor.

20              MS. HAMILTON:  Go back and look at the Summary Charts

21  for 2008.  And you know from Agent Ponzo's testimony, he gave

22  the defendant every credit he possibly could.  You go back and

23  see whether he reimbursed those voided checks --

24              MR. S. ADAM, JR:  Objection, Your Honor.  Here.

25              THE COURT:  Proceed.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 48 of 143 PageID #:1823
opening argument - by Hamilton
1164

1            MS. HAMILTON:  You will find he did not.  Now, beyond

2    that, what Ms. Coleman testified is that she would wait for the

3    defendant to give her an explanation before she would put it in

4    a check stub or put it on a D-2.

10:38:36    5            What that tells you is if he had given her any

6    explanation for those voided checks, she would've written it

7    down.  If it had been a valid campaign expense, she would have

8    written it down.  But he gave her no explanation.

9            Now, for the other 8 checks, the stub is totally

10:39:01   10   blank, totally blank.  And it's these checks that we went

11   through with Ms. Coleman, pages of them.  You'll have all of

12   them, the original checks, the original check stubs; nothing,

13   nothing.  Remember, Ms. Coleman testified looking at the checks

14   from the check stubs, no idea what that money was used for.  No

10:39:22   15   idea.  It's completely blank.

16           And, of course, you know, again it's not just August

17   of 2008, it's not just these 12 checks, the defendant used 93

18   out of 100 checks for gambling and never told anyone.

19           So how do you know that the defendant intentionally

10:39:50   20   left these checks off his income tax returns.  Well, you know

21   he's the one who cashed the checks, he's the one who used the

22   money, he's the one who gave no explanation, he's the one

23   controlling all the information about the money.  He knows what

24   he spent that money on.

10:40:11   25           Now, treasurers, sure, they knew he had written the

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 49 of 143 PageID #:1824
opening argument - by Hamilton
1165

10:40:33

1  checks to himself, but if it's all so transparent, why doesn't

2  anyone know what he's actually doing with the money?  Why not

3  just tell the treasurer "I'm taking the money and gambling with

4  it."  Or if you don't want to talk about gambling, fine, just

5  say "I'm taking the money and I'm personally using it."  He

6  never even says that.  And, again, it's because he knows, he

7  learned his listen from 2005, once he admits he's taking that

8  money personally, it's got to go on his tax return.  So he

9  keeps everyone in dark about what he is doing with the money.

10:40:53

10  He doesn't want to have to pay income tax on it.

11       So what does the defense say to all of this?  They're

12  loans, he loaned himself the money, he advanced himself the

13  money.  Well, how do you know that is just not true?  Well, all

14  of the checks, there is absolutely no notation whatsoever on

10:41:22

15  the check that it is a loan.  He wrote the checks, he cashed

16  the checks, he could've easily put in the memo line "loan."

17  Not there, not on one of them.

18       There is no documentation that these are loans.  No

19  loan agreement, no promissory note, not even a handwritten IOU.

10:41:44

20  No document about when he's planning on repaying any of these

21  loans.  Nothing about whether there's interest due, he

22  certainly didn't pay any interest, or whether these are all

23  just interest free loans he's giving himself.

24       And, of course, he never tells the treasurers they're

10:42:03

25  loans.  Patrice Coleman said he never told her these were

1   loans.  He also didn't list these loans on any of his personal

2   financial statements he signed and gave to the bank.  You will

3   have both of these, this is the first one, filled out and

4   signed by the defendant June 13th, 2007 (indicating).  And just

10:42:31   5   to put that date into context, that's 7 months after he writes

6   the $68,000 check to his pension and after he's been receiving

7   the increased pension payments, he's fully aware that he has

8   taken that money, and June 2007 is right in the middle of him

9   taking all of these campaign checks.  He lists none of that on

10:42:59   10   a personal financial statements he fills out and signs with the

11   bank.  And Michael Debre took you through this and why it was

12   important and where it should've been listed.  He writes

13   nothing under amounts paying to others, either secured or

14   unsecured.  We know they're not secured, but he doesn't put

10:43:21   15   them under either.

16          Look at what he does include, unpaid income tax

17   return, that winds up on the financial statement because he

18   knows that's an obligation he has, he's got to pay back.

19   Remember the experts talked about one of things that they look

10:43:37   20   at is documentation showing whether or not the borrower really

21   thinks he's obligated to pay it back.  Sure looks like, from

22   these personal financial statements, he does not view this as

23   an obligation he needs to pay back at all, any amounts.  He

24   includes $20,000 in unpaid income taxes.  He wrote a $68,000

10:44:00   25   check that went to personal use for him and that doesn't get

1    included on here?  And it's not just once, he does it again in

2    2008.  Again, he's still getting his bumped out pension

3    pay-outs every month.  He knows why he's getting $6,000 rather

4    than the lower amount he was originally going to get, because

5    he took the money from the campaign fund.  It doesn't end up on

6    here at all.  And again, look what does, unpaid income tax.  He

7    knows that's an obligation he has to repay, but, in his mind,

8    he does not believe he owes that campaign fund anything,

9    because it wasn't a loan, he took that money.

10          Now, you also know he doesn't list any loans with the

11   Illinois State Board of Elections.  You have the D-2, the D-2's

12   from 2005, he shows having taken personal loans.  It's in there

13   in 2005.  2006, 2007, 2008, you will have all the D-2's, and

14   you heard the testimony from numerous witnesses, not one, not

15   one of those D-2's lists a loan he has taken from any one of

16   the campaign funds.

17          Now, does the fact that the defendant sporadically

18   puts his own money into the campaign fund and calls some of

19   these deposits reimbursements for really just a small portion

20   of the checks support the fact that they were loans?

21   Under what you know about this case, it does not, and here's

22   the reason why:  There is no evidence that the defendant was

23   somehow tracking these loans himself.  There's no evidence that

24   he was regularly attempting to repay this money at any point in

25   '06, '07, and '08.  The whole time he now claims he was paying

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 52 of 143 PageID #:1827
opening argument - by Hamilton
1168

1    back that money, he just keeps taking more and more and more.

2    He's not even making a dent in what he owes the campaign fund.

3    What the reimbursed check tell you is that he knew that money

4    was not his to take in the first place, and he knew he had to

10:46:31    5    do something to make sure things weren't totally out of whack

6    so he still has access to all of that money in over this entire

7    period of time.

8           And what you heard from the experts and what you know

9    based on your own common sense is what matters at the time the

10:46:50    10    money was taken.  Focus on the time that the defendant cashed

11    those checks.  And when you focus on them, you know they were

12    not loans.  Again, nothing in any of the notations at all about

13    loans.

14           And, of course, he doesn't have to have a formal

10:47:12    15    agreement.  He could have just written on a napkin "IOU."  Take

16    a look in Summary Chart 10 at the expenses this defendant keeps

17    track of.  There is a receipt for McDonald's for a $1.09 in the

18    campaign records.  He keeps track of things.  When the campaign

19    owes him something, the records are there, but when he now

10:47:44    20    wants to say he actually was obligated to pay a campaign, no

21    record.

22           Now, of course, he could have just told Patrice

23    Coleman.  She said there were times when he told her things and

24    didn't have a receipt and she obviously took his word and she

10:48:02    25    kept track of that.  And you have an example of this,

10:48:24

1    Ms. Coleman testified about it, it's check 2126.  She said the

2 defendant told her he needed to be reimbursed for having bought

3 a refrigerator.  So she typed out a check to him in the amount

4 that he told her and put on the memo line "reimbursed for a

5 refrigerator" and then she put in the check stub.  There is

6 total transparency, everybody now knows this check was used to

7 reimburse the defendant for a campaign expense.  They know how

8 to do it, that's the way they did it.  These were not campaign

9 expenses and he was not reimbursing the campaign.  This shows

10:48:46

10 you he knows how to track it when he's doing it.

11    You know when he took that money they were not loans.

12 He was not intending on paying it back.  When he took that

13 money, he didn't feel an obligation to pay back the campaign

14 fund.  He just wanted to go gamble.  His focus was not on what

10:49:11

15 was going to happen later, it was what was going to happen

16 right then, and he took that money to use for himself.

17    And as for the $68,000 check, just to be very clear,

18 by the time the defendant files his taxes for 2008, which is

19 about 2 and a half years after he took this money, he had made

10:49:38

20 no attempt whatsoever to pay the campaign back.  If it truly

21 had been a loan, he could've used the increase bump up that he

22 got in his monthly checks from the pension to start paying the

23 campaign back.  If he had done just that, just that amount,

24 just the bump up, the increase based on the money he took from

10:50:04

25 the campaign, he would've paid it back in about 2 years.  He

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 54 of 143 PageID #:1829
opening argument - by Hamilton
1170

1    didn't put one cent back in the campaign for that $68,000 that

2    he took and then got the personal benefit for.

3         What the evidence shows is that the defendant took

4    this money from the campaign and used it when it benefited him,

5    but when it was time for him to admit that he used it as his

6    own to benefit him he did not include it on his income tax

7    returns.  It is that failure, the willful failure to report

8    those monies that prove the defendant guilty of Counts 2, 3 and

9    4.

10        But, of course, there's more than just the campaign

11   funds, there's the Cook County Contingency Fund.  Those were

12   also not included on the defendant's 2006, 2007, and 2008 tax

13   returns.

14        Now, you heard that because he was a Cook County

15   Commissioner he received a salary of $85,000 a year.  And the

16   County also allowed for him to request and receive $1200 a

17   month to cover expenses.  The evidence shows that from the

18   moment he started in December of 2006 through November of 2008,

19   which is the end of the fiscal year for the County, it doesn't

20   include December of 2008, the defendant put in vouchers

21   requesting to receive the $1200 and he received $1200 each and

22   every month.  Here is one of the vouchers (indicating).  You

23   saw this already.  Signed by him.  The "MY," you heard, was for

24   Mersaydes Young which was his assistant.  And then you got the

25   checks.  And what you know is that these checks were different

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 55 of 143 PageID #:1830
opening argument - by Hamilton
1171

1      separate and apart from his salary.  They were hardcopy checks

2      that he received, there were no deductions taken out, and the

3      defendant either cashed or deposited those checks personally.

4            Now, what you also know is that on the expense forms

5      that the County required the defendant to fill out, he admitted

6      that he didn't actually use this money on expenses, that he

7      used it personally.

8            In 2007, he said "Commissioner Beavers will claim his

9      fiscal year 2007 contingency as income" signed by William

10      Beavers.  2008, contingency funds were taken as income for

11      fiscal year 2008.  It turns out both of those things were lies.

12      He did take the money and used it personally but he didn't

13      report it on his income taxes.  For 2007, this is an additional

14      $14,400 that he received from the County on which he paid no

15      taxes.  Here is his W-2 for 2007.  It's for the $85,000 a year

16      salary, it does not include the contingency funds.  If it did,

17      this would've been close to $100,000.  Here's the W-2 for 2008,

18      again it doesn't include the money which, because the fiscal

19      year ends in November of 2008, it's slightly less than that,

20      $13,200, and if that had been included, again it would have

21      been close $200,000.  But the defendant didn't claim this money

22      on his income tax returns.

23            So how do you know that this was willful and not just

24      a mistake?  Well, you heard the testimony of the defendant's

25      accountant, Philip Achusim.  He said a number of things, but

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 56 of 143 PageID #:1831
opening argument - by Hamilton
1172

1    one of this things that he testified about was after he

2    completed the 2008 tax return, he got a call from the defendant

3    telling him he had made a mistake.  The defendant told him he

4    had actually not picked up all of the federal withholding on

10:54:46    5    the W-2G forms and he needed to fix the tax return.

6            And let me explain to you what that tells you.  You're

7    going to have the originals of this in the jury room with you.

8    This is just one of the W-2G forms that was attached to the

9    income tax return for 2008.  Here's the original (indicating).

10:55:15    10    What Philip Achusim was saying is that the defendant looked

11    through the attachments.  These attachments are --

12            MR. S. ADAM, JR:  Objection.

13            THE COURT:  Objection is overruled.

14            MS. HAMILTON:  And he noticed that Philip Achusim had

10:55:31    15    missed something on that little line on the attachments to this

16    tax return.  And let me just put in perspective, the W-2G for

17    the County is attached here (indicating).  The first W-2G that

18    he notices, you'll see there's a little mark here, is there.

19    But before that, there is a whole bunch of other W-2Gs.  He

10:56:02    20    would've had to have gone through all of these to know that

21    Philip Achusim had missed what was on this line, and then two

22    later he marks another one, and then two later he marks another

23    one, and again, later another one.  He had to have gone through

24    all of these documents attached to this income tax return to

10:56:35    25    catch that error.  He caught that error.  And what that tells

opening argument - by Hamilton

1    you is this is not someone who is blindly following what his

2    accountant does and just signs his return and moves on.  What

3    that testimony tells you is this is someone who is careful and

4    notices things.  He noticed that small line on the documents

10:56:56    5    and he called his accountant out on it.  He knew that money was

6    not on his W-2 and he knew he had used that money personally as

7    income.

8         Now, the defense also tried to make an argument that

9    somehow the Cook County expense reports were his way of telling

10:57:21    10    the County "put it on my W-2."  Well, what the defense fails to

11    point out is that the expense reports were completed after Cook

12    County issued the W-2.  And here's how you know that happened:

13    First, the defendant's own expert said that employers provide

14    W-2's by January 31st.  Paula Matela, she was the woman who

10:57:54    15    came in here from Cook County, she was the assistant to Matt

16    DeLeon, she testified that she was the one who provided the

17    blank forms to the Commissioners and they were usually provided

18    in January and due back at the end of March.  She also

19    testified that for the 2007 fiscal year expense report, she

10:58:20    20    wrote that.  And what she said is that about a week before

21    these reports were due, which was the end of March 2008, she

22    hadn't received anything from Commissioner Beavers.  So she

23    called his office and was told this, she herself wrote that,

24    then at some later date she sent it back to the defendant's

10:58:43    25    office to get him to sign that and then it was returned to her.

1  All of that is happening, at the earliest, in very late March

2  of 2008.  Look at the tax return.  Philip Achusim prepared the

3  defendant's 2007 tax return, had it completed on March 11th,

4  2008.

10:59:14  5  What that means is that the defendant had already

6  received his W-2, had already provided Achusim the W-2, and

7  Achusim had already completed the entire tax return before

8  Paula Matela ever called his office and asked for the expense

9  form.

10:59:33  10  And 2008 is just a start.  You've got the memo from

11  Matt DeLeon to the defendant.  It is dated March 25th, 2009.

12  You will have it.  You can go back and read it.  Matt DeLeon

13  told you that the reason this was sent was attaching the blank

14  expense form and giving the defendant until the end of April to

10:59:59  15  complete this one.  So what you know is the defendant's office

16  didn't even receive the blank expense form and certainly hadn't

17  filled anything out before March 25th, 2009.

18  Philip Achusim had already completed the defendant's

19  tax return the day before DeLeon's memo.  Again, what that

11:00:24  20  tells you is the County had already issued the W-2, the

21  defendant had already received the W-2 and had already given it

22  to his tax preparer before that form even comes up in his

23  office.  The earliest he got the blank form was a day after his

24  tax return was complete.  What that means is that he knows that

11:00:48  25  expense form has no bearing on the company issuing the W-2.

opening argument - by Hamilton

1       This was not a mistake.  What the evidence shows you

2   beyond a reasonable doubt is that just like with the campaign

3   funds, the defendant used these contingency funds as his own

4   when it benefited him but he did not claim it as his own on his

11:01:16   5   tax returns, and that is proof beyond a reasonable doubt on

6   Counts 2, 3, and 4.

7       Now, before I move on to Count 1, I should explain

8   that Counts 2, 3 and 4 charge the defendant willfully

9   underreported his total income on his tax returns.  For

11:01:39   10  Count 2, which is 2006, you can find the defendant guilty based

11  on any one of these three ways.  You do not need to find all

12  three.  Failing to report any one of these reduced the amount

13  of total income and therefore made that number false.  So you

14  can find it on the pension check, the hundred check, or the

11:02:06   15  Cook County check.  You can find all three, can find two, you

16  can find one, but you do not have to find all three.

17      For Count 2 and count -- I'm sorry, for 2007 and 2008,

18  which are Counts 3 and 4, the pension fund check is not an

19  issue.  It's the last two pots of money.  And again, you don't

11:02:29   20  need to find both.  You can find one, you can find both, but

21  you don't have to find both in order to find the defendant

22  guilty beyond a reasonable doubt on those counts.

23      So let's move on to Count 1.  All of the evidence that

24  I just went through proves the defendant guilty of Counts 2, 3

11:02:52   25  and 4 and also proves him guilty of count 1.  This is another

1   violation of federal tax laws which is basically trying to

2   impede the IRS.

3        In order to prove this count, the government needs to

4   prove beyond a reasonable doubt these things:  That the

11:03:10  5   defendant made an effort to impede the IRS, that his effort had

6   a reasonable tendency to do so, that he acted knowingly and

7   acted corruptly with the purpose to obtain an unlawful benefit.

8        Now, in the instructions you're going to see that

9   there's a phrase that he was going to try to impede the due

11:03:32  10  administration of the Internal Revenue laws.  What that

11  includes is the IRS's ability to compute taxes, collect taxes,

12  and investigate possible criminal violations.  And you saw that

13  last element had the word "corruptly."  In this context what it

14  means is he was trying not to pay taxes on all of his income.

11:04:00  15       So it's fair to say what this charge really boils down

16  to is, did the defendant take steps to keep the IRS from

17  knowing that he had received more income than he reported so

18  that he didn't have to pay additional income tax.  And the

19  answer, based on all the evidence is, yes, he did.

11:04:24  20       So let's go through the various ways.  First and

21  foremost, he filed false income taxes, and those, clearly,

22  didn't include all of the income that he had received, but he

23  gave much more than that.  The defendant made it virtually

24  impossible for anyone to be able to tell what he was really

11:04:43  25  doing with large portions of his campaign funds.  This meant

11:05:04

1    that not only were the treasurers and the State Board of
2    Elections in the dark about what he was doing, but the IRS was
3    obviously in the dark as well.  Even though he was using those
4    campaign funds for personal use, he intentionally kept that
5    money off his tax returns so that he wouldn't have to pay taxes
6    on it and the way that he did it, he kept the IRS from figuring
7    it out.

8         So $68,000 check, he never tells the treasurers what
9    the purpose of this check is.  There's no explanation on the

11:05:21

10   check stub, he never reports it on the D-2, and, of course,
11   then it never gets reported on the tax return.  By keeping
12   everyone in the dark about this money, he is impeding the IRS's
13   ability to calculate taxes based on that money, to collect
14   taxes based on that money, and also to investigate him based on

11:05:44

15   his use of that money.  He's got the 100 checks.

16        Now, on the 100 checks, you heard testimony from IRS
17   revenue Agent Paul Ponzo.  He explained his review and analysis
18   on the 3 campaign funds and specifically on the 100 checks the
19   defendant wrote to himself from 2006 to 2008.  What you know is

11:06:08

20   that Agent Ponzo took these records at face value in his
21   analysis, in trying to determine what happened to that money he
22   took it all at face value.  But what you know is that for some
23   of the things that Agent Ponzo gave the defendant credit for,
24   the books and records are actually based on lies told by the

11:06:30

25   defendant.  And they were told by the defendant in an effort to

1   keep his real use of the campaign funds off the books and

2   records to impede the IRS in determining and collecting income

3   tax on those funds.  I'm going to walk through some of the

4   after-the-fact explanations for the campaign money the

11:06:49   5   defendant took for himself.

6           For each one of these the defendant took the cash with

7   no explanation whatsoever, then months and months later he

8   claimed that the cash had been used on campaign expenses.  What

9   you know from the cashed checks is that he did not use the

11:07:10   10  money on campaign expenses.  He kept the money for himself and

11  he used it to gamble, and then 10, 8 months later he claimed

12  that he'd used the money on a campaign expense.

13          Now, these amounts that I'm about to go through were

14  subtracted out and given to defendant as credit by Agent Ponzo.

11:07:31   15  Agent Ponzo told you he subtracted out those amounts because he

16  was taking the records at face value.  In his analysis, his job

17  wasn't to determine the truth of what was written, how a check

18  was classified, how it was put on a D-2 report.  And even

19  taking everything that he saw at face value, some of which you

11:07:53   20  know is based on lies told by the defendant, there were still

21  $30,000 for which Agent Ponzo couldn't find absolutely no

22  campaign explanation whatsoever.

23          But your job, when you look at this evidence, is

24  different than Agent Ponzo's job.  You can and you should

11:08:16   25  question the explanations in those documents.  You can look at

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 63 of 143 PageID #:1838
opening argument - by Hamilton
1179

1  the timing of invoices and checks and figure out what that

2  means.  You can and should think about who was controlling all

3  of the information in those records.  It was the defendant.

4  And his motivation was not to be transparent and upright,

11:08:41  5  upfront and forthright about what he was doing with the

6  campaign funds.  He, his motivation was exactly the opposite.

7  It was to keep the truth from everyone, because if he said I'm

8  using this money personally, he was going to have to pay income

9  taxes on it.  He was taking the money, using it as he saw fit,

11:09:04  10  and decided later what he was going to say happened to that

11  money.  And that's really the essence of Count 1, it's the

12  efforts that he is making to hide what he is doing so that he

13  doesn't actually have to pay taxes on it.  So let's go through

14  some of the examples that will tell you that you know that the

11:09:23  15  defendant made efforts to keep this information off his books

16  and records so no one would know that he was actually doing it.

17  So as I said, for some of the checks he wrote to

18  himself he later claimed, almost a year later, that they had

19  been used for campaign expenses.  So what that means is on the

11:09:48  20  face of the record, it looks like the money was used for

21  legitimate campaign expense.  It's only after digging through

22  lots and lots of records that you can tell that the money was

23  actually cashed by the defendant, used for gambling, and then a

24  year later claimed as a campaign expense.

11:10:05  25  Now, you have these in Summary Chart 7 and I'm going

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 64 of 143 PageID #:1839
opening argument - by Hamilton
1180

1  to go through an example.  I'm going to go through check number

2  2101.  It's written and cashed on March 2nd, 2007, for $4,000.

3  You can see the time and the date that it's cashed on the back

4  of the check.  Gambling records show that the defendant put his

11:10:30  5  card into the slots at 10:55, about 15 minutes after the check

6  was cashed.

7  Now, the check stub now shows Breaker Press, but

8  initially it said "William Beavers."  That was correct, of

9  course, because he did cash the check and use it but it's later

11:10:52  10  crossed out, but that's what the check stub would have looked

11  like at the time the check was written and cashed.

12  Now, the $4,000 check that we just looked at, 2101,

13  that the defendant cashed on March 2nd, 2007, should've been

14  included in the D-2 for that campaign fund for that period of

11:11:12  15  time, it was not.  Here is the D-2, it doesn't show anything to

16  the defendant (indicating).  So at this point what this means

17  is there is no record with the Illinois State Board of

18  Elections that the defendant has used this money personally.

19  Andy Nauman told you they didn't get bank records, they didn't

11:11:28  20  get the backup, they just got the D-2.  So as far as the

21  Illinois State Board of Elections is concerned, this $4,000 has

22  not been used by the defendant.

23  Then on January 18th, 2008, which is 10 months after

24  the defendant cashed that check, Citizens For Beavers gets this

11:11:50  25  invoice from Breaker Press for work that it was doing on the

11:12:18

1    campaign.  Here is where the games begin.  Now, the $4,000

2    check, 2101, that was cashed by the defendant in March of 2007

3    and used to gamble is now magically paying for a portion of the

4    January 2008 invoice.  That money is long since gone.  That

5    check has been out of the campaign funds since March of 2007

6    and now in January of 2008 the records make it look like it's

7    being used to pay part of this invoice.  And to complete the

8    picture, the check stub is now changed to show that this check

9    was written to Breaker Press replacing the real payee, William

11:12:43  10   Beavers, with now Breaker Press.  And since, of course, this

11   check, 2101, has long been spent by the defendant in his

12   gambling and, therefore, can't actually be sent to Breaker

13   Press to pay the invoice, the defendant has to write a check

14   himself.  He writes a personal check to cover the $4,000 he had

11:13:06  15   taken 10 months earlier and never explained to anyone.

16       But, of course, none of this is remotely apparent on

17   the face of the campaign books.  Looking just at the check stub

18   and his receipt, it appears as 2101 was used for a legitimate

19   campaign expense.  There's absolutely no record that the

11:13:34  20   defendant used this personally for gambling.  And that's the

21   point, this is all a fiction to keep everyone from knowing

22   what's actually happening with the campaign records.

23       When you look at the face of the records, nobody knows

24   what he did with that money.  It looks like it went to Breaker

11:13:55  25   Press and that is false, but that's the whole point, he doesn't

opening argument - by Hamilton

1  want the Illinois State Board of Elections to know he used that

2  money, and he certainly doesn't want the IRS to know that he

3  used the money.

4        And then it happens again, check number 335, on

11:14:15   5  Friends For William Beavers.  The check was written in cash on

6  April 18th, 2007.  From the back of the check you can see the

7  time, it's 2:19.  Gambling records show the defendant's

8  player's card going in at 3:03, just under an hour after the

9  check is cashed.  You see the exact same business with the

11:14:34  10  check stub.  Originally, it says "William Beavers," and then at

11  some point it's crossed out.  Then comes the Breaker Press

12  invoice, this one 8 months later in December of 2007, 8 months

13  after the defendant has cashed that check and used it

14  personally.  And then, all of a sudden, now that money, 335

11:15:00  15  from Friends For William Beavers, is somehow magically being

16  used to pay Breaker Press when, in fact, you know from the

17  records that's false.  That money was put into a slot machine.

18  It was used by the defendant, but you would never know that

19  based on these records.

11:15:16  20        The check stub now is changed.  It's crossed out

21  "William Beavers" and "Breaker Press" is put in.  And, again,

22  because this money has long since gone and check number 335

23  can't actually be sent to Breaker Press, the defendant

24  completes the fiction by writing a personal check to cover the

11:15:39  25  rest of the invoice.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 67 of 143 PageID #:1842
opening argument - by Hamilton
1183

1       And again, the D-2 is false.  If you look at the D-2,

2   it looks as if Breaker Press was paid directly by the campaign

3   fund that $4,000, and that is the necessary part of the whole

4   fiction.  The Illinois State Board of Elections now has no idea

11:15:59   5   that the defendant actually had that money for 8 months before

6   any money was sent to Breaker Press.  On the face of the books

7   and records, the check stub, the D-2, the invoices, it looks

8   like this money was used to pay Breaker Press when you know it

9   was not.  The defendant personally used it.  And what you heard

11:16:22   10   from the treasurers is they relied on the defendant to tell

11   them how checks were used and what expenses to put down.  He

12   was directing them to do this.

13       This is not sloppy bookkeeping by the treasurers.

14   These are very intentional efforts by the defendant to keep

11:16:49   15   everybody, the treasurers, the State Board of Elections, and

16   the IRS in the dark about what he's really doing with that

17   money.  And, of course, it's not just these checks, he

18   reimbursed certain checks whatever ever explaining what he did

19   with the money in the first place.

11:17:08   20       Now, we went through the earlier checks that showed he

21   used the money to gamble and then later claimed he had

22   reimbursed money as unused campaign funds.  He lied to the

23   Illinois State Board of Elections about the quote/unquote

24   reimbursements.  You got these at Summary Chart 8.  We went

11:17:29   25   through this lie.  This money was not taken out for election

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 68 of 143 PageID #:1843
opening argument - by Hamilton
1184

1   expenses and then returned.  That's not what happened.  But on

2   the face of the records, that's what it looks like, and that is

3   the essence of Count 1, is that he's taking steps, he's making

4   efforts to make sure that the IRS doesn't know that he's

5   actually the one using this money personally.

6           We talked about all of the blank stubs and we went

7   through these.  You can look through all the pages and pages

8   with absolutely no explanation.  And again, this is done

9   keeping everybody in the dark.  He doesn't tell anybody what he

10  is using the money for.  And what does that allow?  It allows

11  him to then claim whatever he wants after the fact.  He doesn't

12  tell anybody at the time, he leaves his options open.  Maybe

13  later it was taken out of for election expenses and then

14  magically reimbursed, maybe later it was used for Breaker

15  Press.  The blank stubs are part of this Count 1, impeding the

16  IRS.  The books and records don't show what's really happening

17  with this money.  You've got all these on Summary Chart 6.  So

18  that's the evidence, just some of the evidence that proves the

19  defendant guilty beyond a reasonable doubt on Count 1, impeding

20  the IRS.

21          Now, I want to say one more thing about how the

22  defendant was keeping these books and records and what that

23  shows you.  What that shows you is that he knew that what he

24  was doing was wrong.  He knew he wasn't supposed to be taking

25  those checks, cashing them, and using them for whatever he

1   wanted.  He certainly wasn't supposed to be cashing checks to

2   replenish his losses from gambling.  And you know this because

3   at the time he takes the money, he doesn't tell anyone what

4   he's doing with it.  He never puts it on the checks, never says

11:19:49   5   anything about check stubs, never tells anybody to put it on

6   the D-2.  He says nothing about what he's actually done with

7   this money.  Treasurers have to keep a running list of the

8   unexplained checks.  He never says to them, "oh, that check?

9   Yeah, I cashed it and then I lost it at the boats" or "that

11:20:13   10   check, you know, cashed that check, I used it for something, I

11   don't really remember."  Instead, he uses invoices 8 and

12   10 months later after, almost a user after he took that money,

13   and used it as his own and then claims it as campaign expenses.

14       And to be clear, the defendant is not on trial because

11:20:36   15   he uses campaign funds as a personal slush fund.  He is on

16   trial because he used his campaign funds as a personal slush

17   fund and did not report it on his income tax returns.  He isn't

18   on trial because he cashed campaign checks and put the money

19   into a slot machine.  He is on trial because he cashed campaign

11:21:01   20   checks, put the money into a slot machine, and then didn't

21   report it on his tax returns.  He isn't on trial because he

22   took money and then later paid a vendor himself.  He's on trial

23   because he took campaign money for almost a year, totally

24   unexplained, and then made up a fiction about what had happened

11:21:25   25   to that money and never reported it on his tax returns.

1      Now, we heard a lot from defense counsel in opening

2  statement about the defendant's long history as a public

3  servant and I anticipate we may hear more about that in the

4  defense counsel's closing argument.  There is no doubt that the

11:21:46   5  defendant has spent the last 30 years as an elected public

6  official.  As an alderman and as a Commissioner, this defendant

7  oversaw numerous things that taxes are used for each and every

8  day.  And this defendant spent most of his adult life being

9  paid his salary by the taxpayers.  He understands and he knows

11:22:17  10  first hand the importance of paying taxes.  He knew he was

11  required to report his personal use of the campaign funds.  In

12  2005, when he did report it, he got smacked with a substantial

13  tax bill that took him years to pay off and he decided he

14  wasn't going to let that happen again.  He decided the rules

11:22:44  15  shouldn't apply to him, so he kept using the campaign funds.

16  He personally took almost $300,000 from those campaign funds

17  over 3 years, most of which he put into a slot machine and a

18  big chunk of it he used to more than double his own pension.

19  That was personal use and he knew it should've been on his tax

11:23:10  20  return.  And he also personally used $30,000 from Cook County

21  above and beyond the salary he already received.  He made an

22  intentional decision on all of that money to keep it off his

23  tax returns.  That's what this case is about, that's what the

24  evidence has shown you.  The government asks you to return the

11:23:32  25  only verdict consistent with the evidence you have in this case

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 71 of 143 PageID #:1846
closing argument on behalf of defendant
1187

1  and it is guilty as charged.

2  THE COURT:  We will recess.

3  THE MARSHAL:  All rise.

4  (The following proceedings were had out of the

11:24:15  5  presence of the jury in open court:)

6  THE COURT:  Somewhere between 10 and 15 minutes.

7  You can be seated in the courtroom.

8  Counsel will approach.  Go to the side.  Off the

9  record.

11:24:33  10  (Sidebar conference had off the record).

11  (Recess.)

12  THE MARSHAL:  All rise.

13  (The following proceedings were had in the presence of

14  the jury in open court:)

11:44:00  15  THE COURT:  Please be seated.

16  You may proceed.

17  MR. S. ADAM, JR:  Thank you, Your Honor.

18  CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

19  BY MR. ADAM, JR:  Commissioner, counsels, government,

11:44:15  20  Your Honor.

21  Ladies and gentlemen of the jury, I know you all know

22  this is the last time I get to talk to you.  In a lot of these

23  cases, the drive, no personality to 'em, there's no -- there's

24  no feel for them, but that's not this case.  Many people think,

11:44:36  25  ah, you're sitting on a jury for a tax case, wake me up when

closing argument on behalf of defendant

1    we're done.  That hasn't been this case.  And I'm not going to

2    talk to you like that is this kind of case.  I'm not going to

3    stand here and put up a PowerPoint that 17 or 18 agents worked

4    on for 3 and a half years since they had this case.  I'm not

11:44:58   5    going to sit here and push buttons and so that they can come up

6    and blow up big things on here, because that's not this case.

7    And you guys, you're honest yourselves, know this, this case is

8    simple.  It's not hard, it's simple.

9    And yesterday, the very last question from the very

11:45:23  10    last witness, the very last day of testimony, broke this case

11    down to what it is.  Vic, my partner, stood right here, a

12    little bit of New York swag, and he asked that witness--their

13    expert, their man from the IRS, who had more degrees than you

14    could count.  He was a lawyer, tax, CPA, IRS judge, IRS

11:46:00  15    appellate judge--and he broke this case down to where we're at

16    today with one simple question and one simple answer, "does a

17    loan really depend upon the intent of the parties?"  And he

18    said, right there (indicating), what this case is about, "it

19    comes down to the intent of the parties," and that is this

11:46:28  20    case, period, bar none, nothing else.

21    You don't have to worry about anything else, because

22    if I'm standing here and at the end of when I'm done talking

23    you guys say, "Sam, you're full of it," who are you kidding?"

24    there's nothing more I can say.  But at the end of this case if

11:46:48  25    you say to yourselves the government never proved to me beyond

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 73 of 143 PageID #:1848
closing argument on behalf of defendant

1189

1　a reasonable doubt that when Commissioner Beavers wrote every

2　single one of those checks, every single one to himself, every

3　single one of those checks made out at his bank, every single

4　one of those checks paid back!

11:47:12　5　　　　Think about that.  The government just said that in

6　her opening statement about Breaker Press, when he got the

7　receipt, it was paid back later.  They're using the term "paid

8　back."  If that's the case -- and we all know that he didn't

9　try to hide any check, that every check was made to him.  The

11:47:37　10　intent of the parties when we're talking about criminal action,

11　that's what we're talking about here.  She just told you.

12　We're not on trial here because he took money out of the

13　campaign fund, we know that because it's legal.  We're not on

14　trial here, as she just told you, because he gambled the money.

11:47:57　15　You know why?  Because it's legal.

16　　　　Andy Nauman told us right from that stand we're not on

17　trial here because the Illinois State Board of Elections,

18　because you can borrow money from your campaign funds.  You can

19　borrow money.  And she just told you we're not here because he

11:48:14　20　borrowed money.

21　　　　This case is, and I stood right here in opening

22　statement and told you, it ain't about taxes, it ain't about

23　gambling.  This case is about whether or not Commissioner

24　Beavers broke a single, solitary law when he borrowed money and

11:48:38　25　paid it back and intended to pay it back.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 74 of 143 PageID #:1849
closing argument on behalf of defendant

1190

11:48:58

1      I have one question, just one question, if I am wrong
2   in this proposition, if I'm not being honest with you in this
3   proposition, you name one person that you know when you're
4   going back there and deliberate, one person that you know that
5   takes income and pays it back.  Name one time it ever happened
6   in your life.  You got a paycheck from your employer but you
7   gave it to back to him.  You name one time in your life where
8   someone came over to you and said keep this, this is income to
9   you and you pay it back.  You name one time where you filled

11:49:17

10   out a deposit slip and put the money into your account, one
11   time, and you said, you know what, I'm going to given this back
12   to the person who hired me.  You don't give back income, you
13   keep it.

14      Yet everything in this case from day one to as I stand

11:49:37

15   here right now and as Matt Getter will get up here in a second
16   in his closing, everything in this case tells each and every
17   one of you when he wrote those checks he intended to pay them
18   back, and you know that from their evidence, from their checks.

19      I'll show you what I'm talking about.  I'll give you

11:50:03

20   an example on the hundred checks that we're talking about.
21   They want to focus on April 9th, April 9th, April 9th.  Let's
22   take a look here.

23      If you look at the top check here (indicating), that's
24   check number 1862.  March 8th of 2007, $2,000 written out to

11:50:32

25   who?  William Beavers.  Then you go to the next one, 1863,

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 75 of 143 PageID #:1850
closing argument on behalf of defendant

1191

11:51:02

1    March 31st, 2007, $2,000.  Who's it made out to?  William

2    Beavers.  1866, April 5th, 2007, William Beavers, $2,000.  The

3    next one, 1867, William Beavers.  April 9th, $2,000.  The next

4    one, April 9th, $2,000.  The next one, April 18th, $2,000.  The

5    next one, April 19th, $4,000.  Now, look at that, look at those

6    checks right there (indicating).  Every single one of those

7    checks borrowed by William Beavers.  Every single one.

8          And how do we know it, ladies and gentlemen?  How do

9    you know what I'm telling you is true?  By their evidence.  In

11:51:23

10   the longest period of time, 2 and a half months he paid back

11   the campaign $16,000 on May 31st, 2007.  16 grand out of his

12   own pocket he puts back in and they tell you it was to pay off

13   these checks, to reimburse those checks.

14         Now, I beg -- which begs the question, if I'm wrong,

11:51:46

15   if I'm wrong, what evidence do you have that he was doing this

16   for a secret purpose?  We know when the IRS got involved in it.

17   And Ponzo told you that, Ponzo told you when he came in on this

18   and it was after December 31st, 2008.  So when she just stood

19   up here and told you a second ago that he did this to hide from

11:52:08

20   the IRS, he was trying to impede the IRS, Ponzo told you he

21   wasn't involved in this as of December 31st, 2008.

22         So what's he putting the 16 grand back for if it's not

23   a loan?  You make Matt Getter get up here and tell you why he's

24   putting the money back if it's not a loan, if he's not

11:52:28

25   borrowing that money.  There's only one answer in a criminal

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 76 of 143 PageID #:1851
closing argument on behalf of defendant
1192

1　trial.  You gotta remember where we're at here.  Somehow this

2　whole thing got flipped out where we're supposed to prove to

3　you they are loans, which we have.  We got to remember where

4　we're at.  They have to prove to you beyond a reasonable doubt.

11:52:46　　5　They're not.  This whole thing has got flipped around here.

6　This whole thing is backwards.  When you look at what the IRS

7　and what these United States Attorneys have done in this case

8　with whom they called, this whole thing is flipped around.

9　　　　　Think about where you're sitting right now.

11:53:03　10　Seriously!  I'm not joking.  We're sitting in the United States

11　Federal District Court.  We're talking about the United States

12　of America.  The best darn country there is in this world.  The

13　toughest country there is in this world.  And who does the IRS

14　bring in here and where their case rises and falls, sink or

11:53:32　15　swim?  That's here, rise or fall, sink or swim, but we do it

16　together.  And that's what the United States of America has

17　said with Agent Ponzo, this case will rise and fall, sink or

18　swim on Agent Ponzo.

19　　　　　They can get the best expert in the world from U. Penn

11:53:54　20　or Morgan School of Business and who do they bring in here?

21　Ponzo who can't even pass the accountant's exam.  The United

22　States, the best thing they can do is get a guy who can't be an

23　accountant to do their accounting.  The best thing they can do

24　is get a man in here who can't be an accountant, who can't pass

11:54:15　25　the test to be an accountant, to tell other accountants what

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 77 of 143 PageID #:1852
closing argument on behalf of defendant

1193

1  they're supposed to do.  That's as backwards as it gets.

2  That's like Lindsay Lohan telling Betty Ford on how to tell

3  people get off drugs.  We talk about football and sports,

4  honestly, that's like Willie Smith telling Phil Jackson how to

11:54:36  5  win championships.  They got a guy here who can't even pass the

6  exam.

7        And if I'm wrong, if I'm wrong, remember their paper.

8  This is a paper case, a paper case, remember their paper.  You

9  have to know, each and every single one of you, that Agent

11:54:56  10  Ponzo told you the truth, that Agent Ponzo filled it in, that

11  Agent Ponzo had 3 and a half years, he told you that, to go

12  through the records.  He looked at the personal records, that

13  he looked at the banking records, he looked at the D-2's, that

14  he looked at the campaign records, all right.  So in 3 and a

11:55:16  15  half years, their guy, their man, should have it right on a

16  date they picked --

17        MS. HAMILTON:  Objection.

18        THE COURT:  I'm sustaining the objection and I'm

19  sustaining the objection because you're not talking about the

11:55:59  20  evidence, you're talking about what lawyers did and lawyers are

21  not witnesses.

22        MR. S. ADAM, JR:  Yes, Your Honor.

23        May I proceed, Your Honor?

24        THE COURT:  You may.

11:56:11  25        MR. S. ADAM, JR:  On a date Agent Ponzo picked,

closing argument on behalf of defendant

1194

1    April 9th.  You guys have your books, I think.  If you guys

2    have your books, if you could turn to Chart 4.

3          I'm not sure it's clear up here (indicating).  What

4    this is about is whether or not you can trust beyond a

11:56:43    5    reasonable doubt Agent Ponzo and his paper.  After all, he is

6    the IRS agent who did this.

7          Now, take a look at the very beginning of Chart 4 that

8    they gave.  If you look here (indicating), and this is why it's

9    highlighted, right here it'll show you the level for cash

11:57:02    10    (indicating).

11          Now, Agent Ponzo was up on that stand and told us that

12    on April 9th 3 checks were written by William Beavers and then

13    he went to the casino right after that and gambled and lost,

14    then he went back and got more checks and lost, and that he

11:57:17    15    went back and got more checks and then eventually ended up

16    winning, that's what Agent Ponzo told you here.

17          But the question is here, what they're trying to show

18    you is, the reason he had to get money was because he was

19    losing all day long, continued to lose.  And he told you these

11:57:35    20    were the complete set.  He went through this and showed you it

21    was the complete set of records.  So let's find out if he's

22    telling the truth or not.  Let's see if he's right.

23          What the accountants told you here, all of them, is

24    that when you go gambling and you win a jackpot of $1200 or

11:57:52    25    more, you get a W-2G; it's a jackpot.  And so if you look here,

closing argument on behalf of defendant

1195

1  on the third line down here, where the very first one says

2  "cash jackpot," isn't that right?  Well, here's the W-2G

3  (indicating).  You're going to have these in evidence, "cash

4  jackpot."  Look in your book at 2:46 p.m., it should say

11:58:13  5  1738.80, here it is right here (indicating).  Let's go to cash

6  jackpot, 3:26, it should be for 1449, W-2G.  Go to 5:10, 1449,

7  should be on the next page, here is the W-2G.  5:31, $3,477,

8  right here, here's the W-2G.  I want you to look at 6:07,

9  $3477.60, W-2G.  Go to the next one, these are winnings, 6:54,

11:58:58  10  $3,477.60, there is the W-2G.  7:00 o'clock, $1,738.80, here is

11  the W-2G.  7:10, $2,318.40, here is the W-2G.  9:15, $2,318.40,

12  here is the W-2G.  And lastly, 10:38, $2,889, here's the W-2G.

13  Now, what I want you to do, for April 9th of 2007, go

14  to 7:38.  Look for 7:38, and it's not on there.  April 9th,

11:59:58  15  2007, $1,738, here's the W-2G.  Why don't you guys look for

16  8:23, it ain't on there.  Here's the W-2G, $1,738.80, Ponzo

17  missed it.  Why don't you guys turn right now to 8:29.  Look

18  for 8:29, it ain't on there, Ponzo missed it, $1,738.80,

19  there's the W-2G.  April 9th, 2007, why don't you turn to 9:32,

12:00:42  20  it ain't on there, Ponzo missed it, $1,449.  Why don't you turn

21  to -- oh, 9:29, a second one, 4/29/07, Ponzo missed it, $1,449.

22  Next one, 9:46, another jackpot, $1,449, Ponzo missed it.  Next

23  one, 10:05, $5,796, Ponzo missed it.  And lastly -- oh, no, no,

24  I almost made a mistake there, I'm not going to do that to you.

12:01:25  25  Ponzo missed all the ones I already told you about.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 80 of 143 PageID #:1855
closing argument on behalf of defendant

1196

1    Now, how can you trust a thing he tells you about

2  gambling?  How can you trust a thing?  They didn't pick that

3  date, Ponzo did.  He picked April 9th and they're hiding that

4  from you.  They're hiding the fact from you that he didn't need

12:01:42    5  campaign funds, that's $15,900 he didn't account for on the

6  very day he picked, 15 grand.  You know what you can do with 15

7  grand?  You know how much gambling you could do with 15 grand?

8  You certainly don't need 3 checks of 6,000 to do it.  He had

9  $15,900 that they purposely -- strike that.  Sorry, Your Honor.

12:02:07   10  That Ponzo purposely didn't put down.  And if I'm wrong about

11  that, you got those records, they're those W-2Gs, you look for

12  'em, and then make Matt Getter get up here and tell you why

13  those jackpots aren't on there if I'm wrong.

14    How can you trust a thing with Ponzo, the whole thing?

12:02:23   15  And I don't mean to be coy about it, I'll just say, it's a

16  Ponzo scheme, that's what this is!  And if I'm wrong, and --

17  well, if the government has the burden beyond a reasonable

18  doubt, how can you trust him?

19    They sat here and put in all of these gambling records

12:02:44   20  and it's you, they want to make you a part of it --

21    MS. HAMILTON:  Objection.

22    THE COURT:  It's really important that you stick to

23  the evidence instead of personal attacks on your opposing

24  lawyers, and I don't want to start that war.

12:03:04   25    MR. S. ADAM, JR:  I understand, Your Honor.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 81 of 143 PageID #:1856
closing argument on behalf of defendant
1197

1      Ponzo.  Now, you look at all those charts.  And if I'm

2    wrong, I'm wrong, but I gave it the best shot we got.  Can you

3    trust any of them now?  Any of them?  And if you can't trust a

4    single one of 'em, can you convict him beyond a reasonable

12:03:29    5    doubt?

6      Can you say, we know, Sam, that the government doesn't

7    even claim he took a dime of taxpayer money, we know that.  We

8    know the government doesn't even claim taking money out of the

9    campaign fund is illegal, she just told you that.  I know that

12:03:52    10    they called up Agent Ponzo and vouched for him and now you

11    can't believe any of that.  Can you really find him guilty

12    beyond a reasonable doubt after that?

13      And we know one thing, and I told you when I started

14    this, the one person, the one person who comes from their camp,

12:04:15    15    who works for the IRS, who has those degrees, they put up

16    yesterday, right there, put him up.  And what did he tell you?

17    "They didn't show me any records."  The one guy who's qualified

18    to do it, the one guy who has the degrees to do it is the one

19    guy who was never shown a document --

12:04:33    20      MS. HAMILTON:  Objection.

21      MR. S. ADAM, JR:  He said that.

22      THE COURT:  Look, I've sat through lots of trials and

23    when you go down this path, they're going to stand up and there

24    are probably some things they can say about you and some things

12:04:50    25    they can say about the trial tactics in this case and they have

closing argument on behalf of defendant

1198

1    the last word.  Just confine yourself to the evidence that was

2    presented and not what somebody's motive was in presenting one

3    piece of evidence or another piece of evidence.  The important

4    thing for this jury to do is focus on what the evidence is and

12:05:14    5    what may be missing.

6                    MR. S. ADAM, JR:  Yes, Your Honor.

7                    THE COURT:  And you're getting very close to personal

8    attacks and that's not the way to go.

9                    MR. S. ADAM, JR:  Yes, Your Honor.

12:05:24    10                    THE COURT:  So I'm ordering you not to do it anymore.

11                    MR. S. ADAM, JR:  Yes, Your Honor.

12                    If I said something to you that's not in the evidence,

13    disregard it, please.  Let's stick to it.

14                    The expert yesterday took the stand and said he didn't

12:05:37    15    see any of the documents, that's in evidence.  He sat there and

16    said "they called me Friday," that's in the evidence.  He said

17    when he sat up that "I talked to them, I don't know if Agent

18    Ponzo was on the phone or not, but I talked to all the

19    lawyers," they still didn't show him anything.

12:05:57    20                    MS. HAMILTON:  Objection.

21                    MR. S. ADAM, JR:  That's in the evidence.

22                    THE COURT:  Look, they offered evidence and you have

23    to argue on the evidence they offered, and that's all.  Lawyers

24    are entitled to make judgments about what evidence they

12:06:15    25    introduced, you are entitled to make decisions about evidence

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 83 of 143 PageID #:1858
closing argument on behalf of defendant

1199

1    they introduced, then the jury decides whether the evidence

2    that the lawyers have chosen to produce proves or does not

3    prove something.  What you're trying to do is to draw

4    implications from evidence that nobody has introduced; don't do

12:06:40    5    it.

6         Do you want to take a short break, maybe consider what

7    you --

8         MR. S. ADAM, JR:  No, no, Your Honor.

9         THE COURT:  No, no, I just -- I don't want to

12:06:50    10    interrupt your momentum with respect to an argument.  If you

11    want to take a few minutes, I'll give you a few minutes, and

12    you may want to change your outline, it's up to you.  Answer

13    yes or no.

14         MR. S. ADAM, JR:  No, Your Honor.

12:07:03    15         THE COURT:  Go ahead and proceed.

16         MR. S. ADAM, JR.:  I'll try to stick to the evidence.

17         The evidence in this case -- you know what?  I take it

18    back.  His Honor is right.  You stick to the evidence.  You

19    stick to it.  You stick to see if I'm wrong about Agent Ponzo

12:07:20    20    and what he presented here in court.  You stick to see if the

21    guy that came in here yesterday, the expert that the government

22    put on, since there's no personal attacks, the government put

23    on, you stick to see what you recall of how many documents he

24    looked at and then decide whether or not I'm sticking to the

12:07:39    25    evidence.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 84 of 143 PageID #:1859
closing argument on behalf of defendant

1200

1                The evidence in this case is clear, those hundred

2        checks, as plainly spoken as can possibly be, was borrowed

3        money.  And you know that because, according to the opening

4        statements by the government, was paid back.

12:07:59   5                Now, I remember standing here and telling you, in

6        opening statement, percentages.  Think about what Agent Ponzo

7        testified in this case about percentages.  "Oh, I didn't do

8        it"!  Think about what he said about whether or not when he

9        went to Mr. Beavers' personal accounts how much personal money

12:08:18   10       he took out at the casino.  Well, I really didn't do an

11       analysis until Aaron pinned him down:  Isn't it possible it was

12       111,530 bucks, $111,530 taken out at the casino, at the ATM, by

13       Commissioner Beavers.  And do you know how much money of that

14       came from the campaign fund?  Not one dollar.  What did Agent

12:08:52   15       Ponzo tell you about past checks?  "Well, I really didn't do an

16       analysis on it, but yes, 250,000 taken out in cash by

17       Commissioner Beavers in those 3 years."  That's his gambling

18       money.  That is his gambling money.

19                And if I'm wrong, let's suppose I'm wrong, let's say

12:09:21   20       that this 71 at the time in 2006, 72 in 2007, 73 in 2008, that

21       this 73-year old man was taking those checks and gambling with

22       them.  First and foremost, we're talking law, and everybody

23       agrees in this case that you can take a loan out, and every

24       check that they came in here with was written out to him.  So

12:09:48   25       it was borrowed money, every single one of them.  But think

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 85 of 143 PageID #:1860
closing argument on behalf of defendant

1201

1  about April 9th, if it's to be believed, 71 year old man heads

2  over to the casino and starts to gamble and runs out of money,

3  according to this theory, and what does he do?  Does he run

4  over to the cage where he knows Jack Guerrero who came in here

12:10:13  5  and said "I know him, I worked in the cage, and cashed a check

6  from the campaign"?  No.  Does he go over to one of the 32?

7  Remember she said, "32 ATM" and runs the card to take money out

8  of the cash machine from the campaign?  No.

9  What do they tell you he does?  A 71 through 73 year

12:10:29  10  old man gets up, leaves the casino, leaves Indiana, goes over

11  to Illinois, and cashes a check from the campaign fund made out

12  to him and he goes back to the casino to continue to gamble, if

13  you believe their theory.

14  But that's not enough.  As he gambles some more, he's

12:10:55  15  got to get up, leave the casino, leave Indiana, go back over to

16  Illinois, get a campaign check, write it out to himself, cash

17  it in his bank, and he goes back to the Horseshoe!  Now, why

18  would anybody do that?  Why?  If according to what the

19  government's theory is, what they just told you, he's not going

12:11:16  20  to report the money anyway.  According to the theory that they

21  just told you, he's not going to put it on the D-2's.

22  According to the theory that you just heard, he's not going to

23  let the Illinois State Board of Elections know any of this.  So

24  why would a man who's not reporting it, who's not showing

12:11:32  25  anybody this stub, who, according to them, is not telling

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 86 of 143 PageID #:1861
closing argument on behalf of defendant

1202

1  anybody, get up at age 71, 72, and 73, leave the casino and do

2  these things?  It's simple!  He wasn't gambling with the money.

3  His office, as they put up a hundred times, is right on 79th

4  Street, and this is during election time on April 9th of 2007.

12:11:58   5  He's getting the money around the election area.  That's what

6  politicians do.  And if I'm wrong, if I'm wrong, how can Agent

7  Ponzo, how can every witness come in here and tell you "I don't

8  know if that money went in the casino or not" "I don't know if

9  that money went into a slot machine or not."

12:12:21  10      Remember, I don't have to prove a thing to you.  I

11  really, truly don't.  Commissioner Beavers doesn't have to

12  prove a thing to you.  He really, truly doesn't.  In fact,

13  you're going to see that in an instruction.  They have to prove

14  to you beyond a reasonable doubt that that money went into the

12:12:37  15  casino and that that money went into the slot machines, and

16  they told you they can't.

17      And you want to know the truth?  The absolute truth?

18  Is even if it did, that's not a crime.  Even if it did, even if

19  what he did was go write a check to himself so that it's made

12:13:00  20  out to him so that he could take a loan, so that he could go

21  gamble, as long as it was in his mind to pay it back, that's

22  not a crime.

23      Remember, I love him and I hope I don't offend anybody

24  about this, but he had that beautiful, gorgeous, thick African

12:13:19  25  accent, and remember the one who does his taxes, and one of the

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 87 of 143 PageID #:1862
closing argument on behalf of defendant
1203

1  questions he was asked was "is there any line there in the

2  forms for loans" and he said, "no, no, it's not taxable."

3  Remember, it was a beautiful, thick African accent, "no, it's

4  not taxable." And that's this case. When you go back into

12:13:39  5  that jury room and you begin to deliberate, start with that,

6  "no, it's not taxable."

7      I mean, I don't mean to make fun here, but we're

8  talking about a Commissioner in Cook County charged by the

9  United States of America. And if loans are not taxable, they

12:13:56  10  can't show you that one dime went into the casino that they

11  spent four days proving up? And that's proof beyond a

12  reasonable doubt? And every single one of those checks written

13  out to him?

14      But one of the things I did tell you in opening

12:14:12  15  statement was, I was going to be able to show you that

16  according to their calculations, according to what they say, in

17  2006, 98 percent was either in receipts or paid back. In 2007,

18  80 percent was either in receipts or paid back. In 2008, 76

19  percent either used as campaign funds or paid back.

12:14:51  20      Remember Agent Ponzo? "I don't do percentages." They

21  got the one, the one IRS agent that can't even add and

22  subtract. He couldn't even do a subtraction sitting in the

23  seat of $1400 from 96,000. But I did it.

24      We'll go year by year. 2006, this is their evidence,

12:15:25  25  $96,000. They say he left in his pocket $1,482.67, which

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 88 of 143 PageID #:1863
closing argument on behalf of defendant
1204

1　leaves 94,517.33.  All you have to do is divide $94,517.33 by

2　96,000 and you get 98 percent paid back or used for campaign

3　funds.

4　　　　　　　2007, $69,300.84, the evidence in this case says he

12:16:02　5　was left with $14,150.62, which leaves $55,150.22.  All you

6　have to do is divide $55,150.62 by 69,300.84, 80 percent --

7　really?  Okay, that's not true.  It's 79.70 percent, I rounded

8　it off to 80.

9　　　　　　　2008, $61,000, left in his pocket $14,552.11 which

12:16:30　10　leaves $46,447.89, 76 percent.

11　　　　　　　And when you do the math on all of it, $226,300.84,

12　and they say he left in his pocket $30,185.40, that leaves

13　$196,115.44, and when you do the calculation that's 86.6

14　percent.

12:17:01　15　　　　　　　Now, I went over that with you in opening.  If I'm

16　wrong, then there's nothing I can do about it.  But what do you

17　call it when someone writes out checks to themselves and pays

18　back or legitimately uses 86.6 percent of the money?  Is that

19　income?

12:17:28　20　　　　　　　If you listen to the opening statement here today, the

21　theory is he should've reported that 86.6 percent.  Do any of

22　you believe that?  Is that what the law is?  And if not, if we

23　use those calculations, and we all agree because they were

24　either paid back which would make them legitimate loans or used

12:17:54　25　for campaign funds, they're not income.  That means he had the

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 89 of 143 PageID #:1864
closing argument on behalf of defendant
1205

1    intent at the time he wrote the checks to pay it back.

2         And if he had the intent at the time of writing the

3    check, what did the very last expert say yesterday?  It's the

4    intent of the parties that determines whether it's a loan.

12:18:17    5    Now, that's not proof beyond a reasonable doubt except for one

6    thing, it does prove one thing beyond a reasonable doubt, is he

7    borrowed the money and intended to pay it back.  And this whole

8    thing comes down to, because by December 31st of 2008, it

9    hadn't all been paid back, but you know from the calculations

12:18:42    10   he got credit in 2006 for things that were written in 2007 and

11   it gave him credit for things in 2007 that were paid back in

12   2008.  So in 2008 what does he get credit for?  We don't know.

13             MS. HAMILTON:  Objection.

14             THE COURT:  The objection to that is sustained.

12:19:08    15             MR. S. ADAM, JR:  And I ask you, is that proof beyond

16   a reasonable doubt?  Are you guys looking at me and saying,

17   "Sam, dude, what are you talking about?  That's just not

18   reasonable"?  You know it is --

19             MS. HAMILTON:  Objection.

12:19:32    20             THE COURT:  The objection is sustained.

21             MR. S. ADAM, JR:  You will have to make that

22   determination.

23         Well, let's talk about the contingency fund.  $1200 a

24   month, every month, that went out.  Every month Cook County

12:19:50    25   knew it went out because they sent the check.  Every month the

closing argument on behalf of defendant

1206

1       treasurer knew it came in.  So this idea that Commissioner

2       Beavers is hiding somehow that he's getting $1200 a month is

3       ridiculous.

4               Cook County sent him the form to fill out.  So to say

12:20:16    5       he's hiding this from the government is ridiculous.  Not only

6       did they send him the form, they sent it with a County employee

7       to get his answer.  So this idea that he somehow is hiding the

8       fact he's getting this money is ridiculous.  The young lady sat

9       right there and told you she put down "William Beavers will

12:20:40    10      take this as income" and went back and gave him the form to

11      sign and he signed it.

12              Now, at one point during the opening argument here is

13      that he's doing all these things and he's a Commissioner and he

14      knows better, yet when it comes time for the checks that he's

12:21:02    15      getting, he's somehow absolutely oblivious to the fact County

16      knows it.  Now, which Commissioner Beavers is it?  The one that

17      knows everything there is to know about taxes or the one who

18      hasn't figured out yet that when the woman came in with a

19      contingency slip she's not going to realize he put down he was

12:21:26    20      taking it for income.  That's ridiculous.

21              What's further ridiculous is, all Commissioner Beavers

22      had to do to keep the money, all he had to do to keep the money

23      is one thing, fill it out --

24              MS. HAMILTON:  Objection.

12:21:45    25              THE COURT:  The objection is sustained.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 91 of 143 PageID #:1866
closing argument on behalf of defendant

1207

1    MR. S. ADAM, JR:  This is the form (indicating).  In

2    evidence is this form (indicating).  In evidence is that the

3    form says "gasoline, oil, et cetera," "expense basis," in

4    evidence is on there "mileage rate," "basis" in evidence is,

12:22:02    5    nothing is written there.  In evidence is that there's parking

6    fees/tolls, "expense basis," nothing written there.  "Mileage

7    base rates," nothing written there.  Other, "other expenses,"

8    no specialization, just "other expenses," nothing written

9    there.  The one thing that's on the form that this man who

12:22:27    10    knows everything about taxes and knows how to hide the fact

11    he's taking taxes is the one statement that says he's taking it

12    as taxes.

13        But more than that, do you know what the opening

14    argument in this case just told you?  It was that he signed it

12:22:52    15    after he had done his taxes.  He had gotten away with it if

16    that was his purpose.  Even after his taxes are done, he's

17    informing the County he wants to pay taxes on it.

18        MS. HAMILTON:  Objection.

19        THE COURT:  The objection is sustained.

12:23:11    20    MR. S. ADAM, JR:  Well, maybe I need a sidebar so I

21    can find out what I can say.

22        THE COURT:  Sure.

23    (Proceedings heard at sidebar on the record.)

24        THE COURT:  Where did he say he wanted to pay taxes?

25        MR. S. ADAM, JR.:  She said --

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 92 of 143 PageID #:1867
closing argument on behalf of defendant
1208

                    1        THE COURT:  Where did he say he wanted to pay taxes?

                    2        MR. S. ADAM, JR.:  Write down, taking it as income.

                    3        THE COURT:  Oh, no, that's not the same thing as

                    4   saying you want to pay taxes.  What you're doing, what you are

12:23:46            5   doing is not reciting, you are not reciting what he said, you

                    6   are changing the words that came into evidence and I don't want

                    7   you to do it.  So I sustain the objection.

                    8        MR. S. ADAM, JR.:  Your Honor --

                    9        THE COURT:  We are done.

12:23:57           10        MR. S. ADAM, JR.:  Yes, Your Honor.

                   11   (Proceedings resumed within the hearing of the jury.)

                   12        MR. S. ADAM, JR.:  I will read verbatim what is in,

                   13   "Commissioner Beavers will claim his fiscal year 2007

                   14   contingency as income" signed "William Beavers," that's what's

12:24:34           15   in evidence.  You can take from that what you will.  You can

                   16   take from that whether if it's signed even after his taxes have

                   17   been done by Achusim, what that means.

                   18        You can take from that what you know that he could've

                   19   gotten away with it and he still does it, what that means.

12:24:55           20   That's this case, plain and simple.  And for you to have this

                   21   (indicating) and still say that it's proof beyond a reasonable

                   22   doubt as to what was in his mind when he got those checks can't

                   23   be done.

                   24        He never -- strike that.  The evidence in this case

12:25:23           25   suggests that when he gave this form to his employer and those

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 93 of 143 PageID #:1868
closing argument on behalf of defendant
1209

1  funds didn't show up on the W-2, he doesn't know it.  How do we

2  get to that?

3       I told you in opening statement that in 2006 he had 50

4  plus W-2's and W-2Gs, in 2007 he had 50 plus -- or 50 plus

12:25:59  5  W-2's and W-2Gs.  He had 50 plus in 2008 W-2's and W-2Gs.  This

6  right here (indicating), as I am showing you, this right here

7  are the W-2Gs for 2007 alone, just alone 2007, the W-2 that

8  came in is mixed in with everything else.  As Achushy told you,

9  "oh, we just went downstairs and got it from him."  Remember?

12:26:42  10  Remember how he got his taxes?  Remember how he went over his

11  taxes?  The Commissioner would drive by, he would run down,

12  hand him an envelope, and go, and then when he came back he did

13  it, signed and sent it out with this in here (indicating).

14       Now, what the government this morning told you is not

12:26:59  15  how I recall his testimony.  And I want you to recall the

16  testimony as to what Achushy -- I call him Achushy, Achusim --

17  I can't say it, Achusim, what he told you regarding the one

18  time in those 3 years he got a call from Commissioner Beavers

19  regarding the withholding.  My recollection and you have to

12:27:23  20  have your own is, he said he got a call from Commissioner

21  Beavers and had to go over and pick up two W-2Gs.  He got the

22  call to go pick them up.  And what does that mean?  How does

23  that differ from what the government told you?  He didn't go

24  through tax forms and see that he was missing some

12:27:48  25  withholdings.  I'll put it over here (indicating).  He had the

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 94 of 143 PageID #:1869
closing argument on behalf of defendant

1210

1    two W-2s in his hand and the W-2s show, if you look right here,

2    "state income tax withheld."  So as he's seeing the W-2G he

3    says, according to Achushy, "oh, did you take out enough on

4    taxes?"  Remember that?  He's got the W-2Gs in his hand.  It's

5    not that he withdrew and saw his taxes.  That's not what he

6    said.  He had to go pick up the W-2Gs.  So the evidence in this

7    case does not suggest Commissioner Beavers is going through his

8    taxes.  Commissioner Beavers forgot extra W-2 winnings he has

9    to pay taxes on.  That's him giving them to Achushy for more

10   taxes.  Is this a corrupt endeavor for him to not pay more

11   taxes?

12        When you look at these W-2Gs, look right on them,

13   "gross winning" you have to pay federal income tax on it.

14   "Gross winnings, $2,000," you have to pay federal income tax on

15   that.  By pointing out the withholding, he had to pay more on

16   his taxes.  But this is a corrupt endeavor!

17        Those contingency checks, in plain view, he was taking

18   it as income, which begs the question, did he have the intent,

19   did he have the intent to file false tax returns?  Did he have

20   that intent?  That's what this case -- I told you when I

21   started, did he have the intent to not pay taxes.  And the

22   answer is clearly no.  And you'll have to be satisfied beyond a

23   reasonable doubt not that I tell you this, you have to be

24   convinced beyond a reasonable doubt that they proved to you he

25   did, and that's not this case.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 95 of 143 PageID #:1870
closing argument on behalf of defendant

1211

1          $68,763.07 check is borrowed money.  I can't say it

2    any simpler than that.  It comes from his campaign fund

3    directly to the pension fund, directly to it.  Now, that is

4    borrowed money.  And how do we know that?  Because as Aaron

12:30:42    5    Goldstein brought out, there's $19,500 paid back into the

6    campaign fund that's attributable to the $68,763.07.  If you

7    recall, Aaron, beautiful cross-examination, put it right up

8    here and went through with Agent IRS Ponzo and went through it,

9    there was "$8500, not attributed," there was "11,000, not

12:31:13   10    attributed," but yet all paid back by Commissioner Beavers by

11    2000 -- -- strike that, by December 31st of 2008.  That's him

12    paying back on the $68,000 loan.

13          Now, did he borrow a significant amount of money?

14    Sure.  But he's repaying it, and he's repaying it on the

12:31:34   15    68,000.  And if I'm wrong, did they prove to you beyond a

16    reasonable doubt that he wasn't?  All of the checks, you see

17    them, I don't have to go through them with you, all the checks

18    going from here to here, him reimbursing go to the $68,000 loan

19    that he took.  That's this case.

12:32:09   20          I very rarely use notes.  So if this distracts you, I

21    apologize.  I very rarely use them, but I don't want to miss a

22    point.

23          What else do we know?  Because I did, I missed one.

24    What else do we know?  We know what payments are on the 68,000.

12:32:30   25    And you know what that is?  Void checks.  Remember who came in

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 96 of 143 PageID #:1871
closing argument on behalf of defendant

1212

12:32:53

1  here and testified?  Vetrice Coleman, the treasurer.  Remember

2  what she said?  And this goes across-the-board on the corrupt

3  endeavor to the $68,000 check to the hundred checks.  Remember

4  what she told you?  Remember whose system the bookkeeping was

5  in this case?  It was not the Commissioner.  Remember how many

6  times Floyd Young and Vetrice Coleman told you the Commissioner

7  sat down at 70-plus years old and sat at the computer doing

8  D-2's?  Never; not once.  Do you remember how many times they

9  told you Commissioner Beavers came up with a plan on how to do

12:33:12

10  bookkeeping?  Never; not once.

11        Vetrice Coleman told you on direct examination that it

12  was her system.  She came up with void checks.  And what do

13  void checks mean?  It means money paid back by Commissioner

14  Beavers that she voided out.  I specifically asked her, "did he

12:33:32

15  tell you to do it that way?"  "No, that was my system."

16        And so if you look at what Aaron had done, that's

17  another 15 or 16, 17,000 dollars paid back, according to a

18  witness who came in, and I had to cross-examine, that was paid

19  back to the campaign fund.  That's all paying back on the

12:33:55

20  loans.

21        You know, what happened here in this case, ladies and

22  gentlemen, is, somehow we got to break these things down by

23  areas.  But at 73 years old, this was payment he had to make

24  back on the loans he took.  And so some of them would go to the

12:34:17

25  hundred that he took, some of them would go to the 68,000, some

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 97 of 143 PageID #:1872
closing argument on behalf of defendant

1213

1     of them would go to Breaker Press.  He said, all right, I

2     borrowed this money, how do I pay that back?  Well, I can take

3     the money I owed here, I borrowed 4,000 here, I'll pay Breaker

4     Press $4,000 out of my own pocket.  We do that every day.  Just

12:34:32   5     yesterday my brother borrowed a hundred dollars from me.

6     There's no doubt I'm not getting that back, so we won't even

7     talk about that.  But it was an agreement between he and I.

8     Now, if he takes me to dinner and for a hundred dollars, we're

9     square; that's Breaker Press.  I borrowed 4,000, I paid Breaker

12:34:48   10     Press out of my own pocket, we're square.  This isn't a Fortune

11     500 Dollar company.  This is now a 78-year old Commissioner

12     who's not doing the bookkeeping.

13           Which begs the final question, after this is that

14     proof beyond a reasonable doubt that that man sitting right

12:35:13   15     there, right there (indicating), Commissioner, alderman, trying

16     to intentionally have some endeavor not to pay it back?  Was

17     this a man who got some loans, paying them back when he could,

18     paying back the IRS when he could, was paying back the money he

19     borrowed when he could?

12:35:42   20           You know, everything today in the opening statement

21     and in the opening argument, it really was, it was good, it was

22     great.  It was a very good opening argument except for one

23     thing, that completely works if he's not paying it back.  For

24     once you see he's trying to pay it back and may--and I told

12:36:11   25     you, we'd be honest about it--may have a problem, may, may have

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 98 of 143 PageID #:1873
closing argument in rebuttal - by Getter

1214

1  a gambling problem, but he's trying to pay it back, and in a

2  criminal trial it's the intent.  Remember, a loan is not

3  taxable.  If he's trying to pay it back, he's not a criminal.

4  If he's trying to pay it back, he's not guilty.

12:36:44   5  Commissioner Beavers may have gotten over his head,

6  but it had nothing to do with the IRS.  It had everything to do

7  with a problem.  And that's not criminal.  Send that 78-year

8  old man off.  They didn't prove anything to you beyond a

9  reasonable doubt.  Thank you.

12:37:11   10  CLOSING ARGUMENT IN REBUTTAL

11  BY MR. GETTER:  Ladies and gentlemen, the defendant

12  knew the rules.  He was an experienced politician who had been

13  an elected official for more than 20 years.  He had raised a

14  lot of money for his campaigns and he had spent a lot of money

12:38:12   15  for his campaigns, and he knew the difference between spending

16  the money -- spending money on your personal campaign -- excuse

17  me, between spending money on your campaign and spending money

18  on yourself.

19  But in 2005, everything changed.  In that year he

12:38:27   20  reported $43,000 in campaign money that he took and he used for

21  himself, and he took a $27,000 hit from money he had to pay

22  back, and he vowed that wasn't going to happen again.  He

23  continued having to pay that money off well after December 2008

24  and he learned his lesson, it wasn't going to happen again.

12:38:50   25  Those monthly installment payments, they were on his mind every

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 99 of 143 PageID #:1874
closing argument in rebuttal - by Getter

1215

1    single month.  5, 600 dollars a month.  He wasn't going to let

2    this happen again.  That tax bill changed everything.

3            So starting in 2006 he was left with two options:

4    Option one, continue to use his campaign money but pay taxes on

5    it.  Option two, stop using his campaign money for himself.

6    But neither of those two options was acceptable to the

7    defendant.  So he chose a third path, option three, in this

8    context as opposed to a letter from MEA&BF, was to keep using

9    his campaign money but hide the fact that he was using his

10   campaign money so he didn't get hit with another tax bill, and

11   that, ladies and gentlemen, is why we're here today.

12           Now, Mr. Adam spent a lot of time in his argument

13   arguing that these were not loans.  Make no mistake -- excuse

14   me, arguing that they were loans.  Make no mistake, these were

15   not loans.  For money to be a loan, there has to be an actual

16   obligation to pay the money back.  If you get a mortgage from

17   your bank to buy a house, you get a mortgage agreement.  It

18   says how much you're borrowing, it says what the rate of

19   interest is going to be, it says how long you have to pay it

20   back, it sets out what happens if you don't pay the money back,

21   you lose your collateral or you pay a penalty, and you can get

22   sued if you default.  Even if you borrow less formally,

23   Mr. Adam borrowing from his brother, or anyone borrowing from

24   his neighbor.  If you tell your neighbor you need 1,000 bucks

25   to fix your car, you'll pay him back next month, you make that

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 100 of 143 PageID #:1875
closing argument in rebuttal - by Getter

1216

1 promise upfront.  You tell the neighbor can I borrow the 1,000

2 bucks from you, I will pay it back, I will pay it back next

3 month.  Even those less formal loans have an up-front agreement

4 with an intention and an obligation to pay the money back.

12:40:54  5          That's not what happened here.  The defendant did not

6 get loans in this case.  The defendant simply took the money

7 with no actual commitment to pay it back.  Sometimes he put

8 money back in, sometimes he didn't.  It was all up to him.  It

9 was his choice whether he was going to put money back in or

12:41:15  10 not.  There was no one else who was going to enforce that

11 promise because there wasn't a promise to enforce and there was

12 no one else to enforce it, it was all up to him.  That's not a

13 loan.  That is taking money that is income.

14          How do you know that these weren't loans?  Well, first

12:41:35  15 and foremost, he didn't tell anybody they were loans.  He

16 didn't tell his campaign treasurers they were loans.  The

17 campaign treasurers asked him what were these checks for.  They

18 prepared lists for him of these checks that he wrote to

19 himself.  They asked for an explanation.  They had to put a

12:41:53  20 reason down on the disclosure form for the campaign, they had

21 to explain why Mr. Beavers was taking the money.  But he didn't

22 give them explanations, and when he occasionally did it wasn't

23 true.  As treasurers, they needed to know the reasons for the

24 checks and he didn't tell them.

12:42:09  25          You remember the last question we asked Vetrice

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 101 of 143 PageID #:1876
closing argument in rebuttal - by Getter

1217

1          Coleman was "did the defendant ever tell you that any of these

2          checks were a loan" and she said no.  She was the treasurer.

3          If anyone had to know that he was borrowing $226,000 from the

4          campaign, it would be the treasurer who had to know.  But he

5          never told her.

6                    For all of those 100 checks, plus the 101, the check

7          that he to the pension fund from his campaign fund, not one

8          single time did he write the word "loan" on a check or

9          evidenced any other sort of obligation to repay it.  For all

10         101 of those check stubs, nothing, no evidence of a loan.  No

11         indication he had to pay it back.

12                    There wasn't a single loan document in the campaign

13         records.  You heard Agent Ponzo testify, he pored through those

14         documents, nothing.  Not a single loan document, not even an

15         IOU.  There was nothing showing any intent to pay the money

16         back at the time he took it.  He didn't tell the Board of

17         Elections that he had any loans.

18                    Now, we pointed out that in 2005 he did tell the Board

19         of Elections that he took out loans, and you'll have that 2005

20         D-2.  It says personal loan, personal loan, personal loan, but

21         he didn't do that in 2006 to 2008, not one time.  Why?  Why

22         Department he do that?  He didn't do it because they weren't

23         loans.  He didn't do it because he didn't want to be obligated

24         to pay the money back.

25                    You heard from Andy Nauman, he was tracking what the

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 102 of 143 PageID #:1877
closing argument in rebuttal - by Getter

1218

1    defendant was doing.  He was writing letters to the defendant.

2    He was calling the defendant.  He wanted explanations for this

3    money that was reimbursed because he didn't see any indication

4    of what the money had been for in the first place.  The last

5    thing the defendant wanted was to put loans down for 2006 to

6    2008 so that Andy Nauman would be calling him up and asking

7    when are you going to be repaying these loans.  If he doesn't

8    put it down as a loan, Nauman is not going to be asking him to

9    pay it back.

10            And here's a really important question, Mr. Adam

11   pointed out several points in his closing argument that there

12   was nothing improper about taking a loan from your campaign

13   fund, and that's exactly what Mr. Nauman said.  Mr. Nauman said

14   there was no prohibition on loaning yourself money from the

15   campaign fund.  Well, if that's the case, if there was nothing

16   wrong with it, why didn't he say it?  Why didn't he put it down

17   in his D-2's that these were loans?  There's nothing improper

18   about it, nothing illegal about it.  But the problem is then he

19   might have to pay the money back.  Someone might come to him

20   and say where's the money, when are you going to put it back,

21   and that's the last thing he wanted when he was still paying

22   off the $27,000 tax bill.  He wanted the flexibility to do

23   whatever he wanted with this money without anyone looking over

24   his shoulder and asking when, why, and how.

25            You need more proof that these weren't loans?  Look at

12:44:15

12:44:31

12:44:50

12:45:09

12:45:27

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 103 of 143 PageID #:1878
closing argument in rebuttal - by Getter

1219

1    the personal financial statements he submitted to New Citibank

2    in 2007 and 2008 when he was applying for equity lines of

3    credit from the bank.  They had a whole section on there for

4    liabilities.  He put down the taxes he was owed, he put down

12:45:48    5    credit card debts that he had.  He was perfectly honest in

6    those personal financial statements.  He was a director of the

7    bank, he was a director of that bank, he had to be honest with

8    them.  Nothing about a loan, nothing about $68,000 loan for his

9    pension and nothing about the number of 100 checks that he had

12:46:08    10    taken out so far at that point, nothing, that's because they

11    weren't loans.  That's the best evidence that this man was

12    taking the money, he wasn't borrowing it.

13           To call them loans now is nothing more than an

14    afterthought.  It's a way of characterizing to argue that it

12:46:29    15    wasn't income.  If they had been loans, he could've called it

16    loans at the time and he didn't.

17           Now, Mr. Adam spent a lot of time arguing that the

18    defendant paid the money back.  If he paid the money back,

19    well, obviously it's a loan, that's his argument.  Well, why

12:46:48    20    did the defendant put money back into his campaign funds?

21    Well, for one thing, he knew he wasn't supposed to be taking it

22    and using it on himself without paying taxes in the first

23    place, so he had to put some money back in --

24           MR. S. ADAM, JR:  Objection.

12:47:05    25           MR. GETTER:  He put the money --

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 104 of 143 PageID #:1879
closing argument in rebuttal - by Getter

1220

1       (Brief pause.)

2               THE COURT:  Overruled.

3               MR. GETTER:  He put the money back in so the

4       treasurers would stop asking questions, he put the money back

12:47:22  5     in so the Board of Elections wouldn't ask questions and no one

6       would be any wiser.  He was afraid of getting caught doing what

7       he was doing, that's why he put some of the money back into the

8       campaign funds.  He struck a balance between using the money

9       for himself and reporting it in a way that didn't shed any

12:47:41  10    light on how he was using the money.  He couldn't deplete his

11      entire campaign fund because then he wouldn't be a viable

12      politician anymore.  If he had nothing left in his campaign

13      fund, what was he going to do to buy the lawn signs, what was

14      he going to do to pay the campaign workers, he'd have nothing

12:48:04  15    left so he had to put some money back in, that doesn't make it

16      a loan.

17              Mr. Adam wants you to focus on the back end of these

18      transactions.  He wants you to focus only on the payback that

19      happened afterwards and not on what happened at the time he

12:48:14  20    took the loan.  In deciding whether it was a loan or not you

21      should look at the front end.  You should look at what was the

22      intent at the time the money was taken.  That's where you look

23      to see if it was a loan and to see if the defendant was

24      obligated to pay the money back, actually obligated to pay it

12:48:33  25    back.  And there was no evidence, none, of an upfront

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 105 of 143 PageID #:1880
closing argument in rebuttal - by Getter

1221

1    commitment.

2        Even the evidence of him putting money back into the

3    campaign fund is weak.  First of all, it was 100 checks we're

4    talking about.  Now, was this 100 loans?  Was it one loan?  Was

12:48:51    5    it an equity line of credit?  What was this?  Did each of the

6    100 checks have its own interest rate?  Its own payment period?

7    Its own collateral?  Mr. Adam didn't explain that to you, he

8    just wants you to say it was all loans.

9        He was the only one involved in these transactions.

12:49:16    10    He was the one writing the checks, he was the one cashing the

11    checks, he was the one using the money, and he was the one who

12    was explaining to the treasurers what they should put down on

13    the stubs as the purpose of those checks.  This was not an

14    arm's length transaction.  And you heard from the expert that

12:49:34    15    if that's not an arm's length transaction, you apply even more

16    scrutiny to see whether or not it was a loan.  And that's the

17    problem, if he's on both sides of the transaction, where is the

18    obligation to pay this money back?  What happens if he falls

19    behind?  Is he going to send someone a frightening letter,

12:49:57    20    "dear Mr. Beavers, pay the money by next week" signed,

21    Mr. Beavers.  If that doesn't work, is he going to sue himself?

22    Beavers versus Beavers?  There's no enforcement mechanism here,

23    it was entirely up to him.  That's not an actual obligation to

24    pay the money back.  And he wasn't repaying a debt in the way

12:50:14    25    you normally repay a debt.  Every time he put money back into

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 106 of 143 PageID #:1881
closing argument in rebuttal - by Getter

1222

1  the campaign, he took more money out and he kept sinking and

2  sinking and sinking.

3       Mr. Adam poked fun at Agent Ponzo and his numbers,

4  there was only 12 or 1400 dollar difference in his analysis in

12:50:37   5  2006, and 14,000 in 2007, and about 14,000 in 2008.  Put that

6  altogether, you got $30,000.  It was continuing to grow.  He

7  was not paying back this money.  He had no intention of paying

8  it all back.  He put back what he needed to put back to cover

9  his trail.

12:51:00   10       Mr. Adam also spent a lot of time talking about

11  percentages.  He said 98 percent in one year was paid back, 86

12  percent overall.  And, actually, that's not true.  When you

13  break down the numbers, let's talk about why Paul Ponzo did the

14  analysis he did.

12:51:22   15       Agent Ponzo was asked to figure out what happened with

16  this money.  He was asked to determine what could've been

17  campaign use versus what could have been personal use.  It was

18  difficult to do that.  It wasn't difficult because he wasn't a

19  real accountant that Mr. Adam says, it was difficult because of

12:51:43   20  what the defendant did.  It was difficult because of the way he

21  kept his records.  It was difficult because of the fictions

22  that he created, that's why it was so hard for Agent Ponzo to

23  do what he did.

24       Agent Ponzo said it's difficult to trace cash, and

12:52:00   25  that's how he took all this money, wrote the checks and cashed

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 107 of 143 PageID #:1882
closing argument in rebuttal - by Getter

1223

1    them.  Agent Ponzo wasn't there to see it happen, so he had to

2    do the kind of analysis where he gives the benefit of the doubt

3    to every single thing in the defendant's campaign records.

4            He looked at the checks, the check stubs, the bank

5    records, the expenses, the invoices.  My gosh, he even looked

6    at handwritten notes and gave him credit for that, because he

7    wanted to be able to testify as to whether giving the defendant

8    every single benefit of the doubt in his campaign funds, there

9    was still money left over.  And that's what he found.  He bent

10   over backwards in his generosity to the defendant and still

11   found $30,000 that could not be explained, and that's just

12   among the hundred checks, that doesn't include the $68,000 and

13   it doesn't include the Cook County contingency checks.

14           And he even gave him credit for invoices for

15   cigarettes, for alcohol, stuff that there's no way that's

16   campaign related, got credit for it, and still $30,000 that

17   couldn't be explained by any possible campaign-related expense,

18   so it had to be personal use.  And he made it very clear up

19   there on the stand that that's the absolute minimum that

20   could've been for personal use.

21           His analysis isn't based on his interpretation of the

22   records, his analysis is based on what the defendant's records

23   were.  The defendant's records were false and he had to rely on

24   those records and he was still able to come up with $30,000

25   that weren't explained.  For Mr. Adam to now use those numbers

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 108 of 143 PageID #:1883
closing argument in rebuttal - by Getter
1224

1    in argument is misleading.  To use that argument is about as

2    bogus --

3              MR. S. ADAM, JR:  Objection.

4              THE COURT:  Let me look at one thing.

12:54:30    5       (Reading realtime transcript:)

6              THE COURT:  I'm striking the word "bogus."

7              MR. GETTER:  I apologize, Judge.

8              To use that argument is as empty as to say that when

9    Mr. Beavers cashed a $4,000 campaign check and went to the

12:54:46    10   casino that that was used actually used for a printing bill

11   that didn't come in until 10 months later.  That argument, just

12   like the nonsense about the printer bill and the campaign

13   records, relies on the hope that no one is looking closely, but

14   Agent Ponzo did and now you can and you can see that that

12:55:04    15   argument fails.

16             Let's go on to the $68,000 check.  The defendant went

17   to Citizens For Beavers campaign fund because he needed $68,000

18   to more than double his pension.  That check went straight to

19   his pension fund for the sole purpose of doubling his monthly

12:55:29    20   annuity for the rest of his life.  It served no legitimate

21   campaign expense and it was entirely for his personal benefit,

22   as a result it was income.

23             Now, Mr. Adam argues there was no evidence that this

24   was a loan.  Well, again, nothing on the check about a loan,

12:55:43    25   nothing on the check stub about a loan, no loan agreement, and

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 109 of 143 PageID #:1884
closing argument in rebuttal - by Getter

1225

1   he didn't tell his campaign treasurers it was a loan, he didn't

2   even tell them what it was for.  And for the time he filed his

3   2008 tax returns, he had not paid a single cent on that money.

4           Now, Mr. Adam says, well, Mr. Goldstein pointed out

12:56:03   5   that $19,500 in unexplained checks came back into the campaign

6   so that was repayment of the loan.  Which is it?  Was a $19,500

7   to pay for the $68,000 check?  Was it $19,500 to pay for the

8   100 checks?  It's double counting.  Which one is it?

9           This is all made up after the fact attributions that

12:56:31   10   are merely a continuation of what the defendant himself did

11   with his campaign records.  He made stuff up after the fact,

12   created fictions to try and make it seem like he wasn't using

13   his money for himself.

14          As far as the Cook County contingency expense funds

12:56:48   15   are concerned, Mr. Adam suggested that the defendant was

16   telling the world that he would declare it as income.  Well,

17   the fact is, he didn't think anyone would look that closely.

18   The only thing he was doing on an expense report when he said

19   "Commissioner Beavers will declare this money as fiscal year

12:57:07   20   2007 or 2008 income" was he was telling the County, he didn't

21   expect the IRS would be looking at it as well.

22          MR. S. ADAM, JR:  Objection.

23          THE COURT:  Overruled.

24          MR. GETTER:  The defendant checks his tax returns

12:57:22   25   closely.  You heard from Philip Achusim that it was the

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 110 of 143 PageID #:1885
closing argument in rebuttal - by Getter

1226

1    defendant who called Mr. Achusim to tell him that he had made a

2    mistake in the W-2Gs by not picking up enough withholding.

3    Mr. Adam and I have a different interpretation of what "pick

4    up" means.  Mr. Adam seems to believe that it meant physically

12:57:44    5    picking up the W-2Gs.  I interpret it differently.  I think

6    what Mr. Achusim was saying was that he, Mr. Achusim, hadn't

7    realized that there was federal withholding on some of these

8    W-2Gs, he hadn't picked it up on the return because he hadn't

9    noticed it.  He even acknowledged "I made a mistake.  We all

12:58:03    10    make mistakes."  It had nothing to do with Mr. Beavers not

11    giving him the W-2G, it was because Mr. Achusim didn't pick up

12    on the W-2Gs that he was given that there had been federal

13    withholding.

14            The defendant didn't want anyone to know what he was

12:58:37    15    doing with his money, with the campaign money, that he treated

16    as his own personal ATM.  So he kept the records in a way to

17    make it as difficult as possible for anyone to figure it out.

18    He made no record of the purpose of the checks.  He said that

19    later invoices were, well, he was actually using the money to

12:58:58    20    pay for it even though he took out the money 8 to 10 months

21    earlier.  And as far as the reimbursed and void check stubs are

22    concerned, consider this, with the reimbursed check stubs, I

23    want to say reimbursed by check 3664, whatever it was, those

24    check stubs were blank at the time Mr. Beavers wrote the checks

12:59:20    25    to himself and they remained blank afterwards because he didn't

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 111 of 143 PageID #:1886
closing argument in rebuttal - by Getter

1227

1      want to put down the real purpose of the check.  And you know

2      that that stub was left blank because the reason it gets

3      written in there is reimbursed per check 3664 which didn't

4      happen until months later.  It hadn't happened yet, he was

12:59:44    5      leaving the stuff blank when he took the money out because he

6      hadn't decided yet how he was going to characterize the money

7      that he took out.  He hadn't yet come up with a way to explain

8      it, so he left himself options.  He could either say it was

9      reimbursed, he could say it was for an invoice that hadn't

01:00:04   10      happen yet, that he would wait for it to come up, or he would

11      let Vetrice Coleman struggle and put "void" because she finally

12      gave up.

13             Mr. Adam spent a great deal of time poking fun at

14      Agent Ponzo.  You'll have the records yourselves.  Look

01:00:29   15      carefully at them.  You'll see that his analysis, his Summary

16      Charts jive with what the records say.  You are the ultimate

17      deciders of fact in this case.  Agent Ponzo's Summary Charts

18      were created to help you figure out what happened.

19      Double-check them, you'll see that they're right.  When you

01:00:53   20      consider his analysis, the kind of analysis that he did here,

21      being as generous as possible to the defendant, you'll see that

22      Agent Ponzo actually understated the amount of money that he

23      took because the moment Mr. Beavers took those campaign checks

24      and used them for himself, there was no actual obligation to

01:01:13   25      pay, that was all income, all of it.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 112 of 143 PageID #:1887
closing argument in rebuttal - by Getter

1228

1       Agent Ponzo said I'm going to conservatively say it

2   was only $30,000 on those 100 checks, but the moment he takes a

3   check and uses it for himself with no obligation to pay it

4   back, that's income, not a loan.

01:01:45   5       As my partner, Ms. Hamilton, pointed out in her

6   closing, the defendant is not accused of gambling, he's not

7   accused of taking money from his campaign fund, neither one of

8   those is illegal, neither one of those is improper.  This case

9   isn't of who done it.  You know who did it.  The question is

01:01:59  10  why, the question is how.  And the evidence we presented to you

11  shows the answers to those questions clearly.

12       Mr. Beavers didn't want the IRS to know what he was

13  doing with the money, so he kept everything in the dark.  But

14  now Agent Ponzo has looked through the records and now you have

01:02:26  15  the opportunity to look through the records as well and shed

16  some light on what exactly it was that the Commissioner was

17  doing.  When you do that, you will conclude, based on the

18  evidence presented to you, that the only verdict consistent

19  with the evidence is that the defendant is guilty on all counts

01:02:50  20  charged.  Thank you for your time.

21       THE COURT:  Members of the jury, you have been sitting

22  for quite a while.  We're going to take a very short break so

23  you can stand up, walk around, then I will instruct you on the

24  law.

01:03:04  25       THE MARSHAL:  All rise.

Case: 1:12-cr-00124 Document #: 125 Filed: 04/03/14 Page 113 of 143 PageID #:1888
closing argument in rebuttal - by Getter
1229

1    (The following proceedings were had out of the

2     presence of the jury in open court:)

3         THE COURT:  Ten minutes, at most.

4    (Recess.)

01:04:02    5    (The following proceedings were had out of the

6     presence of the jury in open court:)

7         THE COURT:  Two things.  I'm going over the jurors

8    with you.  Unless somebody gets killed, the jurors are 1, 2, 4,

9    13 --

01:08:17    10         MR. SOROSKY:  Could we start again from the beginning?

11         THE COURT:  Sure.  1, 2, 4, 13, 16, 19, 21, 22, 25,

12    27, 29, and 41.  The alternates are 43, 44, 45, and listed as

13    an alternate is 24 but he's not a real alternate.  24 is the

14    one who was not fully candid and by agreement he is not going

01:09:05    15    to sit on the jury but he's on the list as the alternate.  So

16    you can check and see if there's something wrong.

17         The second issue is, lunch will probably arrive before

18    I finish reading the instructions.  There are two things I can

19    do, I can send all 14 of them back to the jury room to eat

01:09:32    20    lunch, instruct them they can't deliberate, and have the

21    marshal sit with them to make sure that they don't discuss

22    this.  I think I would prefer that and then pull out the four.

23    Is everybody okay with it?

24         MR. GOLDSTEIN:  Yes.

01:09:52    25         MR. GETTER:  Yes.

closing argument in rebuttal - by Getter

1       THE COURT:  Okay.  Then that's basically how we'll do

2    it, and it's just as well.  My main reason is not only for the

3    four but, generally speaking, I'm not a big fan of having them

4    deliberate while they start eating.  They're looking at

01:10:09    5    something else, their sandwiches, and I'd rather not have them

6    deliberate, so that's where we are.

7       MR. SOROSKY:  Are you going to have them begin

8    deliberations this afternoon?

9       THE COURT:  Yeah.  But bear in mind, my rule is once

01:10:20   10    the case is given to them, the schedule is theirs to choose.

11    If they all want to go home and go to polka lessons and come

12    back tomorrow morning, if that's the majority, that's what they

13    do.

14       MR. SOROSKY:  So there's a possibility they may not

01:10:38   15    deliberate today.

16       THE COURT:  Yes, it's a possibility they may not

17    deliberate today, although I think they will, because, I

18    Figure, 2:30 is absolutely the latest time that they would

19    start deliberations.

01:10:49   20       MS. HAMILTON:  Would you consider having your

21    courtroom deputy just contact one side from -- or one person

22    from each side to let us know when they go home for the day?

23       THE COURT:  I cannot tell you how tempting it is for

24    me to say no, but I can't.  So yes.

01:11:14   25       MS. HAMILTON:  Thank you, Judge.

1    THE COURT:  I expect a volunteer from each side.

2    MS. KAESEBERG:  My baby thanks you, too.

3    (Proceedings resumed within the hearing of the jury:)

4    (Recess.)

01:18:32    5    THE MARSHAL:  All rise.

6    (The following proceedings were had in the presence of

7    the jury in open court:)

8    THE COURT:  Please be seated.

9    I'm about to instruct you.  I remind you again, you'll

01:19:18    10    have copies of these so you don't have to take notes.

11                              JURY CHARGE

12    BY THE COURT:  Members of the jury, I'm now going to

13    instruct you on the law that you must follow in deciding this

14    case.  I will provide copies of these instructions for your use

01:19:34    15    in the jury room.

16    You must follow all of my instructions about the law

17    even if you disagree with them.  This includes instructions I

18    gave you before trial, any instructions I gave you during

19    trial, and instructions I'm giving you now.

01:19:50    20    As jurors, you have two duties.  Your first duty is to

21    decide the facts from the evidence you saw and heard here in

22    court.  This is your job, not my job, or anyone else's job.

23    Your second duty is to take the law as I give it to

24    you, apply it to the facts, and decide if the government has

01:20:11    25    proved the defendant guilty beyond a reasonable doubt.

1       You must perform these duties fairly and impartially.

2   Do not let sympathy, prejudice, fear, or public opinion

3   influence you.

4       You must not take anything I said or did during the

01:20:28   5   trial as indicating that I have an opinion about the evidence

6   or about what I think your verdict should be.

7       The charges against the defendant are in a document

8   called "an indictment."  You will have a copy of the indictment

9   during your deliberations.

01:20:43  10       The indictment in this case charges that the defendant

11  committed the crimes of, first, corruptly endeavoring to

12  obstruct and impede the Internal Revenue Service, that's

13  Count 1, and 2, filing false tax returns for the calendar years

14  2006, 2007, and 2008.  Counts 2, 3 and 4 the defendant has pled

01:21:09  15  not guilty to the charges.

16       The indictment is simply the formal way of telling the

17  defendant what crimes he's accused of committing.  It is not

18  evidence that the defendant is guilty.  It does not even raise

19  a suspicion of guilt.

01:21:23  20       The defendant is presumed innocent of each and every

21  one of the charges.  This presumption continues throughout the

22  case including during your deliberations.  It is not overcome

23  unless, from all the evidence in the case, you are convinced

24  beyond a reasonable doubt that the defendant is guilty as

01:21:44  25  charged.

Jury Charge

1233

1   The government has the burden of proving the

2   defendant's guilt beyond a reasonable doubt.  This burden of

3   proof stays with the government throughout the case.

4   The defendant is never required to prove his

5   innocence.  He is not required to provide any evidence at all.

6   You must make your decision based only on the evidence

7   that you saw and heard here in court.

8   Do not consider anything you may have seen or heard

9   outside of court, including anything from the newspaper,

10  television, radio, the Internet, or any other source.

11  The evidence includes only what the witnesses said

12  when they were testifying under oath, the exhibits that I

13  allowed into evidence, and the stipulations that the lawyers

14  agreed to.  A stipulation is an agreement that certain facts

15  are true.  Nothing else is evidence.

16  The lawyers' statements and arguments are not

17  evidence.  If what a lawyer said is different from the evidence

18  as you remember it, the evidence is what counts.  The lawyers'

19  questions and objections likewise are not evidence.  A lawyer

20  has a duty to object if he thinks a question was improper.

21  If I sustain objections to questions the lawyers

22  asked, you must not speculate on what the answers might have

23  been.

24  If during the trial I struck testimony or exhibits

25  from the record or told you to disregard something, you must

1    not consider it.

2        Give the evidence whatever weight you decide it
3    deserves.  You should use common sense in weighing the evidence
4    and consider the evidence in light of your own observations in
01:23:30    5    life.  People sometimes look at one fact and conclude from it
6    that another fact exists, this is called an inference.  You are
7    allowed to make reasonable inferences so long as they are based
8    on the evidence.

9        You may have heard, and certainly have probably, heard
01:23:46    10    the terms "direct evidence" and "circumstantial evidence."
11    Direct evidence is evidence that directly proves a fact,
12    circumstantial evidence is evidence that indirectly proves a
13    fact.  You are to consider both direct and circumstantial
14    evidence.  The law does not say that one is better than the
01:24:04    15    other.  It is up to you to decide how much weight to give to
16    any evidence, whether it is direct or circumstantial.

17        Do not make any decisions simply by counting the
18    number of witnesses who testified about a certain point.  You
19    may find the testimony of one witness or a few witnesses more
01:24:24    20    persuasive than the testimony of a larger number.  You need not
21    accept the testimony of the larger number of witnesses, what is
22    important is how truthful and accurate the witnesses were and
23    how much weight you think their testimony deserves.

24        A defendant has an absolute right not to testify.  You
01:24:43    25    may not consider in any way the fact that the defendant did not

1 testify.  You should not even discuss it in your deliberations.

2 Part of your job as jurors is to decide how believable

3 each witness was and how much weight to give each witness'

4 testimony.  You may accept all of what a witness says, or part

01:25:19 5 of it, or none of it.  Some factors you may consider include

6 the age of the witness, the intelligence of the witness, the

7 witness' ability and opportunity to see, hear, or know the

8 things the witness testified about, the witness' memory, the

9 witness' demeanor, whether the witness had any bias, prejudice,

01:25:40 10 or any other reason to lie or slant the testimony, the

11 truthfulness and accuracy of the witness' testimony in light of

12 the other evidence presented.

13 It is proper for an attorney to interview any witness

14 in preparation for trial.

01:25:57 15 You have heard witnesses, namely Barry Gershinzon and

16 David Weiner, who gave testimony about taxation.  You do not

17 have to accept these witnesses' testimony.  You should judge

18 their testimony the same way you judge the testimony of any

19 other witness.  In deciding how many weight to give the

01:26:19 20 testimony of these witnesses, you should consider the witness'

21 qualifications and the factors I have described for determining

22 the believability of testimony.

23 Certain summaries were admitted into evidence.  You

24 may use those summaries as evidence.

01:26:34 25 The indictment charges that the crimes happened "on or

1 about" certain dates.  The government must prove that the

2 crimes happened reasonably close to the dates alleged.  The

3 government is not required to prove that the crimes happened on

4 those exact dates.

01:26:51  5 The defendant has been accused of more than one

6 offense.  The number of charges is not evidence of guilt and

7 should not influence your decision.  You must consider each

8 charge separately.  Your decision on one charge, whether it is

9 guilty or not guilty, should not influence your decision on any

01:27:18  10 other charge.

11 If a defendant knowingly causes the acts of another,

12 then the defendant is responsible for those acts as though he

13 personally committed them.

14 Count 1 of the indictment charges defendant with

01:27:39  15 corruptly endeavoring to obstruct or impede the due

16 administration of the Internal Revenue laws.  In order for you

17 to find the defendant guilty of this charge, the government

18 must prove each of the following four elements beyond a

19 reasonable doubt:

01:27:55  20 One, the defendant made an effort to obstruct or

21 impede the due administration of the interval receive laws.

22 The phrase "due administration of the Internal Revenue laws"

23 includes the Internal Revenue Service's lawful functions which

24 include the ascertainment, computation, assessment, and

01:28:17  25 collection of income taxes and the investigation of possible

1  criminal violations of the Internal Revenue laws, such as the

2  filing of false or fraudulent individual income tax returns.

3       Two, the defendant's effort had a reasonable tendency

4  to obstruct or impede the due administration of the Internal

01:28:40  5  Revenue laws.  The effort need not be successful.

6       Three, the defendant acted knowingly.

7       Four, the defendant acted corruptly, that is, with a

8  purpose to obtain an unlawful benefit for himself.

9       If you find from your consideration of all the

01:28:59  10  evidence that the government has proved each of these elements

11  beyond a reasonable doubt, then you should find the defendant

12  guilty of Count 1.

13       If, on the other hand, you find from your

14  consideration of all the evidence that the government has

01:29:14  15  failed to prove any one of these elements beyond a reasonable

16  doubt, then you should find the defendant not guilty of

17  Count 1.

18       A person acts knowingly if he realizes what he is

19  doing and is aware of the nature of his conduct and does not

01:29:32  20  act through ignorance, mistake, or accident.  In deciding

21  whether the defendant acted knowingly you may consider all of

22  the evidence, including what the defendant did or said.

23       In considering whether the government has proven that

24  the defendant corruptly endeavored to impede the due

01:29:53  25  administration of the Internal Revenue laws, it is essential

1  that the government prove beyond a reasonable doubt one or more

2  of the acts alleged in paragraphs 3 through 11 of Count 1 as

3  acts which were part of the corrupt endeavor and that such act

4  or acts was a corrupt endeavor to impede the due administration

01:30:15  5  of the Internal Revenue laws.  The government, however, is not

6  required to prove all of them.

7          Counts 2, 3 and 4 of the indictment charge the

8  defendant with filing a false tax return.  In order for you to

9  find the defendant guilty of this charge the government must

01:30:33  10  prove each of the following elements beyond a reasonable doubt:

11          One, the defendant prepared or caused someone to

12  prepare an income tax return.

13          Two, the income tax return was false as to a material

14  matter as charged in the count.

01:30:50  15          Three, the defendant signed the income tax return

16  which contained a written declaration that it was made under

17  penalties of perjury.

18          Four, the defendant acted willfully, that is, he knew

19  he had a legal duty to file a truthful and correct tax return,

01:31:11  20  but when he signed a return he did not believe it was truthful

21  or correct as a material matter.

22          Five, the defendant filed or caused someone to file

23  the incorrect return with the Internal Revenue Service.

24          Again, if you find from your consideration that all

01:31:28  25  the evidence that the government has proved each of these

1   elements beyond a reasonable doubt as to the count you are

2   considering, then you should find the defendant guilty of that

3   count.

4        If, on the other hand, you find from your

01:31:44   5   consideration of all the evidence that the government has

6   failed to prove any one of these elements beyond a reasonable

7   doubt as to the count you are considering, then you should find

8   the defendant not guilty of that count.

9        If the defendant acted in good faith, then he lacked

01:32:02   10   the willfulness or corrupt intent required to prove the charged

11   offenses.  For the purpose of Count 1, the defendant acted in

12   good faith if he did not act for the purpose of obtaining an

13   unlawful benefit for himself.

14        And for the purposes of Counts 2, 3 and 4, if at the

01:32:23   15   time he filed or caused his tax returns to be filed defendant

16   honestly believed the truthfulness and correctness of the

17   statements that the government has charged as being false the

18   defendant does not have to prove his good faith; rather, the

19   government must prove beyond a reasonable doubt with respect to

01:32:42   20   Count 1 that the defendant acted with the purpose of obtaining

21   an unlawful benefit and with respect to Counts 2, 3 and 4 that

22   the defendant acted willfully.

23        A false matter is material if the matter was capable

24   of influencing the Internal Revenue Service.

01:33:02   25        "Income" is broadly defined and includes such items as

1    wages, profits from business, and other financial gains.

2        When a taxpayer receives a loan, he incurs an

3    obligation to repay that loan. Because of that obligation to

4    repay, loan proceeds do not constitute income.

01:33:27   5        The transfer of money from one party to another

6    constitutes a loan only if, at the time of transfers, the

7    parties to the transaction intend that the person who receives

8    the money actually will be obligated to repay it.

9        In determining whether the defendant has received

01:33:46  10    particular funds as a loan or as income, you should consider

11    all of the facts and circumstances surrounding the defendant's

12    receipt of the funds.

13        In order to prove a charge of filing a false tax

14    return, the government does not need to prove the existence of

01:34:05  15    a tax deficiency or a loss to the government.

16        If you have taken notes during the trial, you may use

17    them during deliberations to help you remember what happened

18    during the trial. You should use your notes only as aids to

19    your memory. The notes are not evidence. All of you should

01:34:33  20    rely on your independent recollection of the evidence and you

21    should not be unduly influenced by the notes of other jurors.

22    Notes are not entitled to anymore weight than the memory or

23    impressions of each juror.

24        In deciding your verdict, you should not consider the

01:34:49  25    possible punishment for the defendant. If you decide that the

1    government has proved the defendant guilty beyond a reasonable

2    doubt, then it will be my job to decide on the appropriate

3    punishment.

4            Once you are all in the jury room, and in this case I

01:35:22    5    should inform you that before you begin anything, you will be

6    having your lunch and during your lunch period you should not

7    start your deliberation or discuss the case in any way.  The

8    marshal will be with you in the room.  But after lunch and your

9    duties begin, once you're all in the jury room the first thing

01:35:52    10   you should do is choose a foreperson.  The foreperson should

11   see to it that your discussions are carried on in an organized

12   way and that everyone has a fair chance to be heard.  You may

13   discuss the case only when all jurors are present.

14           Once you start deliberating, do not communicate about

01:36:12    15   the case or your deliberations with anyone except other members

16   of your jury.  You may not communicate with others about the

17   case or your deliberations by any means.  This includes oral or

18   written communications, as well as any electronic method of

19   communication.  And, basically, this involves all current

01:36:37    20   technology or services likely to be used:  Telephone, cell

21   phones, smart phones, iPhones, Blackberrys, computers, text

22   messaging, instant messaging, the Internet chat rooms, blogs,

23   websites, or services like Facebook, MySpace, Linkedin, U-Tube

24   and Twitter, and I think you understand what I'm getting at, or

01:36:56    25   any other method of communication.

01:37:12

1    If you need to communicate with me while you are

2  deliberating, you send a note to the court security officer.

3  The note should be signed by the foreperson or by one or more

4  members of the jury.  To have a complete record of the trial,

5  it is important that you do not communicate with me except by a

6  written note.  I may have to talk to lawyers about your

7  message, so it may take some time to get back to you.  You may

8  continue for your deliberations while you wait for my answer.

9  Please believe the transcripts of trial testimony are not

01:37:33

10  available to you.  You must rely on your collective memory of

11  the testimony.

12    If you do send me an message, do not include any

13  breakdown of any votes you may have conducted; in other words,

14  don't tell me you are split 6 to 6 or 8 to 4, or whatever your

01:37:50

15  vote happens to be.

16    A verdict form has been prepared for you.  You will

17  take this form to the jury room.  The verdict form is simple.

18  It's got a line for Count 1, Count 2, Count 3 and Count 4.  Two

19  boxes, one says "guilty" the other says "not guilty," and then

01:38:15

20  there's a place for the signature of each of the jurors and a

21  date.

22    When you have reached unanimous agreement on a

23  verdict, your foreperson should fill in and date the verdict

24  form, each of you will then sign the verdict form.  You should

01:38:33

25  advise the court security officer once you have reached a

1    verdict.  When you come back to the courtroom, the clerk will

2    read the verdicts out loud.

3         Marshal, please stand and raise your right hand.

4      (Marshal sworn).

01:38:55  5         THE COURT:  I have one final instruction for you.

6         The verdict must represent the considered judgment of

7    each juror.  Your verdict, whether it is guilty or not guilty,

8    must be unanimous.

9         You should make every reasonable effort to reach a

01:39:27  10   verdict.  In doing so, you should consult with each other,

11   express your own views, and listen to your fellow jurors'

12   opinions.  Discuss your differences, if you have them, with an

13   open mind.  Do not hesitate to reexamine your own view and

14   change your opinion if you come to believe it is wrong, but you

01:39:49  15   should not surrender your honest beliefs about the weight or

16   effect of evidence just because of the opinions of your fellow

17   jurors or just so there can be a unanimous verdict.

18         Each of you should give fair and equal consideration

19   to all the evidence.  You should deliberate with the goal of

01:40:08  20   reaching an agreement that is consistent with the individual

21   judgment of each juror.  You are impartial judges of the facts.

22   Your sole interest is to determine whether the government has

23   proved its case beyond a reasonable doubt.

24         Marshal, please escort the jurors.

01:40:31  25         THE MARSHAL:  All rise.

1    (The following proceedings were had out of the

2     presence of the jury in open court:)

3        THE COURT:  People may be seated in the courtroom.

4  Counsel come to the lectern.

01:41:12    5    (Brief pause.)

6        THE COURT:  I have typos.

7        MS. BONAMICI:  I noticed 3, Judge.

8        THE COURT:  What?

9        MS. BONAMICI:  I noticed 3.

01:41:23   10        THE COURT:  I have 9 and 13.  13 is how much weight to

11  give each witness' testimony, including that of the defendant.

12        MS. BONAMICI:  Right.

13        THE COURT:  You have another one?

14        MS. BONAMICI:  On 2 we had a plural "defendants."

01:41:42   15        THE COURT:  Yeah.

16        MS. BONAMICI:  On 29, the technology, I don't know

17  why, it just needs to have the brackets removed.

18        THE COURT:  Right.  That has to be done soon.

19        MS. BONAMICI:  I just made a request.  Should be up in

01:42:00   20  a minute.

21        THE COURT:  And then Ms. Perez will give you the

22  packages and you can jointly put them together.  The jurors'

23  lunch has arrived.  They are eating together.  The marshal is

24  with them.  They have been instructed that they do not

01:42:23   25  deliberative until lunch is over and then I will pull the

1  alternates.

2      MS. KAESEBERG:  Just for the record, we object the

3  indictment going back to the jury.

4      THE COURT:  You object to what?

01:42:33  5      MS. KAESEBERG:  To the indictment going back to the

6  jury.

7      THE COURT:  Ah --

8      MS. KAESEBERG:  And our position is that --

9      THE COURT:  Yeah, I know that.

01:42:43  10      You want the indictment back?

11      MS. HAMILTON:  Yes, we do.

12      THE COURT:  I did this once, not give the indictment

13  to the jury; they asked for the indictment.  So I think I'm

14  going to give them the indictment.  I would give them only one

01:43:02  15  verdict form.  So as soon as possible, I want --

16      MS. BONAMICI:  I made the request.  I'm confused a

17  little bit because the language that you mentioned I found page

18  on page 9 and not on page 13 --

19      THE COURT:  Page 9 it says --

01:43:22  20      MS. BONAMICI:  Oh, okay.  I got it.

21      It will be up in just a few minutes, Judge.

22      THE COURT:  Okay.

23      MR. GOLDSTEIN:  Exhibits, Your Honor?  How do you want

24  that?

01:43:32  25      THE COURT:  The exhibits, issue of exhibits?

1        MR. GOLDSTEIN:  Not necessarily an issue, it's just

2   how you want it.

3        THE COURT:  Do we have a list of exhibits that people

4   want to go back?  Yes?  No?

01:43:45   5        MR. GOLDSTEIN:  We have our folder of exhibits.

6        THE COURT:  Is there any objections sending the

7   exhibits back?

8        MR. GETTER:  No.

9        MS. HAMILTON:  No.

01:43:55   10        THE COURT:  You?

11        MR. GOLDSTEIN:  No.

12        THE COURT:  That's fine.

13        MR. GOLDSTEIN:  Any objections we had to evidence

14   being admitted, obviously we renew our objection, but other

01:44:05   15   than that ....

16        THE COURT:  Right.  Then you can put a cart or two

17   together with the defense exhibits and we'll send them back.

18        MS. HAMILTON:  Yes, Your Honor.

19        THE COURT:  Okay?

01:44:18   20        MR. GOLDSTEIN:  Thank you.

21        THE COURT:  Thanks.

22        (Jury retired to deliberate at 1:45 p.m.)

23     (Recess.)

24

01:44:52   25

1     (The following proceedings were had out of the

2      presence of the jury in open court:)

3         MR. HENDERSON:  Your Honor, I was -- my daughter fell

4 ill last night so I did not have an opportunity to participate

02:03:07   5 in certain aspects -- going over the instructions for the jury

6 and we would like to renew one objection and that's to -- I

7 don't know what number this is.

8         THE COURT:  I no longer have my copy, for a variety of

9 reasons, but you can tell me what it is.

02:03:31   10         MS. BONAMICI:  This is a loan definition, Your Honor.

11         THE COURT:  It's the definition of a loan?

12         MS. BONAMICI:  Yes.

13         THE COURT:  You did not object to it before?

14         MR. HENDERSON:  I believe we did, but I would just

02:03:41   15 like to renew that objection.

16         MS. KAESEBERG:  We objected to it.

17         THE COURT:  Are you going to change the objection?

18 You're going to add something to it?

19         MS. BONAMICI:  Yes, they're making a new objection.

02:03:48   20         THE COURT:  Okay, I believe it's too late to do a new

21 objection but I'll hear it, at least.

22     (Document tendered.)

23         THE COURT:  Okay.

24         MR. HENDERSON:  Judge, the way the instruction reads

02:04:05   25 now is "when a tax payer receives a loan he incurs an

1    obligation to pay that loan because the obligation to repay

2    loan proceeds do not constitute income," and it's the next

3    sentence that's problematic, "the transfer of money from one

4    party to another constitutes a loan only if at the time of the

01:33:33    5    transfer the parties to the transaction intend that the person

6    who receives the money" and then, of course, there's the words

7    "actually will be obligated to repay it."  That can't be the

8    law for any number of reasons, because, number one, what that

9    will do -- and the objectionable phrase is "only if at the time

02:04:37    10    of transfer."  So, for example, if I transfer some money to

11    someone today and they asked me, which has happened in real

12    life, is this a gift or a loan, I can reserve my determination

13    about what it's going to be, I'll tell you tomorrow or I'll

14    tell you in a week.  So at the time of the transfer, if I give

02:04:55    15    my son, for example, $20, I haven't told him whether it's going

16    to be a gift or a loan, I'll figure that out later.  And so it

17    would, by definition, prohibit someone from reserving their

18    right to determine the nature of the transaction.

19                THE COURT:  But what you argued in this case was, it

02:05:12    20    was a loan from the very first.  To say this is not consistent

21    with the argument you made.

22                MR. HENDERSON:  Well, no, but what the government

23    wants to do is they want to tie -- what they've attempted to do

24    with this language is trying to tie the Commissioner to a

02:05:30    25    decision at that point in time.  And that may have been the

1   case at that point in time, however, this particular language

2   does not need to be in an instruction to make it true.

3           THE COURT:  In the context of this case, this

4   instruction is valid.  The tone of the entire argument is "at

02:05:48   5   the very beginning he intended to pay it back and his whole

6   course of action is to pay it back," from the very beginning.

7   There's nothing on which some juror can say, well, wait a

8   second, maybe he didn't do it in the beginning, he did it

9   later.  There's no factual support for that.  His argument is,

02:06:09   10   "this was my practice, this is what I intended to do from the

11   very beginning, this is what the evidence shows."  Or to put it

12   more precisely, "the government can't really show that there

13   was no obligation."  Timing was not an issue in this case, it's

14   not presented by the facts.

02:06:31   15           MR. HENDERSON:  And, Your Honor, I would accept that

16   in terms of from a factual presentation, but from a legal

17   presentation the juror instruction has an independent

18   obligation to be correct, and this conflicts with the

19   definition of a loan, you know, from a U.S. Supreme Court case

02:06:49   20   which does not tie -- I don't know if we cited this into the

21   record or not.

22           MS. KAESEBERG:  It is, Tufts.

23           MR. HENDERSON:  Okay.  Tufts, a Supreme Court case, it

24   conflicts with this instruction.  It conflicts at least our

02:07:02   25   reading of it, it directly conflicts what what's in Tufts.

1　THE COURT:  You want to say something?

2　MS. BONAMICI:  Your Honor, we agree that this is not a

3　question presented by the facts and the evidence -- or the

4　evidence raised in the arguments in this case, and, in

02:07:12　5　addition, we think it's an accurate statement of the law.

6　THE COURT:  The objection is overruled on the grounds

7　that, one, it comes too late; two, it's not appropriate to the

8　facts of this case; and three, it's not inconsistent with the

9　law.  Now you have your record.

02:07:31　10　MR. HENDERSON:  Okay.  With respect to it's too late,

11　have the instructions actually gone to the jury yet?

12　THE COURT:  They've been read to the jury.

13　MS. HAMILTON:  Judge, we just noticed that the Summary

14　Chart binders are still on the chairs.  Do you want us to

02:08:02　15　remove them and put them on the cart or --

16　THE COURT:  Put them on the cart.

17　(Recess.)

18

19

20

21

22

23

24

08:22:18　25

1251

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

UNITED STATES OF AMERICA,  )
                           )     No.  12 CR 124
        Government,         )
                           )
Vs.                        )     Chicago, Illinois
                           )
WILLIAM BEAVERS,           )     March 21, 2013
                           )
        Defendant.         )     4:06 o'clock p.m.

VOLUME 6 - VERDICT
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES B. ZAGEL
AND A JURY

For the Government:

                THE HONORABLE GARY S. SHAPIRO,
                UNITED STATES ATTORNEY
                BY: Matthew Michael Getter
                    Carrie E. Hamilton
                    Debra Riggs Bonamici
                    Samuel B. Cole
                Assistant United States Attorneys
                219 South Dearborn Street
                Suite 500
                Chicago, Illinois    60604
                 (312) 353-5300

For the Defendant:
                KAPLAN & SOROSKY
                BY:  Sheldon M. Sorosky
                158 West Erie
                Chicago, Illinois 60610
                 (312) 640-1776


             Court Reporter:

                Blanca I. Lara, CSR, CP, RPR
                219 South Dearborn Street
                Room 2504
                Chicago, Illinois 60604
                 (312) 435-5895

1252

1  Appearances (continued:)

2

3  For the defendant:

4                    OFFICES OF AARON B. GOLDSTEIN
                     BY: Aaron Benjamin Goldstein
5                    6133 South Ellis
                     Chicago, Illinois 60637
6                    (773) 752-6950

7                    OFFICES OF LAUREN FAUST KAESEBERG
                     BY:  Lauren Faust Kaeseberg
8                    2140 N. Lincoln Park West
                     Suite 307
9                    Chicago, Illinois 60614
                     (773) 517-0622

10
                     LAW OFFICE OF SAMUEL E. ADAM
11                   BY:   Samuel Forbes Adam
                           Samuel Adam, Jr.
12                   6133 South Ellis Avenue
                     Suite 200
13                   Chicago, Illinois 60637
                     (312) 726-2326

14

15
                     Henderson Adam, LLC
16                   BY:  Victor P. Henderson
                     The Insurance Center Building
17                   330 South Wells, Suite 1401
                     Chicago, Illinois 60606
18                   (312) 262-2900

19

20

21

22

23

24

25

1      (The following proceedings were had in the presence of

2       the jury in open court:)

3           THE COURT:  Has the jury reach a verdict?

4           Everyone may be seated.

04:06:26    5       THE FOREPERSON:  Yes, we have.

6           THE COURT:  Please hand up the verdict.

7      (Verdict tendered.)

8                           VERDICT

9           THE COURT:  Read the verdict, please.

04:06:57   10       THE CLERK:  (Reading:)

11     With respect to Count 1 of the indictment in which

12      defendant William Beavers is charged with corruptly

13      endeavoring to obstruct and impede the Internation

14      Revenue Service, we, the jury, find the defendant

04:07:13   15      guilty.

16          With respect to Count 2 of the indictment in

17      which defendant William Beavers is charged with

18      filing a false tax return for calendar year 2006, we,

19      the jury, find the defendant guilty.

04:07:30   20          With respect to Count 3 of the indictment in

21      which defendant William Beavers is charged with

22      filing a false tax return for calendar year 2007, we,

23      the jury, find the defendant guilty.

24          With respect to Count 4 of the indictment in

04:07:52   25      which defendant William Beavers is charged with

1    filing a false tax return for calendar year 2008, we,

2    the jury, find the defendant guilty."

3         And it has been signed by the foreperson and all

4    jurors.

04:08:09    5    THE COURT:  Anyone want the jury polled?

6    MR. S. ADAM, JR:  Yes, Your Honor.

7    THE COURT:  I'll poll the jury.

8    Juror number 1, was this your verdict when you signed

9    it and is it now your verdict?

04:08:28    10    JUROR NUMBER 1:  Yes, sir.

11    THE COURT:  Juror number 2, was this your verdict when

12    you signed it and is it now your verdict?

13    JUROR NUMBER 2:  Yes, sir.

14    THE COURT:  Juror number 4, was this your verdict when

04:08:42    15    you signed it and is it now your verdict?

16    JUROR NUMBER 4:  Yes, it is.

17    THE COURT:  Juror number 13, was this your verdict

18    when you signed it and is it now your verdict?

19    JUROR NUMBER 13:  Yes, sir.

04:08:55    20    THE COURT:  Juror number 16, was this your verdict

21    when you signed it and is this now your verdict?

22    JUROR NUMBER 16:  Yes, sir.

23    THE COURT:  Juror 19 --

24    JUROR NUMBER 19:  Here.

04:09:07    25    THE COURT:  Was this your verdict when you signed it

1   and is it now your verdict?

2           JUROR NUMBER 19:  Yes, sir.

3           THE COURT:  Juror 21, was this your verdict when you

4   signed it and is it now your verdict?

04:09:17   5           JUROR NUMBER 21:  Yes, sir.

6           THE COURT:  Juror 22?

7           JUROR NUMBER 22:  (Raising hand.)

8           THE COURT:  Was this your verdict when you signed it

9   and is it now your verdict?

04:09:26   10           JUROR NUMBER 22:  Yes, sir.

11           THE COURT:  Juror 25?

12           JUROR NUMBER 25:  (Raising hand.)

13           THE COURT:  Was this verdict when you signed it and is

14   it now your verdict?

04:09:35   15           JUROR NUMBER 25:  Yes, sir.

16           THE COURT:  Juror 27?

17           JUROR NUMBER 27:  (Raising hand).

18           THE COURT:  Was this your verdict when you signed it

19   and is it now your verdict?

04:09:44   20           JUROR NUMBER 27:  Yes, sir.

21           THE COURT:  Juror 29?

22           JUROR NUMBER 29:  (Raising hand).

23           THE COURT:  Was this your verdict when you signed it

24   and is it now your verdict?

04:09:49   25           JUROR NUMBER 29:  Yes, sir.

1    THE COURT:  Juror 41?

2    JUROR NUMBER 41:  (Raising hand).

3    THE COURT:  Was this your verdict when you signed it

4    and is it now your verdict?

04:09:59    5    JUROR NUMBER 41:  Yes, sir.

6    THE COURT:  Anything further with respect to the jury?

7    MR. S. ADAM, JR:  No, Your Honor.

8    THE COURT:  From the government?

9    MR. GETTER:  No.

04:10:11    10    THE COURT:  Members of the jury, I want to thank you

11    very much for your service.  I want to tell you that you are

12    now excused and you're free to leave or go anywhere you wish,

13    but I would request that you go back with the marshal to the

14    jury room because I would like to speak with you briefly, and

04:10:35    15    after that there are a couple other things that I have to tell

16    you about.

17    With that, all rise.

18    (The following proceedings were had out of the

19    presence of the jury in open court:)

04:11:02    20    THE COURT:  Counsel, approach the lectern.

21    (Brief pause).

22    THE COURT:  Motions with respect to time?

23    MS. KAESEBERG:  Well, first we'd ask that the Court

24    enter a judgment outstanding the verdicts based on the

04:11:23    25    arguments we previously made in court.  I believe you continued

1   our motion for directed verdicts and that needs to be resolved.

2         THE COURT:  That motion is denied.

3         MS. KAESEBERG:  And an extension of time for the

4   filing of the post-trial motions.

04:11:34   5         THE COURT:  To?

6         MS. KAESEBERG:  To 30 days?

7         THE COURT:  35 days.

8         MS. KAESEBERG:  35 days.

9         THE COURT:  What's 35 days?

04:11:46   10         THE CLERK:  It's --

11         MS. KAESEBERG:  Can it be potentially be 35 beyond the

12   initial filing date?  So that would make it more around

13   45 days.  I was thinking 30 additional days beyond the 14 days.

14         THE COURT:  So you want 6 weeks?

04:12:03   15         MS. KAESEBERG:  Yes.

16         THE COURT:  6 weeks.

17         THE CLERK:  May 6th.

18         THE COURT:  Let me see you, then, after that on May --

19   toward the end of May.

04:12:30   20         THE CLERK:  Thursday, May 30th.

21         THE COURT:  I would give the government 4 weeks to

22   answer.  If that's a difficult for you, you can raise that.

23         MR. GETTER:  Thank you, Judge.

24         THE COURT:  Anything further?

04:12:50   25         MR. GETTER:  Not that I can think of, Judge.

1    MR. S. ADAM, JR:  No.

2    THE COURT:  Current bond will stand.

3    MR. S. ADAM, JR:  Yes, Your Honor.

4    THE COURT:  Thank you, counsel.

04:12:59   5    MS. HAMILTON:  Thank you, Your Honor.

6    MR. S. ADAM, JR:  Thank you, Your Honor.

7    MR. GETTER:  Oh, Judge, I apologize.  The gag order,

8    is that now lifted since the verdict has been reached?

9    THE COURT:  Yeah, the gag order is lifted.  I will see

04:13:19   10   counsel, one from each side, at the side for a moment.

11       (Proceedings heard at sidebar off the record.)

12       THE COURT:  All right.  We are adjourned.

13

14

15       (Which concluded the proceedings had on this date in

16        the above entitled cause.)

17

18

19

20

21

22

23

24

25

VERDICT

1

2               *      *      *      *      *      *      *      *

3

4

5   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

6         RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

7

8

9

10              /s/Blanca I. Lara                    date

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25