```
 1                  IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    UNITED STATES OF AMERICA,    )
                                   )   No.  12 CR 124
 4              Government,        )
                                   )
 5    Vs.                          )   Chicago, Illinois
                                   )
 6    WILLIAM BEAVERS,             )   March 19, 2013
                                   )
 7              Defendant.         )   1:18 o'clock p.m.

 8                             VOLUME 4
                        TRANSCRIPT OF PROCEEDINGS
 9             BEFORE THE HONORABLE JAMES B. ZAGEL
                            AND A JURY
10

11    For the Government:

12              THE HONORABLE GARY S. SHAPIRO,
                UNITED STATES ATTORNEY
13              BY: Matthew Michael Getter
                    Carrie E. Hamilton
14                  Debra Riggs Bonamici
                    Samuel B. Cole
15              Assistant United States Attorneys
                219 South Dearborn Street
16              Suite 500
                Chicago, Illinois   60604
17

18    For the Defendant:
                KAPLAN & SOROSKY
19              BY:  Sheldon M. Sorosky
                158 West Erie
20              Chicago, Illinois 60610
                (312) 640-1776
21

22         Court Reporter:

23              KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                219 South Dearborn Street
24                      Room 2144-A
                  Chicago, Illinois 60604
25                   (312) 435-5569
```

1    Appearances (continued:)

2

3    For the defendant:

4                        OFFICES OF AARON B. GOLDSTEIN
                         BY: Aaron Benjamin Goldstein
5                        6133 South Ellis
                         Chicago, Illinois 60637
6                        (773) 752-6950

7                        OFFICES OF LAUREN FAUST KAESEBERG
                         BY:  Lauren Faust Kaeseberg
8                        2140 N. Lincoln Park West
                         Suite 307
9                        Chicago, Illinois 60614
                         (773) 517-0622

10
                         LAW OFFICE OF SAMUEL E. ADAM
11                       BY:   Samuel Forbes Adam
                               Samuel Adam, Jr.
12                       6133 South Ellis Avenue
                         Suite 200
13                       Chicago, Illinois 60637
                         (312) 726-2326

14

15
                         Henderson Adam, LLC
16                       BY:  Victor P. Henderson
                         The Insurance Center Building
17                       330 South Wells, Suite 1401
                         Chicago, Illinois 60606
18                       (312) 262-2900

19

20

21

22

23

24

25

1

# I N D E X

2

                                                          PAGE

PAUL PONZO

Cross Examination By Mr. Goldstein                        740

Redirect Examination  By Mr. Getter                       822

Recross Examination  By Mr. Goldstein                     838

NATHAN SARNACKI

Direct Examination  By Mr. Getter                         844

Cross Examination  By Mr. Goldstein                       853

## INDEX TO EXHIBITS

GOVERNMENT EXHIBIT                                        RECEIVED

 Government's Exhibit Map 1 (Demonstrative)               847

 Government Exhibit Horseshoe Casino 3                    855

Ponzo - cross by Goldstein

740

1    (Jury enters courtroom.)

2        COURT SECURITY OFFICER:  All rise.

3    (Jury enters courtroom.)

4        THE COURT:  Please be seated.

01:18:04    5        Go ahead.

6        MR. GOLDSTEIN:  Thank you, Judge.  If it's okay if I

7    may question from here?

8        THE COURT:  Absolutely.

9        PAUL PONZO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

01:18:23   10                CROSS EXAMINATION

11   BY MR. GOLDSTEIN:

12   Q.  Good afternoon, Mr. Ponzo.

13   A.  Good afternoon.

14   Q.  Yesterday and somewhat today you spent a lot of time

01:18:30   15   talking about gambling and campaign checks, is that fair to

16   say?

17   A.  Yes.

18   Q.  And for tax purposes, if these checks were borrowed, it

19   doesn't matter what Mr. Beavers did with them; is that

01:18:43   20   correct?

21        MR. GETTER:  Objection to the form.

22        THE COURT:  Objection sustained.

23   BY MR. GOLDSTEIN:

24   Q.  Well, in your analysis, as far as cash remaining, it

01:18:51   25   doesn't matter what was done with the money if this money was

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 5 of 134 PageID #:2169
Ponzo - cross by Goldstein
741

1  borrowed; is that correct?

2            MR. GETTER:  Same objection.

3            THE COURT:  Objection is sustained.

4  BY MR. GOLDSTEIN:

01:19:02  5  Q.  If -- you talked about that you didn't find any documents

6  in the campaign reports and such that indicated that any of

7  these checks were loans; is that correct?

8  A.  On the D-2s, correct.

9  Q.  On the D-2s.

01:19:18  10            Did you look through any of the campaign documents?

11  A.  The campaign records that we received, yes.

12  Q.  Okay.  And you received them from whom?

13  A.  By subpoena.

14  Q.  By subpoena.

01:19:28  15            Did you go to the office, the campaign office?

16  A.  No, I did not.

17  Q.  Okay.  So you don't know if that's the complete full books

18  that you looked through?

19  A.  As far as I know, it is.

01:19:39  20  Q.  Okay.

21            Okay.  Now, you indicated that there were no

22  documents in the records you received via subpoena that said

23  loan or something to that effect; is that correct?

24  A.  Correct.

01:19:52  25  Q.  Did you receive any documents from the campaign that

Ponzo - cross by Goldstein

742

1    indicate that Mr. Beavers said he was taking it as income?

2    A.  No.

3         MR. GOLDSTEIN:  If you can put up Cook County Expense

4    Report 2007.

01:20:11    5    I think -- oh, okay.  I was seeing birds.  I wasn't

6    sure if that was in my mind or not.

7    BY MR. GOLDSTEIN:

8    Q.  Now, do you recognize this document, Mr. Ponzo?

9    A.  Yes.

01:20:25   10    Q.  And this is Government Exhibit Cook County Expense Report

11    2007; is that correct?

12    A.  Correct.

13    Q.  And in this document, it indicates on the bottom

14    Commissioner Beavers will claim his FY 2007 contingency as

01:20:38   15    income, correct?

16    A.  Correct.

17    Q.  Did you see anything like that in any of the campaign

18    reports where it says I'm taking these checks as income?

19    A.  Are you referring to the hundred checks?

01:20:50   20    Q.  Correct.

21    A.  Yes.  No, I did not.

22    Q.  Okay.  And there was a 2008 report similar to this as far

23    as the contingency fund; is that correct?

24    A.  A fiscal year end November 30th, 2008, yes.

01:21:00   25    Q.  So you saw no documents whatsoever that indicated

1    Mr. Beavers showed in any way an intent to take this as

2    income.  Is that fair to say?

3              MR. GETTER:  Objection.

4              THE COURT:  Objection to the form of the question is

01:21:16   5    sustained.

6    BY MR. GOLDSTEIN:

7    Q.  In the documents you reviewed from all of the campaign

8    committees for Mr. Beavers, you found nothing on any of the

9    documents that indicated something like this that said

01:21:28  10    Mr. Beavers are taking those checks or is taking those checks

11    as income.

12    A.  That's correct.

13    Q.  Or for personal reasons.

14    A.  I didn't see that.

01:21:42  15    Q.  And you said you didn't see the word loan in any of the

16    documents; is that correct?

17    A.  I didn't see the word loan on the -- on the memo part of

18    the check, on the stubs or on the D-2s.

19    Q.  Okay.  But you did see reimbursement.

01:22:00  20    A.  Yes.

21    Q.  Okay.  And you understand reimbursement to mean pay back,

22    correct?

23              MR. GETTER:  Objection.

24              THE COURT:  Sustained.

01:22:08  25    BY MR. GOLDSTEIN:

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 8 of 134 PageID #:2172
Ponzo - cross by Goldstein
744

1    Q.  You saw -- forget about just the writing.  You saw money

2    actually go back into the campaign fund, correct?

3    A.  I saw personal checks deposited into the campaign fund.

4    Q.  And these are personal checks from Mr. Beavers to his

01:22:27   5    various campaign committees, correct?

6    A.  Correct.

7    Q.  If we could just go back, you talked a little bit --

8    you've been an IRS agent for how long, Mr. Ponzo?

9    A.  26-and-a-half years.

01:22:39  10    Q.  Are you a certified public accountant?

11    A.  No, I'm not.

12    Q.  Did you ever take the certified public accountant exam?

13    A.  Yes.

14    Q.  So you didn't pass it?

01:22:47  15    A.  I didn't.

16    Q.  And have you ever prepared someone's tax returns?

17    A.  Family members.

18    Q.  Family members?  Okay.

19        Other than -- have you ever been paid to prepare

01:22:58  20    anyone's tax returns?

21    A.  I can't --

22        MR. GETTER:  Objection.

23        MR. GOLDSTEIN:  I'll strike the question.  I

24    apologize.

01:23:04  25    BY MR. GOLDSTEIN:

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 9 of 134 PageID #:2173
Ponzo - cross by Goldstein
745

```
 1   Q.  Other than family members, have you ever been asked to
 2   prepare someone's tax returns?
 3            MR. GETTER:  Objection, relevance.
 4            THE COURT:  Sustained.
 5   BY MR. GOLDSTEIN:
 6   Q.  Have you ever prepared a company's tax returns?
 7            MR. GETTER:  Same objection.
 8            THE COURT:  Sustained.
 9   BY MR. GOLDSTEIN:
10   Q.  Have you ever been trained in preparing D-2s?
11            MR. GETTER:  Objection.
12            THE COURT:  Sustained.
13   BY MR. GOLDSTEIN:
14   Q.  Have you ever prepared a D-2?
15            MR. GETTER:  Objection.
16            THE COURT:  Sustained.
17            MR. GOLDSTEIN:  That was sustained, your Honor?
18            THE COURT:  Yes.
19            MR. GOLDSTEIN:  Now, if you can turn the Elmo on.
20   Thank you.  Perfect.
21   BY MR. GOLDSTEIN:
22   Q.  Okay.  Now, your -- your review of -- and let's just talk
23   about the hundred checks that you discussed the last two days.
24   Your review of these hundred checks, that covered 2006 to
25   2008; is that correct?
```

01:23:11   (line 5)
01:23:16   (line 10)
01:23:28   (line 15)
01:23:38   (line 20)
01:23:58   (line 25)

1    A.  Yes.

2    Q.  And you reviewed Mr. Beavers' bank accounts, correct?

3    A.  His personal accounts, yes.

4    Q.  Personal accounts, as well as the campaign committee

01:24:09  5    accounts, correct?

6    A.  Correct.

7    Q.  And we'll get into it in a second, but you also reviewed

8    various credit cards and bank cards; is that correct?

9    A.  Credit cards, right.

01:24:18  10   Q.  Okay.  And the accounts you reviewed, they went as far

11   back as 2001, correct?

12   A.  Some of them may have.

13   Q.  Okay.  And some of the analysis you did of bank records

14   went all the way to 2010; is that correct?

01:24:34  15        MR. GETTER:  Objection.

16        THE COURT:  Objection is sustained.

17   BY MR. GOLDSTEIN:

18   Q.  Well, you talked about money or cash, as you termed it,

19   that was remaining in Mr. Beavers' possession.  Do you recall

01:24:46  20   that?

21   A.  Yes.

22   Q.  And one of the things you did was subtract the money that

23   was taken out and given to Mr. Beavers, money that was then

24   given back to the campaign committee; is that correct?

01:24:59  25   A.  I didn't follow you.

```
            1   Q.  I probably didn't follow myself on that one.

            2        Money that was given back from Mr. Beavers to the

            3   campaign committee, you took that out as far as money

            4   remaining in his possession.

01:25:13    5   A.  I subtracted checks from the personal account.

            6   Q.  That's the word I was looking for.

            7        So if we can just go through a few checks.  But

            8   before we go through that, let me see if I understand you

            9   correctly.

01:25:28   10        Is it fair to say if a check was written to

           11   Mr. Beavers for, let's say, a thousand dollars, and then a

           12   check, a subsequent check was written to the campaign

           13   committee for a thousand dollars, those two would cancel out;

           14   is that correct?

01:25:39   15   A.  I don't know.  Where was the first check written from?

           16   Q.  It was written from the campaign committee to Mr. Beavers.

           17   A.  I don't know specifically if they would cancel out.

           18   Q.  Okay.  Okay.  Well, let's get into specifics then.

           19        MR. GOLDSTEIN:  Actually, may I approach, your Honor?

01:25:55   20        THE COURT:  You may.

           21   BY MR. GOLDSTEIN:

           22   Q.  Now, Mr. Ponzo, I've given you a notebook.  I just want

           23   you, when I put up something, you could just go through the

           24   notebook, and we'll look at it together.

01:26:23   25        Let me ask you in the first exhibit I'm labeling as
```

Ponzo - cross by Goldstein

748

1  Beavers Exhibit Check Number 542, do you recognize that

2  document?

3  A.  Yes.

4        MR. GOLDSTEIN:  And I believe this has already been

01:26:38  5  admitted, and may I publish, your Honor?

6        THE COURT:  You may.

7  BY MR. GOLDSTEIN:

8  Q.  Okay.  You recognize this document.  This is a check from

9  William Beavers to Citizen For Beavers; is that correct?

01:26:52  10  A.  Correct.

11  Q.  And that is written May 30th, 2006 for $10,000 to Citizens

12  For Beavers; is that correct?

13  A.  Yes.

14  Q.  Now, if you can turn the page.  Do you recognize what's in

01:27:11  15  the next page, which is check 589?

16  A.  Correct.

17        MR. GOLDSTEIN:  May I publish?

18        THE COURT:  You may.

19  BY MR. GOLDSTEIN:

01:27:22  20  Q.  And check 589 is a check from William Beavers to Friends

21  of Beavers for $12,000, and that was written March 12th, 2007;

22  is that correct?

23  A.  Correct.

24  Q.  And the time or the date that it's written indicates

01:27:40  25  March 12, 2007.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 13 of 134 PageID #:2177
Ponzo - cross by Goldstein
749

1       Do you know what date this was deposited?

2   A.  I'd have to see the deposit slip.

3   Q.  If you'd look at the top, and let me ask you this.  If you

4   look at the top right-hand corner, it says "capture date."

01:28:07   5   What does that indicate?

6   A.  April 4th, 2007.

7   Q.  What does the capture date mean?

8   A.  I don't know.

9   Q.  Okay.  Could that be the deposit date?

01:28:17   10      MR. GETTER:  Objection.

11  BY THE WITNESS:

12  A.  I don't know.

13  BY MR. GOLDSTEIN:

14  Q.  Okay.

01:28:20   15      If you can turn the page, do you recognize what's in

16  the next document, Check Number 3664?

17  A.  Yes.

18      MR. GOLDSTEIN:  May I publish, your Honor?

19      THE COURT:  You may.

01:28:33   20  BY MR. GOLDSTEIN:

21  Q.  This is a check written May 31, 2007 from Mr. Beavers'

22  personal account; is that correct?

23  A.  Yes.

24  Q.  And the prior two checks we just went over were from

01:28:47   25  Mr. Beavers' personal account as well; is that correct?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 14 of 134 PageID #:2178
Ponzo - cross by Goldstein
750

1  A.  They were.

2  Q.  And this particular check was written to the 7th Ward

3  Democratic Organization; is that correct?

4  A.  Yes.

01:28:56  5  Q.  And that's in the amount of $16,000.

6  A.  Right.

7  Q.  Correct?

8         And if you look at the next document, that's check

9  3665; is that correct?

01:29:15  10  A.  Yes.

11         MR. GOLDSTEIN:  May I publish?

12         THE COURT:  You may.

13  BY MR. GOLDSTEIN:

14  Q.  And 3665 is, again, a check from Mr. Beavers' personal

01:29:26  15  bank account to Citizens For Beavers; is that correct?

16  A.  Yes.

17  Q.  That was written May 31, 2007?

18  A.  Yes, it was.

19  Q.  And it indicates for $6,000, correct?

01:29:37  20  A.  Correct.

21  Q.  Now, on the right-hand side just under amount, it says

22  post date.  Do you see that?

23  A.  Yes.

24  Q.  What does post date indicate?

01:29:47  25  A.  The date that it was posted to the bank account.

Ponzo - cross by Goldstein

751

1  Q.  Would that be the deposit date or it could be, is that
2  fair to say?
3  A.  It could be.
4  Q.  Okay.  But you had indicated, like, if it was deposited on
01:29:58  5  a Saturday, it possibly won't post until the following
6  business day?
7  A.  That was regarding checks that were cashed.
8  Q.  Okay.  Okay.
9        Now, if you can turn your page, do you recognize
01:30:15  10  check 3700?
11  A.  Yes.
12        MR. GOLDSTEIN:  May I publish, your Honor?
13        THE COURT:  You may.
14  BY MR. GOLDSTEIN:
01:30:27  15  Q.  This is a check from William Beavers' personal bank
16  account, correct?
17  A.  Correct.
18  Q.  And it's written to Citizen for Beavers in the amount of
19  $2,500; is that correct?
01:30:39  20  A.  Yes.
21  Q.  And it was written July 27, 2007; is that correct?
22  A.  Correct.
23  Q.  And these checks that you reviewed that we've just gone
24  over, all these checks were credited towards checks that were
01:30:58  25  written to Mr. Beavers; is that correct?

Ponzo - cross by Goldstein

752

1  A.  They were -- yes.

2  Q.  Okay.  So in other words, this check $2,500, that would be

3  subtracted from the amount that was taken out and given to

4  Mr. Beavers; is that correct?

01:31:13  5  A.  Correct.

6  Q.  Okay.  And we've seen a few checks just now, but is it

7  fair to say there were more checks that were written from

8  Mr. Beavers' personal account to his campaign committee?

9  A.  Yes.

01:31:27  10  Q.  And we are talking about the years 2006 through 2008.

11  A.  2006 through 2008, yes.

12  Q.  Yes.  Okay.

13       Now, do you have your exhibit chart?

14  A.  No, I don't.

01:31:43  15  Q.  Okay.  I'm going to put it up, if that's okay.

16       MR. GOLDSTEIN:  If I can put up Summary Chart 10,

17  please.

18       May I publish Summary Chart 10, please, your Honor?

19       THE COURT:  You may.

01:32:01  20       MR. GOLDSTEIN:  Thank you.

21  BY MR. GOLDSTEIN:

22  Q.  Can you see that okay?

23  A.  Yes.

24  Q.  All right.  And Summary Chart 10 is the chart labeled Cash

01:32:14  25  Remaining in William Beavers' Possession For the Years 2006

Ponzo - cross by Goldstein

753

1   Through 2008; is that correct?

2   A.  Yes.

3   Q.  Okay.  So what you just got done going through here on

4   your direct-examination is you went through and took all the

01:32:31   5   checks that were written to Mr. Beavers, correct?

6   A.  Correct.

7   Q.  And you tallied those up and you -- for each year you came

8   up with a number; is that correct?

9   A.  Correct.

01:32:40   10   Q.  And then you took into account money that was paid back,

11   correct?

12          MR. GETTER:  Objection.

13          THE COURT:  Sustained.

14   BY MR. GOLDSTEIN:

01:32:52   15   Q.  Well, you took into account money that Mr. Beavers gave to

16   the campaign committee.

17   A.  Correct.

18   Q.  And let me just ask you, Mr. Ponzo.  You reviewed the

19   D-2s, correct?

01:33:01   20   A.  Correct.

21   Q.  Was any of that money that Mr. Beavers gave to the

22   campaign committee, were those labeled as contributions?

23   A.  They weren't on the D-2s.

24   Q.  Well, there was -- there was times that it indicated on

01:33:17   25   the D-2s that -- that checks were reimbursed, correct?

Ponzo - cross by Goldstein

754

1  A.  Or unused.

2  Q.  Or unused.  And those were checks that Mr. Beavers from

3  his personal account gave back to the committee, correct?

4  A.  They were deposited in the committee's accounts, yes.

01:33:35  5  Q.  Correct.  And they weren't labeled as contributions to the

6  committee in the D-2s, correct?

7  A.  No.

8  Q.  Now, if we look at year 2006, it starts with $96,000; is

9  that correct?

01:33:49  10  A.  Yes.

11  Q.  And then there's a series of subtractions, so expenses

12  related to campaign fund, checks payable to William Beavers,

13  correct?

14  A.  Correct.

01:33:57  15  Q.  And it then goes on to receipts, as well as D-2 items and

16  then other subtractions; is that correct?

17  A.  Yes.

18  Q.  And then you came up with a cash remaining in Mr. Beavers'

19  possession, correct?

01:34:10  20  A.  Correct.

21  Q.  Okay.

22      Now, if we can go over this, the amounts of money

23  that Mr. Beavers took out in 2006 was $96,000, correct?

24  A.  Yes.

01:34:28  25  Q.  And the amount remaining that you say is in Mr. Beavers'

Ponzo - cross by Goldstein

755

1    possession is $1,482.67, correct?

2    A.  Correct.

3    Q.  Okay.  And so that means that $94,517.33 was either paid

4    back or money was given, if we don't like that language, money

01:35:00    5    was given by Mr. Beavers to his campaign account, as well as

6    other itemized expenses that you gave credit to him; is that

7    correct?

8                MR. GETTER:  Objection.

9                THE COURT:  Objection to the form of the question is

01:35:12    10    sustained.

11    BY MR. GOLDSTEIN:

12    Q.  Well, let's do a little math.  $96,000 minus $1,482.67 is

13    $94,517.33, correct?

14    A.  I -- I don't know offhand.

01:35:31    15    Q.  Well, is it fair to say I'm in the ballpark?

16    A.  Yes.

17    Q.  Okay.  And so with that number, if we're to do the

18    percentages here, that means that 98 percent, just over

19    98 percent of that $96,000 was either money given from

01:35:55    20    Mr. Beavers to the campaign account or money that was somehow

21    accounted for; is that correct?

22    A.  That was subtracted, yes.

23    Q.  Okay.  So 98 percent; is that correct?

24    A.  I don't know the percent offhand.

01:36:11    25    Q.  You didn't do any of these calculations?

Ponzo - cross by Goldstein

1    A.  Percentages?  No.

2    Q.  Correct.

3         Would it be fair to say -- well, let me ask you this:

4    Would you agree with me that it's over 98 percent?

01:36:26    5    A.  I -- I -- I don't have a calculator.  I didn't compute it.

6         MR. GOLDSTEIN:  Your Honor, may I provide a

7    calculator?

8         THE COURT:  You're going to have him calculate

9    something now?

01:36:40    10        MR. GOLDSTEIN:  Well, for demonstrative purposes.  I

11   guess I should put it on the Elmo and we can do it together in

12   quick time.

13        THE COURT:  I don't think so.

14        MR. GOLDSTEIN:  Fair enough, fair enough.

01:36:51    15   BY MR. GOLDSTEIN:

16   Q.  Okay.  In 2007, all right, there was $69,300.84 that you

17   tabulated with I'm assuming a calculator that was taken out

18   from Mr. -- or from the campaign committees to Mr. Beavers,

19   correct?

01:37:13    20   A.  There were checks written to Mr. Beavers in that amount --

21   Q.  Correct.

22   A.  -- that were cashed.

23   Q.  And that's the top line in 2007.

24   A.  Correct.

01:37:21    25   Q.  Okay.  And if we go down the list, we won't itemize every

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 21 of 134 PageID #:2185
Ponzo - cross by Goldstein
757

1  number, but basically the bottom line is $14,150.62, correct?

2  A.  Yes.

3  Q.  And that's money that you say, as the bottom line

4  indicates, remaining in Mr. Beavers' possession, correct?

01:37:42  5  A.  Correct.

6  Q.  So is it fair to say that after all that money that was

7  taken out, $55,150.22 was either money that Mr. Beavers gave

8  to the account or money that was accounted for in some way?

9  A.  It's money --

01:38:08  10        MR. GETTER:  Objection to form, the term "accounted

11  for."

12        MR. GOLDSTEIN:  Here, I'll ask a different question.

13        THE COURT:  Yeah, rephrase the question.

14  BY MR. GOLDSTEIN:

01:38:17  15  Q.  Mr. Ponzo, the items I'm circling right there, that totals

16  $55,150.22, correct?

17  A.  I don't know offhand, but that's -- 69,000 minus all those

18  items equals 14,150.62.

19  Q.  So out of $69,300.84, 80 percent was either money that was

01:38:51  20  given from Mr. Beavers to the campaign account or, as you

21  indicated under the description, expenses related to campaign

22  fund checks, receipts not associated with a campaign fund

23  check, D-2 items, or other subtractions?

24  A.  I don't know the percentage.

01:39:10  25  Q.  Does 80 percent sound accurate?

1    A.  I don't have the percentage.

2    Q.  Well, how about this:  It's more than 50 percent, correct?

3    A.  Correct.

4    Q.  And it's more than 70 percent, correct?

01:39:28    5    A.  I -- I don't know.

6    Q.  That's a tougher one.  Okay.

7        It -- in 2008, $61,000 you say is money in checks

8    written to Mr. Beavers from the campaign accounts; is that

9    correct?

01:39:44    10    A.  Yes.

11    Q.  And these numbers that I am poorly circling right now is a

12    total of $46,447.89.

13        MR. GETTER:  Objection, form of the question.

14        THE COURT:  Is that a question?

01:40:13    15        MR. GOLDSTEIN:  Maybe it's my poor writing that

16    probably confused people.

17    BY MR. GOLDSTEIN:

18    Q.  That number, the total number that I've circled right

19    here, and I'll put a little arrow right there, okay?  The

01:40:23    20    total number that I circled right there is -- let me get my

21    number -- $46,447.89, correct?

22    A.  I don't know offhand.

23    Q.  Don't know.

24        And that bottom line number, $14,552.11, okay, is

01:40:43    25    what you say is cash remaining to Mr. Beavers; is that

Ponzo - cross by Goldstein

759

1　correct?

2　A.　Correct.

3　Q.　So these items that I bracketed right there?　Okay?　Do

4　you see that?

01:41:03　5　A.　Yes.

6　Q.　Those items?

7　　　　　Those items in 2008 account for over 76 percent of

8　the checks that were written to Mr. Beavers; is that correct?

9　A.　I don't know the percentage.

01:41:17　10　Q.　Well, you agree with me that it's over 50 percent.

11　A.　Yes.

12　Q.　Now, if we look at the totals, okay, and it indicates, by

13　your calculation, $226,300.84 was for those three years money

14　taken out from the campaign fund written to Mr. Beavers; is

01:41:44　15　that correct?

16　A.　They were checks payable to Mr. Beavers that were cashed,

17　right.

18　Q.　And this number, this total number that I've just circled,

19　all those numbers that I've circled, the total number is

01:42:00　20　$196,115.44; is that correct?

21　A.　I don't know that offhand.

22　Q.　Okay.　Does that look accurate?　Does that number I just

23　quoted you look accurate?

24　　　　　MR. GETTER:　Objection, your Honor, asked and

01:42:17　25　answered.

Ponzo - cross by Goldstein

760

```
         1        THE COURT:  Objection sustained.
         2   BY MR. GOLDSTEIN:
         3   Q.  Okay.  And it's fair to say -- well, Mr. Ponzo, how long
         4   have you been on this case?
01:42:29 5   A.  I believe I was assigned to this case in March or April
         6   of 2009.
         7   Q.  2009, March or April, so we're about the four-year
         8   anniversary.
         9        MR. GETTER:  Objection to relevance.
01:42:44 10       THE COURT:  Objection sustained.
        11   BY MR. GOLDSTEIN:
        12   Q.  You've been on the case four years.
        13   A.  Approximately.
        14   Q.  Approximately.
01:42:51 15       And in the four years of analyzing all this, you
        16   haven't figured out the percentage of money that Mr. Beavers
        17   paid to the campaign fund or somehow allocated towards
        18   Mr. Beavers.
        19       MR. GETTER:  Objection.
01:43:02 20      THE COURT:  Sustained.
        21   BY MR. GOLDSTEIN:
        22   Q.  Now, these items, and I'll circle for 2006, all the items
        23   that I've circled, you're not suggesting in any way that those
        24   items had to be reported as income by Mr. Beavers.
01:43:23 25      MR. GETTER:  Objection.
```

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 25 of 134 PageID #:2189
Ponzo - cross by Goldstein
761

1    THE COURT:  Objection is sustained.  It's beyond the

2    scope.

3    BY MR. GOLDSTEIN:

4    Q.  Now, the -- we talked about the totals, and I quoted 190

01:43:46    5    or thereabout number, 190,000 thereabout number, and you said

6    you weren't sure.

7        Now, if I could just ask one more question on the

8    totals issue.  The total amount of money -- so I'll just put

9    an arrow right there -- that total, whatever number it is,

01:44:05    10    that reflects 86 percent of the $226,000.

11    A.  I didn't compute the percentage.

12    Q.  Now, Mr. Ponzo, you talked about how you did your analysis

13    and going over checks and bank accounts; is that fair to say?

14    A.  Yes.

01:44:32    15    Q.  And you talked about certain things that you looked at,

16    so, for example, receipts.  As you said, you gave credit to

17    Mr. Beavers as far as cash remaining in his possession; is

18    that correct?

19    A.  Yes.

01:44:46    20    Q.  And we've already talked about the money that Mr. Beavers

21    gave to the campaign account, correct?

22    A.  Money that came back into the campaign accounts, right.

23    Q.  Now, your focus was 2006 through 2008, correct?

24    A.  Yes.

01:45:00    25    Q.  Now, if you can go back to your -- your notebook, and if

Ponzo - cross by Goldstein

762

1    you can turn to the next page --

2    A.  I don't have a notebook.

3    Q.  No, no, the notebook that I gave you.

4         Okay.  Do you see what's indicated as check 3374?

01:45:24    5    A.  Yes.

6    Q.  Do you recognize this document?

7    A.  Yes.

8    Q.  Okay.

9         MR. GOLDSTEIN:  May I publish?

01:45:29    10        MR. GETTER:  Objection, your Honor.  Relevance of

11   this document, the time period.

12        MR. GOLDSTEIN:  I can go through before I publish it.

13   BY MR. GOLDSTEIN:

14   Q.  Okay.  Mr. Ponzo, this is a check written from

01:45:41    15   Mr. Beavers' personal account to the 7th Ward Democratic

16   Organization; is that correct?

17   A.  Yes.

18   Q.  And the date written on the check is December 28, 2005,

19   correct?

01:45:53    20   A.  Correct.

21   Q.  The date that this was deposited, this check was deposited

22   was January 17, 2006, correct?

23   A.  I -- I -- I don't know.  I don't have the deposit slip.

24   Q.  Well, look at the bottom.  Look at the back of the check.

01:46:11    25   There's a time stamp, right, on the back of the check?

```
            1    A.  I don't see a time stamp.

            2    Q.  Okay.  Here's what I want you to do.  I want you to turn

            3    the paper horizontal, landscape, okay?  And do you see at the

            4    top of the back of the check, there's a stamp that says 7th

01:46:35    5    Ward Democratic Organization.  Do you see that?

            6    A.  Yes.

            7    Q.  Okay.  If you go down below that, it says Chicago,

            8    Illinois.

            9    A.  Correct.

01:46:42   10    Q.  Do you see that?

           11    A.  Correct.

           12    Q.  Then there's a series of numbers under Chicago, Illinois.

           13    A.  Correct.

           14    Q.  The next thing you see under those series of numbers is

01:46:50   15    what?

           16    A.  A date.

           17    Q.  A date.  And that date would be?

           18    A.  I don't know.

           19    Q.  Jan stand for January?

01:47:00   20    A.  January 17th, '06.

           21    Q.  Okay.  So that indicates when this check was deposited,

           22    correct?

           23          MR. GETTER:  Objection, foundation.

           24          THE COURT:  Objection is sustained.

01:47:10   25    BY MR. GOLDSTEIN:
```

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 28 of 134 PageID #:2192
Ponzo - cross by Goldstein
764

1  Q.  Well, Mr. Ponzo, you just testified for some time now how

2  checks were deposited and when they were written, correct?

3  A.  The date of the check, the date it was processed.

4  Q.  Date it was processed, okay.

01:47:29    5          And this date, January 17, 2006, what does that

6  signify to you?

7  A.  I got the date processed from the bank statements, so I'm

8  not sure if that's going to be the same date or not.

9  Q.  Okay.  Well, tell me on this check, the back of the check

01:47:45   10  on which you see January 17, 2006, what does that indicate to

11  you?

12  A.  It may be the date processed.

13  Q.  May be the date processed.  Okay.

14          So if it's the date processed, okay?  You say it may

01:48:01   15  be.  If it is the date processed, that would indicate that

16  this check was deposited January 17, 2006, correct?

17  A.  Correct.

18          MR. GOLDSTEIN:  May I publish, your Honor?

19          MR. GETTER:  I'm still not sure of the relevance,

01:48:15   20  Judge.

21          THE COURT:  Publish it.

22  BY MR. GOLDSTEIN:

23  Q.  Okay.  So this is the check we were just talking about,

24  correct?

01:48:24   25  A.  Correct.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 29 of 134 PageID #:2193
Ponzo - cross by Goldstein
765

1  Q.  Okay.  And the date that's written says 28 DEC 2005,

2  correct?

3  A.  Correct.

4  Q.  And the thing we were just talking about, I'll zoom in,

01:48:36  5  and actually I'll turn it this way, it's a little easier to

6  see.  This thing that I'm circling right there, that's what we

7  were talking about?

8  A.  Correct.

9  Q.  Okay.  And that's what we -- we're not a hundred percent

01:48:46  10  sure, but you believe it's possibly the date it was processed.

11  A.  Correct.

12  Q.  Okay.  Now, if we go back to this check, this is a check

13  written from Mr. Beavers to one of his campaign committees for

14  $1,000, correct?

01:49:02  15  A.  Correct.

16  Q.  And you did not count this check in your analysis; is that

17  correct?

18  A.  Correct.

19  Q.  And if you can turn the page of your notebook, do you see

01:49:20  20  check 522?

21  A.  Yes.

22  Q.  And this is a check from Mr. Beavers' personal bank

23  account, correct?

24  A.  Correct.

01:49:30  25  Q.  And it's written to 7th Ward Democratic Organization.

1    A.  Correct.

2    Q.  For $2,000.

3    A.  Correct.

4    Q.  And the date written is 30 December 2005, correct?

01:49:43    5    A.  Correct.

6    Q.  Now, if we look at the back of the check again, similar to

7    where we saw on the other one, it indicates January 23rd,

8    2006, correct?

9    A.  Correct.

01:49:54    10    MR. GOLDSTEIN:  May I publish, your Honor?

11    THE COURT:  Yes.

12    MR. GOLDSTEIN:  Thank you.

13    BY MR. GOLDSTEIN:

14    Q.  This check 522 is the check we were just talking about,

01:50:07    15    correct?

16    A.  Yes.

17    Q.  And if we turn it this way, what I circled right there

18    indicates January 23rd, 2006, correct?

19    A.  Correct.

01:50:18    20    Q.  Okay.  And that's what you believe is the process date?

21    A.  Correct.

22    Q.  Which most likely means when it was deposited, correct?

23    A.  Probably, yes.

24    Q.  Okay.  And this check for $2,000 that Mr. Beavers wrote to

01:50:34    25    his campaign committee was not computed in your analysis; is

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 31 of 134 PageID #:2195
Ponzo - cross by Goldstein
767

1  that correct?

2  A.  Correct.

3  Q.  If you can turn the page, Mr. Ponzo.  Do you see check

4  523?

01:50:50  5  A.  Yes.

6  Q.  And this is a check from Mr. Beavers' personal account,

7  correct?

8  A.  Correct.

9  Q.  And from his personal account to Citizens For Beavers for

01:51:02  10  $2,000; is that correct?

11  A.  Yes.

12  Q.  And that's written 30 December 2005.

13  A.  Correct.

14  Q.  I'm sorry, I didn't hear you.

01:51:13  15  A.  Yes.

16  Q.  And then if we look again on the back of the check, it

17  indicates January 23rd, 2006 as what you believe is the

18  possible process date, correct?

19  A.  Correct.

01:51:24  20      MR. GOLDSTEIN:  May I publish, your Honor?

21      THE COURT:  Yes.

22      MR. GOLDSTEIN:  Thank you.

23  BY MR. GOLDSTEIN:

24  Q.  So this check 523, this is the check we were just talking

01:51:34  25  about, correct?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 32 of 134 PageID #:2196
Ponzo - cross by Goldstein
768

01:51:53

01:52:23

01:52:43

01:52:56

01:53:12

1   A.  Yes.

2   Q.  And the date I circled right there is January 23rd, 2006.

3   A.  Yes.

4   Q.  And this check for $2,000 written from Mr. Beavers to

5   Citizens For Beavers was not tabulated in your analysis of

6   checks written in and out.

7   A.  Correct.

8   Q.  Now, if I can publish your summary chart.  Now, on Summary

9   Chart 10 --

10         MR. GOLDSTEIN:  May I publish, your Honor?

11         Thank you.

12   BY MR. GOLDSTEIN:

13   Q.  So -- sorry.

14         All right.  So that was -- those last three checks

15   were for $1,000, $2,000 and $2,000, respectively; is that

16   correct?

17   A.  Yes.

18   Q.  And that totals $5,000, correct?

19   A.  Correct.

20   Q.  And that was money you did not calculate in your analysis,

21   correct?

22   A.  Correct.

23   Q.  So $5,000 was not tabulated; is that correct?

24   A.  Yes.

25   Q.  Excuse my chicken scratch.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 33 of 134 PageID #:2197
Ponzo - cross by Goldstein
769

1    Okay.  So if you did tabulate that $5,000 of checks

2    that were deposited in January of '06 for '06, the campaign

3    committee would actually owe Mr. Beavers money; is that

4    correct?

01:53:34    5    MR. GETTER:  Objection.

6    THE COURT:  Objection is sustained.

7    BY MR. GOLDSTEIN:

8    Q.  Well, that number, instead of $1,482.67, would be -- let

9    me -- I had it written down here -- would be $3,517.33, but it

01:54:00    10    would be negative, correct?

11    A.  It would be a negative number.

12    Q.  Okay.  But you're not sure whether it's -- the number I

13    gave you is the correct one.

14    A.  Correct.

01:54:09    15    Q.  And if we put it towards our totals, 5,000, okay?  We

16    won't give you -- we won't go through specifics, but

17    $30,185.40, I think even I can tabulate this one, would be

18    $25,185.40 remaining.

19    A.  Correct.

01:54:36    20    Q.  If you tabulated the $5,000 that Mr. Beavers deposited in

21    January of 2006.

22    A.  Correct.

23    Q.  Okay.  Now, you did, Mr. Ponzo, an extensive analysis of

24    Mr. Beavers' personal bank accounts, correct?

01:55:01    25    A.  I reviewed them, yes.

Ponzo - cross by Goldstein

770

```
          1   Q.  And you analyzed an account from Pullman Bank; is that
          2   correct?
          3   A.  I -- I -- yes.
          4   Q.  And there was an account from Pullman Bank, Account Number
01:55:17  5   9486, those are the final four numbers; is that correct?
          6   A.  Correct.
          7   Q.  Okay.  Now, and you've looked through all the bank
          8   records?
          9   A.  For 2006 through 2008.
01:55:29  10  Q.  Okay.  But you did analyze more than 2006 to 2008; is that
          11  correct?
          12  A.  I reviewed them.
          13  Q.  Okay.  You reviewed them but didn't do an analysis.
          14  A.  Correct.
01:55:38  15  Q.  Okay.  Now, if you can look at the next document in your
          16  binder, in front of you is a statement of account for
          17  Mr. Beavers' personal bank account ending in 9486; is that
          18  correct?
          19  A.  Yes.
01:56:01  20  Q.  Okay.  And the statement date is January 26th, 2006; is
          21  that correct?
          22  A.  Correct.
          23  Q.  Do you recognize this document?
          24  A.  Yes.
01:56:11  25  Q.  And you reviewed it?
```

Ponzo - cross by Goldstein

771

| | | |
|---|---|---|
| | 1 | A.  Yes. |
| | 2 | Q.  And I believe it was previously admitted as an exhibit; is |
| | 3 | that correct, Mr. Ponzo, if you know? |
| | 4 | A.  I don't know. |
| 01:56:22 | 5 | Q.  You might not know that.  I apologize. |
| | 6 | MR. GOLDSTEIN:  May I publish, your Honor? |
| | 7 | THE COURT:  You may publish. |
| | 8 | MR. GOLDSTEIN:  Thank you. |
| | 9 | BY MR. GOLDSTEIN: |
| 01:56:30 | 10 | Q.  Now, this is obviously a lot harder to read.  We'll try |
| | 11 | and zoom in. |
| | 12 | Now, I want you to focus because we're only talking |
| | 13 | about '06, so I will put -- make this a little bit easier for |
| | 14 | us to read. |
| 01:56:49 | 15 | Okay.  So you see the first date there, it says |
| | 16 | 01-03, correct? |
| | 17 | A.  Correct. |
| | 18 | Q.  And that indicates January 3rd, 2006, correct? |
| | 19 | A.  Correct. |
| 01:57:03 | 20 | Q.  And if we look -- oops, sorry. |
| | 21 | If we look over, there's a check number 3375; is that |
| | 22 | correct? |
| | 23 | A.  Yes. |
| | 24 | Q.  And it indicates for $1,000, correct? |
| 01:57:16 | 25 | A.  Correct. |

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 36 of 134 PageID #:2200
Ponzo - cross by Goldstein
772

1  Q.  And the negative number in front of that number indicates

2  that that was not a deposit, it was actually an outgoing

3  check; is that correct?

4  A.  A check that cleared the account.

01:57:29  5  Q.  Okay.  So it was a check written from Mr. Beavers' bank

6  account to some other entity; is that correct?

7  A.  Correct.

8  Q.  Okay.  And if you look down on January 5, check 3378,

9  there's another minus $1,000, correct?

01:57:45  10  A.  Correct.

11  Q.  Okay.  If you can turn to the next page.  And I'll just

12  show you a few here.  I'll just bracket it right here.

13      Those checks, the 3380, 3374, those are checks

14  written from Mr. Beavers, correct?

01:58:14  15  A.  Correct.

16  Q.  To some entity, correct?

17  A.  Correct.

18  Q.  And those -- those first three, January 17th, are for a

19  thousand dollars.

01:58:25  20  A.  Correct.

21  Q.  And if you can turn to the next page, the next page is a

22  statement from the same bank account but for February 24,

23  2006; is that correct?

24  A.  Correct.

01:58:43  25  Q.  And do you recognize this document?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 37 of 134 PageID #:2201
Ponzo - cross by Goldstein
773

1    A.  Yes.

2          MR. GOLDSTEIN:  Okay.  May I publish, your Honor?

3          THE COURT:  Yes.

4          MR. GOLDSTEIN:  Thank you.

01:58:54    5    BY MR. GOLDSTEIN:

6    Q.  And here you see some more checks.  So if we look at

7    January 30, check 3383, do you see that?

8    A.  Yes.

9    Q.  Okay.  And then below that is January 30, check 3382 for

01:59:15    10    $1,000.

11    A.  Correct.

12    Q.  Okay.  Now, you looked into these checks, correct?

13          MR. GETTER:  Objection.

14          MR. GOLDSTEIN:  I'll rephrase.

01:59:28    15    BY MR. GOLDSTEIN:

16    Q.  Did you analyze these checks as part of your analysis from

17    2006 to 2008?

18    A.  I -- I may have reviewed the checks.

19    Q.  Okay.  Well, is it fair to say in your review that many of

01:59:42    20    these checks from the first of January 2006 to towards the end

21    of February 2006, you classified as unknown; is that correct?

22    A.  Unknown?

23    Q.  Unknown.

24    A.  Not from the personal account.

02:00:00    25    Q.  Okay.  Well, let me ask you this:  Maybe -- can you look

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 38 of 134 PageID #:2202
Ponzo - cross by Goldstein
774

1  at your -- it's in a folder.  It's your analysis of William

2  Beavers' Pullman Park National Bank account number -- the

3  final numbers are 9486.  It should be in an actual -- not one

4  of those legal folders I'm holding.  Maybe -- is that it that

02:00:29   5  you have there?

6  A.  I think these are the credit cards.

7  Q.  Okay.  Is there one other -- look in that folder.  Do you

8  see that?  Is that it?  Is that your summary of Mr. Beavers'

9  bank account?

02:00:57   10  A.  It's a draft.

11  Q.  Okay.  It's a draft, but it's a summary.

12  A.  It's a draft of the items in the bank account.

13  Q.  Okay.  Is this document prepared by you?

14  A.  I believe so.

02:01:09   15  Q.  Okay.  If you can turn to Page 50 of that document.

16          Are you there?

17  A.  Yes.

18  Q.  At the top of the page in the middle, it says payee/payor.

19  A.  Correct.

02:01:38   20  Q.  And it says unknown.

21  A.  Yes.

22  Q.  Okay.  Unknown indicates that you don't know who that

23  check was written to; is that correct?

24  A.  I didn't have the check.

02:01:48   25  Q.  Okay.  So you never provided the check.

Ponzo - cross by Goldstein

1    A.  Correct.

2    Q.  Okay.  So you didn't know who that check was written to;

3    is that correct?

4    A.  Correct.

02:01:57    5    Q.  Okay.  Now, if you look through Page 50, all the way down

6    the page, there's a -- there's a decent amount of unknowns

7    written to payee/payor; is that correct?

8    A.  Correct.

9    Q.  Okay.  Turn to Page 51, and on 51, the first six checks or

02:02:24    10    transactions, five of them are unknown; is that correct?

11    A.  Correct.

12         MR. GOLDSTEIN:  May I publish Pages 50 to 51, your

13    Honor?

14         MR. GETTER:  Judge, the only objection I have here is

02:02:38    15    that he termed these documents drafts.  It says draft on the

16    document, so to the extent that he's cross-examining him on a

17    draft of a spreadsheet, I'm not sure it's quite fair.

18         MR. GOLDSTEIN:  Well, it's a previously written

19    document.  I certainly established this is a draft.

02:03:00    20         THE COURT:  Overruled.

21    BY MR. GOLDSTEIN:

22    Q.  Now, Mr. Ponzo, this is Page 50 of the document we were

23    just going over; is that correct?

24    A.  Correct.

02:03:14    25    Q.  So what you did was you went through every transaction in

Ponzo - cross by Goldstein

1    Mr. Beavers' personal bank account for a number of years; is

2    that correct?

3    A.  Yes.

4    Q.  Okay.  So on the left, you have bank date, correct?

02:03:32    5    A.  Correct.

6    Q.  And bank date indicates when it was deposited; is that

7    correct?

8    A.  It's the date on the statement.

9    Q.  Date on the statement.

02:03:40    10           And CAT is category, correct?

11    A.  Correct.

12    Q.  And check number indicates the number of check, right?

13    A.  Correct.

14    Q.  And there's a check date there, but there's nothing

02:03:51    15    written in that column; is that correct?

16    A.  On that page, right.

17    Q.  Okay.  And then payee/payor, correct?

18    A.  Correct.

19    Q.  And payee/payor indicates either who the check was written

02:04:03    20    to, if it's going out, or who it was from if it's coming in?

21    A.  Correct.

22    Q.  Okay.  And the amount is the amount of check, correct?

23    A.  Correct.

24    Q.  And if it's in parentheses, that means it's being taken

02:04:19    25    out of Mr. Beavers' bank account, correct?

1  A.  It's a subtraction.

2  Q.  It's a subtraction.

3         And there's check memo, but there's nothing written

4  there; is that correct?

02:04:29  5  A.  Correct.

6  Q.  And then on the right, it's balance, correct?

7  A.  Correct.

8  Q.  Okay.  So for these ones right here, you wrote unknown; is

9  that correct?

02:04:42  10  A.  Correct.

11  Q.  So it's unknown even though there's no N in between that O

12  and K, correct?

13  A.  Correct.

14  Q.  And an unknown indicates that you just couldn't see the

02:04:54  15  check.

16  A.  I didn't have the check.

17  Q.  Okay.  And then right here is some more unknown, correct?

18  A.  Correct.

19  Q.  And here, here, here, and all those bracketed or put a

02:05:10  20  little dash right next to it, those are all the ones that you

21  indicated are unknown, correct?

22  A.  I didn't have the check, correct.

23  Q.  Correct.

24         And if we turn to Page 51, the unknowns stop right

02:05:30  25  here on February 24, 2006, correct?

1    A.  Correct.

2    Q.  Okay.  So out of those first transactions, those first six

3    transactions, five of them you indicated as unknown, correct?

4    A.  Correct.

02:05:44    5    Q.  Now, these were -- these were a decent amount of checks

6    that were unknown, according to your analysis.

7    A.  Correct.

8    Q.  And the total of those checks that were unknown is

9    $13,518.46; is that correct?

02:06:23    10    A.  I don't know.

11    Q.  You don't know if those checks were written for a campaign

12    expense, do you?

13    A.  I -- I don't have the checks, no.

14    Q.  And these checks did occur in 2006.

02:06:41    15    A.  They cleared the bank in 2006.

16    Q.  Correct.  And if we look back at your summary, the unknown

17    checks were not tabulated in your calculation; is that

18    correct?

19    A.  Correct.

02:07:03    20    Q.  Okay.  And is it fair to say that approximately $13,000 in

21    checks was unknown?

22    A.  I don't know the total.

23    Q.  Okay.  So we'll put question mark by that.  But you just

24    know you didn't tabulate it in this chart.

02:07:25    25    A.  Correct.

|   |   |
|---|---|
| 1 | Q.  Now, you did some analysis on checks that were called |
| 2 | void.  Do you recall that? |
| 3 | A.  Yes. |
| 4 | Q.  And on Summary Chart 9, you actually created a chart that |
02:07:43 | 5 | discussed void checks.  Do you recall that? |
| 6 | A.  Yes. |
| 7 | Q.  And then on Summary Chart 10, void checks were analyzed as |
| 8 | well; is that correct? |
| 9 | A.  Correct. |
02:07:56 | 10 | Q.  If I may, in Summary Chart 10, I want to go over with you |
| 11 | regarding void checks, and I'm going to turn to Page 14. |
| 12 | MR. GOLDSTEIN:  If I may publish, your Honor? |
| 13 | Thank you. |
| 14 | THE COURT:  Yes, you may. |
02:08:29 | 15 | MR. GOLDSTEIN:  Sorry, a little premature.  Thank |
| 16 | you. |
| 17 | BY MR. GOLDSTEIN: |
| 18 | Q.  So this is -- let me zoom out.  This is Page 14 of Summary |
| 19 | Chart 10, correct? |
02:08:43 | 20 | A.  Correct. |
| 21 | Q.  All right.  So if we can go all the way to the column |
| 22 | right next to the far right, and it indicates amount credited |
| 23 | against check, do you see that? |
| 24 | A.  Yes. |
02:08:55 | 25 | Q.  Okay.  So just for example, in number 1 on this page, |

1    amount credited against check was $2,000, correct?

2    A.  Correct.

3    Q.  So that -- as you termed it, that's a subtraction.

4    A.  Correct.

02:09:08    5    Q.  Okay.  If we go down to Line 18, I'll just circle it here,

6    do you see that?

7    A.  Yes.

8    Q.  And that is a check that was written to Mr. Beavers for

9    $2,000, correct?

02:09:25   10    A.  Correct.

11    Q.  Okay.  And it was indicated on the check stub "void,"

12    correct?

13    A.  Correct.

14    Q.  And this dash here indicates you did not give credit to

02:09:36   15    Mr. Beavers for that check; is that correct?

16    A.  Directly against that check, right.

17    Q.  Okay.  And I want to turn to Page 20 of Summary Chart 10.

18    Look at Page 20 of Summary Chart 10.  There's a substantial

19    amount of void checks; is that correct?

02:10:11   20    A.  Yes.

21    Q.  Okay.  And other than the one amount right here that I'm

22    circling, every void check you did not give credit to

23    Mr. Beavers for; is that correct?

24    A.  Not directly, right.

02:10:26   25    Q.  And if we go finally to Page 21 of your Summary Chart 10,

1 there are two void checks, correct?

2 A.  Correct.

3 Q.  And that's No. 26 and 27, correct?

4 A.  Correct.

02:10:45  5 Q.  And those two checks you did not give credit to

6 Mr. Beavers for; is that correct?

7 A.  Correct.

8 Q.  Now, are you aware that void checks indicated checks were

9 paid back?

02:11:16  10 A.  The void was just on the check stub.

11 Q.  Okay.

12 A.  The checks cleared the bank.

13 Q.  Well, did you -- correct.

14         Are you aware that the term written void on the stub

02:11:27  15 indicated that the money was paid back to the campaign

16 committee by Mr. Beavers?

17         MR. GETTER:  Objection, foundation.

18         THE COURT:  Sustained.

19 BY MR. GOLDSTEIN:

02:11:37  20 Q.  Do you know who Vetrice Coleman is?

21 A.  Yes.

22 Q.  She was the treasurer of Mr. Beavers' campaign committees,

23 correct?

24 A.  Correct.

02:11:46  25 Q.  Have you spoken to her?

Ponzo - cross by Goldstein

1  A.  I believe I met her once before she testified in the grand

2  jury.

3  Q.  Okay.  And it's your understanding that when -- she wrote

4  the void.  She wrote void on the check stubs, correct?

02:12:00    5          MR. GETTER:  Objection.

6          THE COURT:  You're objecting to that?

7          MR. GETTER:  Yes.

8          THE COURT:  Sustained.

9  BY MR. GOLDSTEIN:

02:12:06   10  Q.  Do you know who wrote void on the check stub?

11  A.  No, I don't.

12  Q.  Do you know what void means?

13  A.  No, I don't.

14  Q.  Do you know what the understanding of the individual that

02:12:16   15  wrote void on the check stub meant?

16  A.  No.

17  Q.  Okay.  If -- but you didn't give credit to checks that

18  were written as void, correct?

19  A.  Void was written on the check stub.

02:12:29   20  Q.  On the check stub, I understand.

21          You did not give credit, you did not make a

22  subtraction when it came to check stubs in which void was

23  written; is that correct?

24  A.  Not directly, right.

02:12:42   25  Q.  So you do not know whether or not those check stubs that

1    were written void, whether money was then reimbursed to the

2    campaign.

3    A.  I -- I know that checks that were written from the

4    personal accounts to the campaign fund accounts.

02:12:59    5    Q.  Okay.  But you're unaware of what void means.

6    A.  Correct.

7    Q.  Okay.  And if we can go back to Summary Chart 10 under

8    totals, you tabulated the amount of void checks, correct?

9    A.  I -- I don't know if I did.

02:13:26    10    Q.  Okay.  Well, is it fair to say that the total amount of

11    void checks that you did not give credit to Mr. Beavers for,

12    that you did not make as a subtraction, was $17,000?

13    A.  I -- I don't know the number.

14    Q.  Let's do this.  If we can go to Summary Chart 10, and

02:13:56    15    we'll start with Page 14.

16            All right.  Void check -- number 18 that's void,

17    that's for $2,000, correct?

18    A.  Correct.

19    Q.  And if we turn to page -- if we turn to Page 20, void

02:14:33    20    check number 2 is $2,000, correct?

21    A.  Correct.

22    Q.  Void check number 3 is $2,000, correct?

23    A.  Yes.

24    Q.  Void check number 8 or check number 8, which is indicated

02:14:48    25    void, is $2,000, correct?

Ponzo - cross by Goldstein

784

1    A.  Correct.

2    Q.  Check number 9, which is indicated as void, $2,000.

3    A.  Correct.

4    Q.  Check 10, which is No. 344, is for $2,000, correct?

02:15:04   5    A.  Correct.

6    Q.  Check 346, which is check number 12 on your list, is

7    $2,000, correct?

8    A.  Correct.

9    Q.  Okay.  Then we skip.  There's some blanks.

02:15:17   10          Number 23, the final number, is a check marked void

11   for $1,000, correct?

12   A.  Correct.

13   Q.  And if we look on Page 21, check 26, $1,000 and marked

14   void, correct?

02:15:43   15   A.  Correct.

16   Q.  Check number 27, which is actually Check No. 351 is marked

17   void for $1,000, correct?

18   A.  Correct.

19   Q.  All right.  So let's do the math here.  This is $2,000,

02:15:58   20   correct?

21   A.  Correct.

22   Q.  This is 2, 4, 6, 8, 10, 12, $13,000, correct?

23   A.  Correct.

24   Q.  And I might have missed one, but we'll go on.

02:16:14   25          Here's one for $2,000, okay; is that correct?

1   A.  Correct.

2   Q.  So that was 13,000 plus 2,000.

3   A.  15,000.

4   Q.  Okay.  $15,000 you did not give credit to Mr. Beavers for;

02:16:31   5   is that correct?

6   A.  Directly against those checks.

7   Q.  Okay.  So $15,000 you did not give credit to, correct?

8   A.  Against those checks.

9   Q.  Against those checks.  Okay.  So we have $5,000, we have

02:16:56   10  you don't know as far as the unknown checks, and we have

11  $15,000, correct?

12  A.  Correct.

13  Q.  Okay.  If -- if you tabulated the unknown as $13,000,

14  would that get you to more than $30,000, those totals?

02:17:17   15  A.  Yes.

16  Q.  Okay.  Now, I want to go through a few checks with you as

17  far as going through your analysis, all right?

18      Now, if you can turn the page in your notebook, do

19  you see Campaign Check 44?  It's a government exhibit.  Do you

02:18:02   20  have that?  You might not have it.  I apologize.  It's

21  already --

22  A.  There's no government exhibit sticker in the book that I

23  have.

24  Q.  Okay.  That's fine.  I apologize.  That's my fault.

02:18:12   25      MR. GOLDSTEIN:  May I publish?  It's already admitted

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 50 of 134 PageID #:2214
Ponzo - cross by Goldstein
786

1  in evidence.  It's Campaign Check 44.

2         Thank you.

3  BY MR. GOLDSTEIN:

4  Q.  Campaign Check 44 is a check written December 12, 2006 to

02:18:28  5  Mr. Beavers for $1,000, correct?

6  A.  Correct.

7  Q.  And you recognize this document.

8  A.  Yes.

9  Q.  Okay.  Now, if we go back to the summary chart, and we're

02:18:48  10  going to turn to Page 6.

11         Give me one moment.  I apologize.

12         This is Page 6 of Summary Chart No. 10; is that

13  correct?

14  A.  Correct.

02:19:17  15  Q.  Okay.  Now, on line number 44, it indicates a check

16  Friends For Beavers, No. 324, do you see that?

17  A.  Yes.

18  Q.  And that was the check we just looked at?

19  A.  Yes.

02:19:37  20  Q.  And the stub indicates that it was reimbursed number 589,

21  3/12/2007, do you see that?

22  A.  Yes.

23  Q.  Now, if we go back to check 589, which was previously

24  published, that is the check that was accounted for or --

02:20:04  25  well, that's the check that we're talking about in Line 44; is

1    that correct?

2    A.  Yes.

3    Q.  So this check for $12,000 written from Mr. Beavers'

4    personal account went to the Friends of Beavers; is that

02:20:20    5    correct?

6    A.  Correct.

7    Q.  Okay.  And that was labeled as reimbursement, correct?

8    A.  On the stub, correct.

9    Q.  Okay.  Now, do you see the date on that check?  It's

02:20:34    10    March 12, 2007, correct?

11    A.  Correct.

12    Q.  Now, if I could just go back, the check 324, the date is

13    12/12/06, correct?

14    A.  The bank date.

02:20:52    15    Q.  The bank date, okay.

16        So what we have -- I apologize for keep going back

17    and forth here, but this check 589 that was deposited about

18    three months after 2007 was credited against check 324,

19    correct?

02:21:13    20    A.  That's what the stub said, right.

21    Q.  Okay.  Now, on your analysis on Page 1 of Summary Chart

22    No. 10, you gave credit in 2006 for that check that

23    Mr. Beavers wrote back to the campaign in 2007; is that

24    correct?

02:21:41    25    A.  In -- I gave credit in 2000 -- whatever the stub said.

1  Q.  Whatever the stub said.

2      You gave credit in 2006, correct?

3  A.  I'd have to look at my --

4  Q.  Here, I'll ask a different question, Mr. Ponzo.

02:22:01  5      You didn't credit against Mr. Beavers that it hadn't

6  been paid as of December 31st, 2006; is that correct?

7  A.  I -- I gave credit whatever the stub said.

8  Q.  Okay.  Let me see if I can ask it a different way.

9      This number $1,482.67, does check 589, right there,

02:22:34  10  from Mr. Beavers to Friends of Beavers for $12,000 written in

11  2007, does that check, okay, that you give credit to, does

12  that apply to 2006 or 2007?

13  A.  I'd have to look at the expenses related to campaign fund

14  checks to be able to tell.

02:22:52  15  Q.  So you're not certain.

16  A.  It's on that schedule.

17  Q.  Okay.  Are you certain of this:  Did you give him credit

18  for it?

19  A.  Yes.

02:23:07  20  Q.  Okay.  You gave him credit for it, but as of -- oh,

21  sorry -- this December 12, 2006 check, as of December 13,

22  2006, Mr. Beavers hadn't paid back the campaign; is that

23  correct?

24      MR. GETTER:  Objection, form.

02:23:35  25      MR. GOLDSTEIN:  I'll ask a different question.

1       THE COURT:  Yes.

2    BY MR. GOLDSTEIN:

3    Q.  December 12th, 2006, this check is written to Mr. Beavers,

4    correct?

02:23:42    5    A.  Correct.

6    Q.  By your analysis, this did not apply to cash remaining in

7    Mr. Beavers' possession in 2006, correct?

8    A.  I'd have to look at my schedule.

9    Q.  Okay.  What schedule do you need to look at?

02:24:00   10    A.  The expenses associated with the campaign check or the

11    other subtractions.

12       MR. GOLDSTEIN:  Just one moment, your Honor.

13        (Counsel conferring.)

14       MR. GOLDSTEIN:  I apologize.  Let me see if I can do

02:24:24   15    this.  Go back -- okay.

16    BY MR. GOLDSTEIN:

17    Q.  If we look at Page 6, this is Summary Chart 10, correct?

18    A.  Correct.

19    Q.  And Summary Chart 10, Page 6, says expenses related to

02:24:38   20    campaign fund checks payable to William M. Beavers for the

21    year 2006, correct?

22    A.  Correct.

23    Q.  And number 328, right there, indicates -- the stub

24    indicates reimburse number 589, 3-12-2007, correct?

02:25:03   25    A.  Correct.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 54 of 134 PageID #:2218
Ponzo - cross by Goldstein
790

1   Q.  And that is tabulated in the amount credited against the

2   check, correct?

3   A.  Correct.

4   Q.  And this is for your analysis in 2006, correct?

02:25:11   5   A.  Correct.

6   Q.  So is it fair to say that this check that Mr. Beavers

7   wrote to his campaign committee in March of 2007 was credited

8   to Mr. Beavers in 2006?

9   A.  Correct.

02:25:24   10   Q.  Okay.  At the end of the year in 2006, had Mr. Beavers

11   paid or accounted for or paid back, whatever term you want to

12   use, that money, that 328 check?

13   A.  At the end of 2000 -- no, the check 581 was written in --

14   later.

02:25:48   15   Q.  Okay.  But you gave him credit in 2006 even though it

16   hadn't been paid back yet, correct?

17   A.  Correct.

18   Q.  And that's because you knew that the check was eventually

19   paid back, correct?

02:26:05   20   A.  I accepted what was on the stub.

21   Q.  Well --

22   A.  And that's why I subtracted it.

23   Q.  In the case of the stub, you knew exactly that that money

24   was deposited into the campaign committee, correct?

02:26:17   25   A.  Correct.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 55 of 134 PageID #:2219
Ponzo - cross by Goldstein
791

1  Q.  So stub or no stub, you have actual documentation from the

2  bank records that indicate this money went from Mr. Beavers to

3  the campaign committee bank account, correct?

4  A.  Correct.

02:26:30  5  Q.  But you didn't know that it was paid back as of December

6  31st, 2006.

7  A.  I just accepted what was written on the stub and

8  subtracted in that year.

9  Q.  And you accepted what the bank records indicate, correct?

02:26:45  10  A.  Correct.

11  Q.  Now -- sorry.  Whenever you need a break, Judge, you just

12  let me know.

13       If we can go to the next item I want to talk about,

14  and I want to publish Campaign Check Number 2, okay?  This is

02:27:09  15  a government exhibit that's previously been admitted.

16       And do you recognize that check?

17  A.  Yes.

18  Q.  That check is a check written to Mr. Beavers for $4,000,

19  January 21, 2006, correct?

02:27:27  20  A.  Correct.

21  Q.  Okay.  Now, if you can look -- this should be in your

22  binder.  Can you see check 573?

23  A.  Yes.

24  Q.  Okay.  This is a check written from Mr. Beavers to

02:27:44  25  Citizens For Beavers for $14,000; is that correct?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 56 of 134 PageID #:2220
Ponzo - cross by Goldstein
792

1   A.  Correct.

2   Q.  And this was written December 21, 2006, correct?

3   A.  Correct.

4   Q.  But the deposit date is January 22, 2007.

02:28:01   5   A.  Correct.

6           MR. GOLDSTEIN:  May I publish, your Honor?

7           Thank you.

8   BY MR. GOLDSTEIN:

9   Q.  So what you see here on the screen, that's the check we

02:28:11   10  just talked about; is that correct?

11  A.  Correct.

12  Q.  Now, this check you gave credit to Mr. Beavers for,

13  correct?

14  A.  Correct.

02:28:21   15  Q.  And this $14,000 accounted for the previous check we just

16  talked about; is that correct?

17          MR. GETTER:  Objection.

18          MR. GOLDSTEIN:  I'll rephrase.

19  BY MR. GOLDSTEIN:

02:28:38   20  Q.  This check that we just went over, okay, per your

21  analysis, this check ended up being subtracted to or

22  subtracted from by this check; is that correct?

23  A.  I'd have to see the stub for check 1998.

24  Q.  The stub, okay.  Well, let's see if we can go to your

02:28:59   25  summary chart.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 57 of 134 PageID #:2221
Ponzo - cross by Goldstein
793

1    MR. GOLDSTEIN:  Just one moment, your Honor.

2        (Pause.)

3  BY MR. GOLDSTEIN:

4  Q.  If we look at Page 4 of Summary Chart Number 10, okay, and

02:29:47    5  the second line is check number 1998; is that correct?

6  A.  Correct.

7  Q.  And then the stub indicates all the way on the far right

8  "see check 573," correct?

9  A.  Correct.

02:29:59    10  Q.  And 573 is this check right here, correct?

11  A.  It is.

12  Q.  And so check 573 was an amount credited against check

13  1998; is that correct?

14  A.  Yes.

02:30:15    15  Q.  Now, check 1998 was written January 23rd, 2006, correct?

16  A.  That's the bank date.

17  Q.  The bank date.  Now, the bank date for check 573, a check

18  deposited from Mr. Beavers' personal account to Citizens For

19  Beavers for $14,000, the bank date is January 22, 2007,

02:30:39    20  correct?

21  A.  Correct.

22  Q.  And you gave credit to Mr. Beavers for this check that he

23  deposited on Citizens For Beavers about a year after; is that

24  correct?

02:30:52    25  A.  I gave credit whatever the stub said, whenever the stub

1  said.

2  Q.  At the end of the year 2006, this check had not been

3  deposited into the bank account for Citizens For Beavers; is

4  that correct?

02:31:07  5  A.  Correct.

6  Q.  Yet credit was given in 2006, correct?

7  A.  Per the stub, correct.

8  Q.  Now, in your analysis, you said your analysis stopped at

9  2008; is that correct?

02:31:29  10  A.  Correct.

11  Q.  So in the situation where check 573 deposited a year after

12  another check, you gave credit for it; but for your analysis

13  in 2008, your analysis was done on the end of 2008.

14  A.  Correct.

02:31:54  15  Q.  Okay.  Now, also you gave credit, and we went over this a

16  little, were campaign expenses; is that correct?

17  A.  On which --

18  Q.  I apologize.  It was a poor question.

19        You gave credit or made a subtraction in a situation

02:32:32  20  where there were campaign expenses.  That was credited towards

21  Mr. Beavers; is that correct?

22  A.  There were campaign receipts.

23  Q.  Campaign receipts.

24  A.  Receipts from the campaign fund.

02:32:43  25  Q.  For campaign expenses, correct?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 59 of 134 PageID #:2223
Ponzo - cross by Goldstein
795

1  A.  I don't know what they were for.

2  Q.  Okay.  But you gave credit, correct?

3  A.  Correct.

4  Q.  Okay.  Now, I'm going to shift subjects a little bit

02:33:02   5  and --

6        THE COURT:  How little is the shift going to be?

7        MR. GOLDSTEIN:  How --

8        THE COURT:  Little is the shift?

9        MR. GOLDSTEIN:  You know, I'm always scared giving

02:33:11   10  predictions, but it's going to be longer than 10, 15 minutes,

11  I can tell you that.

12        THE COURT:  Let's take a break.

13        COURT SECURITY OFFICER:  All rise.

14    (Jury exits courtroom.)

02:33:59   15        THE COURT:  Fifteen minutes.

16    (Recess from 2:32 to 2:52 p.m.)

17     (Jury enters courtroom.)

18        THE COURT:  Please be seated.

19        MR. GOLDSTEIN:  Thank you, Judge.

02:52:53   20  BY MR. GOLDSTEIN:

21  Q.  Okay, Mr. Ponzo.  I want to change subjects with you and

22  talk about the issue of gambling, okay?

23  A.  Okay.

24  Q.  In your analysis of all the bank records and the gambling

02:53:06   25  records, did you observe any checks from the campaign fund

Ponzo - cross by Goldstein

796

1  written to a casino?

2  A.  No.

3  Q.  Did you ever witness in any of the records any money from

4  the campaign fund deposited directly into a slot?

02:53:29  5  A.  No, I wasn't there.

6  Q.  And did you observe throughout all the records you saw any

7  money withdrawn at the casino from the campaign fund?

8  A.  No.

9  Q.  You understand that there were ATM machines at the casino?

02:53:49  10  A.  There are.

11  Q.  And there were no ATM transactions from the campaign fund;

12  is that correct?

13  A.  Correct.

14  Q.  And you were given a lot of information from the casino, I

02:54:00  15  assume via subpoena, correct?

16  A.  Correct.

17  Q.  And you're not the keeper of the casino records; is that

18  correct?

19  A.  Correct.

02:54:06  20  Q.  And you can't verify the accuracy of any of these

21  documents; is that correct?

22  A.  The documents -- the accuracy -- the items that were on

23  the sheets are accurate, but there might have been glitches

24  where some days were omitted.

02:54:23  25  Q.  Wait, wait.  You say they're accurate.  You have no basis

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 61 of 134 PageID #:2225
Ponzo - cross by Goldstein
797

| | |
|---|---|
| 1 | to test whether they're accurate; is that correct? |
| 2 | A.  The numbers on there, no, I don't. |
| 3 | Q.  Okay.  You can't verify whether that couple-hundred pages |
| 4 | of spreadsheet is accurate, correct? |
| 5 | A.  Correct. |

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 61 of 134 PageID #:2225
Ponzo - cross by Goldstein
797

1  to test whether they're accurate; is that correct?
2  A.  The numbers on there, no, I don't.
3  Q.  Okay.  You can't verify whether that couple-hundred pages
4  of spreadsheet is accurate, correct?
02:54:42  5  A.  Correct.
6  Q.  And, in fact, you did notice, and you just mentioned, that
7  there were times at which the casino couldn't record certain
8  things; is that correct?
9  A.  If -- right, correct.
02:55:01  10  Q.  And you're aware of no test that was done to see if these
11  documents are even accurate.
12  A.  Test, no.
13  Q.  Well, test the process of how this is recorded.
14  A.  No, I don't know of any test.
02:55:19  15  Q.  And you analyzed the player card that was in Mr. Beavers'
16  name; is that correct?
17  A.  Correct.
18  Q.  Do you even know if that particular card was functioning
19  properly from year 2006 through 2008?
02:55:39  20  A.  As far as I know, it was.
21  Q.  As far as you know, and that's based on -- well, let me --
22  let me rephrase.
23  You have no knowledge to verify whether that's true
24  or not; is that correct?
02:55:52  25  A.  Based on what was given to us by the casino.

Ponzo - cross by Goldstein

798

```
          1   Q.  You were given documents, right?
          2   A.  Correct.
          3   Q.  And you don't know whether the card was working.
          4   A.  The card was in machines, and that was the data produced
02:56:03  5   when the card was in the machine.
          6   Q.  You don't even know if the card went in the machine.  You
          7   were just given documents.
          8   A.  The document -- the spreadsheet would only record the time
          9   in and time out when the player's card was in the machine.
02:56:19 10   Q.  Can you independently verify one gambling instance in that
         11   300-page spreadsheet?  Are you able to say with absolute
         12   certainty that there was one instance that was accurate?
         13   A.  Well, the date that the jackpots were won, identification
         14   had to be obtained from the person that won the jackpot, so on
02:56:44 15   those days, the person that won the jackpot was there.
         16   Q.  Okay.  But verifying the actual spreadsheet.  You did no
         17   test to see if the way the casino recorded these things were
         18   recording it accurately; is that correct?
         19   A.  I -- I didn't do a test.
02:57:02 20   Q.  And in your analysis and review of the documents, are you
         21   aware that these player cards, there can actually be companion
         22   cards?
         23   A.  I -- I believe you can have more than one card.
         24   Q.  Okay.  And so a card is assigned a particular number,
02:57:23 25   correct?
```

Ponzo - cross by Goldstein

799

1    A.  Correct.

2    Q.  And there can be more than one card with that exact same

3    number, correct?

4    A.  Correct.

02:57:30    5    Q.  So more than one person could be playing on the same card

6    at one time, correct?

7    A.  It's possible.

8    Q.  And when one card, according to the spreadsheets, indicate

9    it's being played, you don't even know who that is that's

02:57:48    10    playing on that card; is that correct?

11    A.  Unless a jackpot was won.

12    Q.  Unless a jackpot was won.

13    A.  Correct.

14    Q.  Now, I've used the term spreadsheet.  Are you familiar

02:58:05    15    when I use that term it's HHCAS 3?

16    A.  Yes.

17    Q.  Now, there's HHCAS 3, which is the spreadsheet, correct?

18    A.  Okay.  Yes.

19    Q.  And that's the one, remember, you reorganized it for date

02:58:20    20    and time -- or for time, I apologize.

21    A.  For time within a day, correct.

22    Q.  And then there are the daily sheets, correct?

23    A.  Correct.

24    Q.  And then there is the win/loss sheet; is that correct?

02:58:38    25    And that's just a one-page sheet?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 64 of 134 PageID #:2228
Ponzo - cross by Goldstein
800

|          |    |                                                                 |
|----------|----|-----------------------------------------------------------------|
|          | 1  | A.  The letters, is that what you're referring to?             |
|          | 2  | Q.  Let me publish it.  It's Government Exhibit Win/Loss 2007.  |
|          | 3  |        MR. GOLDSTEIN:  May I publish, your Honor?              |
|          | 4  |        THE COURT:  Yes.                                         |
| 02:58:50 | 5  |        MR. GOLDSTEIN:  Thank you.                               |
|          | 6  | BY MR. GOLDSTEIN:                                               |
|          | 7  | Q.  Do you recognize this document?                            |
|          | 8  | A.  Yes.                                                        |
|          | 9  | Q.  Okay.  This is the win/loss sheet?                         |
| 02:58:56 | 10 | A.  Yes.                                                        |
|          | 11 | Q.  Can you see that okay?  I'm sorry, it's a little -- I'll    |
|          | 12 | blow it up a little bit.                                        |
|          | 13 |        Do you see that?                                         |
|          | 14 | A.  Yes.                                                        |
| 02:59:03 | 15 | Q.  Okay.  And it indicates gaming history statement for the    |
|          | 16 | year 2007.                                                      |
|          | 17 | A.  Correct.                                                    |
|          | 18 | Q.  Okay.  And on the bottom there's a series of numbers,       |
|          | 19 | total win/loss, W-2G, and various other numbers; is that        |
| 02:59:20 | 20 | correct?                                                        |
|          | 21 | A.  Yes.                                                        |
|          | 22 | Q.  Okay.  Do you know if those numbers for 2007 on this        |
|          | 23 | win/loss sheet end up being the same number for the daily       |
|          | 24 | sheets?                                                         |
| 02:59:32 | 25 | A.  I -- the numbers are -- I don't believe they're the same.   |

Ponzo - cross by Goldstein

801

1    Q.  Okay.  So the daily sheet numbers, if you tabulated them

2    for 2007, they're not the same as this number up here.

3    A.  Correct.

4    Q.  Okay.  And the big spreadsheet that we talked about, are

02:59:50    5    those numbers in the spreadsheet the same as this one-page

6    sheet?

7    A.  I -- I didn't add up the spreadsheet.  I just --

8    Q.  So we -- you had three documents indicating gambling

9    winnings and losses; is that correct?

03:00:13    10    A.  Correct.

11    Q.  And from your analysis, what you can tell, all three had

12    different numbers, different tabulations?

13    A.  I didn't add up the ones on the re-sorted spreadsheet.

14    Q.  Okay.  But you know as far as the daily sheet compared to

03:00:31    15    the win/loss sheet, those are actually different tabulations,

16    correct?

17    A.  Correct.

18    Q.  Now, you analyzed Mr. Beavers' personal bank accounts, and

19    we've gone over this a little bit.  When you analyze -- well,

03:01:00    20    let me ask you:  Did you analyze Mr. Beavers' credit card

21    statements?

22    A.  I reviewed them, yes.

23    Q.  And that's in addition to the bank statements of

24    Mr. Beavers.

03:01:11    25    A.  Correct.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 66 of 134 PageID #:2230
Ponzo - cross by Goldstein
802

1  Q.  And Mr. Beavers had a Chase/Bank One credit card; is that

2  correct?

3  A.  Yes.

4  Q.  And he had a Harris Bank card, correct?

03:01:18  5  A.  Correct.

6  Q.  He had a Bank of America Visa card?

7  A.  Correct.

8  Q.  He had an Emerge credit card?

9  A.  Correct.

03:01:24  10  Q.  He had a Sears card?

11  A.  Yes.

12  Q.  He had a Target card.

13  A.  Yes.

14  Q.  And these were all cards that could be used to withdraw

03:01:33  15  money; is that correct?

16  A.  To take cash advances, yes.

17  Q.  Take cash advances.

18      If you can open your folder to Chase/Bank One 2006.

19  Do you see that?

03:01:54  20  A.  Yes.

21  Q.  Okay.  If you look at Page 1 of Chase/Bank One 2006, this

22  is a Chase statement with a payment due date of January 29,

23  2006, correct?

24  A.  Yes.

03:02:15  25  Q.  And below it is a series of transactions; is that correct?

Ponzo - cross by Goldstein

803

1   A.  Correct.

2   Q.  And it starts with mid December of 2005 and then goes into

3   January of 2006; is that correct?

4   A.  Correct.

03:02:30   5          MR. GOLDSTEIN:  May I publish, your Honor?

6          THE COURT:  You may.

7          MR. GOLDSTEIN:  Thank you.

8   BY MR. GOLDSTEIN:

9   Q.  Now, this is obviously very small.  I'll try and blow it

03:02:42   10  up.

11         If we go down to the fourth line from the bottom, so

12  right here, do you see that?

13  A.  Yes.

14  Q.  Okay.  That is a withdrawal for January 2nd of 2006,

03:03:11   15  correct?

16  A.  Cash withdrawal.

17  Q.  Cash withdrawal, and that's done at Global Casino Hammond,

18  Indiana, correct?

19  A.  At Hammond Casino.

03:03:25   20  Q.  Okay.  And this is for $1,003; is that correct?

21  A.  Correct.

22  Q.  And it's your understanding that $3 indicates an ATM fee;

23  is that correct?

24  A.  It may be.

03:03:35   25  Q.  May be?  I'm sorry?

```
 1   A.  It may be.
 2   Q.  Okay.  And the next line indicates a cash advance finance
 3   charge; is that correct?
 4   A.  Correct.
```
03:03:45
```
 5   Q.  Okay.  So this money right here, this $1,000 with the $30
 6   advance fee, is money that Mr. Beavers from his account is
 7   advancing to himself; is that correct?
 8   A.  The $1,003.
 9   Q.  At the casino ATM.
```
03:04:10
```
10   A.  Correct.
11   Q.  And that advance wouldn't be considered income --
12          MR. GETTER:  Objection.
13   BY MR. GOLDSTEIN:
14   Q.  -- for purposes of taxes; is that correct?
```
03:04:19
```
15          MR. GETTER:  Objection.
16          THE COURT:  Objection sustained.
17   BY MR. GOLDSTEIN:
18   Q.  If we go down to the next line, there's a $303 withdrawal;
19   is that correct?
```
03:04:28
```
20   A.  Correct.
21   Q.  With a $10 cash advance finance charge.
22   A.  Correct.
23   Q.  Okay.  And if you can turn to Page 5 of this -- turn to
24   Page 5 of this, this is a different statement from the next
```
03:04:46
```
25   month; is that correct?
```

Ponzo - cross by Goldstein

1    A.  Correct.

2    Q.  And it's a payment due date of March 1, 2006, correct?

3    A.  Correct.

4    Q.  Okay.

03:04:55    5         MR. GOLDSTEIN:  May I publish, your Honor?

6         THE COURT:  You may.

7         MR. GOLDSTEIN:  Thank you.

8    BY MR. GOLDSTEIN:

9    Q.  Now, if we just look generally at this document, what you

03:05:07    10   can see here starting from January through March are a

11   significant amount of withdrawals from the ATM at the casino;

12   is that correct?

13   A.  Correct.

14   Q.  Okay.  So these are from Mr. Beavers' personal account,

03:05:22    15   correct?

16   A.  Personal charge card.

17   Q.  Personal charge card in which he's taking money at the

18   casino.

19   A.  Correct.

03:05:29    20   Q.  And is it fair to say in your analysis of these records,

21   that there was a lot of times where Mr. Beavers withdrew money

22   from various bank and credit cards?

23        MR. GETTER:  Objection.

24        THE COURT:  Objection is sustained.

03:05:53    25   BY MR. GOLDSTEIN:

1  Q.  Well, you did review all these bank and credit cards,
2  correct?
3  A.  Yes.
4  Q.  And from your analysis of the Emerge card, the Bank of
5  America card and all these cards that we just listed, there
6  were withdrawals from the beginning of '06 to the end of '08
7  amounting 340.  There were 340 total withdrawals in that year
8  period?
9  A.  I didn't count them.
10  Q.  And the amount of money that was withdrawn from
11  Mr. Beavers' personal bank and credit cards between 2006 and
12  2008 was over $110,000; is that correct?
13  A.  I don't know.
14  Q.  Now, in your analysis, you were trying to determine if
15  campaign money was being used for gambling; is that correct?
16  A.  I was just laying out the timing of when a check was
17  cashed and when gambling activity occurred.
18  Q.  Well, you were laying out the timing in order to find out
19  if you can prove that Mr. Beavers was using campaign money for
20  gambling, correct?
21  A.  I didn't use that in the analysis of the cash remaining in
22  Mr. Beavers' possession.
23  Q.  I'm not talking about cash remaining.  We went for a very,
24  very long period of time yesterday talking about, well, he
25  withdrew a check, and he cashed it, and then he went and he

03:06:09
03:06:28
03:06:55
03:07:16
03:07:32

Ponzo - cross by Goldstein

807

1   went and gambled.  Do you remember that?

2   A.  Yes.

3   Q.  And the point was to somehow show that he was using money

4   for gambling; is that correct?

03:07:44   5         MR. GETTER:  Objection.

6         THE COURT:  Objection is sustained.

7         MR. GOLDSTEIN:  I'll withdraw it.

8   BY MR. GOLDSTEIN:

9   Q.  You did no analysis to see if there was money that

03:07:54   10   Mr. Beavers used personally for his own gambling.

11   A.  I didn't have the times that the cash advances were taken.

12   Q.  And when I say personally, his own personal money from his

13   own personal accounts, you did not analyze how much was spent

14   for gambling.

03:08:18   15   A.  I don't know how --

16         MR. GETTER:  Objection.

17         MR. GOLDSTEIN:  I'm sorry?

18         THE COURT:  I'm looking.

19         MR. GOLDSTEIN:  Okay.

03:09:16   20         THE COURT:  Rephrase the question.  I think the

21   witness did not understand the question, at least I gather

22   that from the beginning of his answer.

23         MR. GOLDSTEIN:  Thank you, Judge.

24   BY MR. GOLDSTEIN:

03:09:29   25   Q.  Now, Mr. Ponzo, in your review of Mr. Beavers' personal

1    bank accounts and credit cards, you said that you couldn't

2    find out the times of these transactions?

3    A.   The cash advances.

4    Q.   The cash advances.  You couldn't figure out the time.

03:09:47    5    A.   It didn't have the times, correct.

6    Q.   But it did have the day.

7    A.   Correct.

8    Q.   Did you make any request of any of these credit card

9    companies for the times in which these transactions were made?

03:09:58    10   A.   I believe they were requested.  I don't think they were

11   available.

12   Q.   They weren't available?

13   A.   I -- I believe that's true.

14   Q.   And that's -- that's for each credit card and bank card?

03:10:08    15   A.   I think so.

16   Q.   You think so, but you're not sure.

17   A.   Not a hundred percent certain.

18   Q.   But -- and what we just went over here with the Chase/Bank

19   One credit card, you can calculate a total amount of money

03:10:27    20   withdrawn at the casino ATM, correct?

21   A.   Correct.

22   Q.   You may not be able to do the time, but if you wanted to,

23   you can just put all the numbers down and add them up and get

24   a number, correct?

03:10:41    25   A.   Correct.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 73 of 134 PageID #:2237
Ponzo - cross by Goldstein
809

1  Q.  You don't know whether it was a hundred -- over a hundred

2  thousand dollars that was withdrawn during that three-year

3  period.

4  A.  I don't know.

03:10:48  5  Q.  We talked about, if I can just go back for one second,

6  remember the daily sheets and the win/loss reports?

7  A.  Yes.

8  Q.  And you said one was different from the other?

9  A.  Yes.

03:11:04  10  Q.  Do you know which one is correct?

11  A.  I don't know.

12  Q.  Do you know if either of them are correct?

13  A.  I don't know.

14  Q.  Now, you analyzed Mr. Beavers' personal bank accounts,

03:11:21  15  correct?

16  A.  Correct.

17  Q.  And what you saw from '06 through '08 was a series of cash

18  withdrawals to Mr. Beavers; is that correct?

19  A.  There were checks from the personal account that were

03:11:37  20  cashed.

21  Q.  Okay.  So Mr. Beavers would write a check, and it would

22  say William Beavers from his own personal account, and that

23  would be cashed and would be cash to him; is that correct?

24  A.  Correct.

03:11:46  25  Q.  Now, that money that was withdrawn as cash could be used

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 74 of 134 PageID #:2238
Ponzo - cross by Goldstein
810

1   for gambling as well, correct?

2   A.  I don't know what it was used for.

3   Q.  Well, over the three-year period from beginning of '06 to

4   the end of '08, Mr. Beavers withdrew cash from his own

03:12:06   5   personal accounts 200 times; is that correct?

6   A.  I don't know.

7   Q.  And during that period from '06 to '08, Mr. Beavers

8   withdrew over $250,000 of his own money, correct?

9   A.  I don't know.

03:12:23   10  Q.  So you did not analyze the amount of money that

11  Mr. Beavers withdrew from his own bank accounts; is that

12  correct?

13  A.  Correct.

14  Q.  And you then did not analyze the amount, the time in which

03:12:39   15  he withdrew his own money and compare it to gambling; is that

16  correct?

17  A.  Correct.

18  Q.  And the first two categories, the bank and the credit

19  cards as well as his own personal cash, that all could have or

03:12:53   20  some could have been used for gambling; is that correct?

21       MR. GETTER:  Objection.

22  BY THE WITNESS:

23  A.  It could have.

24  BY MR. GOLDSTEIN:

03:13:01   25  Q.  And you also, in reviewing Mr. Beavers' personal bank

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 75 of 134 PageID #:2239
Ponzo - cross by Goldstein
811

1  accounts, you observed that there were actually electronic

2  checks written to the casino; is that correct?

3  A.  Correct.

4  Q.  If you can look at your next document in your binder, and

03:13:23    5  that's Beavers Exhibit PNB 9486 10/24/07 Statement, do you

6  have that?

7  A.  Yes.

8  Q.  Great.

9      And this document that you're looking at is a

03:13:35   10  statement from Mr. Beavers' personal PNB bank account, Park

11  National Bank account, ending in the numbers 9486; is that

12  correct?

13  A.  Correct.

14  Q.  And the date of this statement is October 24, 2007,

03:13:55   15  correct?

16  A.  Correct.

17  Q.  You recognize this document?

18  A.  Yes.

19      MR. GOLDSTEIN:  May I publish, your Honor?

03:14:02   20      THE COURT:  You may.

21  BY MR. GOLDSTEIN:

22  Q.  Look here.  I'm just going to point to it.  This arrow

23  indicates an October 2nd electronic -- oops, sorry.  We'll go

24  through it anyway.  It's October 2nd electronic check to

03:14:27   25  Verizon; is that correct?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 76 of 134 PageID #:2240
Ponzo - cross by Goldstein
812

1    A.  Correct.

2    Q.  That's not exactly where I want to go.

3         This next one is October 2nd electronic check to

4    Horseshoe Casino, correct?

03:14:36    5    A.  Correct.

6    Q.  And that is for $400?

7    A.  Correct.

8    Q.  Okay.  So that's money coming from Mr. Beavers' personal

9    account to directly the casino.

03:14:48    10    A.  Correct.

11    Q.  And if we look at the next page of this statement, this is

12    the same statement, October 24, 2007, and if we look at an

13    October 11 transaction, it indicates electronic check,

14    Horseshoe Casino, and that indicates $400, correct?

03:15:14    15    A.  Correct.

16    Q.  So, again, this is Mr. Beavers' own personal account

17    paying the casino $400, correct?

18    A.  Correct.

19    Q.  And you noticed several of these transactions; is that

03:15:27    20    correct?

21    A.  Correct.

22    Q.  In fact, just those transactions alone were the amount of

23    $18,000 over that three-year period; is that correct?

24    A.  I don't know the amount.

03:15:43    25    Q.  Did you in any way tabulate the amount of money from

Ponzo - cross by Goldstein

1    electronic checks from Mr. Beavers' personal account to the

2    casino?

3    A.  I -- I don't think I did that.

4    Q.  So we have the electronic checks, the -- his own personal

03:16:06    5    cash he withdrew, as well as the bank cards and credit cards,

6    correct?

7    A.  Correct.

8    Q.  And there's no analysis by you done of that.

9    A.  But you misspoke.  I didn't add those up.

03:16:18    10    Q.  Okay.  Well, do you agree with that number $18,000?

11    A.  I don't have them with me.  I don't know the exact

12    numbers.

13    Q.  Does that number sound familiar?

14    A.  It could be in the ballpark.

03:16:26    15    Q.  Did you analyze the times in which these electronic checks

16    were written to the casino?

17    A.  The time is not indicated on the statement.

18    Q.  Did you analyze the dates that these checks were written

19    to the casino?

03:16:39    20    A.  The dates are on the statement, yes.

21    Q.  They are.  Did you analyze them?

22    A.  Yes.

23    Q.  Okay.  Did you make any summary charts for the jury that

24    indicate this is when he took an electronic check, and this is

03:16:53    25    when he went gambling?

1    A.  No.

2    Q.  Now, there's another category of potential money that

3    could have been used for gambling, and that is gambling

4    winnings.

03:17:08    5         Did you in any way analyze gambling winnings that was

6    put back in to any of the casino?

7    A.  The casino records netted those out.

8    Q.  Well, you're familiar with the term house money; is that

9    correct?

03:17:25    10   A.  Not really.

11   Q.  I'm not either, but I've learned this, okay?

12        House money -- well, there's money that you win at

13   the casino, correct?

14   A.  That's your money, right.

03:17:38    15   Q.  It's your money, but when you win that money, you can then

16   play it again, correct?

17   A.  It's available to be played, correct.

18   Q.  And that money that is played after won then gets

19   tabulated in the analysis of win/loss; is that correct?

03:17:55    20   A.  Yes.

21   Q.  Did you do any analysis of the amount of house money or

22   money that was won by the Beavers player's card?  Did you do

23   any analysis specifically as to played money after it was won?

24   A.  No.

03:18:30    25   Q.  Now, you said this in direct-examination, but it's fair to

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 79 of 134 PageID #:2243
Ponzo - cross by Goldstein
815

1  say you cannot conclusively say that campaign money was used

2  for gambling; is that correct?

3  A.  Correct.

4  Q.  And even if you could say that money was used for

03:18:45  5  gambling, you can't even say how much.

6  A.  Correct.

7  Q.  Now, I want to talk a little bit about this pension check,

8  okay, Mr. Ponzo?  And it was your understanding that this was

9  a check written from a campaign committee of Mr. Beavers to

03:19:21  10  the MEA&B; is that correct?

11  A.  It was.

12  Q.  And you said that you didn't find anything indicating or

13  something written down "loan"; is that correct?

14  A.  Where are you referring?

03:19:36  15  Q.  Well, regarding the $68,000 check.

16  A.  I didn't see anything.

17  Q.  Okay.  In the documents that you reviewed.

18  A.  Correct.

19  Q.  And likewise, you didn't see any documents indicating that

03:19:49  20  Mr. Beavers is taking this as income.

21  A.  Correct.

22          MR. GETTER:  Objection.

23      (Pause.)

24          THE COURT:  Sustained.

03:21:00  25  BY MR. GOLDSTEIN:

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 80 of 134 PageID #:2244
Ponzo - cross by Goldstein
816

1  Q.  Now, you indicated from your analysis that you didn't see

2  any money from Mr. Beavers to the campaign committee

3  regarding -- back to the campaign committee regarding the

4  $68,000 check; is that correct?

03:21:19  5  A.  Correct.

6  Q.  And if we can go to Summary Chart 10, and I want to

7  publish Page 18.  And Page 18 is entitled Other Subtractions

8  for the year 2007; is that correct?

9  A.  Correct.

03:21:47  10  Q.  Now, you titled this Other Subtractions because you

11  couldn't attribute these personal checks to any specific check

12  that had been written to Mr. Beavers; is that correct?

13  A.  The campaign records didn't have any indication of these

14  checks, but I found them when I reviewed the personal

03:22:07  15  accounts.

16  Q.  Okay.  And your analysis was such that you attributed this

17  number to these hundred checks, correct?

18  A.  Correct.

19  Q.  And that's a total of $8,500, correct?

03:22:20  20  A.  Correct.

21  Q.  That money, if you chose to, could have been attributed to

22  the $68,000 check, correct?

23  A.  I followed what the campaign did regarding other checks,

24  which was to attribute it against the hundred checks, so I

03:22:38  25  followed the same pattern.

1  Q.  Whoa, whoa, whoa.

2      The campaign made no indication of, hey, these are a

3  hundred checks written to Mr. Beavers.  They didn't

4  distinguish that, did they?

03:22:50  5  A.  They were the checks written to Mr. Beavers that were

6  cashed on which reimburse was written.

7  Q.  Okay.  And you understood that the MEA&B was the pension

8  fund for Mr. Beavers, correct?

9  A.  Correct.

03:23:02  10  Q.  And this check was not attributed to that check, that

11  $68,000 check, correct?

12  A.  Correct.

13  Q.  And you could have done that, correct?

14      MR. GETTER:  Objection.

03:23:16  15  BY THE WITNESS:

16  A.  I --

17      THE COURT:  The objection is sustained.

18  BY MR. GOLDSTEIN:

19  Q.  There's no accounting rule that prohibits you from

03:23:23  20  applying this 8,500 to the 68,000, correct?

21      MR. GETTER:  Objection.

22      THE COURT:  Sustained.

23  BY MR. GOLDSTEIN:

24  Q.  There's nothing in your experience as an IRS agent that

03:23:34  25  says in this context, that 8,500 has to be attributed only to

Ponzo - cross by Goldstein

818

1   the hundred checks.

2           MR. GETTER:  Objection.

3           THE COURT:  Form of the question objection sustained.

4   BY MR. GOLDSTEIN:

03:23:49   5   Q.  The fact is in your analysis, $8,500 written in 2007 was

6   not applied to the $68,000 check, correct?

7   A.  Correct.

8   Q.  And it was the analysis that you conducted, correct?

9   A.  Correct.

03:24:07   10  Q.  Okay.  If we turn to Page 24 of Summary Chart Number 10,

11  this is other subtractions for the year 2008, correct?

12  A.  Correct.

13  Q.  And it includes two personal checks, correct?

14  A.  Correct.

03:24:36   15  Q.  As well as cash deposited into Friends For Beavers.

16  A.  Correct.

17  Q.  And it totals $11,000.

18  A.  Correct.

19  Q.  And you attributed or you made a subtraction in the

03:24:49   20  context of the hundred checks, correct?

21  A.  Correct.

22  Q.  That $11,000 could have been applied to the $68,000 check,

23  correct?

24          MR. GETTER:  Objection.

03:25:01   25          THE COURT:  Objection sustained.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 83 of 134 PageID #:2247
Ponzo - cross by Goldstein
819

1    BY MR. GOLDSTEIN:

2    Q.  You did not account for the $11,000 to the $68,000 check;

3    is that correct?

4            MR. GETTER:  Objection -- withdrawn.

03:25:14    5    BY MR. GOLDSTEIN:

6    Q.  Do you understand the question?

7    A.  I attribute it to a subtraction as part of the hundred

8    checks.

9    Q.  Okay.  But not -- this $11,000 was not attributed to that

03:25:26    10   pension check, correct?

11   A.  Correct.

12   Q.  And so we have 8,500 and 11,000, and I'm doing the math,

13   and I'm scared.

14           That totals $19,500, am I right?

03:25:51    15   A.  Correct.

16   Q.  Thank you.

17           $19,500 was not attributed by your analysis to the

18   $68,000 check.

19   A.  Correct.

03:26:03    20   Q.  And even though you say you didn't find any documentation

21   that indicated loan, you would agree that money given back to

22   the committee would indicate that this was a loan agreement.

23           MR. GETTER:  Objection.

24           THE COURT:  Objection is sustained.

03:26:23    25   BY MR. GOLDSTEIN:

```
            1   Q.  Now, we can go -- I want to talk a little bit about the

            2   contingency fund check, okay?  And you analyzed these

            3   contingency funds from the County that went to Mr. Beavers; is

            4   that correct?

03:26:56    5   A.  Correct.

            6   Q.  And it's your understanding that as a commissioner,

            7   Commissioner Beavers was allowed to take this contingency fund

            8   as income; is that correct?

            9          MR. GETTER:  Objection.

03:27:15   10          THE COURT:  Objection is sustained.

           11   BY MR. GOLDSTEIN:

           12   Q.  Well, in your experience as an IRS agent, you understood

           13   this plan to be a non-accountable plan; is that correct?

           14          MR. GETTER:  Objection.

03:27:25   15          THE COURT:  Sustained.

           16   BY MR. GOLDSTEIN:

           17   Q.  Do you know what kind of plan it was, this contingency

           18   fund check was?

           19          MR. GETTER:  Objection.

03:27:32   20          THE COURT:  Sustained.

           21          MR. GOLDSTEIN:  Just one moment, your Honor.

           22      (Counsel conferring.)

           23   BY MR. GOLDSTEIN:

           24   Q.  Just a few more questions, Mr. Ponzo.

03:28:32   25          In your analysis of all these checks that went to
```

Ponzo - cross by Goldstein

821

1　Mr. Beavers, other than the pension check which went

2　specifically or was written specifically to the pension fund,

3　were there any checks written to a phony name?

4　　　　MR. GETTER:  Objection.

03:28:50　5　BY THE WITNESS:

6　A.  From the --

7　　　　THE COURT:  You're really way outside the scope.

8　Sustained.

9　BY MR. GOLDSTEIN:

03:29:04　10　Q.  Well, every single one of those hundred checks you

11　analyzed were written to William Beavers, correct?

12　A.  Correct.

13　Q.  And every check written to William Beavers was signed by

14　William Beavers.

03:29:16　15　A.  Yes.

16　Q.  And you had no difficulty understanding who that check was

17　written to.

18　A.  Correct.

19　Q.  And we talked about the bank records, okay, the credit

03:29:33　20　card statements and all those things.  You've reviewed these

21　documents, correct?

22　A.  Correct.

23　Q.  And you understand that these are true and accurate

24　copies, correct?

03:29:43　25　A.  Correct.

Ponzo - redirect by Getter

822

1   Q.  And that the veracity has been stipulated to by the

2   parties; is that correct?

3   A.  Yes.

4           MR. GOLDSTEIN:  Nothing further.

03:29:57   5           MR. GETTER:  Judge, can we get about ten minutes?

6           THE COURT:  Sure.

7           MR. GETTER:  Thank you.

8           COURT SECURITY OFFICER:  All rise.

9       (Jury exits courtroom.)

03:30:45   10          THE COURT:  Ten minutes.  Please be seated.

11      (Recess from 3:33 to 3:44).

12          THE COURT:  Counsel, redirect?

13          MS. HAMILTON:  Redirect.

14          THE COURT:  How long?

03:45:02   15          MS. HAMILTON:  Matt?

16          MR. GETTER:  Ten.

17          THE COURT:  Okay.

18          COURT SECURITY OFFICER:  All rise.

19      (Jury enters courtroom.)

03:47:01   20          THE COURT:  Please be seated.

21          MR. GETTER:  May I proceed, Judge?

22          THE COURT:  You may proceed.

23                  REDIRECT EXAMINATION

24  BY MR. GETTER:

03:47:20   25  Q.  Agent Ponzo, do you recall some questions Mr. Goldstein

1  asked you on cross-examination about the percentages of money

2  that were applied by you or credited by you against the money

3  received by Mr. Beavers for each of those three years in your

4  hundred-check analysis?

03:47:36  5  A.  Yes.

6  Q.  When you were crediting those amounts to Mr. Beavers, do

7  you actually know what he did with the cash from those hundred

8  checks?

9  A.  No, I don't.

03:47:47  10  Q.  For purposes of your analysis, did you assume that all the

11  expenses listed in the campaign records were legitimate?

12  A.  I did.

13  Q.  And did you assume for purposes of your analysis that

14  every time the campaign said that money was accountable or

03:48:07  15  attributable to those hundred checks, that they were for

16  purposes of your analysis?

17  A.  Yes.

18        MR. GOLDSTEIN:  Objection, your Honor.  Shifting the

19  burden.

03:48:16  20        THE COURT:  Overruled.

21  BY MR. GETTER:

22  Q.  And every time Mr. Beavers put money back into the

23  campaign, did you credit that as a campaign-related figure to

24  be credited against the money that came out to him?

03:48:31  25  A.  I did.

Ponzo - redirect by Getter

1    Q.  Why did you give him all this credit in your analysis?

2    A.  To look through all the receipts and everything to make

3    sure that I gave credit for everything that was there and then

4    to determine whether anything was left over.

03:48:49    5    Q.  Do you recall some questions that Mr. Goldstein asked you

6    about a couple of checks from Mr. Beavers to a couple of his

7    campaign funds in December 2005?

8    A.  Yes.

9    Q.  Was one of those checks -- do you have the binder still up

03:49:34    10   there?

11          Was one of those checks his personal check 3374?

12   A.  Yes.

13   Q.  And was that in the amount of $1,000?

14   A.  Yes.

03:49:49    15   Q.  Written to the 7th Ward?

16   A.  Yes.

17   Q.  December 28, 2005 is the date?

18   A.  Yes.

19   Q.  Was another one of them check 522?

03:50:00    20   A.  Yes.

21   Q.  Dated December 30th, 2005?

22   A.  Yes.

23   Q.  Payable to the 7th Ward?

24   A.  Yes.

03:50:06    25   Q.  In the amount of $2,000?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 89 of 134 PageID #:2253
Ponzo - redirect by Getter
825

1    A.   Correct.

2    Q.   And was the third one his personal check 523?

3    A.   Yes.

4    Q.   Was that dated December 30, 2005?

03:50:20    5    A.   Yes.

6    Q.   To Citizens For Beavers?

7    A.   Yes.

8    Q.   In the amount of $2,000?

9    A.   Yes.

03:50:27    10    Q.   Agent Ponzo, Mr. Goldstein asked you why you didn't give

11    Mr. Beavers credit for those checks in 2000 -- late 2005 that

12    were deposited in early 2000 -- January 2006.  Do you remember

13    that?

14    A.   Yes.

03:50:52    15    Q.   Why didn't you give him credit for those checks in the

16    2006 income analysis that you did?

17    A.   The checks were dated in December and the grandfathered

18    money from Mr. Beavers' campaign fund account was zero at that

19    time.

03:51:08    20    Q.   Well, let's break that down a little bit.

21         You said the checks were dated in December.  What

22    significance is it that the checks were dated in December?

23    A.   That was the prior year.

24    Q.   Is there something particular about -- is there something

03:51:22    25    called a cash analysis?  Am I using the right term?

1  A.  Cash basis, yes.

2  Q.  Cash basis, I'm sorry.

3       What is a cash basis?

4  A.  It's when the cash is received.

03:51:33  5  Q.  And if you're looking at these three checks that he wrote

6  to the campaign funds in December 2005 and applying a

7  cash-basis analysis, when would you credit those checks, to

8  what year?

9  A.  In 2005 when they were written.

03:51:53  10  Q.  Did you apply that same cash-basis analysis to 2006, 2007

11  and 2008?

12  A.  Yes.

13  Q.  Were you consistent in your application of that analysis

14  over these years?

03:52:06  15  A.  Yes.

16     (Counsel conferring.)

17       MR. GETTER:  May I approach the witness?

18       THE COURT:  You may.

19  BY MR. GETTER:

03:52:34  20  Q.  Agent Ponzo, if you don't mind, I'm going to stand here

21  for one second because I'm going to take these back from you.

22       What have I just handed you?

23  A.  Three check stubs from Mr. Beavers' 7th Ward Democratic

24  Organization and three canceled checks from the 7th Ward

03:52:50  25  Democratic Organization.

1    Q.  Where were those checks received from?

2    A.  The campaign fund of 7th Ward Democratic Organization.

3    Q.  In response to subpoenas?

4    A.  Yes.

03:52:58    5    Q.  Do you recognize those documents?

6    A.  I do.

7    Q.  And did you review them in conducting your analysis?

8    A.  I did.

9         MR. GETTER:  Your Honor, may I publish these?

03:53:11    10        THE COURT:  You may.

11   BY MR. GETTER:

12   Q.  Let's look at the top check first.  Are you able to see it

13   from where you're seated?

14   A.  Most of it, yes.

03:53:59    15   Q.  What account does this check appear to be written on?

16   A.  7th Ward Democratic Organization.

17   Q.  What's the check number?

18   A.  1793.

19   Q.  Who was the check payable to?

03:54:12    20   A.  William M. Beavers.

21   Q.  And what is the date of the check?

22   A.  December 24th, 2005.

23   Q.  What's the amount of the check?

24   A.  $1,000.

03:54:20    25   Q.  And is there a check stub stapled to that check?

1    A.  Yes.

2    Q.  What does the check stub for check 1793 say?

3    A.  It's dated December 24, 2005 to M -- W. Beavers in the

4    amount of $1,000.

03:54:42    5    Q.  Looking at the next check down, are you able to see that?

6    A.  It's 7th Ward Democratic Organization check 1794 dated

7    December 27, 2005 in the amount of $2,000.

8    Q.  Made out to whom?

9    A.  William M. Beavers.

03:54:57    10    Q.  And what does the check stub say?

11    A.  Check stub says a date December 27, 2005, the "to" says

12    alderman, and then the "for" line says paid -- I can't really

13    read the number, and then December 28, 2005, total of $2,000.

14    Q.  So those two checks 1793 and 1794 total $3,000; is that

03:55:34    15    right?

16    A.  Yes.

17    Q.  Now, looking back in your binder at those three checks

18    that Mr. Goldstein pointed out to you from Mr. Beavers to the

19    7th Ward Democratic Organization for late December 2005?

03:55:48    20    A.  Yes.

21    Q.  Check 1374, what was the amount of that check?

22    A.  $1,000.

23    Q.  And check -- I'm sorry, I said 1374, I apologize.  3374?

24    A.  3374 was for $1,000.

03:56:00    25    Q.  And check 522?

1   A.   The amount was $2,000.

2   Q.   Does that equal $3,000?

3   A.   Yes, it does.

4   Q.   Do these two checks up here and these two checks in the

5   binder equal each other out at $3,000?

6   A.   They do.

7   Q.   Is that part of why you didn't attribute these checks that

8   Mr. Beavers wrote to the 7th Ward organization in late 2005 to

9   the income analysis for 2006?

10  A.   Yes.

11  Q.   Now, the third check that Mr. Goldstein pointed out to

12  you --

13       (Counsel conferring.)

14  BY MR. GETTER:

15  Q.   Before I get to that third check.

16       (Counsel conferring.)

17       MR. GETTER:   Showing this to the defense.

18       Could I approach the witness?

19       THE COURT:   You may.

20  BY MR. GETTER:

21  Q.   Agent Ponzo, if I could show this to you, what is that I

22  just handed you?

23  A.   This is a page from the D-2 of the 7th Ward Democratic

24  Organization that was filed December -- January 21st, 2006.

25  Q.   For what period does that D-2 cover?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 94 of 134 PageID #:2258
Ponzo - redirect by Getter
830

1  A.  For -- the reporting period is July 1st, 2005 through

2  December 31, 2005.

3        MR. GETTER:  Your Honor, permission to publish a page

4  from that D-2?

03:57:56  5        THE COURT:  You may.

6  BY MR. GETTER:

7  Q.  First let me show you the first page of this D-2.  Looking

8  at the top left, this -- does this say 7th Ward Democratic

9  Organization?

03:58:19  10  A.  Yes, it does.

11  Q.  Reporting period July 1, 2005 through December 31, 2005?

12  A.  Correct.

13  Q.  Let me show you Page 7 of this D-2.  Under Schedule A,

14  Part 4, other receipts.  Are you able to see that?

03:58:55  15  A.  Yes.

16  Q.  What does this show, Agent Ponzo?

17  A.  It shows other receipts for the time period July 1st, 2005

18  through December 31st, 2005.

19  Q.  Okay.  I'll get more specific.

03:59:15  20  A.  Okay.

21  Q.  Are there three items listed on this -- in this section?

22  A.  Yes, there are.

23  Q.  And what are the amounts of those items?

24  A.  There are three entries, each for $1,000.

03:59:27  25  Q.  And what are the dates of those items?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 95 of 134 PageID #:2259
Ponzo - redirect by Getter
831

1   A.   The first item is dated December 28th, 2005.   The second

2   item is dated December 30th, 2005, and the third item is dated

3   December 30th, 2005.

4   Q.   Is there a description of what these entries are?

03:59:47   5   A.   Yes.

6   Q.   What is the description provided in this D-2 report from

7   the 7th Ward Democratic Organization?

8   A.   The first -- for the first item, the description says

9   personal loan, and then underneath it says payment check

04:00:02   10   number 1794.

11   Q.   How about the next one?

12   A.   The second item says for description:   Reimbursement for

13   check 1793-ALD.

14          MR. GOLDSTEIN:   Objection, your Honor.   These aren't

04:00:22   15   matching to the checks in question.   It's just not relevant.

16          MR. GETTER:   Yeah, Judge, those -- those match the

17   check numbers from the 7th Ward, 1793 and 1794.   It is

18   relevant.

19          MR. GOLDSTEIN:   The amount doesn't match, your Honor.

04:00:52   20          MR. GETTER:   Totals of $3,000, Judge.

21          THE COURT:   Give me a second.

22          These are 2005s?

23          MR. GETTER:   Yes.

24          THE COURT:   These are the 2005s?

04:02:27   25          MR. GETTER:   Yes.

Ponzo - redirect by Getter

832

| | |
|---|---|
| 1 | THE COURT:  Overruled. |
| 2 | BY MR. GETTER: |
| 3 | Q.  From the D-2, does it appear that it's being treated, |
| 4 | these checks from Mr. Beavers in late December, December 30th, |
| 04:02:48  5 | 2005, and December 30th, 2005 as -- excuse me -- |
| 6 | December 30th, 2005 and December 28th, 2005, as repayments for |
| 7 | these checks written to him earlier? |
| 8 | MR. GOLDSTEIN:  Objection, speculation. |
| 9 | THE COURT:  Overruled. |
| 04:03:07  10 | BY THE WITNESS: |
| 11 | A.  Yes, that's the way it appears. |
| 12 | BY MR. GETTER: |
| 13 | Q.  Is that part of why you did not credit those 2005 checks, |
| 14 | December 2005 checks from Mr. Beavers to the 7th Ward |
| 04:03:22  15 | Democratic Organization in 2006? |
| 16 | A.  Yes. |
| 17 | Q.  Now, the third check Mr. Goldstein showed you was the |
| 18 | December 30th, 2005 check 523 from Mr. Beavers to Citizens For |
| 19 | Beavers, correct? |
| 04:03:50  20 | A.  Correct. |
| 21 | Q.  In the amount of $2,000 and dated December 30, 2005? |
| 22 | A.  Correct. |
| 23 | Q.  I believe you touched on this a moment ago, but we focused |
| 24 | on the 7th Ward. |
| 04:04:01  25 | Why didn't you credit this December 30, 2005 check |

Ponzo - redirect by Getter

1    from Beavers to Citizens For Beavers in the 2006 income

2    analysis?

3    A.  It was dated December 30th, 2005, and the D-2 indicated

4    that the grandfathered money had a zero balance at the end of

04:04:20  5    December 2005.

6    Q.  Could you explain to the jury the significance of that in

7    your -- in terms of your analysis and why you didn't credit

8    this in 2006?

9    A.  Once the balance was zero at the end of 2005, then we

04:04:31  10    started fresh in 2006.

11    Q.  Do you recall Mr. Goldstein showing you a draft

12    spreadsheet that you had created of one of Mr. Beavers'

13    personal bank accounts that included the word unknown for some

14    checks?

04:05:05  15    A.  Yes.

16    Q.  Now, you -- I believe you testified that the reason you

17    put unknown there was because you didn't have complete bank

18    records for Mr. Beavers' personal account; is that right?

19    A.  Correct.

04:05:19  20    Q.  Did you have complete bank records, though, for

21    Mr. Beavers' campaign committee bank accounts?

22    A.  I did.

23    Q.  And did you review all of those campaign bank account

24    records?

04:05:39  25    A.  Yes, I did.

1  Q.  And did you review those campaign bank account records

2  during the same period of time for which these personal checks

3  that he wrote were characterized as unknown?

4  A.  Yes.

04:05:50  5  Q.  In reviewing the campaign bank account records, is there

6  any indication that any of those personal checks that appeared

7  unknown were deposited into any of the campaign bank accounts?

8  A.  No, there's no indication.

9  Q.  And I believe Mr. Goldstein also asked if it was possible

04:06:20  10  that any of those checks written unknown could have been spent

11  on campaign-related expenses.  Do you recall that?

12  A.  Yes.

13  Q.  You had complete records from the campaign treasurers,

14  correct?

04:06:33  15         MR. GOLDSTEIN:  Objection, your Honor.

16  BY MR. GETTER:

17  Q.  Did you have complete records from the campaign treasurer?

18  A.  As far as --

19         MR. GOLDSTEIN:  Objection.

04:06:39  20         THE COURT:  Overruled.  He can answer.

21  BY THE WITNESS:

22  A.  As far as I know, we asked for everything, and we have

23  everything.

24  BY MR. GETTER:

04:06:47  25  Q.  In reviewing the campaign treasurer's records, did you see

1  any indication that any expenses, campaign expenses, were

2  attributed to those personal checks Mr. Beavers wrote where

3  the payor/payee was unknown?

4  A.  No.

04:07:05  5  Q.  And did you try to account for all possible

6  campaign-related expenses in going through those campaign

7  records and doing your income analysis?

8  A.  I did.

9  Q.  Do you recall Mr. Goldstein asking you some questions

04:07:52  10  about check stubs that said void on them?

11  A.  Yes.

12  Q.  As an initial matter in Summary Chart 10 for 2008, why

13  didn't you give on the void spreadsheet -- excuse me -- on the

14  expense spreadsheet, why didn't you give Mr. Beavers credit on

04:08:15  15  that part of the summary chart for those void -- for those

16  checks that had void stubs?

17  A.  On that part of the summary chart, I was attributing

18  amounts from -- that are written on the check stub, so the

19  check stub said void, that's why there were no amounts

04:08:31  20  attributed directly.

21  Q.  Do you still have the summary charts in front of you?

22  A.  No, I don't.

23  Q.  Okay.  Let me --

24       MR. GETTER:  May I hand this to the witness, Judge?

04:08:52  25  BY MR. GETTER:

Ponzo - redirect by Getter

1  Q.  Looking at Summary Chart 10, towards the end of that

2  chart, Agent Ponzo, on Page 24 of 24, in fact, it's the last

3  page of the chart, could you tell the jury again what this

4  page is?

04:09:38  5  A.  These are amounts that I subtracted in coming up with the

6  computation of the cash remaining in Mr. Beavers' possession

7  for the year 2008.

8  Q.  Despite the fact that you didn't give Mr. Beavers credit

9  for those checks with void stubs on the earlier part of the

04:09:55  10  2008 chart, did you give him credit for $11,000 of money he

11  paid into the campaign fund for 2008?

12  A.  Yes.

13  Q.  And is that set forth on this last page of Summary Chart

14  10?

04:10:09  15  A.  It is.

16  Q.  So any check that had a void check stub that was

17  reimbursed you gave credit for.

18  A.  Yes.

19  Q.  Do you recall Mr. Goldstein asking you some questions

04:10:55  20  about gambling?

21  A.  Yes.

22  Q.  And do you recall him asking you some questions about

23  Mr. Beavers' personal credit card use?

24  A.  Yes.

04:11:05  25  Q.  And cash advances from those credit cards?

Ponzo - redirect by Getter

837

1    A.  Yes.

2    Q.  Agent Ponzo, what was the total amount of money that

3    Mr. Beavers wrote to himself in campaign checks between 2006

4    and 2008?

04:11:20    5    A.  $226,300.84.

6    Q.  Do you recall the approximate amount of money that

7    Mr. Beavers, according to the casino records, bet at the

8    casino during 2006 to 2008?

9    A.  No, I don't.

04:11:35    10   Q.  Do you recall if it was more than $226,000?

11   A.  Yes.

12   Q.  So even if you were to have given credit -- excuse me.

13        Even if you were to assume that Mr. Beavers gambled

14   all $226,000 in those campaign checks, would he still have had

04:11:57    15   to use at least some personal money to gamble?

16   A.  Yes.

17   Q.  But you're not saying that you know -- are you saying that

18   you know whether any of the money that he took from his

19   campaign funds were used for gambling?

04:12:08    20   A.  I don't know.

21        MR. GETTER:  Can I have one second, Judge?

22        (Counsel conferring.)

23   BY MR. GETTER:

24   Q.  Just one more thing, Agent Ponzo.  On the last page of

04:13:18    25   Summary Exhibit Chart 10, Page 24, you see that there are four

Ponzo - recross by Goldstein

1   entries there?

2   A.  Yes.

3   Q.  What is the date of the first two entries?

4   A.  January 12th, 2009.

04:13:34   5   Q.  Why did you give Mr. Beavers credit for personal checks

6   deposited into Friends For Beavers with a bank date of January

7   12, 2009?

8   A.  Between January 1st and January 12th, 2009, I reviewed the

9   three campaign fund accounts, and there were no checks going

04:13:55  10   to Mr. Beavers during that time, so to be conservative, I

11   considered those two checks as part of my analysis.

12   Q.  So you gave him credit for those two checks in January

13   of '09 to be conservative, correct?

14   A.  Yes.

04:14:10  15   Q.  And that's giving more credit to Mr. Beavers in your

16   income analysis.

17   A.  Yes.

18   Q.  Because it's a further subtraction from the -- from the

19   campaign checks to him, correct?

04:14:19  20   A.  It is.

21        MR. GETTER:  No further questions, Judge.

22                RECROSS EXAMINATION

23   BY MR. GOLDSTEIN:

24   Q.  Mr. Ponzo, you just testified that this was a strict

04:14:46  25   analysis from '06 to '08, correct?

Ponzo - recross by Goldstein

839

1    A.  Correct.

2    Q.  But in 2009, you decided to look at some checks that were

3    deposited; is that correct?

4    A.  I did look at those.

04:14:58    5    Q.  And then you just decided to end it right there,

6    January 12th, 2009?

7              MR. GETTER:  Objection, Judge.

8              THE COURT:  Objection is sustained.

9    BY MR. GOLDSTEIN:

04:15:08    10   Q.  Well --

11             THE COURT:  That was not his answer.

12   BY MR. GOLDSTEIN:

13   Q.  Okay.  Well, was your analysis -- did it end in 2008 or

14   January 12th, 2009?

04:15:16    15   A.  It ended --

16             MR. GETTER:  Objection.

17             THE COURT:  Objection is sustained.

18   BY MR. GOLDSTEIN:

19   Q.  When did your analysis end?

04:15:24    20             MR. GETTER:  Objection.

21             THE COURT:  Objection is sustained.

22   BY MR. GOLDSTEIN:

23   Q.  You gave credit, according to you, to a check deposited

24   January 12th, 2009, correct?

04:15:38    25   A.  Yes.

Ponzo - recross by Goldstein

1    Q.  And you talked about the cash analysis?

2    A.  Yes.

3    Q.  You're familiar with that as an IRS agent?

4    A.  Yes.

04:15:51  5    Q.  And you said that cash analysis is when money is received?

6    A.  Yes.

7    Q.  Does that -- is that the bank date that it's deposited or

8    the date that it's written on the check?

9    A.  That was the bank date, January 12th.

04:16:08  10   Q.  Okay.  So in your cash analysis, are you looking at bank

11   date or date that is written on the check?

12   A.  Date that was written on the check, but to be

13   conservative, I considered these two checks.

14   Q.  Okay.  Is it your testimony that in analyzing these

04:16:28  15   checks, you used bank date or date written on the check?

16   A.  This -- for these two checks, the bank date.

17   Q.  And what about the rest of the analysis?

18   A.  The date on the check.

19   Q.  Okay.  So you actually changed analyses in this context;

04:16:45  20   is that correct?

21   A.  I allowed these two checks.

22   Q.  You allowed these two checks.

23          Well, let's look at Page 2 of Summary Chart No. 10.

24          Tell me what I've just circled right there.

04:17:00  25   A.  Bank date.

Ponzo - recross by Goldstein

841

```
         1   Q.  That's the date you used for your analysis, correct?
         2   A.  That's the date I put on the -- yes.
         3   Q.  And I won't belabor the point, but every single date on
         4   this chart has bank date, correct?
04:17:18 5   A.  Yes.
         6   Q.  That's the date you used in this chart, correct?
         7   A.  That's the date on the chart.
         8   Q.  And when we looked at this check 523 as we went through,
         9   that was deposited January 23rd, 2006, correct?
04:17:40 10  A.  Correct.
         11  Q.  The bank date is January 23rd, 2006, correct?
         12  A.  It is.
         13  Q.  Now, you talked about some loans, some indication on the
         14  D-2s, and that was the reason why you didn't give credit.
04:17:56 15  A.  Correct.
         16  Q.  That totalled $3,000, correct?
         17  A.  On the D-2s.
         18  Q.  Yes.  And I showed you checks in total of $5,000, correct?
         19  A.  Correct.
04:18:07 20  Q.  And you didn't give credit for even $2,000, correct?
         21  A.  Correct.
         22  Q.  And, in fact, on the D-2s, it says nothing about loan or
         23  reimbursement, check 523, does it?
         24          You can look at me when you answer.
04:18:26 25          MR. GETTER:  I'm going to object to that comment.
```

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 106 of 134 PageID #:2270
Ponzo - recross by Goldstein
842

```
           1       THE COURT:  The objection is sustained.  The jury is
           2   instructed to disregard it.
           3       MR. GOLDSTEIN:  I apologize.
           4   BY MR. GOLDSTEIN:
04:18:34   5   Q.  You didn't see check number 523 indicated on that D-2.
           6   A.  On which D-2?
           7   Q.  The D-2 that was shown to you just a moment ago.
           8   A.  No.
           9   Q.  And you didn't see check 522 indicated on that D-2, did
04:18:50  10   you?
          11   A.  No.
          12   Q.  You didn't see check 3374 indicated on that, did you?
          13   A.  No.
          14   Q.  Now, the unknown checks that were discussed, you found no
04:19:09  15   receipts somehow linking these unknown checks; is that
          16   correct?
          17   A.  Correct.
          18   Q.  Those checks still could have been used for campaign
          19   expenses; is that correct?
04:19:19  20       MR. GETTER:  Objection.
          21       THE COURT:  Rephrase the question.
          22   BY MR. GOLDSTEIN:
          23   Q.  You do not know what those unknown checks were used for,
          24   correct?
04:19:30  25   A.  I don't know the payees.
```

Ponzo - recross by Goldstein

843

1    Q.  And the payees could have been for campaign-related

2    expenses, correct?

3    A.  I don't know.

4    Q.  They could have been for campaign-related expenses.

04:19:45    5            MR. GETTER:  Objection, asked and answered.

6            THE COURT:  Sustained.

7    BY MR. GOLDSTEIN:

8    Q.  Now, you -- after cross-examination, we took a break; is

9    that correct?

04:20:06    10   A.  Yes.

11   Q.  And then you went and spoke to the U.S. Attorneys; is that

12   correct?

13   A.  I did.

14   Q.  And you went over the testimony you just gave right now;

04:20:14    15   is that correct?

16   A.  We went over the documents.

17   Q.  You went over the documents to see if you can explain the

18   $5,000; is that correct?

19   A.  Yes.

04:20:21    20           MR. GETTER:  Objection.

21           Objection.

22           THE COURT:  Sustained.

23   BY MR. GOLDSTEIN:

24   Q.  Well, when you went over the documents, did you go over

04:20:39    25   Summary Chart No. 10?

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 108 of 134 PageID #:2272
Ponzo - recross by Goldstein
844

1    A.  I think --

2    Q.  Page 1?

3    A.  No.

4    Q.  Okay.  So you weren't able to calculate percentages of how

04:20:52    5    much was given back or how much was accounted for in any way.

6              MR. GETTER:  Objection.

7              THE COURT:  You know, if you want to do percentages,

8    you can do the percentages.  He's not obliged to do it that

9    way.

04:21:05    10             MR. GOLDSTEIN:  I understand.  I understand.

11   BY MR. GOLDSTEIN:

12   Q.  The 5,000, 13,000 and 15,000 that you did not account for,

13   that would be more than this $30,185.40; is that correct?

14             MR. GETTER:  Objection.

04:21:28    15             THE COURT:  Sustained.

16             MR. GOLDSTEIN:  Nothing further.  Thank you.

17             MR. GETTER:  No questions, Judge.

18             THE COURT:  You can step down.

19        (Witness excused.)

04:21:49    20             MR. GETTER:  The government calls Nathan Sarnacki.

21             THE COURT:  Raise your right hand.

22        (Witness sworn.)

23             THE COURT:  Please be seated.

24         NATHAN SARNACKI, GOVERNMENT'S WITNESS, DULY SWORN,

04:22:05    25                       DIRECT EXAMINATION

Sarnacki - direct by Getter

845

BY MR. GETTER:

Q.  Could you please state your name and spell it.

A.  Nathan Sarnacki.  N-A-T-H-A-N, S-A-R-N-A-C-K-I.

Q.  Where do you work?

04:22:30    A.  The Internal Revenue Service.

Q.  What is your position with the Internal Revenue Service?

A.  I am a Special Agent with IRS criminal investigation.

Q.  How long have you been in that position?

A.  Since 2011.

04:22:41    Q.  In connection with this case, Agent Sarnacki, were you

asked to drive between different locations involved in this

case?

A.  Yes, I was.

Q.  Were you asked to see how long it would take to drive

04:22:52    those distances?

A.  Yes.

Q.  Where were you asked to drive between?

A.  I was asked to drive between four bank locations and the

Horseshoe Hammond Casino.

04:23:06    Q.  Was one of those bank locations at 900 South Michigan

Avenue in Chicago?

A.  Yes, it was.

Q.  Was that where New City Bank was located?

A.  Yes, it was.

04:23:14    Q.  Was 8905 South Commercial in Chicago another of those

Sarnacki - direct by Getter

846

1    locations?

2    A.  Yes.

3    Q.  Was that where the South Chicago branch of Pullman Park

4    National Bank was located?

04:23:26    5    A.  Yes.

6    Q.  Was 3501 East 106th Street in Chicago another of those

7    locations?

8    A.  Yes, it was.

9    Q.  Was that where the East Side branch of Pullman Park

04:23:38    10    National Bank was located?

11    A.  Yes, it was.

12    Q.  Was 1000 East 111th Street in Chicago another of those

13    locations?

14    A.  Yes.

04:23:47    15    Q.  Was that where the Pullman branch of Pullman Park National

16    Bank was located?

17    A.  Yes.

18    Q.  When you made these drives, Agent, when did you stop --

19    start and when did you stop your timing?

04:23:59    20    A.  I traveled between the casino and the bank locations.  I

21    started the time when my vehicle drove away from the bank on

22    three separate -- or at three different instances, and I ended

23    when I arrived at the casino, parked my vehicle on the fourth

24    level and took the elevator down to the casino floor entrance.

04:24:26    25    Q.  So did you stop your timing when you got to the casino

Sarnacki - direct by Getter

1    floor entrance after parking your car?

2    A.  Yes.

3    Q.  When you made these drives, did you obey all traffic laws?

4    A.  Yes.

04:24:38    5    Q.  Did you drive at or below the speed limit?

6    A.  Tried my very best.

7    Q.  Did you help to prepare a map showing the results of your

8    drives?

9    A.  Yes, I did.

04:24:49    10   Q.  Showing you, rather than publishing it right now,

11   Government Exhibit Map 1, do you recognize this document?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It's a map showing the time it took me to travel to each

04:25:08    15   of the four bank branch locations.

16         MR. GETTER:  Your Honor, we're not seeking to move

17   this into evidence, but we are seeking to publish it as a

18   demonstrative.

19         MR. GOLDSTEIN:  No objection.

04:25:21    20         THE COURT:  Admitted as a demonstrative exhibit.

21      (Government's Exhibit Map 1 (Demonstrative) was received

22       in evidence.)

23   BY MR. GETTER:

24   Q.  Let's take these one at a time.  Could you show -- let me

04:25:36    25   actually point you.

Sarnacki - direct by Getter

848

|         |    |                                                                      |
|---------|----|----------------------------------------------------------------------|
|         | 1  | Do you see five red dots on this map?                                |
|         | 2  | A.  Yes, I do.                                                       |
|         | 3  | Q.  Okay.  Which of those dots is the Horseshoe Hammond             |
|         | 4  | Casino?                                                              |
| 04:25:51| 5  | A.  It is the dot right above where the arrow is pointing to,       |
|         | 6  | Horseshoe Casino.  Underneath that is 777 Casino Drive,             |
|         | 7  | Hammond, Indiana.                                                   |
|         | 8  | Q.  And is that the address of the Horseshoe Hammond Casino?       |
|         | 9  | A.  Yes, it is.                                                     |
| 04:26:08| 10 | Q.  Let's take these bank branches one at a time.                  |
|         | 11 | The one all the way up top, far north, which bank                  |
|         | 12 | branch is that?                                                     |
|         | 13 | A.  That would be New City Bank.                                   |
|         | 14 | Q.  And do you have on here how long it took you to do the         |
| 04:26:23| 15 | trip between New City Bank and the Horseshoe Casino?               |
|         | 16 | A.  Yes.                                                            |
|         | 17 | Q.  Is that time located in the white box beneath the blue box     |
|         | 18 | that has the name of the bank?                                     |
|         | 19 | A.  Yes, it is.                                                    |
| 04:26:36| 20 | Q.  And what is the amount of time it took you to make that       |
|         | 21 | drive?                                                             |
|         | 22 | A.  28 minutes.                                                    |
|         | 23 | Q.  Now, let's go to the next bank branch down, the Park          |
|         | 24 | National Bank branch at 8905 South Commercial Avenue.  Do you     |
| 04:26:52| 25 | see that?                                                          |

Sarnacki - direct by Getter

849

1    A.  Yes, I do.

2    Q.  And that was, I believe you said, the South Chicago

3    branch?

4    A.  Yes, it was.

04:26:59    5    Q.  How long did it take you to make that drive between the

6    South Chicago branch and the Hammond casino?

7    A.  18 minutes.

8    Q.  Now let's take the next one down where it says Park

9    National at 3501 East 106th Street.  I believe you said that

04:27:18    10    was the East Side branch, correct?

11    A.  Yes.

12    Q.  How long did it take you to make the drive between the

13    East Side branch and the Hammond casino?

14    A.  11 minutes.

04:27:29    15    Q.  Now, the last one, down in the bottom left-hand corner,

16    which bank branch is that, what address?

17    A.  1000 East 111th Street, Chicago, Illinois.

18    Q.  Is that the Pullman branch of Pullman Park National Bank?

19    A.  Yes.

04:27:47    20    Q.  How long did it take you to make the drive between the

21    Pullman branch and the Horseshoe Hammond Casino?

22    A.  21 minutes.

23    Q.  Did you review bank and casino records for April 9, 2007?

24    A.  Yes, I did.

04:28:09    25    Q.  Did you look to see how long -- let me back up for a

Sarnacki - direct by Getter

850

1   moment.

2          Could you take a look at Summary Exhibit 4.

3          MR. GETTER:  May I approach?

4          THE COURT:  Yes.

04:28:47   5   BY MR. GETTER:

6   Q.  Do you have that in front of you, Summary 4?

7   A.  Yes, I do.

8   Q.  For -- do you see that check 1867 was cashed at

9   12:05 p.m.?

04:28:59   10   A.  Yes, I do.

11   Q.  Where was the check cashed?

12   A.  That check was cashed at the South Chicago branch.

13   Q.  Did Mr. Beavers' player's card go into a machine at the

14   casino at 12:31 p.m.?

04:29:16   15   A.  Yes.

16   Q.  Is that 26 minutes later?

17   A.  Yes, it is.

18   Q.  Are you able to drive from the South Chicago branch to the

19   Horseshoe Casino in less than 26 minutes?

04:29:26   20   A.  Yes.

21   Q.  Was Mr. Beavers' player's card withdrawn from the machines

22   at 1:18 p.m.?

23   A.  Yes.

24   Q.  Did he cash check 1868 at 2:07 p.m.?

04:29:42   25   A.  Yes.

Sarnacki - direct by Getter

851

1   Q.  Is that about 49 minutes later?

2   A.  Yes.

3   Q.  Where did he cash check 1868?

4   A.  At the East Side branch.

04:29:51    5   Q.  Were you able to drive between the Horseshoe and the East

6   Side branch in less than 49 minutes?

7   A.  Yes, I was.

8   Q.  Was his player's card put back into a machine at the

9   casino at 2:27 p.m.?

04:30:07   10   A.  Yes, it was.

11   Q.  Is that 20 minutes after check 1868 was cashed?

12   A.  Yes.

13   Q.  And were you able to do that drive between the East Side

14   branch and the casino in 11 minutes?

04:30:16   15   A.  Yes.

16   Q.  Did his card get pulled from the casino at 4:06 p.m.?

17   A.  Yes.

18   Q.  And was check 1869 cashed at 4:33 p.m.?

19   A.  Yes, it was.

04:30:33   20   Q.  Is that 27 minutes later?

21   A.  Yes.

22   Q.  Where was it cashed?

23   A.  It was cashed at the East Side branch.

24   Q.  Were you able to do that drive in 11 minutes?

04:30:50   25   A.  Yes.

Sarnacki - direct by Getter

852

1  Q.  Was his player's card put back into a machine at the
2  Horseshoe at 4:52 p.m.?
3  A.  Yes.
4  Q.  Is that 19 minutes after check 1869 was cashed?
04:31:02  5  A.  Yes.
6  Q.  And is that more time than the 11 minutes it took you to
7  drive that route?
8  A.  Yes, it was.
9  Q.  Did you review Government Summary Exhibits 6, 7, 8 and 9?
04:31:16  10  A.  Yes, I did.
11  Q.  Did you review on those charts the check-cashing time,
12  date and location for each of those checks?
13  A.  Yes.
14  Q.  And did you compare those times to the gambling records
04:31:33  15  for Mr. Beavers' casino card?
16  A.  Yes.
17  Q.  Were you able to determine for all of those checks listed
18  on those four spreadsheets how many of those would you have
19  been able to do a drive to make the drive between the relevant
04:31:50  20  bank location and the casino?
21  A.  All of them, and there was two that were questionable.
22  Q.  What was questionable about those two?
23  A.  There was two where it looks as if it was -- it might have
24  been cashed on either a Saturday or a Monday, and there was
04:32:09  25  gambling taking part on both days.

Case: 1:12-cr-00124 Document #: 128 Filed: 04/03/14 Page 117 of 134 PageID #:2281
Sarnacki - cross by Goldstein
853

1  Q.  And for each of those two instances where you had a

2  Saturday-Monday and a Saturday-Monday, was the drive do-able

3  for one of those days but not the other?

4  A.  Yes.

04:32:24  5      MR. GETTER:  One moment, please?

6          (Counsel conferring.)

7      MR. GETTER:  Nothing further, Judge.

8                    CROSS EXAMINATION

9  BY MR. GOLDSTEIN:

04:32:35  10  Q.  Mr. Sarnacki, you're with the FBI?

11  A.  IRS.

12  Q.  IRS, sorry.  I apologize.  I don't know if that's

13  offensive.

14  A.  No.

04:32:42  15  Q.  Okay.  So you went during regular business hours to make

16  these routes that are on the map; is that correct?

17  A.  Yes.

18  Q.  Okay.  Did -- and this was done within the last couple

19  months; is that correct?

04:33:00  20  A.  It was done November and December of 2012.

21  Q.  Okay.  So you had never attempted to follow Mr. Beavers to

22  the casino at any time.

23  A.  No, I did not.

24  Q.  And you drove your car from these particular banks and

04:33:19  25  then went into the casino, is that what you did?

Sarnacki - cross by Goldstein

854

1   A.  I took the elevator down.  I parked my vehicle, then I

2   took my -- the elevator down and stopped at the casino floor

3   entrance.

4   Q.  Okay, and then went back.

04:33:33   5           Did you time it on the way back or only on the way

6   there?

7   A.  On one instance, I timed it from the casino to the bank;

8   and on the other three locations, I timed it from the bank to

9   the casino.

04:33:48   10  Q.  Okay.  Do you know -- well, we're sort of presupposing

11  that Mr. Beavers went from the bank to the casino.  We don't

12  know if that actually happened, is that fair to say?

13  A.  I do not know.

14  Q.  Because you didn't see him there; is that correct?

04:34:06   15  A.  Yes.

16  Q.  Okay.  Do you know if there was any specific route that

17  was taken?

18  A.  I do not know.

19  Q.  Okay.  So you took one particular route for each distance;

04:34:20   20  is that correct?

21  A.  Yes.

22  Q.  And so -- but you went -- the route you took was during

23  morning hours or daytime hours?

24  A.  Morning hours.

04:34:38   25          MR. GOLDSTEIN:  Nothing further.

1    MR. GETTER:  No redirect.

2    THE COURT:  You may step down.

3    (Witness excused.)

4    MR. GETTER:  Judge, could we have about five minutes

04:34:53  5  to confer to make sure all of our exhibits are in?

6    THE COURT:  Yes.

7    MR. GETTER:  Okay.  Thank you.

8    COURT SECURITY OFFICER:  All rise.

9    (Jury exits courtroom.)

04:35:41  10  THE COURT:  You can be seated in the courtroom.

11   (Recess from 4:35 to 4:36.)

12   THE COURT:  You're going to rest?

13   MR. GETTER:  We are, but there was one exhibit,

14   Judge, that our records show was conditionally admitted and I

04:38:23  15  wanted to make sure that we actually got admitted.  It's the

16   Horseshoe Casino 3 Exhibit.  It's the re-sorted spreadsheet

17   that Agent Ponzo did, and Mr. Goldstein objected.  We laid

18   what we believe is an appropriate foundation.

19   THE COURT:  I remember this.  I remember this.

04:38:41  20  You're adhering to your objection?

21   MR. GOLDSTEIN:  Yes.

22   THE COURT:  I'm overruling it.  It's admitted.

23   (Government Exhibit Horseshoe Casino 3 received in

24    evidence.)

04:38:46  25  THE COURT:  Anything else?

```
              1        MR. GETTER:  No, that's it.  Government rests.
              2        THE COURT:  What I'm going to do is you're going to
              3    announce that you're resting.  I'm going to excuse the jury.
              4    I'm going to ask them to return at 9:30 tomorrow morning
04:39:00      5    because I have a very light early call.  And then we have some
              6    stuff that we can do after I do that.
              7        Get the jury back in.
              8        COURT SECURITY OFFICER:  All rise.
              9      (Jury enters courtroom.)
04:41:29     10        THE COURT:  Please be seated.
             11        For the government?
             12        MR. GETTER:  Your Honor, the government rests.
             13        THE COURT:  The government has now rested its case,
             14    which means they're done calling witnesses, at least for this
04:41:55     15    stage of the case.
             16        What I'm going to do is I'm going to excuse you from
             17    the rest of the day.  There's some administrative things we
             18    have to attend to, and I -- we will begin tomorrow morning at
             19    9:30.
04:42:11     20        COURT SECURITY OFFICER:  All rise.
             21      (Jury exits courtroom.)
             22        THE COURT:  Please be seated.  Counsel approach the
             23    bench.
             24        I'm assuming you might possibly wish to make a motion
04:43:13     25    at this time.
```

1          MR. GOLDSTEIN:  That is correct, your Honor.  If we

2     can make it orally --

3          THE COURT:  Orally is fine.

4          MR. GOLDSTEIN:  -- the motion for directed verdict on

04:43:22    5     this case, and potentially supplement it written if need be,

6     your Honor.

7          THE COURT:  That's fine, too.

8          MR. GOLDSTEIN:  Do you want to hear argument?

9          THE COURT:  You can take a minute or two to go over

04:43:39   10     your salient points.

11          MR. SOROSKY:  While he's going over his salient

12     points, let me begin by saying prior to trial, there was a

13     motion that the defense made concerning the admissibility of

14     all this gambling evidence, and we objected to it being

04:43:59   15     admitted because we felt it was irrelevant to the fundamental

16     accusation of tax evasion, and a number of months ago I gave

17     the example let's suppose Mr. Beavers had written all these

18     checks from his campaign fund to himself and spent the money

19     helping sick children.  That was the last thing the government

04:44:27   20     might want to do is present this to a jury, that he spent all

21     this money on sick children because it would create a great

22     deal of sympathy for Mr. Beavers.  They merely presented all

23     this evidence about gambling because it creates the opposite

24     effect on the jury.

04:44:44   25          And with all due respect, whether -- once this money

1   went into Mr. Beavers' personal account, as it did, the

2   fundamental issue in this case is was it a loan or was this

3   income to him regardless of how he spent it.  Suppose he spent

4   it investing it on the stock market.  It's immaterial how he

04:45:10   5   spent it.

6       And the Court ruled that the government could present

7   this evidence of gambling because the government said it was

8   essential to its case.  However, these were the Court's exact

9   words:  They must present this evidence of gambling in a

04:45:26   10   moderate tone, and it must not be their entire case.

11       And, frankly, the government did just the opposite of

12   what this Court directed it to, and -- and it was their entire

13   case, and it certainly wasn't moderate, and its sole and only

14   purpose was to prejudice the jury.  And, therefore, we'd ask

04:45:49   15   for a mistrial.

16       THE COURT:  Do you want to bring up another salient

17   point so I can address them all at the same time?

18       MR. GOLDSTEIN:  I'll address the other motion, your

19   Honor, if you'd like, if you want it that way, or do you want

04:46:04   20   the government to respond to that motion, and then I'll come

21   and do the other motion?

22       THE COURT:  The government can respond to them.  I'm

23   pretty sure I know what they're going to say, but sometimes

24   I'm surprised.

04:46:15   25       MR. GETTER:  I'll try not to surprise you, Judge.

1    We've been over this several times during the
2   pretrial process, as well as during the course of the trial.
3        The gambling evidence here was used for two purposes.
4   One is 404(b) to show -- to show motive, to show intent, and
04:46:32   5   it's also direct evidence of the crime.  It's direct evidence
6   in the sense that we are trying to show that the defendant
7   filed false tax returns, that he didn't declare money that he
8   used personally, that he converted to his personal use.

9        The gambling records, in conjunction with the bank
04:46:51   10   records, show an extremely strong inference that can be drawn
11   between the timing of the check cashing and the gambling to
12   show exactly what Mr. Beavers was using the money for.

13        Yes, the defense's defense is loans, but it's our
14   burden to prove beyond a reasonable doubt that these tax
04:47:13   15   returns were false, and part of proving they're false is
16   showing the use of the money and the fact that it was
17   converted to personal use.

18        It's also relevant because we showed through
19   government -- at least through Government Exhibit Summary
04:47:29   20   Charts 6 through 9 that the defendant was causing to be
21   created campaign records that concealed the true use of his
22   funds, and we show in those charts, again, by comparing the
23   times of the gambling with the check cashing and how he
24   attributed it, he made false statements in his D-2s, claiming
04:47:57   25   things were campaign expenses when they clearly weren't, how

1    he attributed checks to himself to invoices that weren't
2    received until ten months later, all of which was designed to
3    try and conceal what he was doing with the money; namely,
4    converting it to personal use.

04:48:13    5        So as far as the gambling is concerned, I believe we
6    watched our tone.  We only used -- we never said gambling was
7    wrong.  We made it very clear that there's nothing improper
8    about gambling, and we never suggested that it was improper
9    for him to use his campaign money to gamble.  All we did was
04:48:30    10   show the temporal relationship between the two.

11       And your Honor even prevented us from using one of
12   the summary charts that we prepared.  So your Honor was
13   vigilant about making sure that we never even got close to the
14   line.

04:48:46    15      So for all those reasons, Judge, your prior ruling on
16   this motion should stand.

17      THE COURT:  Bear in mind that at this stage of the
18   proceedings, I have to take the prosecution evidence at its
19   best, and since there is no defense evidence, but there was
04:49:17    20   cross-examination, I have to take the defense evidence at its
21   worst.

22       I have to make inferences if supported by the
23   evidence that favor the government.  I cannot rely on
24   inferences that might favor the defense.  It's basically a
04:49:43    25   rule where you pretty much take the government's evidence at

relative

1    its maximum value and, absent rare circumstances, you don't --

2    you pretty much discount everything about the defense.

3        I don't think that there was a theme of gambling is

4    bad, and for this reason, the defendant ought to be condemned.

04:50:14    5    There was a subtext here, and the subtext had to do with the

6    charts and with the timing.

7        This is a situation in which one could infer, doesn't

8    have to, but could infer, for example, that this was an

9    individual who wanted very much to gamble, made special

04:50:43    10   efforts to obtain money to gamble with, and this is an element

11   that a juror could use in deciding why it is that a respected

12   public official with a very long career would embark on this

13   course where he is transferring money from campaign funds that

14   were not loans because I'm prohibited at this stage from

04:51:20    15   assuming that there was a loan.  What I've got is I've got

16   evidence of no loan documents, and he took money.

17       So why would something like this happen to somebody

18   with his career?  And in the course of the opening statement,

19   much was said about his career, his career as a police

04:51:45    20   officer, his career as an alderman.  So motive is a -- is a

21   factor in this case.  It doesn't have to be proved, but if it

22   can be proved, most prosecutors go ahead and try to prove it.

23       And what I saw in the gambling evidence was not so

24   much the gambling but the timing of the money followed --

04:52:21    25   quickly followed on its heels, leaving apart the driving time,

1   by wagers.  And this, for me, is sufficient to say that

2   there's at least one way a jury could conclude this was

3   deliberate action to satisfy a personal need or personal

4   desire of the defendant, catering to a private interest, not a

04:53:01   5   public interest.

6          So I don't think the way the evidence was presented

7   focused on gambling for the sake of gambling.  And, in fact,

8   part of the reason that I think the government was concerned

9   about reputation is the opening statement contained a lot of

04:53:32  10   praise for the career of the defendant before he got to this

11   courtroom.

12          So basically, I'm going to deny the motion for

13   directed verdict.  I think the argument about whether the case

14   should go to the jury might be a little different after the

04:54:04  15   defense; but as it stands right now, it's not useful of the

16   defense to make much more of it than they just did, which was

17   a reasonable approach.

18          So that motion is denied.  I now have two remaining

19   things that we can do.  One is to inquire of the defense how

04:54:34  20   much time they might take if they're going to offer a defense

21   because I need the timing, and the other thing we can probably

22   discuss is some of the instructions that might be given.  I

23   don't want to wind up in a situation where we end, say, in mid

24   or early afternoon tomorrow and we send the jury home without

04:55:02  25   hearing instructions.  I think as a general rule, it is a very

1    bad practice to send a jury home after having heard closing

2    arguments if they haven't also heard the instructions.

3         It's not so bad reading the instructions to them and

4    then telling them to go home and spend the night so that they

04:55:26    5    get a good rest so they're ready for the next day; but in

6    order for that system to be effective, they have to have heard

7    the instructions before they're let go for the day, so I want

8    the instructions ironed out.

9         I would also like the permission of the government to

04:55:41    10    confer with the defense in the absence of government counsel

11    so that I have a little better idea of what the timing is.

12         MR. GETTER:  Of course.

13         THE COURT:  Want to come over to the side?





1

2

3

4

04:59:20      5

6

7

8          (Proceedings heard in open court:)

9              THE COURT:  The defense has informed me, which you

05:00:04     10   already know, that they are going to call the --

11              MR. GETTER:  They are going to call?

12              THE COURT:  -- the accountant for whom there was a

13   voir dire.

14              MR. GETTER:  That accountant, okay.

05:00:13     15              THE COURT:  The other thing that I think would be

16   useful is there are some instructions in the package that are

17   going to be subject to debate, and there are going to be other

18   instructions that you can agree on.

19              What I would like the prosecution and the defense to

05:00:33     20   do is confer with each other and take from the list the stuff

21   that's going to be given, the standard stuff, and then leave a

22   short list of what I have to deal with, which will be at least

23   one instruction that we're all aware of.  There might be some

24   others.  There might be something, since we've gotten none

05:00:57     25   from the defense yet, some that the defense would like to show

1    you, and maybe you'll agree to them, maybe you won't.  We can

2    do that, too.

3         And then we'll try to -- and I think succeed -- in

4    going over instructions and getting rulings on most if not all

05:01:18    5    of the contested ones, and I think we have to start at 8:00 in

6    the morning.

7         MS. BONAMICI:  Judge, I didn't hear that last.

8         THE COURT:  What?

9         MS. BONAMICI:  I didn't hear what you said at the

05:01:30    10    very end.

11         THE COURT:  8:00 in the morning.

12         MS. BONAMICI:  I just didn't hear you.

13         THE COURT:  So with that, basically, I think we are

14    ready to go.

05:01:37    15         I believe that if you take the longest and largest

16    possible case that the defense will offer, we will still be

17    able to get through closing argument tomorrow.

18         MR. GETTER:  We -- Judge, if I may, we saw Philip

19    Achusim out in the hall who already testified in our case.

05:02:01    20    He's an outside tax preparer.

21         I'm assuming that he's under subpoena by the defense

22    and wanted to see if that's someone who they're going to call

23    because I'm not sure what relevance that would have to the

24    case.

05:02:13    25         THE COURT:  Yes?  No?  Maybe?

1    MR. GOLDSTEIN:  Maybe.

2    THE COURT:  Okay.

3    MR. GETTER:  If possible, I'd like to kind of vet

4    what the issues are that they intend to bring in --

05:02:23    5    THE COURT:  You may wish to discuss that with them,

6    and if there's something that you want to bring up before he

7    gets on the witness stand, you can tell me in the morning.

8    Anything else?

9    MR. COLE:  Your Honor, there are a couple points

05:02:36   10    about their expert that we'd like to be heard on in terms of

11    the particular look that their expert is going to testify

12    about.

13    THE COURT:  I believe that we -- I believe that some

14    of this they can talk to you about today.  I believe that we

05:02:53   15    can deal with the rest of it in the morning.

16    There was a point in the voir dire in which the -- in

17    which their witness, the accountant, was relying on the

18    assumption that the government had -- the government's tax guy

19    had, in fact, determined -- had determined as a matter of fact

05:03:23   20    certain things.

21    It's quite clear from his testimony that he had not

22    determined them.  As a matter of fact, they were arbitrary

23    lines drawn for the sake of -- of not getting into prolonged

24    arguments as to what should and should not be included.

05:03:47   25    To the extent -- and that was quite clear from

1   everybody's evidence and clearly accepted by the defense on

2   cross-examination.

3           That would preclude him from repeating at least that

4   portion of his testimony, and at least change the emphasis of

05:04:05   5   it, but I think they're aware of that, so you can discuss that

6   with them, too, and we ought to have enough time.

7           MS. BONAMICI:  We'll raise anything that we can't

8   agree on with you tomorrow morning.

9           THE COURT:  Right, exactly.

05:04:16   10          MR. COLE:  Is there a concern with having our -- we

11  may have a rebuttal expert.  Is it okay if our rebuttal expert

12  listens to their expert's testimony?

13          THE COURT:  It depends on precisely the nature of his

14  expertise, but usually the answer is yes.

05:04:32   15          And in many cases, and I don't know if we're doing it

16  in this case, but we have had cases in which the -- I've

17  always thought it was awkward to have the witness sit in the

18  room, any expert to observe another expert.  I do not think

19  it's awkward for one expert to listen to the other expert, and

05:04:57   20  we may have something set up where people can hear what's

21  happening in the courtroom.  I would prefer that, but we'll

22  see what happens.

23          MR. COLE:  Okay.

24          THE COURT:  And it can be raised in the morning.

05:05:07   25          Yes.

1     MS. BONAMICI:  May we use the courtroom to confer, or

2  do you want us to confer --

3         THE COURT:  Use the courtroom --

4         MS. BONAMICI:  Thank you, Judge.

05:05:14    5         THE COURT:  -- because I don't think I will be in it.

6  Thank you.

7         MR. GOLDSTEIN:  Thank you.

8         MR. GETTER:  Thank you.

9         COURT SECURITY OFFICER:  All rise.

10      (Court adjourned, to reconvene at 8:00 a.m. on 3/20/13.)

11                        CERTIFICATE

12    I certify that the foregoing is a correct transcript from

13  the record of proceedings in the above-entitled matter.

14  */s/Kathleen M. Fennell*              *March 20, 2013*

15  _____      _____

16  Kathleen M. Fennell                      Date
    Official Court Reporter

17

18

19

20

21

22

23

24

25